# Exhibit D

Henderson Demand Letter

BLANKROME
*One Logan Square | 130 North 18th Street | Philadelphia, PA 19103*

***Phone:*** ***(215) 569-5702***
***Fax:*** ***(215) 832-5702***
***Email:*** ***gregory.vizza@blankrome.com***

July 7, 2026

**VIA EMAIL AND FIRST CLASS MAIL**

Barn Henderson
144 Victoria Drive
Virgina Beach, Virgina
Email: Dlion04@gmail.com

**RE: *Barn Henderson v. Solar Servicing LLC*; American Arbitration Association – Demand for Arbitration**

Dear Mr. Henderson,

We represent Solar Servicing LLC ("Solar Servicing") in connection with claims asserted in the Demand for Arbitration and Statement of Claim filed before the American Arbitration Association by you and attached to this letter as **Exhibit A** (the "Demand"). We write to **insist that you voluntarily withdraw the Demand against Solar Servicing LLC**. Withdrawal is required because (i) your claims against Solar Servicing were released, discharged, and enjoined under a confirmed chapter 11 plan; and (ii) Solar Servicing is not a successor in interest to Solar Mosaic LLC; and (iii) the FTC Holder rule does not reach Solar Servicing as it is not the holder of your loan. If you do not voluntarily withdraw your claims, Solar Servicing will seek relief from the Bankruptcy Court as described below.

The claims asserted against Solar Servicing in the Demand are a direct violation of the release and injunction provisions of the *Fourth Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Certain of Its Affiliated Debtors* (the "Plan")[1] and the *Findings of Fact, Conclusions of Law, and Order Confirming the Fourth Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Certain of Its Affiliated Debtors* (the "Confirmation Order") entered by the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") in the cases captioned *In re Mosaic Sustainable Finance Corporation, et al.*, Bankr. Case No. 25-90156 (CML) (the "Bankruptcy Cases"). The Plan became effective on September 22, 2025 (the "Effective Date"), which is the operative date on which the Plan's releases, discharges, and injunctions became binding on all parties in interest and on which the post-emergence corporate structure, including Solar Servicing, came into existence. The Bankruptcy Court retains exclusive jurisdiction over all matters arising in, arising out of, or related to the Bankruptcy Cases and the Plan. *See* Confirmation Order; Plan art. XIII. Copies of the Confirmation Order and Plan are attached collectively as **Exhibit B**.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

Your claims arise from a sales contract with Freedom Forever Virgina, LLC ("Freedom Forever") for the purchase and installation of a solar panel system and a related consumer loan originated by Solar Mosaic LLC ("Solar Mosaic") prior to commencement of the Bankruptcy Cases. Solar Servicing was not a party to either agreement. In the Demand, you erroneously allege that Solar Servicing is the current successor to Solar Mosaic and assert various causes of action relating to alleged misrepresentations in the solar financing contract and deficiencies in the solar panel installation. As to Solar Servicing specifically, you erroneously attribute successor liability to Solar Servicing to allege that Solar Servicing is now liable for claims arising from the conduct of both Freedom Forever and Solar Mosaic. Each claim arises from pre-petition conduct and alleged pre-petition claims that were discharged through the Plan.

As a preliminary matter, your reliance on the FTC Holder Rule (16 C.F.R. § 433.2) is misplaced. The Holder Rule applies to holders of consumer credit contracts and preserves consumer claims and defenses against such holders. Solar Servicing is not a holder of your loan. Solar Servicing is a servicer—it provides administrative servicing of loans for the holders of those loans in accordance with new servicing agreements entered into after the Effective Date. It does not own, hold, or have any ownership interest in your loan. The Holder Rule, by its terms, does not impose liability on loan servicers; it imposes liability only on "holder[s] of th[e] consumer credit contract." 16 C.F.R. § 433.2. Because Solar Servicing is not the holder of your loan, the Holder Rule does not apply to it and it cannot be held liable for any claims that could be asserted against the holder.

## I. Background.

On June 6, 2025, Solar Mosaic and certain affiliates filed for chapter 11 protection in the Bankruptcy Court. The Bankruptcy Court confirmed the Plan on September 5, 2025, and the Plan became effective on September 22, 2025. As part of the Restructuring Transactions approved and implemented under the Plan and Confirmation Order, Solar Mosaic remains in existence as a "Wind Down Debtor" under the supervision of a court-appointed Plan Administrator. Solar Servicing is a newly formed, separate operating subsidiary of the Reorganized Debtor that services loans under new servicing agreements entered into after the Effective Date. Through the Plan, pre-petition claims were discharged and released vis-à-vis Solar Servicing. Accordingly, the Plan and Confirmation Order establish that Solar Servicing is not responsible for pre-petition liabilities of the Debtors and, therefore, is not a successor in interest to Solar Mosaic.

As reflected in the Restructuring Transactions Memorandum attached to the *Notice of Second Amended Plan Supplement* (the "Restructuring Transactions Memorandum") and attached to this letter as **Exhibit C**, Solar Servicing became the servicer of certain solar loans pursuant to new servicing agreements with loan holders taking effect after the Effective Date. Solar Servicing was formed by the Plan Sponsor, Forbright Bank, as a wholly owned subsidiary. *See* Restructuring Transactions Memorandum, Effective Date Steps 1, 8–9. Solar Servicing therefore constitutes an "Affiliate" of the Reorganized Debtor within the meaning of Plan § 1.9 (incorporating 11 U.S.C. § 101(2)) and is a "Released Party" under Plan § 1.154, which expressly includes "each of [the Reorganized Debtor's] Affiliates and Related Parties." As a Released Party, Solar Servicing is protected by the Third-Party Release, discharge, and injunction provisions of Article XII of the Plan.

## II. <u>The Plan Bars Your Claims Against Solar Servicing</u>.

A confirmed chapter 11 plan operates as a federal court judgment with binding effect on all parties who received notice of it. Under section 1141(a) of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor and all creditors, equity security holders, and general partners, whether or not their claims or interests are impaired and whether or not they accepted the plan.

In confirming the Plan, the Bankruptcy Court found that the Debtors provided "due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, [and] the release, exculpation, and injunction provisions contained in the Plan … to all parties in interest in the Chapter 11 Cases." Confirmation Order ¶ 14.

You are a Releasing Party under the Plan. As a borrower with a pre-Effective Date Consumer Credit Transaction Claim arising from a Solar Mosaic-originated loan, you received the Notice of Potential Voting Status, the full text of the Article XII release provisions, and the Release Opt-Out Form in accordance with the procedures approved by the Bankruptcy Court, which the Bankruptcy Court found were complied with as to all consumer borrowers (Confirmation Order ¶ 12), and that finding is binding on you. You do not appear on the list of timely filed Release Opt-Out Forms received by Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent appointed by the Bankruptcy Court. Under the Plan's definition of "Releasing Parties" (Plan § 1.155) and the Bankruptcy Court's express finding that the opt-out mechanism is a valid means of obtaining consent to the Third-Party Release (Confirmation Order ¶ 33), you are bound by the Third-Party Release and are among the parties enjoined from continuing the Demand against Solar Servicing. You did not appeal the Confirmation Order. Your continued prosecution of the Demand therefore constitutes an impermissible collateral attack on the Bankruptcy Court's release findings, which acquired res judicata effect as to all parties in interest once the time to appeal expired. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152 (2009) (confirmation order's release provisions, when sufficiently clear, are entitled to res judicata effect against later collateral attack); *In re Linn Energy, L.L.C.*, 927 F.3d 862, 866–67 (5th Cir. 2019) (same). The statutory binding effect of the Plan independently confirms this result. *See* 11 U.S.C. § 1141(a) (a confirmed plan binds every creditor "whether or not such creditor . . . has accepted the plan"). The Confirmation Order is a Final Order. Confirmation Order ¶ 83. Although section 1141(a) addresses the binding effect of a confirmed plan on claims against the Debtors, it is the Plan's separately enacted Third-Party Release in Section 12.3, confirmed by the Bankruptcy Court through the Confirmation Order, that operates to bar pre-Effective Date claims asserted by Releasing Parties against Solar Servicing as a non-debtor Released Party.

Section 12.3 of the Plan, entitled "Third-Party Release," releases the Released Parties, which include the Reorganized Debtor and its affiliates and subsidiaries (including Solar Servicing), from all claims and causes of action "arising from or related in any way in whole or in part to any of the Debtors" based on conduct "existing or taking place prior to or on the Effective Date." Plan § 12.3. The Confirmation Order makes that release effective without further order and "permanently enjoin[s] the commencement or prosecution" of any released claims. Plan § 12.3; Confirmation Order ¶ 33.

The Plan's discharge and injunction provisions contain a narrow carveout preserving "Consumer Credit Transaction Claims against Solar Mosaic LLC and any Financing Partners

(solely in their capacity as Financing Partners) or ABS Released Parties." Plan § 12.5(d); *see also* Plan § 12.6; Confirmation Order ¶ 52. This carveout does not extend to Solar Servicing. Solar Servicing is not a "Financing Partner" under the Plan—it is a servicer, not a loan holder. The Financing Partner carveout preserves claims only against entities "in their capacity as Financing Partners"; it does not preserve claims against servicers. Accordingly, your claims against Solar Servicing are barred by the Third-Party Release (Plan § 12.3), the discharge provisions (Plan § 12.5), and the Plan injunction (Plan § 12.6).

**III. <u>The FTC Holder Rule Does Not Reach Solar Servicing</u>.**

As established above, Solar Servicing is not a "holder" of any consumer credit contract. Even assuming for purposes of this letter that the Solar Mosaic-originated loan is a "consumer credit contract" within 16 C.F.R. § 433.1(i), Solar Servicing is not subject to Holder Rule liability because it did not originate or receive a transfer of that contract—the threshold prerequisite for such liability. *See* 16 C.F.R. § 433.1(i). A servicer, like Solar Servicing, is not subject to the Holder Rule. *See* 16 C.F.R. § 433.2 (imposing liability only on "holders" who take or receive consumer credit contracts).

Solar Servicing services loans pursuant to servicing agreements entered into after the Effective Date—it has never held any ownership interest in Solar Mosaic-originated consumer loans. The Restructuring Transactions Memorandum confirms that Solar Mosaic transferred only designated intellectual property and operational data to Reorganized TopCo—not consumer loans. *See* Restructuring Transactions Memorandum at Steps 2–4, 9. On the Effective Date, Reorganized TopCo contributed to Solar Servicing only "assets, contracts, and copies of the information, forms and data necessary for the continued operation of the Servicing Business"—again, not consumer loans. *Id.* The underlying servicing agreements supporting the loan in question are for "go-forward servicing," i.e., administrative services, not loan ownership. *Id.* at Step 4.

**IV. <u>Successor Liability Does Not Reach Solar Servicing</u>.**

Although the Demand asserts various causes of action against Solar Servicing, each claim relies on the faulty premise that Solar Servicing is the "successor in interest" to Solar Mosaic. It is not. Successor liability requires that an entity have actually assumed responsibility for a predecessor's liabilities or conduct through a qualifying transaction. None of these circumstances apply to Solar Servicing.

Solar Servicing was formed by the Plan Sponsor, Forbright Bank—not by Solar Mosaic or the Reorganized Debtor—as a wholly owned subsidiary. *See* Restructuring Transactions Memorandum at Step 1. On the Effective Date, the Plan Sponsor contributed the equity interests in its holding company to Reorganized TopCo. *Id.* at Step 8. Solar Servicing therefore came into existence as a newly formed entity with no prior relationship to Solar Mosaic. It did not assume Solar Mosaic's liabilities. Rather, discharge and release provisions of the Plan and Confirmation Order establish that Solar Servicing is not responsible for pre-petition liabilities of the Debtors and, therefore, is not a successor in interest to Solar Mosaic.

The servicing agreements are for "go-forward servicing," i.e., administrative services, not loan ownership or assumption of liability for predecessor conduct. *See* Restructuring Transactions

Memorandum at Step 4. A loan servicer that provides administrative services under servicing agreements is not a "successor in interest" to the loan originator.

Given the clear language of the Plan and Confirmation Order, the continued prosecution of claims against Solar Servicing is not only meritless but also violates the Plan injunction. We hereby **insist that you voluntarily withdraw the Demand against Solar Servicing LLC, with prejudice, within seven (7) days** of the date of this letter.

If you do not voluntarily withdraw your claims against Solar Servicing, Solar Servicing intends to file a motion to enforce the Plan and Confirmation Order, and for civil contempt, under sections 105(a) and 1142 of the Bankruptcy Code, seeking: (i) a determination that the claims against Solar Servicing in the Arbitration Demand constitute released and discharged pre-Effective Date claims; (ii) enforcement of the Plan injunction; (iii) an order directing withdrawal with prejudice of those claims as barred by the Confirmation Order; and (iv) an award of attorneys' fees, costs, and civil contempt sanctions, for knowing violation of a pre-existing federal court injunction. Such enforcement proceedings are routinely resolved on an accelerated basis in the Bankruptcy Court and would require you to appear in the Southern District of Texas to defend the continued prosecution of claims that the Bankruptcy Court has already enjoined.

Very truly yours,

Gregory F. Vizza

Gregory F. Vizza

Enclosures

# **Exhibit A**

Arbitration Demand filed before the American Arbitration Association

AMERICAN ARBITRATION ASSOCIATION®

**CONSUMER ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

JUN 17 2026

**Complete and file this form to start arbitration under an arbitration agreement in a consumer contract.**

| **Consumer** | | |
|---|---|---|
| Name of Consumer: Barn Henderson | | |
| Address: 144 Victoria Drive | | |
| City: Virginia Beach | State: Virginia | Zip Code: 23452 |
| Telephone: (757) 275-3872 | Email Address: Dlion04@gmail.com | |
| Representative's Name (if known): Self-Represented (pro se) | | |
| Firm (if applicable): N/A | | |
| Representative's Address: Same as Consumer | | |
| City: Virginia Beach | State: Virginia | Zip Code: 23452 |
| Telephone: (757) 275-3872 | Email Address: Dlion04@gmail.com | |
| **Business** | | |
| Name of Business: Freedom Forever Virginia, LLC | | |
| Address: 43445 Business Park Drive, Suite 110 | | |
| City: Temecula | State: California | Zip Code: 92590 |
| Telephone: (800) 685-1850 | Email Address: legal@freedomforever.com | |
| Representative's Name (if known): Greg Albright, President / Registered Agent for Service | | |
| Firm (if applicable): Freedom Forever Virginia, LLC / Freedom Legal Department | | |
| Representative's Address: 27442 Portola Parkway, Suite #180 | | |
| City: Foothill Ranch | State: California | Zip Code: 92610 |
| Telephone: (800) 685-1850 | Email Address: legal@freedomforever.com | |

Which party is filing this arbitration case? *(check one)* ☑ Consumer ☐ Business

Mediation: If you would like the AAA to contact the other parties to attempt to arrange mediation, please check this box. ☐

Amount of Claim: $ 74,882.16

Other Relief Sought: ☑ Attorney's Fees ☑ Interest ☑ Arbitration Costs ☑ Other; explain:

Treble/punitive damages; rescission; specific performance; refund $250 fee; disgorgement of dealer fee. See attached Statement

Briefly explain the dispute and each claim. You may attach additional pages if necessary:

See attached Statement of Claim (incorporated by reference). Dispute arises from a March 11, 2024 door-to-door sale of a $74,882.16 residential solar PV system, financed through Solar Mosaic LLC. Claims include breach of contract, breach of express and implied warranty, Magnuson-Moss Warranty Act, Virginia Consumer Protection Act, fraudulent inducement, Virginia Home Solicitation Sales Act, FTC Cooling-Off Rule, and Truth in Lending Act. The lender is liable under the FTC Holder Rule, 16 C.F.R. § 433.2.

AMERICAN ARBITRATION ASSOCIATION®

**CONSUMER ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

Please describe the qualifications you would like the arbitrator(s) to have:

Claimant requests a neutral arbitrator who is a licensed attorney in good standing with substantial experience in (a) Virginia consumer protection law, including the Virginia Consumer Protection Act and Virginia Home Solicitation Sales Act; (b) consumer credit and lending law, including the Truth in Lending Act and the FTC Holder Rule (16 C.F.R. § 433.2); (c) Virginia UCC Article 2 warranty law; and (d) residential construction or home-improvement contract disputes. Familiarity with residential solar disputes is preferred but not required.

Type of process being requested: ☐ Documents-Only Procedures ☑ Evidentiary Hearing

If you are requesting an Evidentiary Hearing, how would you like it to take place (check one):

☑ Virtually (online) ☐ In-Person — Locale (Location): City State

Filing Fee to be paid if filed by the Consumer: $225 (unless the parties' arbitration agreement states that consumers will pay a lesser amount).

Filing Fee to be paid if filed by the Business: ☐ $600 single arbitrator ☐ $725 three-arbitrator panel

Signature (may be signed by a representative): [signature]
Barn Henderson (May 12, 2026 14:08:16 EDT)

Date: 12/May/26

**Notice: To begin the arbitration process, you must provide the AAA a copy of this completed form as well as:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes (Please note: Parties located in California or New Jersey must submit to AAA the entire contract that contains the agreement to arbitrate);
- The proper filing fee (filing fee information is noted above and in the Costs of Arbitration section of the Consumer Arbitration Fee Schedule, which can be found at www.adr.org); and
- A copy of the court order, if arbitration is court-ordered.

**Also send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

To file online, visit www.adr.org and click on File a Case and follow directions. To avoid the creation of duplicate filings, please submit the filing documents and payment at the same time. When filing electronically, no hard copies are required.

To file by mail, send the initial filing documents and the filing fee to: American Arbitration Association, Case Filing Services, 120 Broadway, Floor 21 - Intake, New York, NY 10271.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less t.han 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Pursuant to New Jersey Statutes § 2A:23B-1 et seq., consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website

AMERICAN ARBITRATION ASSOCIATION®

# CONSUMER ARBITRATION RULES
# DEMAND FOR ARBITRATION

**Complete and file this form to start arbitration under an arbitration agreement in a consumer contract.**

| **Consumer** | | |
|---|---|---|
| Name of Consumer: Barn Henderson | | |
| Address: 144 Victoria Drive | | |
| City: Virginia Beach | State: Virginia | Zip Code: 23452 |
| Telephone: (757) 275-3872 | Email Address: Dlion04@gmail.com | |
| Representative's Name (if known): Self-Represented (pro se) | | |
| Firm (if applicable): N/A | | |
| Representative's Address: Same as Consumer | | |
| City: Virginia Beach | State: Virginia | Zip Code: 23452 |
| Telephone: (757) 275-3872 | Email Address: Dlion04@gmail.com | |
| **Business** | | |
| Name of Business: Solar Servicing LLC, as successor-in-interest to Solar Mosaic LLC | | |
| Address: 601 12th Street, Suite 325 | | |
| City: Oakland | State: California | Zip Code: 94607 |
| Telephone: (855) 746-7849 | Email Address: loannotices@joinmosaic.com | |
| Representative's Name (if known): Solar Servicing LLC, Loan Servicing / Legal Department | | |
| Firm (if applicable): c/o Concord Servicing Corporation (loan servicer) | | |
| Representative's Address: 4150 North Drinkwater, Suite #200 | | |
| City: Scottsdale | State: Arizona | Zip Code: 85251 |
| Telephone: (855) 746-7849 | Email Address: loannotices@joinmosaic.com | |

Which party is filing this arbitration case? *(check one)* ☑ Consumer ☐ Business

Mediation: If you would like the AAA to contact the other parties to attempt to arrange mediation, please check this box. ☐

Amount of Claim: $ 74,882.16

Other Relief Sought: ☑ Attorney's Fees ☑ Interest ☑ Arbitration Costs ☑ Other; explain:

Treble/punitive damages; statutory damages (TILA, VCPA, Magnuson-Moss); rescission of loan; disgorgement of undisclosed

Briefly explain the dispute and each claim. You may attach additional pages if necessary:

See attached Statement of Claim (incorporated by reference). Dispute arises from a March 11, 2024 door-to-door sale of a $74,882.16 residential solar PV system by Freedom Forever Virginia, LLC, financed through Solar Mosaic LLC (Loan No. 784292, now serviced by Solar Servicing LLC as successor-in-interest). Pursuant to the FTC Holder Rule, 16 C.F.R. § 433.2, the notice of which appears in Section 15 of the Loan Agreement, all claims that Claimant could assert against Freedom Forever may be asserted against Solar Servicing/Mosaic up to amounts paid by Claimant under the loan. Independent direct claim against Mosaic/Solar Servicing under the Truth in Lending Act, 15 U.S.C. § 1638 and 12 C.F.R. § 1026.18, for failure to clearly itemize the dealer fee retained from the financed amount. Bankruptcy-related successor liability preserved under 11 U.S.C. § 363(o).

AMERICAN ARBITRATION ASSOCIATION®

**CONSUMER ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

Please describe the qualifications you would like the arbitrator(s) to have:

Claimant requests a neutral arbitrator who is a licensed attorney in good standing with substantial experience in (a) consumer credit and lending law, including the Truth in Lending Act (15 U.S.C. §§ 1601 et seq.) and Regulation Z (12 C.F.R. Part 1026); (b) the FTC Holder Rule (16 C.F.R. § 433.2) and assignee/holder liability; (c) Virginia consumer protection law, including the Virginia Consumer Protection Act; and (d) successor liability and Section 363(o) of the Bankruptcy Code as it relates to consumer loan claims. Familiarity with residential solar financing is preferred.

Type of process being requested: ☐ Documents-Only Procedures ☑ Evidentiary Hearing

If you are requesting an Evidentiary Hearing, how would you like it to take place (check one):

☑ Virtually (online) ☐ In-Person — Locale (Location): City State

Filing Fee to be paid if filed by the Consumer: $225 (unless the parties' arbitration agreement states that consumers will pay a lesser amount).

Filing Fee to be paid if filed by the Business: ☐ $600 single arbitrator ☐ $725 three-arbitrator panel

Signature (may be signed by a representative):

Barn Henderson (May 12, 2026 14:08:16 EDT)

Date: 12/May/26

**Notice: To begin the arbitration process, you must provide the AAA a copy of this completed form as well as:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes (Please note: Parties located in California or New Jersey must submit to AAA the entire contract that contains the agreement to arbitrate);
- The proper filing fee (filing fee information is noted above and in the Costs of Arbitration section of the Consumer Arbitration Fee Schedule, which can be found at www.adr.org); and
- A copy of the court order, if arbitration is court-ordered.

**Also send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

To file online, visit www.adr.org and click on File a Case and follow directions. To avoid the creation of duplicate filings, please submit the filing documents and payment at the same time. When filing electronically, no hard copies are required.

To file by mail, send the initial filing documents and the filing fee to: American Arbitration Association, Case Filing Services, 120 Broadway, Floor 21 - Intake, New York, NY 10271.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less t.han 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Pursuant to New Jersey Statutes § 2A:23B-1 et seq., consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website

**AMERICAN ARBITRATION ASSOCIATION**
**Consumer Arbitration Rules**

**BARN HENDERSON,**
144 Victoria Drive
Virginia Beach, VA 23452
Telephone: (757) 275-3872
***Self-Represented Claimant,***

v.

**FREEDOM FOREVER VIRGINIA, LLC,**
43445 Business Park Drive, Suite 110
Temecula, CA 92590
***Respondent,***

and

**SOLAR SERVICING LLC, as successor-in-interest to Solar Mosaic LLC,**
601 12th Street, Suite 325
Oakland, CA 94607
***Respondent.***

---

# STATEMENT OF CLAIM

---

## I. INTRODUCTION

1. Claimant Barn Henderson ("Claimant"), proceeding without counsel, respectfully submits this Statement of Claim against Respondents Freedom Forever Virginia, LLC ("Freedom Forever") and Solar Servicing LLC, as successor-in-interest to Solar Mosaic LLC ("Mosaic") (collectively, "Respondents") and demands arbitration pursuant to the Dispute Resolution Agreement contained in Exhibit C of the Supply and Installation Agreement dated March 11, 2024 (the "Installation Agreement"), and Section 17 of the Mosaic Loan Agreement dated March 11, 2024, Loan Number 784292 (the "Loan Agreement").

2. This dispute arises out of the purchase, financing, and installation of a 12.32 kW residential solar photovoltaic system with battery storage at Claimant's residence located at 144 Victoria Drive, Virginia Beach, VA 23452 (the "Property").

## II. JURISDICTION, FORUM, AND GOVERNING LAW

3. Jurisdiction over this dispute is conferred by the binding arbitration provisions agreed to by the parties. The Installation Agreement, Exhibit C, Section 1, provides that any

controversy, dispute, claim, or disagreement between the parties relating to or in connection with the agreement and/or the work must be resolved exclusively by binding arbitration administered by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules.

4. The Mosaic Loan Agreement, Section 17, similarly provides that claims arising out of or relating to the Loan Agreement may be resolved by individual binding arbitration, with the AAA designated as an available administrator.

5. Both agreements acknowledge that the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, governs the enforceability of the respective arbitration provisions.

6. As to governing substantive law, the Installation Agreement, Article 14.1, provides that the agreement is governed by the laws where the Property is located, which is the Commonwealth of Virginia. The Mosaic Loan Agreement, Section 15, similarly provides that, to the extent state law applies, the substantive laws of the state where the Residence is located shall govern. Accordingly, Virginia law applies to all substantive claims herein.

7. Claimant has satisfied the pre-arbitration dispute resolution requirements of the Installation Agreement, Exhibit C, Section 2, which requires the parties to exchange written descriptions of claims and negotiate in good faith for sixty (60) days before commencing arbitration.

## III. THE PARTIES

8. Claimant Barn Henderson is an individual residing at 144 Victoria Drive, Virginia Beach, VA 23452. Claimant is proceeding in this matter without legal counsel.

9. Respondent Freedom Forever Virginia, LLC is a Delaware limited liability company holding Virginia Contractor License No. 2705177141, with its principal address at 43445 Business Park Drive, Suite 110, Temecula, CA 92590. Freedom Forever is the installer and contractor under the Installation Agreement.

10. Respondent Solar Servicing LLC ("Solar Servicing") is the successor-in-interest to Solar Mosaic LLC ("Mosaic"), which originated the Loan Agreement. Mosaic was a California limited liability company holding California Finance Lenders License No. 6054631, with its principal address at 601 12th Street, Suite 325, Oakland, CA 94607. Mosaic is now out of business and has filed for Chapter 11 bankruptcy. Solar Servicing has assumed the servicing and processing of Claimant's loan. Pursuant to Section 363(o) of the Bankruptcy Code, any purchaser or successor to the consumer loan remains subject to all claims and defenses that Claimant could assert against Mosaic, and Claimant's claim rights are fully preserved. All references to "Mosaic" herein refer to Solar Mosaic LLC and/or Solar Servicing LLC as its successor-in-interest, as applicable.

## IV. STATEMENT OF FACTS

11. **Contract Execution.** On March 11, 2024, Claimant executed the Installation Agreement with Freedom Forever for the supply and installation of a 12.32 kW solar photovoltaic system with energy storage (1 x Enphase IQ 5P battery) at the Property. The total contract price was $74,882.16. The system was to use Enphase inverters and monitoring equipment, with panels from a grouped list of manufacturers. Freedom Forever provided a 25-year production guarantee estimating first-year production of 13,556 kWh.

12. **Financing.** On the same date, Claimant executed the Loan Agreement with Mosaic to finance the full contract price of $74,882.16 at a 3.99% APR over a 25-year term, with an estimated total of payments of $119,937.69. Claimant did not independently select Mosaic as his lender and was not presented with alternative financing or cash-price options.

13. **Door-to-Door Solicitation.** The transaction originated as a door-to-door home solicitation. Sales representatives made oral representations to Claimant including that his electric bill would be eliminated, that the system would pay for itself, that he would receive a 30% cash rebate, and that the offer was time-limited and required same-day signing.

14. **Cancellation Notice Deficiencies.** The Notice of Cancellation forms provided by Freedom Forever in the Installation Agreement do not appear to contain a specific "cancel by" deadline date, as may be required by the FTC Cooling-Off Rule, 16 C.F.R. Part 429, and Virginia's home solicitation cancellation framework under Va. Code § 59.1-21.1 *et seq.*.

15. **Blank Contract Fields.** The Installation Agreement includes a conspicuous instruction: "DO NOT SIGN THIS CONTRACT IF THERE ARE ANY BLANK SPACES." Despite this instruction, several fields in the executed agreement remain unfilled, including the Down Payment amount, the Independent Sales Representative License Number, and certain co-homeowner fields.

16. **System Sizing and Production Gap.** Claimant's documented pre-solar annual electricity consumption was approximately 24,677 kWh (July 2023 through June 2024). The contracted first-year production estimate of 13,556 kWh represents an offset of only approximately 54.9% of Claimant's historical usage, leaving a predicted annual deficit of approximately 11,121 kWh. This sizing is mathematically irreconcilable with the sales representations that Claimant's electric bill would be eliminated.

17. **Installation and Activation.** The system received Permission to Operate ("PTO") on July 4, 2024, approximately 115 days after contract execution. The Mosaic loan's first payment was due on June 22, 2024, twelve days before the system was legally authorized to operate or produce any benefit for Claimant.

18. **Equipment Discrepancies.** The Installation Agreement specifies Enphase for the inverter group, monitoring equipment, and battery storage (Enphase IQ 5P). However, the system as installed utilizes SolarEdge monitoring and a SolarEdge Home Battery 400V (9.7 kWh

usable). No signed Change Order documenting this material equipment substitution has been produced, despite the Installation Agreement's requirement that modifications changing materials must be in writing and signed by all parties.

19. **Initial Production Performance.** During its first year of operation (approximately July 2024 through June 2025), the system produced approximately 13,550 kWh, or roughly 99.9% of the contract estimate, confirming that the system functioned as designed during that period.

20. **System Failure and Production Stoppage.** Beginning in approximately June 2025, the system ceased producing electricity entirely. Utility statements confirm zero export credits from June through December 2025, a pattern inconsistent with normal seasonal variation and indicative of a significant equipment or system failure. The system outage persisted for approximately seven months.

21. **Roof Leak Incidents.** Claimant has experienced three separate roof leak incidents at or near the solar panel penetration points. The most recent repair was completed in approximately January 2026. Interior damage from the leaks remains unresolved. Claimant was charged a disputed $250 service dispatch fee despite the leaks recurring in the same location and within the 10-year roof penetration warranty period under Article 7.1 of the Installation Agreement.

22. **Financial Harm.** Prior to the solar installation, Claimant's average monthly electricity cost was approximately $200. After installation, Claimant's combined monthly cost (utility bill plus loan payment) increased to approximately $442 per month during the system's operational period and to approximately $523 per month during the outage period. Claimant's monthly costs are projected to increase further to approximately $645 per month after the scheduled loan re-amortization in the absence of a voluntary prepayment of approximately $22,564.

23. **Dealer Fee Concerns.** The Mosaic TILA Itemization of Amount Financed lists $74,882.16 as the "Amount Due To: Freedom Forever" while simultaneously disclosing that the Installation Contractor may provide Mosaic a "fee or discount" and that Mosaic may "satisfy the Amount Financed on [Claimant's] behalf by disbursing less than the Amount Financed." The specific dollar amount of this fee or discount is not itemized in any disclosure provided to Claimant. Based on industry data for comparable Mosaic loan products (25-year, 3.99% APR), the embedded dealer fee may be approximately 30.75% of the financed amount, or roughly $23,026, meaning the actual cash-equivalent system cost may be approximately $51,856.

24. **FTC Holder Rule Notice.** The Mosaic Loan Agreement, Section 15, contains the Federal Trade Commission Holder in Due Course Rule notice required by 16 C.F.R. § 433.2, stating: "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF.

RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER." By operation of the Holder Rule and its incorporation into the Loan Agreement, every claim asserted herein against Freedom Forever is also assertable against Mosaic up to the amount paid by Claimant under the Loan Agreement.

## V. CLAIMS FOR RELIEF

### COUNT I — BREACH OF CONTRACT

**(Against Freedom Forever; and, by operation of the FTC Holder Rule, against Mosaic)**

25. Claimant incorporates each preceding paragraph as though fully set forth herein.

26. Under Virginia law, the elements of a breach-of-contract claim are: (1) a legally enforceable obligation of the defendant to the plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach. *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004); see also *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009).

27. ***Element 1 — Legally enforceable obligation.*** On March 11, 2024, Claimant and Freedom Forever executed the Installation Agreement, a written, signed, integrated home-improvement contract obligating Freedom Forever to: (a) install a 12.32 kW solar photovoltaic system using Enphase inverters, Enphase monitoring equipment, and one Enphase IQ 5P battery (Cover Page; Art. 2.1(a)); (b) perform the work "in a good and workmanlike manner" (Art. 2.3); (c) warrant the work and system free of defects in construction and workmanship for ten (10) years following Completed Installation (Art. 7.1); (d) warrant the roof against damage and water infiltration at each roofing penetration made in connection with the installation for the same ten-year period (Art. 7.1, "Covered Roof Area"); and (e) make no equipment substitution outside the Module Group and Inverter Group except by written, signed Change Order describing the scope, price, and schedule impact (Arts. 6.2, 6.3, 14.18, Exh. B). The Installation Agreement is a legally enforceable obligation as to each of these duties.

28. ***Element 2 — Breach.*** Freedom Forever breached the Installation Agreement in at least four independent ways: **(a) Equipment substitution without a Change Order.** The Installation Agreement specifies Enphase inverters, Enphase monitoring, and an Enphase IQ 5P battery (Cover Page). The system as installed uses SolarEdge monitoring and a SolarEdge Home Battery 400V (9.7 kWh usable). Article 6.2 and the third bullet on page 3 of the Installation Agreement require any modification that changes "materials" to be "in writing and signed by all parties," and Exhibit B prescribes the Change Order Form. No Change Order has been produced, and Claimant signed none. Freedom Forever's unilateral substitution of a battery and monitoring platform from a different manufacturer therefore breached the express terms of Articles 6.2 and 14.18. **(b) Failure to perform in a workmanlike manner.** Although the system produced approximately 13,550 kWh in its first year of operation (¶ 19 above), it then ceased producing electricity entirely beginning

in approximately June 2025 and remained non-productive for approximately seven months, with utility export credits at zero from June through December 2025 (¶ 20 above). Total mid-life production collapse is incompatible with the "good and workmanlike manner" standard of Article 2.3. **(c) Roof penetration warranty breach.** Article 7.1 expressly warrants the Covered Roof Area against "damage and water infiltration at each roofing penetration" for ten years. Claimant has experienced three separate roof-leak incidents at the solar penetration points (¶ 21 above). Recurrence of leaks at the same penetrations, within the 10-year period, establishes that the penetrations were not adequately sealed and that the repairs attempted by Freedom Forever did not in fact remedy the defect. **(d) Improper service-fee charge.** Freedom Forever charged Claimant a $250 service dispatch fee for a condition (recurring roof leaks at solar penetrations) that fell squarely within the Article 7.1 roof-penetration warranty. Exhibit A, Article 4.5 authorizes a Service Tech Dispatch Fee only when "the technical issue is determined to be the fault of a party other than Freedom Forever." The leaks are at Freedom Forever's installation penetrations and within Freedom Forever's warranty; the fee was therefore unauthorized.

29. ***Element 3 — Injury and damages caused by the breach.*** Each of the four breaches caused Claimant identifiable, measurable injury: (i) the equipment substitution deprived Claimant of the bargained-for Enphase ecosystem (the system Claimant agreed to purchase) and delivered, instead, an unbargained-for system; (ii) the seven-month production stoppage forced Claimant to purchase grid electricity to cover load that the system should have offset, while continuing to pay the Loan Agreement's monthly principal-and-interest payment, increasing his combined monthly out-of-pocket cost from approximately $442 to approximately $523 during the outage (¶ 22 above); (iii) the unremediated roof leaks caused interior property damage at the Property that remains uncured; and (iv) Claimant paid $250 for a warranty-covered repair he should not have been charged for. Damages are sought as set forth in Section VI below. Damages are an essential element of breach of contract under Virginia law. *Sunrise Continuing Care*, 277 Va. at 156, 671 S.E.2d at 136.

30. By operation of the FTC Holder Rule notice incorporated into the Loan Agreement (¶ 23 above) and 16 C.F.R. § 433.2, Mosaic is subject to this claim up to the amount Claimant has paid under the Loan Agreement.

**COUNT II — BREACH OF EXPRESS WARRANTY**

**(Against Freedom Forever; and, by operation of the FTC Holder Rule, against Mosaic)**

31. Claimant incorporates each preceding paragraph as though fully set forth herein.

32. Under Virginia law, an express warranty is created by "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Va. Code § 8.2-313(1)(a). To recover for breach of express warranty, a claimant must prove: (1) creation of a warranty by affirmation, promise, description, or sample relating to the goods that became part of the basis of the bargain; (2) breach of the warranty by the seller; (3) reasonable notice of the breach to the seller; and (4)

damages proximately caused by the breach. Va. Code §§ 8.2-313, 8.2-607(3), 8.2-714, 8.2-715; *Bayliner Marine Corp. v. Crow*, 257 Va. 121, 125–26, 509 S.E.2d 499, 501–02 (1999).

33. ***Element 1 — Express warranties created and made part of the basis of the bargain.*** Freedom Forever made the following written express warranties to Claimant on or in connection with the Installation Agreement: **(a) 25-Year Production Guarantee** (Exhibit A, Article 2.1) guaranteeing a first-year Annual kWh of 13,556 with a defined degradation curve; **(b) 10-Year Limited Workmanship Warranty** (Article 7.1) warranting the work and system free from defects in construction and workmanship for ten years following Completed Installation; **(c) 10-Year Roof-Penetration Warranty** (Article 7.1) warranting the roof against damage and water infiltration at each penetration made in connection with the installation for ten years; and **(d) Equipment Description Warranty** (Cover Page) describing the system as utilizing Enphase inverters, Enphase monitoring, and one Enphase IQ 5P battery. Each of these warranties is an affirmation of fact or promise relating to the goods/services. Each was bargained for: Claimant relied on these representations — particularly the production guarantee and the 25-year warranties — in deciding to sign a contract priced at $74,882.16.

34. ***Element 2 — Breach of each warranty.*** Each warranty has been breached: **(a)** The system's seven-month total production stoppage from June 2025 through December 2025 (¶ 20 above) breaches the Production Guarantee for Production Year 2; **(b)** Total mid-warranty system failure is a defect in workmanship within the meaning of Article 7.1; **(c)** Three separate water-infiltration incidents at the solar penetration points, with repairs not durably remedying the defect (¶ 21 above), constitute breach of the express roof-penetration warranty; and **(d)** Installation of a SolarEdge battery and SolarEdge monitoring in place of the specified Enphase IQ 5P battery and Enphase monitoring (¶ 18 above) breaches the equipment description warranty in the Cover Page.

35. ***Element 3 — Notice of breach.*** Claimant has provided Freedom Forever with timely and repeated notice of each breach, including notice of the production stoppage during the outage period and notice of each of the three roof-leak incidents. Freedom Forever's receipt of these notices is established by, among other things, the fact that it dispatched service technicians to the Property and charged the $250 service fee. Notice is therefore satisfied under Va. Code § 8.2-607(3).

36. ***Element 4 — Damages proximately caused.*** The measure of damages under Va. Code § 8.2-714(2) is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted," together with incidental and consequential damages under § 8.2-715. Claimant's damages from breach of these warranties include diminished system value (a non-producing system has materially less value than a producing one), the cost of replacement utility electricity during the outage, the cost of repairing interior water damage, and the $250 improperly charged service fee. The attempted limitation of damages and disclaimer of implied warranties in Article 7.7 fails of its essential purpose under Va. Code § 8.2-

719(2) where the limited warranty itself has been breached and repairs have not made Claimant whole.

37. By operation of the FTC Holder Rule notice incorporated into the Loan Agreement and 16 C.F.R. § 433.2, Mosaic is subject to this claim up to the amount Claimant has paid under the Loan Agreement.

**COUNT III — VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**

**(15 U.S.C. §§ 2301 et seq.) (Against Freedom Forever; and, by operation of the FTC Holder Rule, against Mosaic)**

38. Claimant incorporates each preceding paragraph as though fully set forth herein.

39. The Magnuson-Moss Warranty Act establishes a federal civil cause of action for a consumer damaged by a warrantor's failure to comply with any obligation under a written warranty or implied warranty. 15 U.S.C. § 2310(d). The elements are: (1) the item at issue is a "consumer product"; (2) the claimant is a "consumer"; (3) the defendant is a "supplier" or "warrantor" who gave a "written warranty" or to whom an implied warranty attaches; (4) the warrantor failed to comply with an obligation under the warranty; and (5) the consumer is damaged thereby.

40. ***Element 1 — Consumer product.*** The 12.32 kW residential rooftop solar PV system, with its inverters, monitoring equipment, and battery storage, is tangible personal property normally used for personal, family, or household purposes within the meaning of 15 U.S.C. § 2301(1). It was installed at Claimant's single-family residence to serve household electricity needs.

41. ***Element 2 — Consumer.*** Claimant is the buyer of the consumer product for purposes other than resale, and is the person to whom the product was transferred during the duration of the written warranties. 15 U.S.C. § 2301(3).

42. ***Element 3 — Written warranty by warrantor/supplier.*** Freedom Forever is the supplier and warrantor. It provided written warranties as defined in 15 U.S.C. § 2301(6), including the 25-Year Production Guarantee (Exhibit A) and the 10-Year Limited Warranty for workmanship and roof penetrations (Article 7.1). These warranties affirm that the workmanship and roof penetrations are defect-free for a specified period and that the system will achieve specified production levels.

43. ***Element 4 — Failure to comply with the warranty obligation.*** Freedom Forever failed to comply with its written warranty obligations as set forth in Count II above. In addition, 15 U.S.C. § 2308 prohibits a supplier who makes a written warranty from disclaiming any implied warranty during the term of the written warranty. Article 7.7 of the Installation Agreement purports to disclaim all implied warranties, including the implied warranty of merchantability. That disclaimer is void and unenforceable under § 2308 during the term of Freedom Forever's written warranties, leaving the Virginia UCC implied warranty of merchantability fully in effect (see Count V below).

44. ***Element 5 — Damages.*** Claimant has been damaged by Freedom Forever's non-compliance in the amounts described in Count II and Section VI below. Under 15 U.S.C. § 2310(d)(2), a prevailing consumer is entitled to recover, as part of the judgment, the costs and expenses of the action, including reasonable attorneys' fees — a fee-shifting provision separate from and not capped by the Holder Rule, *see* FTC Statement on the Holder Rule and Attorneys' Fees and Costs, 87 Fed. Reg. 24,420 (Apr. 26, 2022).

45. By operation of the FTC Holder Rule and 16 C.F.R. § 433.2, Mosaic is subject to this claim up to the amount Claimant has paid under the Loan Agreement.

**COUNT IV — VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT**

**(Va. Code §§ 59.1-196 et seq.) (Against Freedom Forever; and, by operation of the FTC Holder Rule, against Mosaic)**

46. Claimant incorporates each preceding paragraph as though fully set forth herein.

47. To state a claim under the Virginia Consumer Protection Act ("VCPA"), a claimant must allege: (1) a "supplier"; (2) engaged in a "consumer transaction"; (3) committed a "prohibited practice" enumerated in Va. Code § 59.1-200(A); (4) on which the claimant relied; (5) causing the claimant to suffer loss. *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497, 764 S.E.2d 256, 260 (2014) (private VCPA claim requires "suffer… loss" resulting from violation); Va. Code § 59.1-204(A) (private right of action). The standard of proof under the VCPA is preponderance of the evidence — not the heightened clear-and-convincing standard applicable to common-law fraud. *Ballagh v. Fauber Enters., Inc.*, 290 Va. 120, 124–25, 773 S.E.2d 366, 368–69 (2015).

48. ***Element 1 — Supplier.*** Freedom Forever and Mosaic are each a "supplier" as defined in Va. Code § 59.1-198. Freedom Forever is a seller and installer of residential goods and services, holding Virginia Contractor License No. 2705177141, who advertises, solicits, and engages in consumer transactions in Virginia. Mosaic is a lender who, in connection with the consumer transaction at issue, originated and serviced the credit instrument used to finance the sale; Mosaic and its successor are also bound through the Holder Rule notice it inserted into the Loan Agreement.

49. ***Element 2 — Consumer transaction.*** The transaction was a sale and credit financing of solar equipment and home-improvement services for personal, family, and household use at Claimant's primary residence, squarely within the definition of "consumer transaction" in Va. Code § 59.1-198.

50. ***Element 3 — Prohibited practices.*** Respondents engaged in at least five prohibited practices enumerated in Va. Code § 59.1-200(A): **(a) § 59.1-200(A)(5)** — misrepresenting that goods or services have certain characteristics, uses, or benefits. The Freedom Forever sales representatives orally represented to Claimant that the system would eliminate his electric bill (¶ 13 above). The contracted production estimate of 13,556 kWh covers only approximately 54.9% of Claimant's documented annual usage of 24,677 kWh,

making bill-elimination mathematically impossible. The system was therefore misrepresented as having a benefit (bill elimination) it did not have. **(b) § 59.1-200(A)(6)** — misrepresenting that goods are of a particular standard, quality, or model. The Cover Page specifies an Enphase IQ 5P battery and Enphase monitoring; the system as installed uses a SolarEdge battery and SolarEdge monitoring (¶ 18 above). Substituting one manufacturer's ecosystem for another, without disclosure or Change Order, misrepresents the model and standard of the goods. **(c) § 59.1-200(A)(14)** — using any other deception, fraud, false pretense, false promise, or misrepresentation. The representations that Claimant would receive a "30% cash rebate" (when the federal investment tax credit is non-refundable and contingent on adequate tax liability) and that the offer was a "limited-time" opportunity requiring same-day signing (a high-pressure sales tactic) are deceptive and constitute false promises within § 59.1-200(A)(14). **(d) § 59.1-200(A)(8) and (14)** — with respect to Mosaic, the failure to clearly and conspicuously disclose the embedded dealer fee or discount retained by Mosaic from the financed amount (¶ 23 above) is a deceptive omission within the meaning of § 59.1-200(A)(14). **(e) Incorporation through § 59.1-200(A) of violations of the Virginia Home Solicitation Sales Act** — the cancellation notice provided to Claimant did not comply with Va. Code § 59.1-21.4 because it did not state the specific deadline date by which Claimant could cancel (¶ 14 above), constituting a separate VCPA violation per *Ballagh*, 290 Va. at 124.

51. ***Element 4 — Reliance.*** Reliance is required under the VCPA. *See Owens*, 288 Va. at 497. Claimant relied on each prohibited practice: he signed the Installation Agreement and Loan Agreement on the day of solicitation based on the bill-elimination representation, the 30% cash-rebate representation, the urgency tactic, and the equipment specification on the Cover Page. Had he been told that the system would cover only 55% of his usage, that the tax credit is not a cash rebate but is dependent on tax liability, that the offer was not actually limited-time, that a different manufacturer's battery would be installed, or that a substantial dealer fee was being added to the financed amount, he would not have signed.

52. ***Element 5 — Loss.*** Claimant has suffered actual loss caused by the prohibited practices, including the difference between the cash-equivalent value of the system actually installed and the inflated financed price, ongoing utility costs that the bill-elimination representation purported to avoid, lost savings during the seven-month outage, interior damage from leaks, and the $250 improperly charged service fee. Va. Code § 59.1-204(A) entitles a prevailing consumer to recover actual damages or $500, whichever is greater; § 59.1-204(A) also authorizes treble damages where the violation is willful, and § 59.1-204(B) authorizes reasonable attorneys' fees and costs.

53. By operation of the FTC Holder Rule and 16 C.F.R. § 433.2, Mosaic is independently subject to this claim up to the amount Claimant has paid under the Loan Agreement; attorneys' fees and costs are recoverable against Mosaic separately under § 59.1-204(B) and are not subject to the Holder Rule's payment cap. *See* FTC Advisory Opinion on the Holder Rule, 87 Fed. Reg. 24,420 (Apr. 26, 2022).

## COUNT V — BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Va. Code § 8.2-314) (Against Freedom Forever; and, by operation of the FTC Holder Rule, against Mosaic)

54. Claimant incorporates each preceding paragraph as though fully set forth herein.

55. Under Virginia law, a warranty that goods will be merchantable is implied in every contract for their sale where the seller is a merchant with respect to goods of that kind. Va. Code § 8.2-314(1). Merchantable goods must, *inter alia*, "pass without objection in the trade," be "fit for the ordinary purposes for which such goods are used," and "conform to the promises or affirmations of fact made on the container or label." Va. Code § 8.2-314(2)(a), (c), (f). The elements of the claim are: (1) the seller is a merchant in goods of the kind; (2) the goods were not merchantable at the time of sale; (3) the unmerchantable condition proximately caused (4) damages to the buyer. *See, e.g., Bayliner Marine Corp. v. Crow*, 257 Va. 121, 509 S.E.2d 499 (1999).

56. ***Element 1 — Merchant.*** Freedom Forever holds itself out as a specialist in the design, supply, and installation of residential solar PV systems and holds Virginia Contractor License No. 2705177141. It is a merchant with respect to solar equipment within the meaning of Va. Code § 8.2-104.

57. ***Element 2 — Not merchantable.*** The system was not merchantable: **(a) Not fit for the ordinary purposes for which such goods are used** (§ 8.2-314(2)(c)) — a residential rooftop solar PV system's ordinary purpose is to generate electricity. A system that produces zero kWh for approximately seven consecutive months mid-warranty (¶ 20 above) is not fit for its ordinary purpose. A roof-mounted system whose penetrations repeatedly leak water into the home (¶ 21 above) is similarly unfit. **(b) Would not pass without objection in the trade** (§ 8.2-314(2)(a)) — a residential PV system that fails entirely within twelve months of operation and whose roof penetrations repeatedly leak would not pass without objection among reasonable solar installers or buyers. **(c) Does not conform to the description** (§ 8.2-314(2)(f)) — the Cover Page describes Enphase monitoring and an Enphase IQ 5P battery; the goods delivered do not conform to that description. The purported disclaimer of implied warranties in Article 7.7 is unenforceable under 15 U.S.C. § 2308 because Freedom Forever provided a written warranty (Article 7.1; Exhibit A); to the extent any disclaimer survives, it fails of its essential purpose under Va. Code § 8.2-719(2) where the limited warranty has been breached and not honored.

58. ***Element 3 — Causation.*** The unmerchantable conditions — total mid-life production failure, recurring roof leaks, and non-conforming components — directly and proximately caused Claimant's lost utility savings, interior water damage, diminution in system value, and other harms described in Section VI.

59. ***Element 4 — Damages.*** Damages are measured under Va. Code § 8.2-714(2) as the difference between the value of the goods accepted and the value they would have had if

merchantable, together with incidental and consequential damages under § 8.2-715. The full damages are set forth in Section VI.

60. By operation of the FTC Holder Rule and 16 C.F.R. § 433.2, Mosaic is subject to this claim up to the amount Claimant has paid under the Loan Agreement.

**COUNT VI — FRAUDULENT INDUCEMENT**

**(Against Freedom Forever; and, by operation of the FTC Holder Rule, against Mosaic)**

61. Claimant incorporates each preceding paragraph as though fully set forth herein.

62. Under Virginia law, fraud in the inducement is an independent tort, distinct from breach of contract, because it concerns misrepresentations made *before* contract formation that induce a party to enter the contract. *Station #2, LLC v. Lynch*, 280 Va. 166, 172–73, 695 S.E.2d 537, 540 (2010); *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 362, 699 S.E.2d 483, 489 (2010). The elements are: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reasonable reliance by the party misled; and (6) resulting damage. *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994); *Thompson v. Bacon*, 245 Va. 107, 111, 425 S.E.2d 512, 514 (1993).

63. ***Element 1 — False representation(s).*** Before Claimant signed the Installation Agreement, Freedom Forever's sales representatives represented orally that: (a) the solar system would *eliminate* Claimant's electric bill; (b) Claimant would receive a "30% cash rebate" as a result of installing the system; and (c) the offered price and terms were available only if Claimant signed that same day. Each of these statements was false: (a) the contracted production of 13,556 kWh covers only ~54.9% of Claimant's 24,677 kWh annual usage, so bill elimination was mathematically impossible at the contracted system size; (b) the federal solar Investment Tax Credit is a non-refundable tax credit that depends on the taxpayer's federal tax liability — not a cash rebate — a fact the Installation Agreement itself acknowledges on page 3 ("Customer must have federal income tax liability that is at least equal to the value of the tax credit"); and (c) Freedom Forever's pricing and offers were not in fact limited to that day, as is well-known in the solar sales industry.

64. ***Element 2 — Material fact.*** Each representation went to the essence of the bargain. Whether a $74,882.16, 25-year financial commitment will (i) eliminate the buyer's electric bill, (ii) generate a $22,000+ cash refund, and (iii) be available tomorrow or not, are facts a reasonable consumer would consider central to the decision to sign. *See Packard Norfolk, Inc. v. Miller*, 198 Va. 557, 562, 95 S.E.2d 207, 211 (1956) (materiality measured by whether a reasonable person would attach importance).

65. ***Element 3 — Made intentionally and knowingly.*** Freedom Forever, as a licensed solar contractor designing systems based on usage data, knew at the time of sale that a 12.32 kW system producing 13,556 kWh annually could not eliminate the bill of a household

consuming 24,677 kWh annually. Freedom Forever's own contract acknowledges that the tax credit is non-refundable and tax-liability dependent (page 3), establishing knowledge that the "30% cash rebate" characterization was false. Same-day-only urgency representations made by trained solar sales representatives are a known industry tactic, made with knowledge of their falsity.

66. ***Element 4 — Intent to mislead.*** The representations were made for the purpose of inducing Claimant to sign that day and to finance through Mosaic. Same-day signing pressure has no purpose other than to deprive the consumer of time to compare prices, verify the math, or consult an independent advisor. The misrepresentations were made by trained sales representatives operating from a sales script, in connection with door-to-door solicitation, and were calculated to overcome consumer hesitation.

67. ***Element 5 — Reasonable reliance.*** Claimant relied on each representation and his reliance was reasonable. The representations were made by a licensed Virginia contractor whose sales representative held himself out as having technical expertise about solar production and the federal tax credit. Claimant signed the Installation Agreement and the Loan Agreement on March 11, 2024, the same day of solicitation. As *Station #2* makes clear, reliance on pre-contractual misrepresentations is not displaced by the existence of the resulting contract: the duty not to defraud is a common-law duty independent of any contract, and the source-of-duty rule does not bar a fraudulent inducement claim. 280 Va. at 172–73.

68. ***Element 6 — Resulting damage.*** But for the misrepresentations, Claimant would not have signed the Installation Agreement or the Loan Agreement that day, would not have committed to a $119,937.69 total-of-payments obligation, and would not have suffered the losses described in Section VI. Punitive damages are recoverable in an action for actual fraud upon a showing of willful, wanton, or malicious conduct. *See Jordan v. Sauve*, 219 Va. 448, 247 S.E.2d 739 (1978).

69. By operation of the FTC Holder Rule and 16 C.F.R. § 433.2, Mosaic is subject to this claim up to the amount Claimant has paid under the Loan Agreement.

### COUNT VII — VIOLATION OF THE VIRGINIA HOME SOLICITATION SALES ACT AND FTC COOLING-OFF RULE

**(Va. Code §§ 59.1-21.1 et seq.; 16 C.F.R. Part 429) (Against Freedom Forever; and, by operation of the FTC Holder Rule, against Mosaic)**

70. Claimant incorporates each preceding paragraph as though fully set forth herein.

71. The Virginia Home Solicitation Sales Act, Va. Code §§ 59.1-21.1 to 59.1-21.7:1, and the FTC Cooling-Off Rule, 16 C.F.R. § 429.1, regulate sales "solicited at a residence." To establish a claim, Claimant must show: (1) a "home solicitation sale"; (2) failure of the seller to comply with the statutory disclosure and form requirements; and (3) a resulting harm or basis for relief.

72. ***Element 1 — Home solicitation sale.*** A "home solicitation sale" under Va. Code § 59.1-21.2 includes a consumer credit sale of goods or services in which the seller (or his representative) personally solicits the sale at the buyer's residence, and the buyer's agreement is given there. The transaction here was a door-to-door solicitation at 144 Victoria Drive, with an in-home sales presentation by a Freedom Forever Independent Sales Representative, culminating in execution of the Installation Agreement that same day (¶ 13 above). The Installation Agreement itself acknowledges this on its first page ("BUYER'S RIGHT TO CANCEL — If this agreement was solicited at a residence ..."). The transaction therefore falls squarely within the Act.

73. ***Element 2 — Non-compliance with the form requirements.*** Va. Code § 59.1-21.4(2) requires that the cancellation notice provided to the buyer state, in bold-face 10-point type or larger, the date of the transaction and the specific date by which the buyer's right to cancel will expire ("not later than midnight of ..."). The FTC Cooling-Off Rule, 16 C.F.R. § 429.1, contains a substantively identical requirement: the seller must furnish a completed Notice of Cancellation form that states the specific date on which the cancellation period ends. Both the "Freedom Forever Copy" and the "Customer Copy" Notices of Cancellation included with the Installation Agreement (Section 16–17 of the Installation Agreement) leave the "not later than midnight of" deadline line blank (¶ 14 above). This is a per-se violation of § 59.1-21.4(2) and 16 C.F.R. § 429.1.

74. ***Element 3 — Consequences.*** Because the cancellation notice did not comply with § 59.1-21.4, the three-business-day cancellation period did not begin to run on March 11, 2024 and remained tolled. *See* Va. Code § 59.1-21.4(3) ("until the seller has complied with this section the buyer may cancel the home solicitation sale by notifying the seller in any manner and by any means of his intention to cancel"). Claimant accordingly retains the right to cancel the home solicitation sale and recover all payments under § 59.1-21.5, and the Loan Agreement, as a credit instrument arising out of the home solicitation sale, is cancelable consistent with § 59.1-21.5. A failure to provide proper notice is also an unlawful act under the VCPA per Va. Code § 59.1-200(A) and *Ballagh*, 290 Va. at 124, which incorporates Va. Code § 59.1-21.4 as a separately enforceable violation.

75. By operation of the FTC Holder Rule and 16 C.F.R. § 433.2, Mosaic is subject to this claim up to the amount Claimant has paid under the Loan Agreement; in addition, because the right to cancel the underlying home solicitation sale remains live, the Loan Agreement — which financed that sale — is itself subject to cancellation.

**COUNT VIII — VIOLATION OF THE TRUTH IN LENDING ACT**

**(15 U.S.C. § 1638; 12 C.F.R. § 1026.18) (Against Mosaic/Solar Servicing)**

76. Claimant incorporates each preceding paragraph as though fully set forth herein.

77. The Truth in Lending Act ("TILA") and Regulation Z require a creditor in a closed-end consumer credit transaction to disclose, *inter alia*, the "amount financed," using that term and an accompanying "brief description such as 'the amount of credit provided to you or

on your behalf,'" together with a separate written itemization of the amount financed, including "the amount that is or will be paid to other persons by the creditor on the consumer's behalf," identifying each such recipient. 15 U.S.C. § 1638(a)(2); 12 C.F.R. § 1026.18(c). The elements of a private TILA disclosure claim are: (1) a covered closed-end consumer credit transaction; (2) by a creditor (3) who failed to make a required disclosure clearly and accurately and in the form required by Regulation Z; (4) causing the consumer to be entitled to statutory and/or actual damages under 15 U.S.C. § 1640.

78. ***Element 1 — Covered closed-end consumer credit transaction.*** The Loan Agreement, Loan Number 784292, is a 25-year, fixed-rate, closed-end installment loan for $74,882.16 used to finance the purchase of solar equipment for personal, family, and household purposes at Claimant's residence. It is squarely within the scope of TILA and Regulation Z. *See* 15 U.S.C. § 1602(i); 12 C.F.R. § 1026.2(a)(12), (15).

79. ***Element 2 — Creditor.*** Mosaic is the original creditor under the Loan Agreement and is identified as such on the TILA Disclosure provided to Claimant. Solar Servicing is Mosaic's successor and is subject to Mosaic's disclosure obligations as to claims preserved against it.

80. ***Element 3 — Inaccurate / incomplete disclosure of amount financed.*** The TILA Itemization of Amount Financed states: "Amount Financed: $74,882.16 (e) Amount Due To: Freedom Forever." Immediately below, however, the same disclosure document states: "The Installation Contractor may provide us a fee or discount against the Amount Financed noted herein. The Amount Financed shown is not reduced by any such fee or discount." In plainer terms: the disclosure represents that the entire $74,882.16 is being paid to Freedom Forever, while simultaneously acknowledging that some unspecified portion will be retained by Mosaic as a dealer fee/discount and **not** paid to Freedom Forever. This is internally contradictory and fails to disclose, clearly and accurately, "the amount paid to other persons by the creditor on the consumer's behalf" as required by 12 C.F.R. § 1026.18(c)(1)(iii). Based on industry data for comparable Mosaic loan products at the same term and APR, the embedded dealer fee may be approximately 30.75% of the financed amount, or roughly $23,026 (¶ 23 above) — a material portion of the loan that is not itemized in any TILA-required disclosure. The amount financed is therefore overstated, and the implied "system cost" paid to Freedom Forever is correspondingly overstated.

81. ***Element 4 — Damages.*** Under 15 U.S.C. § 1640(a), Claimant is entitled to recover: (i) actual damages caused by the violation, including the financing cost attributable to the undisclosed dealer fee/discount over the 25-year term; (ii) statutory damages of twice the finance charge in connection with the transaction (not less than $400 and not more than $4,000 for an individual action involving a closed-end credit transaction other than a mortgage); and (iii) costs of the action and reasonable attorneys' fees. Disgorgement of the undisclosed dealer fee as actual damages, plus statutory damages, plus attorneys' fees, is sought.

## VI. DAMAGES

82. Claimant has suffered the following categories of damages, the specific amounts of which will be established through discovery and at the arbitration hearing:

a) The difference between the contract price paid ($74,882.16) and the fair market value of the system as actually delivered and installed, including any embedded dealer fees not disclosed to Claimant;

b) Lost energy savings and excess utility costs incurred during the approximately seven-month system outage and ongoing period of non-production;

c) Increased combined monthly energy costs over the pre-solar baseline, resulting from a system designed to offset only approximately 55% of Claimant's energy usage contrary to sales representations;

d) Cost of repair to interior property damage caused by recurring roof leaks at solar penetration points;

e) The improperly charged $250 service dispatch fee for a warranty-covered condition;

f) Treble damages, as authorized under Va. Code § 59.1-204(A) for willful violations of the Virginia Consumer Protection Act;

g) Statutory damages under the Truth in Lending Act, 15 U.S.C. § 1640(a)(2), and actual damages under § 1640(a)(1);

h) Punitive damages on the fraudulent inducement claim per *Jordan v. Sauve*, 219 Va. 448 (1978);

i) Reasonable attorneys' fees, costs, and expenses of arbitration to the extent permitted by applicable law and the arbitration agreements (including under Va. Code § 59.1-204(B), 15 U.S.C. § 1640(a)(3), 15 U.S.C. § 2310(d)(2), and the prevailing-party provisions of Exhibit C, ¶ 3 of the Installation Agreement and Section 17 of the Loan Agreement); and

j) Such other and further relief as the Arbitrator deems just and equitable.

## VII. RELIEF REQUESTED

83. Claimant respectfully requests that the Arbitrator award the following relief:

a) Compensatory damages in an amount to be proven at the hearing;

b) Treble damages under the Virginia Consumer Protection Act;

c) Statutory and actual damages under TILA;

d) Punitive damages on the fraudulent inducement count;

e) An order requiring Freedom Forever to repair or replace all defective equipment and restore the system to full operational capacity at no cost to Claimant;

f) An order requiring Freedom Forever to complete all necessary roof leak repairs and remediate all interior damage at the Property at no cost to Claimant;

g) A refund of the $250 service dispatch fee improperly charged;

h) An order requiring Mosaic/Solar Servicing to provide a complete and accurate itemization of the dealer fee or discount retained from Claimant's loan proceeds, and disgorgement of that fee as actual damages under TILA;

i) Rescission of the Installation Agreement and the Loan Agreement under Va. Code § 59.1-21.5 and Va. Code § 59.1-200, or, in the alternative, a reduction of the loan balance to reflect the actual cash-equivalent value of the system installed;

j) Reasonable attorneys' fees, costs, and expenses of arbitration; and

k) Such other and further relief as the Arbitrator deems just and equitable.

Respectfully submitted,

Barn Henderson (May 12, 2026 14:08:16 EDT)

Barn Henderson, Self-Represented Claimant
144 Victoria Drive
Virginia Beach, VA 23452
Telephone: (757) 275-3872

Dated: 12/May/26

MOSAIC

# HOME SOLAR LOAN DOCUMENTS

## TABLE OF CONTENTS

**Disclosure and Consent to Electronic Receipt of Loan Disclosures** ..........
This document reviews the terms and conditions for Mosaic to provide loan disclosures and communicate electronically.

**Authorization and Consent to Share Application Information** ..........
This document authorizes Mosaic to share your information with the installation contractor and related parties.

**Truth in Lending Disclosure Statement** ..........
This document discloses the terms and costs of financing associated with the loan.

**Loan Agreement** ..........
This is the legally binding agreement between you and Mosaic that reviews the terms of the home solar loan.

**Notice of Cancellation** ..........
This document outlines how and when you may cancel your Mosaic Home Solar Loan.

**Authorization for Direct Payment via ACH (If Applicable)**..........
This is the form where you may provide bank information to automate monthly payments.

**Alaska Consumers Only: Alaska Small Loan Disclosure**..........
This disclosure is only for Alaska borrowers with loans of $25,000 or less.

**California Consumers Only: California Finance Lenders Law Statement of Loan**..........
This document reviews your rights and requires your consent to receiving disclosures related to your loan from CA lenders.

**What Does Solar Mosaic LLC ("Mosaic") Do With Your Personal Information?**..........
This document discloses and explains what kinds of information Mosaic can share.

COPY VIEW

MOSAIC

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607
loannotices@joinmosaic.com | 855.746.7849
CA Finance Lenders License 6054631

## DISCLOSURE AND CONSENT TO ELECTRONIC RECEIPT OF LOAN DISCLOSURES

You understand that in order to submit a credit application to Solar Mosaic LLC ("we", "us", "our", or "Mosaic") and view and retain a copy of the related notices, disclosures, agreements, authorizations, acknowledgements, terms and conditions, and other documents during the course of our relationship with you (collectively, "Loan Disclosures") you must consent to receive Loan Disclosures electronically. Described below are the terms and conditions for providing Loan Disclosures to you electronically. Please read the information below carefully and thoroughly.

You acknowledge and agree that we may provide you with the Loan Disclosures in electronic format, and that we are not required to send a paper document to you, unless and until you withdraw your consent as described below. All Loan Disclosures that we provide to you in electronic format will be provided either (i) via e-mail, (ii) by access to our online platform including the DocuSign, Inc. ("DocuSign") electronic signing system, or (iii) by requesting you to download a PDF through the DocuSign system.

**1. Getting paper copies.**

You may request from us a paper copy of any Loan Disclosure that we have provided or made available to you electronically without charge, provided that such request is made within a reasonable time after we first provided the Loan Disclosure to you. To request paper copies, you must send an e-mail to loannotices@joinmosaic.com with the subject line "Past Paper Copy Request" and in the body of the e-mail you must state your e-mail address, full name, US Postal address, and telephone number.

**2. Withdrawing your consent.**

You may withdraw your consent to receive Loan Disclosures in electronic form by either (i) declining to sign a document within the DocuSign system, and on the subsequent page, selecting the checkbox indicating you wish to withdraw your consent, or (ii) sending an e-mail to loannotices@joinmosaic.com with the subject line of "Future Paper Copy Request" and in the body of the e-mail request you must state your e-mail address, full name, US Postal Address, and telephone number. Your withdrawal of consent will be effective only after we have had a reasonable period of time to process your request. Please be aware that if you elect to receive Loan Disclosures only in paper format we will be unable to process your application and if you elect to receive Loan Disclosures only in paper format after your loan is approved, it may slow the speed at which we can deliver services to you.

**3. To advise Solar Mosaic of your new e-mail address.**

You are required to provide us with an accurate and complete e-mail address and update any changes to the information promptly. To let us know of a change in your e-mail address, you must send an e-mail message to us at loannotices@joinmosaic.com with the subject line "Email Address Change" and in the body of the e-mail you must state your previous e-mail address and your new e-mail address. At our discretion, we may treat your failure to provide us with a valid e-mail address or the malfunction of a previously valid e-mail address as a withdrawal of your consent to receive electronic documents.

**4. Required hardware and software.**

In order to access, view and retain the Loan Disclosures we make available to you in electronic form, you must provide at your own expense an Internet connected device. You must have the following hardware and software:

| | |
|---|---|
| Operating System | Windows® 2000, Windows® XP, Windows Vista®, Windows® 7, Windows® 8, Mac OS® X. Pre-release (e.g. beta) versions of operating systems are not supported. |
| Browsers | Final release versions of Internet Explorer® 8.0 or above (Windows only); Google® Chrome™ (Windows or Mac), Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only). Pre-release (e.g. beta) versions of browsers are not supported. |
| PDF Reader | Software that enables you to view and print Portable Document Files (PDF) such as Adobe® Acrobat Reader or similar |
| E-Mail Account | An e-mail account with an Internet service provider and e-mail software in order to receive electronic communications from us |
| Storage Capacity | Sufficient electronic storage capacity on your computer's hard drive or other data storage unit |



COPY VIEW

This is a copy. The authoritative copy of this record is held at na2.docusign.

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607
loannotices@joinmosaic.com | 855.746.7849
CA Finance Lenders License 6054631

| | |
|---|---|
| | to retain the Loan Disclosures and/or a printer to print them |
| Screen Resolution | 800 x 600 minimum |
| Browser Settings | Allow per session cookies |

**5. Federal Law.**

All Loan Disclosures we provide to you in either electronic or paper format will be considered "in writing". You should print or download for your records a copy of this Disclosure and Consent of Electronic Receipt of Loan Disclosures ("E-Sign Consent") and any other Loan Disclosures. You agree and we both intend the federal Electronic Signatures in Global and National Commerce Act to apply to (i) this E-Sign Consent and (ii) our ability to conduct business with you by electronic means.

**6. Termination/Changes.**

We reserve the right, in our sole discretion, to provide you with any Loan Disclosures in paper format and to discontinue electronic provision of Loan Disclosures at any time. We will provide you with notice of any such termination or change as required by law.

**7. Acknowledging your access and consent to receive materials electronically.**

By signing below, you: (i) confirm your consent to receive Loan Disclosures in electronic format; (ii) affirmatively demonstrate your ability to access and read, and also print or save, this E-Sign Consent and the Loan Disclosures; (iii) confirm that you have provided a valid e-mail address at which we can send electronic Loan Disclosures to you; (iv) have access to software and hardware that satisfies the above requirements; (v) agree to the terms and conditions of this E-Sign Consent; and (vi) affix your electronic signature to this E-Sign Consent.

I AGREE: DocuSigned by: Barn Henderson
43882B78857841E
**Barn Henderson**

Borrower Signature

3/11/2024

Date Signed

Co-Borrower Signature

Date Signed

COPY VIEW

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607
loannotices@joinmosaic.com | 855.746.7849
CA Finance Lenders License 6054631

MOSAIC

## Authorization and Consent to Share Application Information

I agree to submit an application to Solar Mosaic LLC ("Mosaic") for a loan to finance the purchase and installation of Solar Equipment including Purchased Goods to be installed at my home by the installation contractor indicated on my home improvement agreement with such contractor.

I authorize the installation contractor including its employees and third party service providers (collectively the *"Installation Contractor"*), to assist me in completing and submitting my application to Mosaic. I recognize that in connection with providing me with this assistance, the Installation Contractor will have access to my application, my signed home solar loan agreement, including personal information contained on my application and other information obtained by Mosaic. I expressly authorize Mosaic to share all such personal information related to my application with the Installation Contractor such as information I provide, credit bureau reports, third party information, and Mosaic's underwriting decision.

I understand that I can revoke this authorization, at any time, in writing to Mosaic at **loannotices@joinmosaic.com**. I understand that if I revoke this authorization, my application cannot be processed by Mosaic and Mosaic will treat the application as withdrawn.

I understand and agree that in order to apply for a loan to finance the purchase and installation of solar equipment, I must agree to receive certain documents electronically as further described in the Disclosure and Consent to Electronic Receipt of Loan Disclosures.

BY SIGNING BELOW, I UNDERSTAND AND AGREE (1) THAT I AM AUTHORIZING MOSAIC TO SHARE PERSONAL INFORMATION RELATED TO MY APPLICATION WITH THE INSTALLATION CONTRACTOR INCLUDING INFORMATION I PROVIDE, CREDIT BUREAU REPORTS, THIRD PARTY INFORMATION AND MOSAIC'S UNDERWRITING DECISION; (2) THAT I HAVE RECEIVED A COPY OF THIS AUTHORIZATION FOR MY FUTURE REFERENCE; AND (3) TO THE TERMS OF THE DISCLOSURE AND CONSENT OF ELECTRONIC RECEIPT OF LOAN DISCLOSURES.

COPY VIEW

Borrower Name: Barn Henderson

Date: 3/11/2024

Signature: DocuSigned by: Barn Henderson 43882B78857841E

Co-Borrower Name: ____________________

Date: ____________________

Signature: ____________________

This is a copy. The original of the document is held at na2.docusign.

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607
loannotices@joinmosaic.com | 855.746.7849
CA Finance Lenders License 6054631

MOSAIC

# Federal Truth in Lending Act ("TILA") Disclosure

Loan Number: **784292**

Date: **3/11/2024**

Borrower Name: **Barn Henderson**

Co-Borrower Name:

Project Address:
**144 Victoria Dr, Virginia Beach, VA 23452**

| ANNUAL PERCENTAGE RATE (the cost of your credit as a yearly rate) | FINANCE CHARGE (the dollar amount the credit will cost you) | Amount Financed (the amount of credit provided to you or on your behalf) | Total of Payments (the amount you will have paid after you have made all payments as scheduled) |
|---|---|---|---|
| **3.99% (e)** | **$45,055.53 (e)** | **$74,882.16** | **$119,937.69 (e)** |
| Monthly Payment Schedule: | | | |
| Number of Payments | Amount of Payments | When Payments are Due | |
| **16 (e)** | **$286.20 (e)** | Monthly, beginning **07/25/2024 (e)** | |
| **281 (e)** | **$409.08 (e)** | Monthly, beginning **11/25/2025 (e)** | |
| 1 | **$407.01 (e)** | **04/25/2049 (e)** | |

**Variable Rate: You indicated that you intend to make your monthly loan payments by ACH. The annual percentage rate ("APR") reflected above contemplates your enrollment in ACH. Your APR will increase by 0.25% on the first calendar day of the next billing period if you terminate ACH payments or we terminate ACH payments because you are not current on your payments or we are unable to process your ACH payment. Any increase will take the form of higher payment amounts. For example, if you have a 25 year loan of $74,882.16 at a 3.99% APR with monthly payments of $286.20, and you begin making payments by check on the First Payment Date, your APR would increase to 4.24% and your monthly payments would increase by $8.02 to $294.22. Any increase may cause your Principal Balance Target to increase.**

**Security:** You are giving a security interest in the personal property you are purchasing in this transaction and your rights under any related agreement.

**Late Charge:** If a payment is more than fifteen (15) days late, we will charge you a non-refundable late fee of no more than 5% of the amount due or ten dollars ($10), whichever is less.

**Prepayment:** If you pay off your loan early, you will not have to pay a penalty.

**Contract Reference:** See your Loan Agreement ("Agreement") for any additional information about nonpayment, default, and any required repayment in full before the scheduled date.

**Insurance:** You will be required to maintain a homeowners' insurance policy or equivalent insurance policy in an amount equal to the full replacement and installation cost of the solar system financed or the outstanding balance of the loan financed. The insurance carrier providing the insurance coverage may be chosen by you.

"(e)" means an estimate.

COPY VIEW

DocuSign Envelope ID: 3E82B941-8644-4C82-AAF8-928435512214

This is A COPY
The authoritative copy of this record is held at na2.docusign.

### Itemization of Amount Financed

Amount Financed: **$74,882.16 (e)**
Amount Due To: **Freedom Forever**

The Installation Contractor may provide us a fee or discount against the Amount Financed noted herein. The Amount Financed shown is not reduced by any such fee or discount. Irrespective, of the Amount Due to the Installation Contractor, you remain contractually bound to repay the full Amount Financed.

The "Loan Start Date" is the date we first send funds to your Installation Contractor (or send directly to the equipment manufacturer/distributor if directed to do so by the Installation Contractor) as described in the "Loan Disbursement Schedule" in the Agreement. The first payment is due on the earlier of: (i) fifteen (15) days after we receive confirmation from your Installation Contractor that your system is operational; or (ii) three (3) months after the Loan Start Date. After the Loan Start Date, we will deliver a final Loan Closing Certificate. The Loan Closing Certificate will update your Payment Schedule.

The Payment Schedule shown above assumes that you make no voluntary prepayments on your Loan. However, approximately eighteen (18) months after the Loan Start Date, we will change your subsequent loan payments to the level required to repay the Loan in full over its scheduled term in light of any early, late or additional payments you have made and/or any missed payments. We have designed the Loan so that, if you make all scheduled payments on time and also make sufficient voluntary prepayment(s) to reduce your total loan amount to at least the "Principal Balance Target" described in your Agreement, your subsequent monthly payments will not increase. In addition, approximately thirty (30) months after the Loan Start Date, we will change your subsequent loan payments to the level required to repay the Loan in full over its scheduled term if you are current on your Loan and if you pay at least $5,000 of your outstanding Loan balance between the time of your Re-amortization Date, as defined in your Loan Agreement, and the second re-amortization, occurring on the 30th month after the Loan Start Date.

COPY VIEW

**By signing below, you acknowledge that you have read and received a complete copy of this Federal Truth In Lending Act Disclosure ("TILA") to keep for future reference before you signed your Loan Agreement.**

**BORROWER:**

DocuSigned by:
Barn Henderson
43882B78857841E...

**CO-BORROWER:**

_______________________________

MOSAIC

# LOAN AGREEMENT

Borrower Name: Barn Henderson

Co-Borrower Name:

Email: Dlion04@gmail.com

Phone: (757) 275-3872

Project Address: 144 Victoria Dr
Virginia Beach, VA 23452

Borrower Address (if different from Project Address):

Co-Borrower Address (if different from Project Address):

Loan Number: 784292

Loan Agreement Date: 03/11/2024

**The Loan Agreement contains the terms "You" and "Your" which mean either the Borrower or the Co-Borrower, or the Borrower and the Co-Borrower collectively, as applicable.**

This document describes the terms and conditions of Your loan ("Summary Page").

| $0 | $74,882.16 | 3.99% |
|---|---|---|
| LOAN DOWN PAYMENT | LOAN AMOUNT | ANNUAL PERCENTAGE RATE |

COPY VIEW

## SYSTEM DESCRIPTION

Installation Contractor: Freedom Forever

Date of Loan Agreement: 03/11/2024

Equipment Manufacturer/Distributor (if applicable):

## PAYMENT TERMS

| Number of Payments | Amount of Payment | When Payments Are Due |
|---|---|---|
| 16 | $286.20 | Monthly, beginning 07/25/2024 |
| 281 | $409.08 | Monthly, beginning 11/25/2025 |
| 1 | $407.01 | Final Payment 04/25/2049 |

**Mosaic Loan**

Initial Monthly Payment(est.): $286.20 Section 3

To keep Your Initial Monthly Payment:

Re-amortization Date(est.): 10/25/2025 Section 3

Principal Balance Target(est.): $52,318.21 Section 3

**Mosaic Adjusted Loan**

Adjusted Monthly Payment(est.): $409.08 Section 3

This is A COPY The Authoritative Copy of this record is held at na2.docusign.

# LOAN SUMMARY

Term: **25 Years**

Loan Start Date(est.): **04/25/2024**

Total Amount Financed: **$74,882.16 (e)**

Total of Payments: **$119,937.69 (e)**

First Payment Date(est.)[1]: **07/25/2024**

Maturity Date(est.): **04/25/2049**

Annual Percentage Rate ("APR")*: **3.99%**

<u>Loan Disbursement Schedule</u>

Initial Disbursement(s)**: **$41,185.18**

Install Complete Disbursement: **$29,952.86**

Final Loan Disbursement: **$3,744.10**

* If You will make loan payments by Automated Clearing House ("ACH"), Your Interest Rate includes a **0.25%** reduction from the annual percentage rate ("APR"). If You terminate ACH payments or are not current on Your loan payments, the APR will increase by **0.25%** on the first calendar day of the next billing period. An increase will take the form of higher payment amounts. If You indicated in Your application that You will make loan payments by check, Your interest rate does not include such a reduction, but we will reduce Your rate if You subsequently authorize ACH payments as described in Section 3(g).

** Initial Disbursement(s) made to Your Installation Contractor may include multiple disbursements not to exceed this amount, with interest beginning to accrue on each amount disbursed in such Initial Disbursement.

(est.) The Loan Start Date is subject to change. The Loan Start Date will be finalized and accurately reflected in the Loan Closing Certificate, which will be sent to You following our first disbursement of loan proceeds to Your Installation Contractor or its designee. The Loan Closing Certificate is fully incorporated herein.

The estimated Loan Start Date assumes the Contractor completes installation and the "Install Complete Disbursement" is made within 180 days from the date of You are prequalified for a loan. The actual Loan Start Date will be the date that we first disburse loan proceeds to Your Installation Contractor. That date will be shown on the Loan Closing Certificate we send to You.

**The estimated First Payment Date assumes You will begin making payments 3 months after the Loan Start Date. You may actually begin making payments on the earlier of 3 months after the Loan Start Date or 15 days after Mosaic confirms Permission to Operate from Your utility company; provided, that in the event that Your installation is not complete within 65 days of Your actual Loan Start Date, Your First Payment Date will be 24 days after Mosaic confirms that installation is complete. Interest on Your loan begins to accrue from the first disbursement and is calculated on the outstanding principal balance, as described in Section 3(c); provided, that in the event that Your installation is not complete within 65 days of Your actual Loan Start Date, interest will not accrue on Your loan between 66 days from Your Loan Start Date until installation is confirmed. You can begin making payments at any time You choose after the Loan Start Date.**

**<u>Tax Credit</u>**

You may be eligible for a federal solar investment tax credit. You acknowledge that eligibility for this tax credit is not guaranteed. In order to realize the benefits of the solar investment tax credit, You must have federal income liability that is at least equal to the value of the credit. We are not financially responsible for Your receipt of any such tax credits. We do not provide tax advice and nothing in this Loan Agreement is intended to be used as tax advice. In order to determine Your eligibility for any federal solar investment tax credit, You should make an independent assessment or consult with Your independent tax advisors. Additionally, if You are not eligible to receive a federal solar investment tax credit You will not be able to use the proceeds of Your tax credit to make a voluntary prepayment as described below.

[1] The estimated First Payment Date and actual First Payment Date may be different. The actual First Payment Date will be disclosed in Your Loan Closing Certificate.

COPY VIEW

**Impact of Voluntary Prepayments**

You are not required to make any prepayments on the Loan. If You choose to make voluntary prepayment(s) on the Loan before the eighteenth (18th) month from the Loan Start Date, then when the Loan automatically re-amortizes on the Re-amortization Date denoted in the Summary Page, any prepayments made to date will be taken into account and the monthly loan payment adjusted accordingly. Additionally, if You make one or more voluntary prepayments totaling at least $5,000 between the eighteenth (18th) month and the thirtieth (30th) month from the Loan Start Date, then the Loan will re-amortize a second time on the thirtieth (30th) month after the Loan Start Date, and any such prepayments will be taken into account and the monthly loan payment adjusted accordingly. Any adjustment to the monthly loan payment resulting from either re-amortization will be sufficient to fully repay the Loan by the Maturity Date.

You acknowledge that in order to avoid an increase in Your Monthly Payment, You must make one or more voluntary prepayments equal to approximately 30% of Your Total Loan Amount within 18 months following Your Loan Start Date. So long as You are not in default under this Agreement, and provided that You reduce Your unpaid Total Loan Amount to the Principal Balance Target by the Re-amortization Date by making sufficient voluntary prepayments, Your monthly payment will not increase. If You pay more than 30% of Your Total Loan Amount, Your monthly payments will be adjusted to a lower amount. If You do not make any prepayments, or if Your prepayments are less than 30% of Your Total Loan Amount, Your monthly payments will be adjusted to a higher amount.

**Loan Re-Amortization**

Your Loan will automatically re-amortize on the Re-amortization Date stated on the Summary Page. This re-amortization event will take place 18 months after the Loan Start Date. During the re-amortization, the monthly loan payment will be adjusted in a manner to fully repay the Loan by the Maturity Date. Any new adjusted monthly loan payment will become due on the 19th month after the Loan Start Date. In addition, your Loan will re-amortize for a second time 30 months after the Loan Start Date if you are current on your Loan and if you have prepaid at least $5,000 of your outstanding Loan balance between the time of the Re-amortization Date and the second re-amortization. You are strongly encouraged to review the monthly loan statements to stay informed about the re-amortization dates of the Loan and any adjustments to the monthly loan payments. Please note that a re-amortization of the Loan and any adjustments to the monthly loan payment amount assumes You are not in default or in breach of this Loan Agreement.

**Liens**

You authorize us to file on Your behalf any documentation, including but not limited to a copy of this Agreement, a UCC financing statement and a county fixture filing required to perfect our security interest in the Collateralized Goods. Our security interest in the Collateralized Goods takes priority over any mortgage on the Residence, whether such mortgage is granted before or after the date of this Agreement. It is possible that a lender making a loan secured by the Residence, including but not limited to a mortgage refinancing of an existing mortgage, will deem the Solar Equipment to be part of the Residence and will object to our interest in the Solar Equipment taking priority over its interest in the Residence. Upon request, we will confirm to any mortgage lender that our lien is limited to the Solar Equipment and does not extend to any part of the Residence. Alternatively, upon request, we may agree to lift our county fixture filing, if any on the Solar Equipment for a limited period for a cost of $250 or more depending on costs incurred and whether we will be able to refile upon closing of the mortgage refinancing to the extent allowable by applicable law. NOTE: If you are a covered borrower as defined by the Military Lending Act and its implementing regulations and a California resident, this Agreement does not create and we will not seek to obtain, perfect, or enforce a security interest against the Collateralized Goods.

COPY VIEW

**BUYER'S RIGHT TO CANCEL**

**ALL BORROWERS: You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.**

CALIFORNIA BORROWERS ONLY: If You are 65 years of age or older: You, the buyer, may cancel this transaction at any time prior to midnight of the fifth business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.

CONNECTICUT BORROWERS ONLY: This instrument is based upon a home solicitation sale; which sale is subject to the provisions of the home solicitation sales act. This instrument is not negotiable. You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.

DISTRICT OF COLUMBIA BORROWERS ONLY: Buyer's Right to Cancel-If this agreement was solicited at or near Your residence and You do not want the goods or services, You may cancel this agreement by mailing a notice to the seller. The notice must say that You do not want the goods or services and it must be mailed before midnight of the third business day after You signed this agreement. The notice must be mailed to Solar Mosaic LLC, Attn: Loan Department, 601 12th Street, Suite 325, Oakland, CA 94607.

MINNESOTA BORROWERS ONLY: An authorized creditor is permitted to charge a delinquency charge on a payment, including the minimum payment due in connection with open-end credit, not paid in full on or before the tenth day after its due date in an amount not to exceed five percent of the amount of the payment or $9.36, whichever is greater.

ILLINOIS BORROWERS ONLY: **DISCLOSURE OF 36% RATE CAP: A lender shall not contract for or receive charges exceeding a 36% annual percentage rate on the unpaid balance of the amount financed for a loan, as calculated under the Illinois Predatory Loan Prevention Act (PLPA APR).**
**Any loan with a PLPA APR over 36% is null and void, such that no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan.**

**The annual percentage rate disclosed in any loan contract may be lower than the PLPA APR.**

KANSAS BORROWERS ONLY: Notice to Consumer
1. Do not sign this agreement before You read it.
2. You are entitled to a copy of this agreement.
3. You may prepay the unpaid balance at any time without penalty.

ARIZONA, RHODE ISLAND AND WASHINGTON BORROWERS ONLY: Notice to Buyer

(1) Do not sign this agreement if any of the spaces intended for the agreed terms of the extent of then available information are left blank.

(2) You are entitled to a copy of this agreement at the time You sign it.

(3) You may at any time pay off the full unpaid balance due under this agreement, and in so doing You may be entitled to receive a partial rebate of the finance and insurance charges.

(4) The seller has no right to enter unlawfully Your premises or commit any breach of the peace to repossess goods purchased under this agreement.

(5) You may cancel this agreement if it has not been signed at the main office or a branch office of the seller, provided You notify the seller at his main office or branch office shown in the agreement by registered or certified mail, which shall be posted not later than midnight of the third calendar day after the day on which the buyer signs the agreement, excluding Sunday and any holiday on which regular mail deliveries are not made. See the attached notice of cancellation form for an explanation of buyer's rights.

TEXAS BORROWERS ONLY: Unless the law or this Note provides otherwise, we are not required to: (1) demand payment of amounts due; (2) give notice that amounts due have not been paid, or have not been paid in the appropriate amount, time, or manner; or (3) give notice that we intend to make, or are making, this Note immediately due.

SOUTH DAKOTA BORROWERS ONLY:
You may contact the South Dakota Division of Banking at 1714 Lincoln Ave., Suite 2, Pierre, SD 57501, or by phone at 605-773-3421, or by email at banking@state.sd.us if any improprieties in making loans or loan practices occur.

COPY VIEW

This is A COPY
The Authoritative Copy of this record is held at na2.docusign.

NORTH DAKOTA BORROWERS ONLY:
NOTICE: MONEY BROKERS ARE LICENSED AND REGULATED BY THE DEPARTMENT OF FINANCIAL INSTITUTIONS, 2000 SCHAFER STREET, SUITE G, BISMARCK, NORTH DAKOTA 58501-1204. THE DEPARTMENT OF FINANCIAL INSTITUTIONS HAS NOT PASSED ON THE MERITS OF THE CONTRACT AND LICENSING DOES NOT CONSTITUTE AN APPROVAL OF THE TERMS OR OF THE BROKER'S ABILITY TO ARRANGE ANY LOAN. COMPLAINTS REGARDING THE SERVICES OF MONEY BROKERS SHOULD BE DIRECTED TO THE DEPARTMENT OF FINANCIAL INSTITUTIONS.
ALABAMA BORROWERS ONLY:
CAUTION -- IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. Ala. Code § 5-19-6.

WISCONSIN BORROWERS ONLY:

NOTICE TO CUSTOMER
(a) DO NOT SIGN THIS BEFORE YOU READ THE WRITING ON THE REVERSE SIDE, EVEN IF OTHERWISE ADVISED.
(b) DO NOT SIGN THIS IF IT CONTAINS ANY BLANK SPACES.
(c) YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN.
(d) YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE DUE UNDER THIS AGREEMENT AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

Married Wisconsin Residents: If you are married: (i) You confirm that this loan is being incurred in the interest of your marriage or family. (ii) No provision of any marital property agreement, unilateral agreement, or court decree under Wisconsin's Marital Property Act will adversely affect a creditor's interest unless before the time credit is granted, the creditor is furnished a copy of that agreement or decree or is given complete information about the agreement or decree. (iii) You understand and agree that we will provide a copy of this Agreement to your spouse for his or her information. If the loan for which you are applying is granted, you will notify us if you have a spouse by sending your name and your spouse's name and address to us at 601 12th Street, Suite 325, Oakland, CA 94607 Attention: Wisconsin Resident.

You specifically agree that we may remotely disable the Solar Equipment if You default under this Loan Agreement.

Accepted and agreed to by:

BORROWER:

DocuSigned by:
Barn Henderson
43882B78857841E...

CO-BORROWER:

COPY VIEW

THIS IS A COPY
The Authoritative Copy of this record is held at na2.docusign.

THIS AGREEMENT IS LEGALLY BINDING AS OF THE DATE YOU SIGN THIS AGREEMENT. IN THIS AGREEMENT, THE WORDS "YOU" AND "YOUR" REFER TO BORROWER AND BORROWER'S PERMITTED ASSIGNEES AND THE WORDS "LENDER," "WE," "US" AND "OUR" REFER TO SOLAR MOSAIC LLC INCLUDING BUT NOT LIMITED TO ITS ASSIGNEES, SUCCESSORS, AFFILIATES, THIRD PARTY BANKING PARTNERS, SUBSIDARIES, AND LOAN SERVICE PROVIDERS. CAPITALIZED TERMS USED HEREIN THAT ARE NOT OTHERWISE DEFINED BELOW ARE DEFINED IN THE PRECEDING LOAN SUMMARY. THIS AGREEMENT SUPERSEDES ANY PRIOR AGREEMENT BETWEEN YOU AND US CONCERNING THE SAME SUBJECT MATTER.

1. **INTRODUCTION.** The parties (each, a "Party" and collectively, "Parties") to this Agreement are You and Solar Mosaic LLC. Your solar installation contractor ("Installation Contractor") has provided us with a copy of a signed home improvement agreement between You and the Installation Contractor (the "Home Improvement Agreement") under which it will install solar panels, inverters, battery storage, hot water solar systems, racking systems, wiring, electrical and mechanical connections, metering, monitoring and/or other distributed generation interconnect equipment ("Solar Equipment") and may, in addition, include the installation of home improvement products (together with the Solar Equipment, "Purchased Goods") at Your home ("Residence") located at the Project Address listed on the first summary page of this Agreement ("Summary Page"). The offer of credit is only binding upon execution by You of this Agreement. Your loan must be used to finance Purchased Goods installed at the Residence, which shall be limited to a one-to-four family dwelling that is permanently affixed to the ground and shall specifically exclude (1) any business or commercial establishment, (2) mobile homes which are not attached to a permanent foundation and (3) condominiums and townhomes where You do not own the roof on which the Solar Equipment is installed. In addition, to the extent the Summary Page indicates that You will receive an Operations and Maintenance Loan Amount, the Installation Contractor and/or Your operations and maintenance contractor ("Operations and Maintenance Contractor") has provided us with a copy of a signed operations and maintenance agreement ("Operations and Maintenance Agreement") between You and the Operations and Maintenance Contractor under which it will provide certain operations and maintenance services for the Solar Equipment for a specified period. Your Loan Start Date is estimated on the Summary Page and will be the actual date of our first loan disbursement as described in Section 5 below.

2. **PROMISE TO PAY.** For value received, You promise to pay to us the principal sum of the Total Loan Amount, which includes the Purchased Goods Loan Amount and the Operations and Maintenance Loan Amount (if any) indicated on the Summary Page, with interest as set forth in Section 3 ("Interest and Payments") below. You understand that we will make the Loan to You by disbursing to the Installation Contractor or its designee the amounts required to satisfy Your obligations under the Home Improvement Agreement between You and the Installation Contractor. To incent us to make the Loan to You at the APR shown in the Truth In Lending Act Disclosure ("TILA Disclosure"), the Installation Contractor has agreed that we can satisfy the Amount Financed on Your behalf by disbursing less than the Amount Financed. Regardless of the amount paid to the Installation Contractor, You agree to be bound to repay the full Amount Financed amount set forth in the TILA Disclosure. Your obligations under this Agreement will be satisfied after You have paid in full all amounts payable by You under this Agreement. You agree to resolve directly with the Installation Contractor any complaint about the Installation Contractor's services and/or any concerns related to system performance and further agree that no such complaint will limit or impair your obligation to make payments hereunder.

3. **INTEREST AND PAYMENTS.**

a. Payment Timing. The first payment on the Loan is due and payable on the First Payment Date (estimated on the Summary Page and finalized on the Loan Closing Certificate). To the extent permitted by applicable law, such date will be the earlier of: (i) fifteen (15) days after permission to operate Your Solar Equipment ("Permission to Operate") is confirmed; or (ii) 3 months after the date we first send funds to Your Installation Contractor ("Loan Start Date"), which occurs after the Installation Contractor achieves the first milestone on the "Loan Disbursement Schedule" described on the Summary Page. If the Loan Start Date is on the 29th, 30th or 31st of the month, the first payment will be due on the 1st of the following month. If Permission To Operate is reached early enough to cause an adjustment to First Payment Date, but Permission To Operate plus 15 days will be on the 29th, 30th or 31st of the month, the first payment will be due on the 1st of the following month. All subsequent payments will be due on the 1st of each month.

b. Payment Application. Payments will be allocated in our discretion, subject to applicable law, including to any fees or costs or expenses payable to us under this Agreement or that we incur related to enforcement of this Agreement as further described in Section 10 ("Remedies") below. To the extent permitted by law, we reserve the right to report to consumer reporting agencies any delinquent payments under this Agreement that are not paid within thirty (30) days of the applicable due date.

c. Accrual. As provided for in this Section 3(c), interest on Your loan will be calculated on the unpaid principal balance in accordance with applicable law. Interest will accrue on the loan amounts actually disbursed, with the first accrual starting on the Loan Start Date. Interest is accrued on the basis of days actually elapsed. Interest will continue to accrue until all amounts owed under this Agreement are paid in full. Unpaid interest will not be added to the principal balance.

COPY VIEW

d. Interest Rate. Your interest rate is stated on the Summary Page. If You indicated in Your loan application that You will make loan payments by ACH, Your interest rate includes a **0.25%** reduction from the annual percentage rate that would otherwise apply. The interest rate will increase by **0.25%** on the first calendar day of the next billing period if You terminate ACH payments or we terminate ACH payments because You are not current on Your payments or we were unable to process Your ACH payment. Any increase in the interest rate will take the form of higher payment amounts. If You indicated in Your application that You will make loan payments by check, Your interest rate does not include such a reduction, but we will reduce Your rate if You subsequently authorize ACH payments as described in Section 3(g).

e. Monthly Payment Amounts.

The monthly loan payments You must make, assuming You make all payments in full and on time, are set forth in Your Loan Closing Certificate. You understand that the Loan will automatically re-amortize on the 18th month following the Loan Start Date that is estimated in the Summary Page and finalized in the Loan Closing Certificate You receive. This event is referred to as the Re-Amortization Date in the Summary Page. On the Re-amortization Date, the Loan will adjust in a manner necessary to ensure that it is fully repaid by the Maturity Date. Any adjustment that occurs on the Re-amortization Date will impact the monthly loan payment, and it may either stay the same, increase or decrease (but in no case will it equal less than $35). In addition, your Loan will re-amortize a second time on the 30th month after the Loan Start Date if you are current on your Loan and if you have prepaid at least $5,000 of your outstanding Loan balance between the time of the Re-amortization Date and the second re-amortization. If the calculated payment based on re-amortization is less than $35, You will owe a minimum of $35 and Your Maturity Date may change. A re-amortization and any corresponding adjustments to the Loan assumes You are not in default under this Loan Agreement.

So long as You are not in default under this Agreement, and provided that You reduce Your unpaid Total Loan Amount to the Principal Balance Target by the Re-amortization Date by making sufficient optional prepayments, Your monthly payment will remain the Initial Monthly Payment. If You do not reduce Your unpaid Total Loan Amount to at least the Principal Balance Target by the Re-amortization Date, then immediately following the Principal Balance Date, Your monthly payment will increase for the remainder of the Term as follows:

(i) If You do not make any optional prepayments before the Re-amortization Date and You have made all Your Monthly Payments by the due date, then Your new monthly payment will be the Adjusted Monthly Payment; and

(ii) If You make optional prepayments before the Re-amortization Date but such prepayments total less than the Principal Balance Target, then Your new monthly payment will be an amount greater than Your Initial Monthly Payment but less than the Adjusted Monthly Payment.

f. Maturity Date. Unless Your loan is due earlier and payable as provided in this Loan Agreement, Your loan will mature on the Maturity Date. On the Maturity Date, You agree to pay in full any unpaid amounts payable under this Loan Agreement.

g. Payment Method. You may pay by ACH or check. To pay by ACH, complete the "Authorization for Direct Payment via ACH" (the "ACH Authorization"). To pay by check, include Your Loan Number on Your check made payable to Solar Mosaic LLC and mail it to Solar Mosaic LLC c/o Concord Servicing Corporation, 4150 NORTH DRINKWATER, STE #200, SCOTTSDALE, AZ 85251. You may change Your payment method by following the instructions in the ACH Authorization or managing Your account online at https://joinmosaic.myaccountinfo.com/Account/LogOn If You change Your payment method, it will change Your interest rate as described in Section 3(d).

h. Prepayment *Before* Automatic First Re-Amortization. On or before the 18th month from the Loan Start Date, You may make any prepayment on the loan at any time without penalty. These prepayments (if any) will be taken into account when the loan automatically re-amortizes, and the monthly loan payment amount will be adjusted in order to ensure the loan is fully repaid by the Maturity Date. Depending on whether You are in default on the Loan Agreement, the adjustment to the monthly loan payment amount may result in an amount that stays the same, increases, or decreases (but in no case will it equal less than $35).



COPY VIEW

i. Prepayment *After* Automatic First Re-Amortization.

After the loan automatically re-amortizes on the 18th month from the Loan Start Date, You may still make any prepayment on the loan without penalty. If after the first re-amortization, You make voluntary prepayments that total at least $5,000 by the second re-amortization, which occurs 30 months after the Loan Start Date, and You are current on the Loan, the monthly payment amount will be adjusted to a lower amount that will pay the outstanding balance of the Loan by the Maturity Date. You may still make any prepayment on the loan after the second re-amortization without penalty. These prepayments (if any) will not impact or result in an adjustment of Your monthly loan payment. Instead, and assuming You are not in default under the Loan Agreement, the prepayments may result in repayment of the entire loan earlier than the Maturity Date.

j. Payment of Disputed Balance. If You wish to make a payment in satisfaction of a disputed balance, You must send it to Solar Mosaic LLC c/o Concord Servicing Corporation, 4150 NORTH DRINKWATER, STE #200, SCOTTSDALE, AZ 85251, ATTN: Disputed Balance, together with a letter of explanation. We may deposit any such payment without such deposit constituting a satisfaction of the disputed balance.

4. **FEES.** We will also charge You the following fees to the extent permitted by applicable law.
a. Insufficient Funds Fee. You will be charged a non-refundable fee of ten dollars ($10) for each failed electronic or check payment attempt. Your bank may assess its own fee in addition to the fee we assess.
b. Late Payment Fee. If a payment is more than fifteen (15) days late, we will charge You a non-refundable late fee of no more than 5% of the amount due or ten dollars ($10), whichever is less.

5. **LOAN DISBURSEMENTS.** We will disburse the loan proceeds on Your behalf to Your Installation Contractor or its designee and, if applicable, to Your Operations and Maintenance Contractor, upon achievement of certain conditions described on the Loan Disbursement Schedule on the Summary Page. Loan disbursements will be disbursed to Your Installation Contractor or its designee after certain conditions we establish at our discretion are met. We reserve the right to update, revise and/or remove the conditions necessary for loan disbursements to be transmitted to the Installation Contractor or its designee without prior verbal or written notice. You understand that in order for us to make disbursements on Your behalf, we may require You to confirm (verbally or electronically) that the Installation Contractor has satisfied certain conditions in the installation process. In the event that You fail to confirm that certain conditions have been met, we may decide in our discretion to still disburse loan proceeds to Your Installation Contractor or its designee if we determine that all conditions were satisfactorily met.

6. **ADDITIONAL OBLIGATIONS AND REPRESENTATIONS.**

a. Collateral. To the extent permissible by law, You irrevocably grant us a limited power of attorney with full power of substitution and re-substitution, to sign any documents and perform any acts, in Your name and on Your behalf, for the exclusive purpose of exercising our rights with respect to the Collateral under this Agreement. You also agree not to pledge, mortgage, encumber or otherwise permit the Collateral at any time to be subject to any lien or encumbrance that is superior to our security interest. Subject to applicable law (including any notice, cure and/or redemption rights provided by applicable law), upon default, we may remotely disable the functioning of the Purchased Goods, whether or not we then attempt to remove the Purchased Goods, enter upon the Residence and disable and/or remove the Purchased Goods, sell or otherwise dispose of the Purchased Goods including any environmental incentives, assume Your rights under any environmental incentives and give notice to the other parties thereto that payments thereunder shall be made to us and not to You, initiate a collection action against You, recover our costs of repossession, storage and collection and exercise any other rights provided by this Agreement or applicable law. If we disable the functioning of the Purchased Goods, You understand that any fees and costs associated with that action may be added to Your Loan. NOTE: If you are a covered borrower as defined by the Military Lending Act and its implementing regulations and a California resident, this Agreement does not create and we will not seek to obtain, perfect, or enforce a security interest against the Collateralized Goods.

b. Ownership and Other Representations. You represent and covenant that You are over the age of 18 and that You are a U.S. citizen or a lawful resident. You further represent and covenant that (1) the Residence is a one-to-four family dwelling that is permanently affixed to the ground and it is not (a) a business or commercial establishment, (b) a mobile home which is not attached to a permanent foundation or (c) a condominium or townhome where at least one of You do not own the roof on which the Solar Equipment is installed; (2) at least one of You, or a trust controlled by at least one of You, is the fee simple owner of the Residence and the Collateral; (3) You are receiving the Purchased Goods and services being financed by Your loan; and (4) You are not, and will not, be in breach of Your Home Improvement Agreement.

This is a copy. The authoritative copy of this record is held at na2.docusign.

c. Collateral Access. You agree to provide us or our designees after receiving reasonable notice, with access to the Residence for the purposes of: (1) inspecting the Purchased Goods until this Agreement terminates; or (2) in the case of a foreclosure on the Collateral, removing the Collateral from the Residence. You agree to provide to us all available access to any energy production data or other data related to Your Purchased Goods or generated in connection with any operations and maintenance service, in each case throughout the Term of this Agreement. You hereby authorize any third party in control or possession of Your energy production data (or other data related to or generated in connection with Your Purchased Goods) to provide us or our designees with such energy production data. You agree to promptly provide such third party with any documentation required by that third party to authorize the third party to provide this data to us.

d. Personal Property. You and we both expressly intend that no portion of the Collateralized Goods will constitute a "fixture" attached to any real property, and that the Collateralized Goods will be removable personal property. You also agree not to take any action that might cause the Collateralized Goods to be treated as real property or as fixtures to real property. However, You agree that we may make a fixture filing, if we choose, out of an abundance of caution, provided that You and we agree that we may enforce rights in the Collateralized Goods under the Uniform Commercial Code and not under state real estate or mortgage law.

e. Installation and Purchased Goods. You will take all steps necessary to enable the installation and proper functioning of the Purchased Goods to be completed in accordance with the Home Improvement Agreement and, if You receive an Operations and Maintenance Loan Amount, to be maintained in accordance with the Operations and Maintenance Agreement. You agree to keep the Purchased Goods in good working order and in compliance with manufacturing specifications, the operating and maintenance manuals, warranty requirements provided by Your Installation Contractor and, if applicable, Your Operations and Maintenance Contractor, and all applicable law, and not to remove or modify the Purchased Goods without our prior written consent. You agree to maintain at all times an internet connection sufficient to ensure that monitoring data for the Solar Equipment can be fully transmitted.

f. Taxes. You agree to pay, when due, any taxes, assessments, governmental charges, or other similar fees related to this Loan. If You do not separately pay these taxes and/or other fees when due, we will pay them on Your behalf and add the amount we pay to the principal of our loan to You under this Agreement. In the event that we choose pay these taxes and/or other fees on Your behalf, You agree to not only repay the amount paid by us as part of Your Loan but also agree to assist us in effectuating these payments.

g. Required Insurance. To the extent permissible by law, You agree to maintain and pay any deductibles under a homeowners' insurance policy or equivalent insurance policy reasonably acceptable to us covering the Purchased Goods in an amount equal to the full replacement and installation cost of the Purchased Goods or the outstanding balance of the loan. If there is a payout under the property coverage for damage to the Purchased Goods, You agree to deliver those insurance proceeds to us, and we will apply those proceeds to the loan in the order of priority set forth in Section 3(b) of this Agreement.

h. Credit Inquiries. You authorize us to obtain a credit report on You for any legal purpose in connection with this loan, including any update, extension of credit, review, or collection of this loan. If You request, we will tell You whether any credit report was requested and, if so, the name and address of the credit bureau furnishing the report.

i. Bankruptcy. You represent that You are not contemplating bankruptcy and that You have not consulted with an attorney regarding bankruptcy in the past six months. Any communication with us required or permitted under the Federal Bankruptcy Code must be in writing, must include Your loan number, and must be sent to Solar Mosaic LLC c/o Concord Servicing Corporation, 4150 NORTH DRINKWATER, STE #200, SCOTTSDALE, AZ 85251, ATTN: Bankruptcy Notice.

7. **GRANT OF SECURITY INTEREST IN COLLATERAL.** As consideration for the loan we are providing to You and to secure Your obligations under this Agreement, You hereby grant to us a security interest in the following property (collectively "Collateral"), whether You own it now or acquire it later, whether now existing or hereafter arising, regardless of where the Collateral is located:

- all Purchased Goods excluding Fixtures (as defined in Article 9 of the UCC), if any (such Purchased Goods which excludes Fixtures are referred to in this Agreement as "Collateralized Goods");
- all accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the Collateralized Goods;
- all proceeds from warranty claims related to the Collateralized Goods, the Home Improvement Agreement and (if You receive an Operations and Maintenance Loan Amount) the Operations and Maintenance Agreement;
- all rebates and incentives that are payable as a result of installing the Collateralized Goods except for such rebates and incentives which have been assigned to Your Installation Contractor or Operations Maintenance Contractor;

COPY/VIEW

- all Your rights, title, interests, and remedies under all agreements, statements and other documentation relating to the Collateralized Goods (including, without limitation, the Home Improvement Agreement, and Operations and Maintenance Agreement); and
- all consideration received from the collection, sale or other disposition of any property that constitutes Collateralized Goods, including any payment received from any insurer arising from any loss, damage or destruction of any Collateralized Goods and any other payment received as a result of possessing any Collateralized Goods, or any other proceeds of Collateralized Goods.

You authorize us to file on Your behalf any documentation, including but not limited to a copy of this Agreement, a UCC financing statement and a county fixture filing required to perfect our security interest in the Collateralized Goods. It is possible that a lender making a loan secured by the Residence, including but not limited to a mortgage refinancing of an existing mortgage, will deem the Solar Equipment to be part of the Residence and will object to our interest in the Solar Equipment taking priority over its interest in the Residence. Upon request, we will confirm to any mortgage lender that our lien is limited to the Solar Equipment and does not extend to any part of the Residence. Alternatively, upon request, we may agree to lift our county fixture filing, if any, on the Solar Equipment for a limited period for a cost of $250 or more depending on costs incurred and provided we will be able to refile upon closing of the mortgage refinancing to the extent allowable by applicable law. NOTE: If you are a covered borrower as defined by the Military Lending Act and its implementing regulations <u>and</u> a California resident, this Agreement does not create and we will not seek to obtain, perfect, or enforce a security interest against the Collateralized Goods.

**8. INDEMNIFICATION.** You agree to indemnify, defend and hold harmless us and our affiliates against any loss, liability, or damage that arises out of or relates to the transactions contemplated by this Agreement.

**9. DEFAULT.** You will be in default under this Agreement if:

a. You fail to make any payment under this Agreement within fifteen (15) days of the date such payment is due;

b. You fail to perform any of Your obligations under this Agreement and You fail to cure such failure to perform to our reasonable satisfaction within thirty (30) days after receiving notice from us of Your failure to perform;

c. You terminate the Home Improvement Agreement without our prior written consent;

d. You remove, modify, sell or otherwise transfer the Collateral without our prior written approval;

e. any representation made by You in, or in connection with, Your loan application or this Agreement is false in any material respect when made;

f. any of the following occurs (each a "Bankruptcy Event"): (1) You make an application for the appointment of a receiver, trustee or custodian or a receiver, trustee or custodian is appointed for You or a majority of Your assets; (2) You initiate or consent to any legal proceedings under the Bankruptcy Code, or equivalent law providing for the relief of debtors; (3) You make an assignment for the benefit of creditors; or (4) You have a petition in bankruptcy or similar relief of debtors filed against You, which is not withdrawn or discharged within thirty (30) days of being filed.

**10. REMEDIES.** Our remedies if You default on this Agreement include the following (to the fullest extent permitted by law):

a. <u>General.</u> In the event that You are in default under this Agreement, we may:

(1) declare our loan to You immediately due and payable, except that Your loan will become immediately due and payable to us under a Bankruptcy Event, regardless of whether or not we take any action;

(2) provide a report to the credit bureaus regarding Your payment history and status of default. As required by law, You are hereby notified that a negative report reflecting on Your credit record may be submitted to a credit reporting agency if You fail to fulfill the terms of this Agreement. **Late payments, missed payments or other defaults on this Agreement may be reflected in Your credit report.**

(3) foreclose on the Collateral (and exercise any other rights with respect to the Collateral that we have under this Agreement or applicable law, including entering upon Your property and disabling the Solar Equipment and/or any monitoring services provided for such Solar Equipment); and/or

(4) pursue any other remedies available to us under applicable law, including those of a secured creditor as permitted by applicable law.

b. <u>Loan Acceleration.</u> If Your loan is immediately due and payable, You must promptly pay in full the unpaid principal amount of the loan, all accrued interest, and any other amounts and fees payable under this Agreement.

c. <u>Taking Possession.</u> If we choose to foreclose on the Collateral, we may, among other things, take possession of the Collateral and then sell, lease or otherwise dispose of this property.

d. <u>Cost Reimbursement; Application of Proceeds.</u> Unless otherwise prohibited by state law, You are to promptly reimburse us, with interest, for all costs and expenses incurred in exercising our remedies related to this Agreement, including reasonable attorneys' fees, the cost of collection after default, the costs we incur in stabilizing and restoring Your roof if we take possession of the Solar Equipment, the cost of disabling the Solar Equipment and subsequent reactivation in

cases of delinquency, and the costs we incur in selling or otherwise disposing of the Collateral. If we choose to foreclose on the Collateral, we will apply any cash proceeds in the order of priority set forth in Section 3(b) of this Agreement and then to You or as a court may otherwise direct.

e. Deficiency Judgment. To the fullest extent permitted by law, regardless of whether or not we foreclose on the Collateral, we may require that You pay any amounts payable by You under this Agreement less any proceeds that we realize from our exercise of our remedies under this Agreement.

TO THE FULLEST EXTENT PERMITTED BY LAW, YOU ARE PERSONALLY LIABLE FOR ALL AMOUNTS PAYABLE UNDER THIS AGREEMENT. WE ARE NOT REQUIRED TO FORECLOSE ON THE COLLATERAL BEFORE INITIATING PROCEEDINGS AGAINST YOU AND YOUR ASSETS.

Our rights under this Agreement are cumulative and we may exercise these rights at any time if You default. In the event that we exercise any of our rights or remedies under this Agreement, You will continue to be in default until such time that You pay to us all amounts due and payable to us and You have cured any and all defaults. OUR FAILURE TO TAKE ANY ACTION OR DELAY TAKING ANY ACTION RELATED TO YOUR DEFAULT, OR SIMILAR OR UNRELATED DEFAULT, DOES NOT WAIVE, OR IMPLY A WAIVER OF ANY OF OUR RIGHTS UNDER THIS AGREEMENT.

**11. TERMINATION.** We may suspend or terminate our obligations under this Agreement upon a Force Majeure Event (as defined below) that prevents, limits or otherwise impairs our ability to perform our obligations under this Agreement. In addition, we may terminate this Agreement (a) if You or Your Contractor fail to provide additional information and/or documentation requested in relation to Your loan; (b) if any representation made by You in, or in connection with, Your loan application or this Agreement is false in any material respect when made (inclusive of providing any falsified or forged documentation); (c) if Your Installation Contractor is no longer an approved contractor on Mosaic's lending platform; (d) if it has been more than thirty (30) days since You first received credit approval by us and we have not yet provided your Installation Contractor with notice to proceed with the procurement of materials for and installation of the Purchased Goods ("Notice to Proceed"); (e) if it has been more than one hundred twenty (120) days between Notice to Proceed being provided to Your Installation Contractor and installation being completed; (f) if evidence of Permission to Operate is not received by Mosaic within one hundred eighty (180) days of the date that Notice to Proceed is provided to your Installation Contractor. No delay in our exercise of the foregoing termination rights shall constitute a waiver of our continuing rights to terminate the Agreement.

If this Agreement is terminated for any of the reasons mentioned in this Section, the termination will not, in and of itself, trigger an event of default unless declared by Mosaic. Your obligations under this Agreement will be satisfied after You have paid in full all amounts payable by You under this Agreement. The terms of this Agreement that would, by their express nature, survive the termination of this Agreement (including the provisions under "Additional Obligations and Representations," "Indemnification," "Governing Law, Arbitration and Miscellaneous," "Notices and Other Information," "Limitation of Liability" and "Termination") will survive and be enforceable under this Agreement. Upon termination of this Agreement, our security interest in the Collateral will terminate.

As used herein, "Force Majeure Event" shall mean, any act or event which delays our performance of our obligations or renders us unable to comply, totally or partially, with our obligations, including our inability to access funding from third party institutions to make loan disbursements, war (whether or not declared), riot, acts of God including storms, floods, lightning, earthquakes, hailstorms, ice storms, tornados, typhoons, hurricanes, landslides, volcanic eruptions, fires, excessive wind speeds; sabotage or destruction of facilities or equipment; and labor strikes.

**12. NOTICES AND OTHER INFORMATION.** You consent to receipt through electronic mail to the email address set forth by You on the Summary Page ("Designated Email") of all notices, records, disclosures and other information related to this Agreement ("Electronic Records"). We may in our discretion deliver in paper form to Your last postal service mailing address of record certain records. You agree that You have or will have access at all times to capabilities that support the requirements in this Section. You must advise us immediately of any changes or updates to, inactivity of or operational problems with Your Designated Email. All provisions of any Electronic Records are binding on You just as if they were delivered in paper to one of the addresses listed on the Summary Page, which can be updated by providing written notice to the email address of record for the other party.

As described when You provided Your phone number in the credit application, we may contact You at any phone number You provide. When You give us Your mobile phone number, we have Your consent to contact You at that number about Your loan. Your consent allows us to use text messaging, automatic dialing technology and artificial or prerecorded voice messages for informational and loan service calls, but not for sales or telemarketing calls. It may include contact from companies working on our behalf to service Your loan. Message and data rates may apply. You may contact us at any time to change these preferences.

**13. ASSIGNMENT**. You may not assign or transfer Your rights or obligations under this Agreement without our prior written consent. If You are selling Your home, with our prior written consent, You may request a transfer the loan obligations to the potential new home owner by notifying us in writing at least thirty (30) days in advance, provided that: (a) the potential new homeowner meets our credit and underwriting criteria in place for loan transfers at that time by notifying us in writing at least thirty (30) days in advance; (b) the warranties and operations and maintenance service obligations (if any) pertaining to the Purchased Goods are transferred to the potential new home owner; and (c) You pay a fee equal to $250, to the extent allowable by applicable law. Mosaic reserves the right to not allow assignment or transfer of the loan. We may assign or transfer all or a portion of this Agreement, including but not limited to ownership of the loan and loan servicing, and the related documents to a third party or affiliate without prior notice to You. YOU HEREBY AUTHORIZE US TO PROVIDE TO A THIRD PARTY OR AFFILIATE ANY INFORMATION THAT THEY MAY REQUEST IN CONSIDERING OR IMPLEMENTING A PURCHASE OF OUR RIGHTS UNDER THIS AGREEMENT.

**14. LIMITATION OF LIABILITY.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, OUR LIABILITY TO YOU UNDER THIS AGREEMENT, IF ANY, SHALL BE LIMITED TO DIRECT, ACTUAL DAMAGES ONLY. YOU AGREE THAT IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, SPECIAL OR INDIRECT DAMAGES.

**15. GOVERNING LAW, ARBITRATION AND MISCELLANEOUS.**

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Except for the Arbitration agreement below, this Agreement shall be governed by federal law and, to the extent state law applies, the substantive laws of the state where the Residence is located. If any provision of this Agreement cannot be enforced, the rest of this Agreement will stay in effect. No amendment of this Agreement will be valid unless in writing and signed by both Lender and You (the Loan Closing Certificate shall not be deemed an amendment of this Agreement and is fully incorporated into this Agreement). This Agreement represents the entire agreement between the Parties regarding Your loan. Our rights under this Agreement shall inure to the benefit of our successors and assigns, and Your obligations under this Agreement shall be binding upon Your heirs, personal representatives and permitted assigns.

If the residence is located in California, then the loan is made pursuant to the California Finance Lenders Law, Division 9 (commencing with Section 22000) of the Financial Code. FOR INFORMATION CONTACT THE DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION, STATE OF CALIFORNIA.

**16. MILITARY LENDING ACT**

Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account). To receive this disclosure and a brief description of your payment obligation under this Agreement, please contact us at (855) 345-4252.

Notwithstanding any other provision of this agreement, if you are a covered borrower as defined by the Military Lending Act and its implementing regulations and a California resident, no part of this agreement shall be interpreted in a manner inconsistent with the Military Lending Act.

**17. ARBITRATION AGREEMENT**

**PLEASE READ THE FOLLOWING ARBITRATION TERMS CAREFULLY AS THEY WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS YOU AND WE HAVE AGAINST EACH OTHER ARE RESOLVED.** If either You or we elect to arbitrate a Claim rather than have a court (a judge or a jury) decide the Claim, it will be resolved by individual (not class or class-wide) binding arbitration in accordance with the terms specified in this Arbitration Agreement.



COPY VIEW

**YOU HAVE THE RIGHT TO REJECT (NOT BE BOUND BY) THIS ARBITRATION AGREEMENT AS DESCRIBED BELOW. If You do not reject this Arbitration Agreement and a Claim is arbitrated, neither You nor we will have the right to: (1) have a court or a jury decide the Claim; (2) engage in information-gathering (discovery) to the same extent as in court; (3) participate in a class action, private attorney general or other representative action in court or in arbitration; or (4) join or consolidate a Claim with claims of any other person. The right to appeal is more limited in arbitration than in court and other rights in court may be unavailable or limited in arbitration.**

**NOTE: If you are a covered borrower as defined by the Military Lending Act and its implementing regulations (or were when this Agreement was made) and a California resident, this Section 17 "Arbitration Agreement" is not enforceable against you.**

**Special Definitions.** Some words have special definitions just for purposes of this Arbitration Agreement. The terms "we," "us" and "our," in addition to the meanings set forth at the beginning of this Loan Agreement, also refer to Solar Mosaic LLC, its assignees, and their employees, officers, directors, parents, controlling persons, subsidiaries, affiliates, successors and assigns. "We," "us" and "our" also apply to third parties if You assert a Claim against such third parties in connection with a Claim You assert against us.

**Definition of "Claim."** A "Claim" is any claim, dispute or controversy between You and us, whether preexisting, present or future, which arises out of or relates to the Loan Agreement, any prior agreement You have had with us, the events leading up to Your loan (for example, any disclosures, advertisements, promotions or oral or written statements made by us), any product or service provided by us or third parties in connection with Your loan, any transaction conducted with us, the collection of amounts You owe us and the manner of collection or the relationship between You and us.

The term "Claim" has the broadest possible meaning. It includes initial claims, counterclaims, cross-claims, third-party claims and federal, state, local and administrative claims and claims which arose before the effective date of this Arbitration Agreement. It also includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity and claims for money damages and injunctive or declaratory relief.

However, the term "Claim" does not include:

a. any dispute or controversy about the validity, enforceability, coverage or scope of this Arbitration Agreement or any part thereof (including, without limitation, the Class Action Waiver set forth below and/or this sentence); all such disputes or controversies are for a court and not an arbitrator to decide. But any dispute or controversy that concerns the validity or enforceability of the Loan Agreement as a whole is for the arbitrator, not a court, to decide.

b. any individual action brought by You or us in small claims court or a state's equivalent court, unless such action is transferred, removed or appealed to a different court;

c. the exercising of any self-help or non-judicial remedies by You or us;

d. any individual action in court by one party that is limited to preventing the other party from using a self-help or non-judicial remedy and that does not involve a request for damages or monetary relief of any kind; and

e. our right to exercise the lawful remedies of a secured creditor under applicable law, including, but not limited to, repossession, foreclosure, and set off.

The institution and/or maintenance of any right, action or litigation specified above will not waive the right of either of the parties to compel arbitration regarding any other dispute subject to arbitration pursuant to this Arbitration Agreement.

**Federal Arbitration Act.** The parties agree and acknowledge that the Loan Agreement evidences a transaction involving interstate commerce and, therefore, the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA") shall govern the interpretation and enforcement of this Arbitration Agreement and proceedings pursuant thereto. To the extent state law is applicable under the FAA, the Residence state law will apply.

COPY VIEW

**Class Action Waiver. Notwithstanding any other provision of the Loan Agreement, if either You or we elect to arbitrate a Claim, neither You nor we will have the right: (a) to participate in a class action, private attorney general action or other representative action in court or in arbitration, either as a class representative or class member; or (b) to join or consolidate Claims with claims of any other persons. No arbitrator shall have authority to conduct any arbitration in violation of this provision or to issue any relief that applies to any person or entity other than You and/or us individually.**

**The parties acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between them and is non-severable from this Arbitration Agreement. If the Class Action Waiver is limited, voided or found unenforceable, then the parties' Arbitration Agreement (except for this sentence) shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. The parties acknowledge and agree that under no circumstances will a class action be arbitrated. If you are a covered borrower under the Military Lending Act and a California resident, this Class Action Waiver does not apply to you.**

**Arbitration Procedures.**

a. **Electing arbitration.** If You or we elect to arbitrate a Claim rather than have a court (a judge or a jury) decide the Claim, the party electing arbitration must notify the other party in writing. This notice can be given after the beginning of a lawsuit and can be given in papers filed in the lawsuit (for example, a motion by the defendant to compel arbitration of claims asserted by the plaintiff in a lawsuit filed in court). Otherwise, Your notice must be sent to 601 12th Street, Suite 325, Oakland, CA 94607, Attn: Legal Department, and our notice must be sent to the most recent address for You in our files. Any arbitration hearing that You attend will take place in a venue reasonably convenient to where You reside unless You and we agree otherwise.

You can choose the one of the arbitration administrators listed below in Your written notice electing to arbitrate, or by giving us written notice of Your selection within 20 days after You notify us of Your election to arbitrate. If You do not do so, we will select the administrator.

If a party files a lawsuit in court asserting Claim(s) that are subject to arbitration and the other party files a motion to compel arbitration with the court which is granted, it will be the responsibility of the party asserting the Claim(s) to select an arbitration administrator pursuant to the paragraph below and start the arbitration proceeding in accordance with the administrator's rules and procedures.

b. **Arbitration administrators and rules.** The arbitration administrator will be either:

| | | |
|---|---|---|
| American Arbitration Association ("AAA")<br>1633 Broadway, 10th Floor<br>New York, NY 10019<br>www.adr.org<br>1-800-778-7879 | or | JAMS<br>1920 Main Street<br>Suite 300<br>Irvine, CA 92614<br>www.jamsadr.com<br>1-800-352-5267 |

You may contact these organizations directly if You have any questions about the way they conduct arbitrations or want to obtain a copy of their rules and forms (which are also available on their websites). However, if the AAA and JAMS are unable or unwilling to serve as administrator, the parties may agree upon another administrator or, if they are unable to agree, a court shall select the administrator or arbitrator. No company may serve as administrator, without the consent of all parties, if it adopts or has in place any formal or informal policy that is inconsistent with and purports to override the terms of the Class Action Waiver in this Arbitration Agreement.

In the event of a conflict between the provisions of this Arbitration Agreement, on the one hand, and any applicable rules of the AAA or JAMS or other administrator used or any other terms of the Loan Agreement, on the other hand, the provisions of this Arbitration Agreement shall control.

COPY VIEW

c. **The arbitrator**. A single arbitrator will be appointed by the administrator and must be a practicing attorney with ten or more years of experience or a retired judge.

d. **What law the arbitrator will apply**. The arbitrator will not be bound by judicial rules of procedure and evidence that would apply in a court, nor by state or local laws that relate to arbitration proceedings. The arbitrator will apply the same statutes of limitation and privileges that a court would apply if the matter were pending in court.

In determining liability or awarding damages or other relief, the arbitrator will follow the applicable substantive law, consistent with the FAA, that would apply if the matter had been brought in court. The arbitrator may award any damages or other relief or remedies that would apply under applicable law to an individual action brought in court, including, without limitation, punitive damages (which shall be governed by the constitutional standards employed by the courts) and injunctive, equitable and declaratory relief (but only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim).

The arbitrator will have the authority to award fees and costs of attorneys, witnesses and experts to the extent permitted by the Loan Agreement, the administrator's rules or applicable law. However, with respect to Claim(s) asserted by You in an individual arbitration, we will pay Your reasonable attorney, witness and expert fees and costs if and to the extent You prevail, if applicable law requires us to or if we must bear such fees and costs in order for this Arbitration Agreement to be enforced.

e. **Arbitration costs**. At Your written request, we will pay all filing, hearing and/or other fees charged by the administrator and arbitrator to You for Claim(s) asserted by You in an individual arbitration after You have paid an amount equivalent to the fee, if any, for filing such Claim(s) in state or federal court (whichever is less) in the judicial district in which You reside. (If You have already paid a filing fee for asserting the Claim(s) in court, You will not be required to pay that amount again). In addition, the administrator may have rules or procedures whereby You may be responsible for a different amount and can seek a waiver of fees charged to You by the administrator and arbitrator. We will always pay any fees or expenses that we are required to pay by law or the administrator's rules or that we are required to pay for this Arbitration Agreement to be enforced.

f. **The arbitrator's decision**. At the timely request of either party, the arbitrator shall write a brief explanation of the grounds for the decision. A judgment on the arbitrator's decision (the "award") may be entered by any court having jurisdiction.

**Severability and Survival.** If any part of this Arbitration Agreement, other than the Class Action Waiver, is deemed or found to be unenforceable for any reason, the remainder shall be enforceable. This Arbitration Agreement shall survive repayment of Your loan, the termination of Your Loan Agreement and the termination of any relationship between us. It will also survive any bankruptcy to the extent consistent with applicable bankruptcy law.

**Effect of Arbitration Award; Appeal.** The arbitrator's award shall be final and binding on all parties, except for any right of appeal provided by the FAA.

**Right to Reject Arbitration Agreement.** You may reject this Arbitration Agreement, and therefore not be subject to being required to resolve any claim, dispute or controversy by arbitration, by sending us a Written Rejection Notice so that we receive it within forty-five (45) days after the Effective Date stated in this Loan Agreement. In order for a Written Rejection Notice to be valid and effective, it must: (a) state that You (or both or all of You, if more than one) wish to reject the Arbitration Agreement; (b) state Your name, address and account number; (c) be signed by You and any other person who is rejecting the Arbitration Agreement; and (d) be sent by certified mail, return receipt requested, to Legal Department, 601 12th Street, Suite 325, Oakland, CA 94607, Attn: Arbitration Rejection. Upon receipt of this notice, we will reimburse You for the standard cost of a certified letter. These are the only procedures You can use to reject the Arbitration Agreement.

Rejection of this Arbitration Agreement will not affect any remaining terms of the Loan Agreement and will not result in any adverse consequence to You or Your loan. **This Arbitration Agreement will apply to You and us and to Your loan as of the date of Your Loan Agreement unless You reject it by providing proper and timely notice as stated above.**

COPY VIEW

**18. WAIVER OF TRIAL BY JURY.** IF A DISPUTE IS RESOLVED IN COURT RATHER THAN ARBITRATION, YOU KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE ANY RIGHT YOU HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING BY US AGAINST YOU OR BY YOU AGAINST US INVOLVING THIS LOAN AGREEMENT, TO THE EXTENT PERMITTED BY APPLICABLE LAW. IF ANY PROVISION OF THIS SECTION 18 CANNOT BE ENFORCED, THE REST OF THIS AGREEMENT WILL STAY IN EFFECT. **If you are a covered borrower under the Military Lending Act and a California resident, this Waiver of Trial by Jury does not apply to you.**

**Arbitration Agreement Accepted and agreed to by:**

BORROWER

DocuSigned by:
Barn Henderson
43882B78857841E...

CO-BORROWER:

______________________________

COPY VIEW

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607
loannotices@joinmosaic.com | 855.746.7849
CA Finance Lenders License 6054631
Loan Agreement Number: 784292

MOSAIC

## NOTICE OF CANCELLATION

3/11/2024
(Enter date of transaction)

**You may CANCEL this transaction, without any Penalty or Obligation, within THREE BUSINESS DAYS from the above date.**

**If You cancel, any property traded in, any payments made by You under the contract or sale, and any negotiable instrument executed by You will be returned within TEN BUSINESS DAYS following receipt by the seller of Your cancellation notice, and any security interest arising out of the transaction will be cancelled.**

**If You cancel, You must make available to the seller at Your residence, in substantially as good condition as when received, any goods delivered to You under this contract or sale, or You may, if You wish, comply with the instructions of the seller regarding the return shipment of the goods at the sellers expense and risk.**

**If You do make the goods available to the seller and the seller does not pick them up within 20 days of the date of Your Notice of Cancellation, You may retain or dispose of the goods without any further obligation. If You fail to make the goods available to the seller, or if You agree to return the goods to the seller and fail to do so, then You remain liable for performance of all obligations under the contract.**

COPY VIEW

To cancel this transaction, mail or deliver a signed and dated copy of this Cancellation Notice, or any other written notice, or send a telegram to Solar Mosaic LLC, Attn.: Loan Department, 601 12th Street, Suite 325, Oakland, California 94607 NOT LATER THAN MIDNIGHT OF 03/14/2024.

I HEREBY CANCEL THIS TRANSACTION.

____________________
(Date)

____________________
(Buyer's Signature)

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607
loannotices@joinmosaic.com | 855.746.7849
CA Finance Lenders License 6054631

MOSAIC

Loan Agreement Number: ___________________

COPY VIEW

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607
loannotices@joinmosaic.com | 855.746.7849
CA Finance Lenders License 6054631
Loan Agreement Number: 784292

MOSAIC

## NOTICE OF CANCELLATION

3/11/2024

(Enter date of transaction)

**You may CANCEL this transaction, without any Penalty or Obligation, within THREE BUSINESS DAYS from the above date.**

**If You cancel, any property traded in, any payments made by You under the contract or sale, and any negotiable instrument executed by You will be returned within TEN BUSINESS DAYS following receipt by the seller of Your cancellation notice, and any security interest arising out of the transaction will be cancelled.**

**If You cancel, You must make available to the seller at Your residence, in substantially as good condition as when received, any goods delivered to You under this contract or sale, or You may, if You wish, comply with the instructions of the seller regarding the return shipment of the goods at the sellers expense and risk.**

**If You do make the goods available to the seller and the seller does not pick them up within 20 days of the date of Your Notice of Cancellation, You may retain or dispose of the goods without any further obligation. If You fail to make the goods available to the seller, or if You agree to return the goods to the seller and fail to do so, then You remain liable for performance of all obligations under the contract.**

COPY VIEW

To cancel this transaction, mail or deliver a signed and dated copy of this Cancellation Notice, or any other written notice, or send a telegram to Solar Mosaic LLC, Attn.: Loan Department, 601 12th Street, Suite 325, Oakland, California 94607 NOT LATER THAN MIDNIGHT OF 03/14/2024.

I HEREBY CANCEL THIS TRANSACTION.

______________________
(Date)

______________________
(Co-Buyer's Signature)

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607
loannotices@joinmosaic.com | 855.746.7849
CA Finance Lenders License 6054631
Loan Agreement Number: ___________________

MOSAIC

COPY VIEW

The authoritative copy of this record is held at na2.docusign.

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607 | loannotices@joinmosaic.com
855.746.7849
CA Finance Lenders License 6054631

MOSAIC

rev. Dec. 2023

# FACTS — WHAT DOES SOLAR MOSAIC LLC ("MOSAIC") DO WITH YOUR PERSONAL INFORMATION?

**Why?** Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do.

**What?** The types of personal information we collect and share depend on the product or service you have with us. This information can include:

- Social Security number and income
- account balances and payment history
- credit history and credit scores

When you are *no longer* our customer, we continue to share your information as described in this notice.

**How?** All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Mosaic chooses to share; and whether you can limit this sharing.

| Reasons we can share your personal information | Does Mosaic share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes**—such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes**— to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes**— information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes**— information about your creditworthiness | No | We don't share |
| **For nonaffiliates to market to you** | Yes | Yes |

**To limit our sharing**

- Call (810) Opt-Out1 or (810) 678-6881 and our menu will prompt you through your choice(s)
- Email us at optout@joinmosaic.com

**Please note:**

If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice. However, you can contact us at any time to limit our sharing.

**Questions?** Call toll-free (855) 746-7849 or go to www.joinmosaic.com

COPY VIEW

**PAGE 2**

| What we do | |
|---|---|
| How does Mosaic protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.<br><br>We also restrict access to your personal information to those employees who need to know this information to perform their job duties. |
| How does Mosaic collect my personal information? | We collect your personal information, for example, when you<br>▪ give us your income information<br>▪ provide employment information<br>▪ provide account information<br>▪ show your driver's license or government issued ID<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>▪ sharing for affiliates' everyday business purposes—information about your creditworthiness<br>▪ affiliates from using your information to market to you<br>▪ sharing for non-affiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>▪ *Our affiliates include companies with a Mosaic or Modern Home name.* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>▪ *Nonaffiliates we share with can include nonprofit organizations.* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>▪ *Mosaic does not jointly market with other nonaffiliated financial companies.* |

COPY VIEW

Solar Mosaic LLC | www.joinmosaic.com
601 12th Street, Suite 325, Oakland, CA 94607 | loannotices@joinmosaic.com
855.746.7849
CA Finance Lenders License 6054631

MOSAIC

rev. Dec. 2023

## PAGE 3

## Other Important Information

**For Vermont Customers:**

- Wewill not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.
- Additional information concerning our privacy policy can be found at https://joinmosaic.com/privacy-policy or call (855) 746-7849.

**For California Customers:**

- We will not disclose your personal information to our nonaffiliates to market to you, unless you authorize us to make those disclosures.
- Additional information concerning our privacy policy can be found at https://joinmosaic.com/privacy-policy or call (855) 746-7849.

COPY VIEW

freedom FOREVER

**(VA) Supply and Installation Agreement**
**Home Improvement Agreement**
**(v1-122023pk)**

43445 Business Park Drive Suite 110
Temecula, CA 92590

Freedom Forever Virginia, LLC
VA Contractor License #2705177141

**System Specifics**

| System Size | Production Guarantee |
|---|---|
| 12.32 kW | 25 Years |

**The Freedom Forever Promise***

We provide an energy production guarantee.
We warrant all of our roofing work.
We warrant and repair the system (as defined below).
We fix or pay for any damage we may cause to your property.
**Please refer to specific terms in your Supply and Installation Agreement*

**System Cost**

**Total Contract Price:** $ 74,882.16

**Down Payment:** $

**Amount Due:** $ 74,882.16

First Year Production (Estimate): 13556 **kWh**

**Notices of Cancellation may be sent to this address:**
Freedom Forever Virginia, LLC
43445 Business Park Drive Suite 110, Temecula, CA 92590

Freedom Forever is a licensed contractor in each state it Operates in. For more information about our contractor licenses, Please visit www.freedomforever.com/licenses

**Date Signed by Customer/Date of this Transaction:**
3/11/2024 | 1:26 PM PDT

**BUYER'S RIGHT TO CANCEL**

If this agreement was solicited at a residence and you do not want the goods or services, you, the buyer, may cancel this transaction at any time prior to midnight of the third business day after you received a signed and dated copy of the Agreement. See the attached notice of cancellation form for an explanation of this right.

freedom FOREVER

**Homeowner ("Customer")**

| | |
|---|---|
| Homeowner Name: Barn Henderson<br>Phone: (757) 275-3872 | Co-Homeowner Name (if applicable):<br>Phone: |

**Installation Address ("Property")**

144 Victoria Drive , Virginia Beach, VA 23452

| | |
|---|---|
| **Total Installed System Price ("Contract Price") (including all finance charges)**<br>$ 74,882.16 | **Down Payment** (not to exceed 1/3 of the Total Contract Price or the cost of special order items, whichever is greater)<br>$<br>(Due on Effective Date) |

**Payment Schedule:**

Customer will make payments according to one of the following schedules (as applicable):

| | |
|---|---|
| Third-Party Financed Projects:<br><br>Payment due upon Completed Installation (as defined below):<br>$ 74,882.16 (100% of System cost) | Customer Self-Financed Projects:<br><br>Customer agrees to use the Escrow Service (as defined below) to facilitate payment to Freedom Forever, in accordance with the terms and conditions set forth in ARTICLE 4.10.<br><br>Customer payment due to the Escrow Service prior to Installation:<br>$ 74,882.16 (100% of System cost)<br><br>**The Escrow Service shall distribute Customer's payment to Freedom Forever pursuant to the following schedule:**<br><br>Freedom Forever shall receive the following payment from the Escrow Service upon Completed Installation:<br>$ 59,905.73 (80% of System cost)<br><br>Freedom Forever shall receive the following payment from the Escrow Service upon the Completed Installation passing final inspection: $ 14,976.43 (Remaining balance) |

**Description of the System to be Installed ("System")**

| | |
|---|---|
| "Module Group" Panels:<br>Jinko 385W, Jinko 380W, Canadian 395W-400W, REC 400W-410W<br><br>"Inverter Group" / Monitoring Equipment:<br>Enphase<br><br>Mounting Type:<br>Roof Mount | **Additional Components \| Allowances \| Notes \| Variances:**<br>, Energy Storage: Enphase IQ 5P x 1 |

freedom FOREVER

| |
|---|
| **Proposed Start and Completion Schedule:** The following schedule will be adhered to unless circumstances beyond Freedom Forever's control arise:<br>Proposed Start Date: Freedom Forever will begin the Work (as defined below) within 30 business days from the date of receiving all required permits, or the date the property is ready for installation, whichever comes later.<br>Completed Installation Date: The Work will be substantially completed approximately 30 days from the installation of the System. |
| Contractor will comply with all local requirements for building permits, inspections, and zoning. |

**Signatures**
**DO NOT SIGN THIS CONTRACT IF THERE ARE ANY BLANK SPACES**
Two identical copies of the contract must be completed and signed. One copy should go to Customer. The other copy should be kept by Freedom Forever.

| Independent Sales Representative | Customer | Customer #2 (if applicable) |
|---|---|---|
| Sales Rep Signature:<br>DocuSigned by: [signature]<br>200A4FBBC9BD403... | Customer Signature:<br>DocuSigned by: [signature]<br>7011AD32C2424FD... | Customer Signature: |
| Name: Devin Saunders | Name: Barn Henderson | Name: |
| Phone: (757) 675-8682 | Date: 3/11/2024 \| 1:26 PM PDT | Date: |
| Date: 3/11/2024 \| 1:25 PM PDT | | |
| License No: | | |
| I hereby represent that this agreement was presented to the customer and that I obtained his/her signature to this agreement. | | |

- **The Customer(s) are collectively referred to as the Customer.**
- **Consumer is hereby notified of the existence of the Virginia Contractor Transaction Recovery Fund. The Virginia Contractor Transaction Recovery Fund provides relief to eligible consumers who have incurred losses through the improper and dishonest conduct of a licensed residential contractor. More information on the Fund or filing a claim can be obtained by visiting** http://www.dpor.virginia.gov/Boards/Contractors_Recovery_Fund **or by contacting the Board for Professional and Occupational Regulation (the "BPOR") for claim information at the following address:**

  Recovery Fund Office | DPOR
  9960 Mayland Drive, Suite 400
  Richmond, VA 23233
  (804) 367-1559
  Email: RecoveryFund@dpor.virginia.gov

- **The Customer is entitled to a completed copy of this Agreement, signed by both Customer and Freedom Forever, before any work may be started.**
- **The Customer understands that in order to realize the benefit of the solar investment tax credit, Customer must have federal income tax liability that is at least equal to the value of the tax credit. Customer hereby acknowledges that Customer has sought tax advice from a qualified tax professional, understands any tax benefits and burdens arising from this Agreement. and affirms that he/she is not relying on Freedom Forever regarding any tax savings or tax burdens as a consequence of the installation.**
- **The Customer has "three-day cancellation rights" meaning the Customer may cancel this Agreement at any time, without penalty, prior to midnight of the third (3rd) business day after the date the Customer signs this Agreement. Please see attached Notice of Cancellation form for more information.**
- **Any modification to the contract, which changes the cost, materials, work to be performed, or estimated completion date, must be in writing and signed by all parties.**
- **The Customer acknowledges that the Customer has been provided with and read the Department of Professional and Occupational Regulation statement of protection available to him through the Board for Contractors.**

DS

**Customer #1's initials:** [initials]

**Customer #2's initials:** ______________

freedom FOREVER

## TERMS AND CONDITIONS

### ARTICLE 1 - PARTIES

This Supply and Installation Agreement (this "Agreement") is made and entered into as of the date of the last signature on the cover page hereof (the "Effective Date") (the "Cover Page") by and between Freedom Forever Virginia, LLC, a Delaware limited liability company ("Freedom Forever") and the customer ("Customer"). If the Customer is not the homeowner (the "Homeowner"), Customer shall provide Freedom Forever with written proof prior to the execution of this Agreement that the Homeowner consents to the system as described on the Cover Page (the "System") and the Work (as defined in ARTICLE 2 of this Agreement). Freedom Forever and the Customer are sometimes referred to in this Agreement individually as a "Party" and collectively as the "Parties".

### ARTICLE 2 - WORK

2.1 Work. Freedom Forever shall provide the Customer the following services at the address of 144 Victoria Drive , Virginia Beach, VA 23452 (the "Property") on the terms set forth in this Agreement (the "Work"):

a. Install the System and its components as described on the Cover Page, which includes design, supply and installation of all photovoltaic panels, inverter(s), AC & DC disconnects, wiring, conduit and overcurrent protection, and racking placement.
b. Obtain any necessary permits to perform the Work.
c. Submit any necessary paperwork to interconnect the System and/or receive permission to operate (hereinafter, "PTO").
   1. Freedom Forever cannot promise or guarantee the date your electric utility provider will provide PTO. Freedom Forever shall turn on the System or will advise the Customer to do so, once the electric utility provider has given its PTO. Customer shall not unilaterally turn on the System, otherwise Customer is liable for any costs and/or damage relating to such premature activation, including, without limitation, any actual damage to the System.
   2. To the extent applicable, Freedom Forever does not promise nor guarantee what sort of rate and/or billing program Customer will be subject to from the applicable electric utility provider. Customer hereby understands and acknowledges that the electric utility provider makes their own independent determinations, including setting their own rates and billing programs. Customer shall adhere to all applicable determinations as implemented by the electric utility provider.
d. Provide all labor, material, equipment, supervision and delivery to furnish and install the entire System as specified under the terms of this Agreement.
e. Conduct related filling and compaction.
f. Coordinate building, electrical and utility inspections.
g. Start up and test the completed System.
h. Additional works described on the Cover Page.

2.2 Exclusions. Any alteration or deviation from the above specifications, including but not limited to any additional material and/or any labor costs incurred by such alteration or deviation, are not part of the Work, and shall only be executed pursuant to ARTICLE 6 of this Agreement, with the costs solely borne by the Customer. These alteration and deviation include but are not limited to:

a. Upgrade of existing main service panels, sub-panels or switchboards (if necessary)
b. Upgrade, replacement or repair of existing roof, or supporting roof structure.
c. Tree removal, fencing, weed abatement, curbing, gravel or landscaping.
d. Non-standard groundwork (such as on difficult soil conditions).
e. Additional grading, rock/boulder removal, blasting, coring, soil testing, compaction for footings, and trenching.
f. Structural engineering calculations or analysis of existing structures.
g. Habitat studies, additional inspections or fees of any type.
h. Additional permitting requirements by local building authorities or jurisdictions, such as zoning, land use, architecture, planning, habitat, environmental, etc.
i. Additional exclusions described on the Cover Page, initialed by both Parties.

2.3 Standard of Performance. Freedom Forever shall perform all construction and related services provided hereunder in a good and workmanlike manner, in accordance with all requirements of the documents contained in this Agreement, and all applicable laws, codes, regulations and other requirements, including safety requirements.

### ARTICLE 3 - PROPERTY

3.1 Property. Freedom Forever shall install the System on the Property. Within ten (10) days of the Effective Date, the Customer shall make the Property available to Freedom Forever for performance of the Work. The Customer or any inhabitants of the Property are not required to vacate the Property during the Work, however, the Customer agrees and understands that there may be loss of power to the Property during the Work, and Customer agrees to indemnify, defend, and hold harmless Freedom Forever for any damage or claims that may occur as a result of that loss of power. If the Customer is a Landlord, the Customer is solely responsible for providing any notice required by any lease to the tenant.

3.2 Ownership, Owner Consent Right to Install and Agent Authority. The Customer represents and warrants to Freedom Forever that all Homeowner(s) have consented to this Agreement, and/or the agent has the authority to sign this Agreement, that the Customer has the right to enter into this Agreement and to install the System on the Property.

freedom FOREVER

3.3 HOA Consent. Customer warrants that they understand and assume all risks associated with obtaining permission from the Home Owner's Association (the "HOA"), Condominium Board or similar governing body (the "Board") to install the System. Customer waives any claim or defenses to this Agreement in the event the Board fails to approve installation of the System. C[illegible] responsible for fulfilling all obligations under this Agreement irrespective of Board approval.

Customer #1: ______________

Customer #2: ______________

3.4 Site Inspection. The Customer agrees to allow Freedom Forever and construction professionals (including engineer, architect, licensed contractors, or their representatives) (collectively "Subcontractors") hired by Freedom Forever to access the Property to inspect any buildings and roofs prior to the installation of the System to ensure that the Property can accommodate the System. Notice shall be required twenty-four (24) hours in advance and access shall be reasonably granted by Customer thereafter.

3.5 Access Rights. The Customer grants to Freedom Forever and the Subcontractors the right to access all of the Property for the purposes of (a) designing, installing, constructing, testing, operating, maintaining, repairing and replacing the System or making any additions to the System or installing complementary technologies on or about the location of the System, and performing Freedom Forever's obligations under this Agreement; (b) installing, testing and maintaining electric lines and inverters and meters, necessary to interconnect the System to the Customer's electric system at the Property and/or to the utility's electric distribution system; (c) taking any other action reasonably necessary in connection with designing, installing, constructing, testing, operating, maintaining, repairing and replacing the System; or (d) repair of any damage to roof, wall or any part of the property determined by Freedom Forever to be caused by the installation of the System. This access right shall continue for up to ninety (90) days after the later of the termination of this Agreement or the expiration of the Production Guarantee Term (as defined in EXHIBIT A), if applicable, and per the below requirements:

a. Reasonable Notice. Freedom Forever shall provide the Customer with twenty-four (24) hours' notice of its need to access the Property whenever reasonable and when not in the case of emergency.
b. No Interference. During the time that Freedom Forever has access rights, the Customer shall ensure that Freedom Forever's access rights are preserved and shall not interfere with or permit any third party to interfere with such rights or access.
c. Prevention of Access. Any act, negligence or omission of the Customer, its representative or by any third party that prevents or delays Freedom Forever from performing its obligations under this Agreement shall not be counted against the time of performance set in this Agreement. Freedom Forever shall not be responsible for any resulting loss or damage from such delay.
d. Personal Property/ Assumption of Risk. Customer acknowledges that the System installation site is a construction zone and that any property (e.g., vehicles, pets, livestock, etc.) left in and around the site during the installation process may run the risk of injury, harm, or loss. As such, prior to Commencement (as defined below) and for the duration that Work is being performed, Customer agrees to be responsible for removing all personal property and effects, including but not limited to, any Customer vehicles, out of the installation site and surrounding areas. Customer hereby agrees to assume all risk and loss to any property not so removed while Work is being performed.

3.6 Removal of Hazardous Materials. The Customer agrees to provide a safe and secure work environment at the Property during the term of this Agreement. The Customer shall be responsible for removal and any costs incurred for the removal of hazardous materials, including asbestos, PCBs, petroleum, or hazardous waste material uncovered or revealed at the Property. If any hazardous materials are discovered, Freedom Forever may immediately cease all the Work in connection with such hazardous condition(s) in any affected area(s). Freedom Forever shall not be required to resume the Work until the Customer delivers written proof of all required local building authority permits related to: (i) specifying that such condition(s) and all affected area(s) have been rendered safe by the building authorities for the resumption of the Work, or (ii) specifying any special conditions under which the Work may resume safely. Any work stoppage due to unavailability of the Property due to the discovery and removal of hazardous materials does not relieve the Customer's obligation to fulfill this Agreement, and any completion dates.

3.7 Existing Conditions. Freedom Forever is not responsible for and bears no liability for the performance of existing electrical equipment at the Property, including but not limited to the main electrical service panel, any major electrical devices, and/or any other similar devices.

## ARTICLE 4 - PAYMENT

4.1 Price. In consideration of performance of the Work and installation of the System, the Customer shall pay to Freedom Forever the Total Contract Price, as set forth on the Cover Page of this Agreement, plus all applicable taxes. The Total Contract Price shall be paid in full upon Completed Installation.

4.2 Payment. Customer agrees to pay the Total Contract Price as set forth on the Cover Page plus all applicable taxes. Customer may choose to finance the Total Contract Price by entering into a financing agreement with a third party. If Customer chooses to enter into an arrangement with a third party for financing of the Total Contract Price, Customer understands that Customer is directly contracting with a third-party financing company and not Freedom Forever for financing services. Customer will remain obligated for the full Total Contract Price until full payment is received by Freedom Forever.

4.3 Down Payment. Upon the Effective Date, the Customer shall pay to Freedom Forever a Down Payment (not to exceed 1/3 of the Total Contract Price) in an amount provided on the Cover Page to Freedom Forever. Freedom Forever agrees to refund the full amount of the Down Payment if the Customer cancels the Agreement within three (3) business days following the Effective Date. Any cancellation after three (3) business days following the Effective Date will cause a forfeiture of the Down Payment. If neither Party cancels the Agreement, the Down Payment shall be applied to the Total Contract Price. This ARTICLE 4.3 does not apply if the Down Payment as provided on the Cover Page is zero ($0).

4.4 Past Due Amount. Past due amounts shall accrue interest from the date such amounts were due until the date paid at an interest rate equal to the lesser of twelve percent (12%) per annum or the maximum rate permitted by law.

4.5 Financing Payments. If Customer is financing the System, the timing and amount of the payments (and any applicable interest accrued) will be subject to the terms and conditions of the financing agreement with the finance company (the "Finance Company"). Any agreement between the Customer with regard to financing shall be solely between the Customer and the Finance Company.

4.6 Incentives. Depending on the state and/or utility district in which Customer resides, Customer may be eligible for state and local incentives and/or rebates. The incentive and/or rebate calculations provided to Customer are estimates. Those estimates are based on certain assumptions that may not be applicable based on the circumstances specific to the Work. However, actual incentives and/or rebates are variable as are eligibility requirements, funding availability and rates which may change. In an effort to assist Customer in capturing any applicable incentive and/or rebate, Freedom Forever will use good faith and reasonable efforts to help Customer to secure applicable incentives and/or rebates, but Freedom Forever shall have no financial obligation to the Customer regarding actual incentive and/or rebate amounts received. Customer agrees to pay the Total Contract Price in full regardless of the actual amount of any incentive and/or rebates Customer may or may not receive. Customer agrees to provide all necessary assistance to Freedom Forever to capture an incentive and/or rebate including but not limited to requested documentation and signatures on additional paperwork. Customer is responsible for any taxes and/or assessments required by federal, state or local governments or related regulatory agencies or utilities.

4.7 Taxes. Customer is responsible for all taxes related to the System and this Agreement, including taxes assessed on or arising from purchase, installation, ownership of the System, including all sales (which may be included as part of the Total Contract Price), use, and personal property taxes and real property taxes associated with the Property. To the extent that the jurisdiction in which the Property is located imposes a recycling fee on the System (or one of like nature), Customer hereby acknowledges and agrees that any such costs associated therewith shall be the sole responsibility of Customer.

4.8 Credit Card Payments. If Customer chooses to pay any amount due under this Agreement with a credit card, Customer shall be responsible for all related fees and/or charges pertaining to such transaction ("Credit Card Fee(s)"). Credit Card Fees shall be calculated at two and nine tenth percent (2.9%) of Customer's credit card transaction, plus twenty-five cents ($0.25) per transaction.

4.9 PTO Delays for Third Party Financed Projects. To the extent that the System has not reached PTO following ninety (90) days from Completed Installation ("PTO Window"), Customer may request that Freedom Forever reimburse Customer for all actual payment amounts invoiced and made by Customer to the Finance Company following the conclusion of the PTO Window, up to the date that PTO for the System is granted; provided, however, that Freedom Forever shall have no obligation to reimburse Customer to the extent the Customer's actions and/or inactions caused or resulted in a delay in reaching PTO. In the event of a conflict between this ARTICLE 4.9 and any other terms and conditions of this Agreement, this ARTICLE 4.9 shall govern. ARTICLE 4.9 only applies to Third-Party Financed Projects.

4.10 Construction Escrow Services. Customer understands and agrees that Customer Self-Financed Projects shall involve the use of a third-party construction escrow service, selected by Freedom Forever in its sole discretion (the "Escrow Service"). All service fees associated with the use of such Escrow Service shall be at Freedom Forever's cost, with the exception of any credit card or bank processing fees (if any) which shall be paid by Customer. By selecting the Customer Self-Financed Projects Payment Schedule option, Customer agrees to pay the Total Contract Price to the Escrow Service upon demand, and in any event, prior to installation of the System. Customer understands and acknowledges that Freedom Forever shall receive scheduled payments from the Escrow Service for Work completed, in accordance with the schedule as set forth on the Cover Page and in compliance with applicable law. Customer hereby acknowledges and agrees that Customer shall not be entitled to any interest accrued on any funds deposited with the Escrow Service, unless required by law. Customer represents and warrants that it shall cooperate with the Escrow Service in its performance of its escrow services, and agrees to use the Escrow Service in accordance with the Escrow Service's terms and conditions, which may be amended from time to time. Customer hereby understands and acknowledges that Customer's agreement to use the Escrow Service is a condition precedent for Freedom Forever to enter into the Agreement with Customer, and that Freedom Forever would not have entered into the Agreement were it not for Customer's agreement to use the Escrow Services, subject to the Escrow Service's terms and conditions. Customer understands and agrees that Freedom Forever shall be excused from all performance under this Agreement until (i) the satisfaction of the following conditions precedent has occurred: (a) Customer shall have deposited the Total Contract Price with the Escrow Service upon demand, and in any event prior to installation of the System; and (b) Freedom Forever shall have received satisfactory evidence, including but not limited to confirmation from the Escrow Service, that Customer has deposited the Total Contract Price with the Escrow Service; or (ii) waiver by Freedom Forever, in its sole and absolute discretion, and as evidenced in writing. Notwithstanding anything to the contrary, Customer will remain obligated for the full Total Contract Price until full payment is received by Freedom Forever through the Escrow Service. ARTICLE 4.10 only applies to Self-Financed Projects.

## ARTICLE 5 - TIME FOR PERFORMANCE; TITLE OF WORK

5.1 Commencement. Freedom Forever shall commence performance of the Work at the Property ("Commencement") within thirty (30) business days from the date of receiving all required permits, or the date the Property is ready for installation, whichever comes later. Following Commencement Freedom Forever shall diligently proceed to achieve Completed Installation.

5.2 Completed Installation. "Completed Installation" means the System is fully installed and is ready for start-up and testing.

5.3 Guaranteed Completion Date. Except as otherwise provided herein, Freedom Forever shall achieve Completed Installation within sixty (60) days from Commencement (the "Guaranteed Completion Date").

5.4 Extension. Freedom Forever retains the sole and exclusive right to modify the Commencement and Guaranteed Completion Date due to Force Majeure Events, Customer-Caused Delay, and other circumstances that are beyond the control of Freedom Forever, including but not limited to:

a. The readiness of the Property for installation;
b. Product delivery time constraints by manufacturer(s);
c. Availability of the Customer's selected equipment;
d. Completion of the Customer's financing, or payment to the Escrow Services (as applicable);
e. Permit process;

freedom FOREVER

f. HOA's and/or Condominium Board's approval process;
g. Weather conditions;
h. Disease, pandemics and/or quarantines;
i. Acts of government; or
j. The Work hereunder includes any of the following: roof work, main panel upgrades, or ground mount(s).

Delays caused by such events do not constitute abandonment and are not included in calculating timeframes for payment or performance.

5.5 Title of System. Prior to Completed Installation, Freedom Forever has good title to all the System Assets (the "System Assets"). The System Assets mean all the Work and all materials delivered to the Property, whether or not actually incorporated in the System or the Property. Upon the Customer's payment of the Total Contract Price, legal title and ownership of the System shall pass to the Customer.

## ARTICLE 6 - CHANGED CONDITIONS

6.1 Right to Cancel.

a. Site Inspection Result. After site inspection by Freedom Forever as set forth in ARTICLE 3.4, Freedom Forever may change, amend, and/or cancel this Agreement and propose a change order or new agreement (the "New Agreement"), based on the site inspection result at Freedom Forever's sole discretion.
b. New Conditions. In the event that Freedom Forever discovers new conditions of the Property which were not discovered or revealed before the Effective Date, or in the event that environmental concerns unexpectedly arise and require involvement and/or further permits from local building authorities, Freedom Forever shall have the right to cancel this Agreement and propose a New Agreement.
c. Customer's Right to Cancel. If Freedom Forever elects to cancel this Agreement and propose a New Agreement, Customer shall have the right to accept or reject the New Agreement. Until such New Agreement is executed by all Parties and the Three (3) Day Right to Cancel has passed, all Work shall cease. In the event the Customer decides not to proceed with the Work under the New Agreement, the Customer is solely responsible for paying for any Work performed under this Agreement, and the removal and repair of the Property to substantially the same condition as it was prior to the Work being performed.

6.2 Extra Work and Change Orders. Extra Work and Change Orders become part of this Agreement once the order is prepared in writing and signed by the Parties prior to the commencement of work covered by the new Change Order. The Change Order must describe the scope of extra work or change, the cost to be added or subtracted from the contract, and the effect the order will have on the schedule of progress payments. Change Orders shall be executed using a form similar to the Change Order Form in EXHIBIT B.

6.3 System Components. Freedom Forever will design the System to incorporate (i) any panels from the Module Group (as defined on the Cover Page) and (ii) any System inverter's monitoring equipment ("Inverter System") from the Inverter Group (as defined on the Cover Page).

6.4 Discretionary Design Changes. To the extent permissible by law, Freedom Forever may redesign the System at any time prior to or after installation, to (i) replace such System equipment with those from a different manufacturer, inclusive of differences in type, model, or wattage, without limitation; (ii) increase the size of the System in its sole discretion; and/or (iii) modify the location of the installation of the System on the roof or ground mounts at the Property without a Change Order. Any replacement of System equipment proposed without a Change Order shall be of equal or greater production to be deemed a reasonably equivalent substitute.

DS

Customer #1: [signature]

Customer #2: ______________

6.5 Removal and Reinstallation of the System. Following Completed Installation of the System, the Customer may submit a written request to Freedom Forever for the removal and later reinstallation of the System so that Customer may perform work on the roof of the Property without obstruction or hinderance from the installed System (hereinafter, "Reinstallation"). Freedom Forever, in its sole discretion, may approve and grant Customer's Reinstallation request. In such an event, Customer shall cooperate and coordinate with Freedom Forever, and execute any documents necessary to accomplish the Reinstallation, including, without limitation, the Removal and Reinstallation Addendum. Upon execution, the Removal and Reinstallation Addendum shall be incorporated into this Agreement by reference and to the extent a conflict exists between the terms of that Removal and Reinstallation Addendum and this Agreement, the terms of the former shall supersede and govern, where applicable, and all other terms and conditions of this Agreement shall remain in effect.

## ARTICLE 7 - LIMITED WARRANTY

7.1 Free of Construction and Workmanship Defect. Subject to the limitations and other provisions of this Agreement, Freedom Forever warrants that (i) the Work and the System will be free from defects in construction and workmanship for ten (10) years following the Completed Installation, and that (ii) any Freedom Forever branded panels, manufactured by or on behalf of Freedom Forever, will be free from defects in materials, construction, and workmanship for twelve (12) years following the Completed Installation (hereinafter, the "Limited Warranty"). Freedom Forever warrants the roof of the Property against damage and water infiltration at each roofing penetration made by Freedom Forever in connection with the installation of the System (the "Covered Roof Area"); provided however that such roof penetration warranty shall be void and voidable if work is performed by Customer or Customer's contractors on the roof during the ten (10) year period. **This is not a warranty of the entire roof.** If the roof has an existing warranty, Customer has the sole responsibility of confirming with the roofing contractor who performed the work that the installation of the System will not void any warranty. If the Work will void any existing roof warranty, the Customer proceeds knowing that this is the case. Any claim under the Limited Warranty must be made before the expiration of the Limited Warranty.

7.2 Warranty Exclusion. The Limited Warranty excludes products that are (i) not Freedom Forever branded and (ii) not manufactured by, or on behalf of, Freedom Forever. The Customer shall be entitled to all warranties, if any, provided by the manufacturers of the components, accessories and equipment that are not manufactured by Freedom Forever, but which Freedom Forever installs (hereinafter, the

"Manufacturer's Warranty"). These items generally include, but are not limited to, solar panels, inverters, and disconnect switches. Freedom Forever does not expressly warrant these items because it is not involved in the manufacturing process. Occasionally, a component, accessory or item of equipment will be unavailable for reasons beyond Freedom Forever's control. If this should occur, Freedom Forever shall have the right to substitute a reasonably equivalent item. The Limited Warranty excludes any measuring or monitoring equipment or service.

7.3 Other Exclusions. The Limited Warranty does not extend to (a) normal wear and tear; or (b) damage or failure caused by (i) abuse or material neglect by the Customer, unless such action or inaction was taken or not taken, as the case may be, in reliance on and in compliance with written instructions provided by Freedom Forever, (ii) modifications not performed by or through Freedom Forever or an affiliate of Freedom Forever or in a manner materially inconsistent with or contrary to the written information or written instructions provided by Freedom Forever or contained in the vendor manuals provided by Freedom Forever, (iii) the negligent acts or omissions of the Customer or the Customer's separate contractors, (iv) defects or deficiencies attributable to Force Majeure Events, (v) failure by the Customer to properly maintain or operate the System, or (vi) defects caused by the failure of the structural integrity of the support system by reason of any earth or fill ground movement.

7.4 Maintenance, Repair, and Replacement. If the Customer discovers a breach of the Limited Warranty and makes a timely claim, then, as the Customer's sole and exclusive remedy, Freedom Forever shall repair or replace the defective Work. Freedom Forever shall commence and complete such repairs or replacements within a reasonable time after receipt of the Customer's notice of warranty claim. If a failure cannot be corrected by Freedom Forever's reasonable efforts, the Parties will negotiate an equitable solution in good faith. Following the expiration of the Limited Warranty and Manufacturer's Warranty (if any), Customer shall be solely responsible for the maintenance, repair, and replacement of the System, including, without limitation, all solar equipment related thereto.

7.5 Disputes of Breach of Warranty. If Freedom Forever disputes whether a breach of warranty has occurred, any tests of the System shall be as mutually agreed, and Freedom Forever shall be notified prior to such testing and may be present at all tests that may be performed.

7.6 Reservation of Right to Access for Limited Warranty. Freedom Forever reserves the right to access the Property, after reasonable notice to the Customer, to repair, inspect or assess the performance of the Customer's System.

7.7 Exclusive Remedy. The Limited Warranty is the exclusive remedy for defects in materials (only as it pertains to Freedom Forever branded products), construction and workmanship provided under this Agreement, and is provided in lieu of all other warranties, express or implied. On expiration of the Limited Warranty, all liability of Freedom Forever for breach of warranty shall terminate.

**EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, FREEDOM FOREVER MAKES NO REPRESENTATIONS AND GRANTS NO WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, BY STATUTE OR OTHERWISE, UNDER THIS AGREEMENT, AND FREEDOM FOREVER SPECIFICALLY DISCLAIMS ANY OTHER WARRANTIES, WHETHER WRITTEN OR ORAL, OR EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. IF IMPLIED WARRANTIES CANNOT BE DISCLAIMED, THEN SUCH WARRANTIES ARE LIMITED IN DURATION TO THE DURATION OF THIS WARRANTY OR THE STATUTORY LIMIT, WHICHEVER COMES FIRST.**

**Some states do not allow limitations on how long an implied warranty lasts, so the above limitations or exclusions may not apply to you. This warranty gives you specific legal rights, and you may also have other rights, which vary from state to state. To obtain warranty service, contact Freedom Forever using the information described at www.freedomforever.com/about/contact-us/. Proof of purchase may be required to verify eligibility.**

7.8 Transferability of Warranty. The Limited Warranty that (i) the Work and the System will be free from defects in construction and workmanship for ten (10) years following the Completed Installation, and that (ii) any Freedom Forever branded panels, manufactured by or on behalf of Freedom Forever, will be free from defects in materials, construction, and workmanship for twelve (12) years following the Completed Installation, is transferable when the Customer conveys or transfers the Property to another party. The Customer or the transferee must give notice, in writing, to Freedom Forever within twenty (20) days from the effective date of the conveyance or transfer. The transfer of warranty shall be effective only if the transferee agrees to be bound by the conditions and terms of this Agreement. The transfer of warranty shall be effective upon Freedom Forever's receipt of the written notice from transferee agreeing to the terms and conditions of this Agreement.

## ARTICLE 8 - SYSTEM PRODUCTION

8.1 Freedom Forever will provide the Customer a production guarantee, as set forth in EXHIBIT A.

## ARTICLE 9 - FORCE MAJEURE EVENTS; CUSTOMER-CAUSED DELAY

9.1 Force Majeure. For purposes of this Agreement, the term "Force Majeure Event" shall mean any event, condition or circumstance that delays or prevents a Party from timely performance of obligations under this Agreement, or from complying with conditions required under this Agreement if such act or event, condition or circumstance, despite the exercise of reasonable efforts, cannot be avoided by, and is beyond the reasonable control of and without the fault or negligence of, the Party relying thereon as justification for such delay, nonperformance, or noncompliance, which includes, to the extent that the foregoing conditions are satisfied, war, sabotage, riots, insurrection, civil unrest or disturbance, military or guerilla action, terrorism, economic sanction or embargo, civil strike, work stoppage, slow-down, or lock-out; inclement weather, earthquake, abnormal weather condition or actions of the elements, hurricane, flood, lightning, wind, drought, volcanic eruption, Acts of God; unavailability of materials acceptable to Freedom Forever, fires, explosions, strikes, concurrent construction at Property affecting solar installation, government prohibitions, action or inaction of government or local utility, disease, pandemics, quarantines, or acts or omissions of other persons.

freedom FOREVER

9.2 Customer-Caused Delay. For purposes of this Agreement, "Customer-Caused Delay" means delays caused by the Customer's failure to comply with the Customer's obligations under this Agreement, and any other delays caused by the Customer, the Customer's agents, or separate subcontractors.

9.3 Performance Excuse. On account of any ongoing Force Majeure Event, each Party shall be excused from performance of its obligations under this Agreement, other than payment obligations. Freedom Forever shall have the right to cancel this Agreement upon the occurrence of any Force Majeure Event or Customer-Caused Delay impacting the performance of the Work.

## ARTICLE 10 - DEFAULT; TERMINATION

10.1 Default by Freedom Forever. Freedom Forever will be in default under this Agreement if any of the following occurs:

a. failure to perform its obligations under this Agreement which remains uncured for thirty (30) days after receipt of notice of default (the "Notice of Default") which shall be sent in writing to Freedom Forever by tracked postal or courier service; however, in the event such cure requires more than thirty (30) days to cure, Freedom Forever shall not be in default provided that Freedom Forever commences to cure during the original thirty (30) day cure period and diligently continues to cure until completion; or
b. Freedom Forever admits in writing its insolvency, files or there is filed against it a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent or undertakes or experiences any substantially similar activity.

10.2 Remedies in Case of Default by Freedom Forever. If Freedom Forever is in default under this Agreement, the Customer may:

a. terminate this Agreement; and/or
b. pursue any other remedy available to the Customer in this Agreement or by law.

10.3 Default by Customer. The Customer will be in default under this Agreement if any one of the following occurs:

a. the Customer fails to make any payment when it is due and such failure continues for a period of five (5) days.
b. the Customer fails to perform any material obligation that the Customer has undertaken in this Agreement (which includes doing something the Customer has agreed not to do, like alter the System) and such failure continues for a period of thirty (30) days after written notice.
c. the Customer has provided any false or misleading financial or other information to obtain this Agreement.
d. the Customer assigns, transfers, encumbers, sublets or sells this Agreement or any part of the System without Freedom Forever's prior written consent, except as provided in ARTICLE 7.8 above.
e. the Customer makes an assignment for the benefit of creditors, admits in writing its insolvency, files or there is filed against the Customer a voluntary petition in bankruptcy, are adjudicated bankrupt or insolvent or undertakes or experiences any substantially similar activity.
f. the Customer conceals or fails to disclose known unpermitted structures on the Property.
g. the Customer willfully refused to obtain proper permits for discovered unpermitted structure.
h. any act or omission by Customer which interferes and/or prevents Freedom Forever from performing and/or completing the Work including, but not limited to, preventing Freedom Forever from installing equipment, failure to obtain Board permission for the Work, or refusing to sign documents necessary to achieve permitting and/or interconnection.

10.4 Remedies in Case of Default by Customer. If the Customer is in default under this Agreement, Freedom Forever may take any one or more of the following actions. If the law requires Freedom Forever to do so, Freedom Forever will give the Customer notice and wait any period of time required before taking any of these actions. Freedom Forever may:

a. terminate this Agreement without terminating payment obligations hereunder.
b. suspend the performance of this Agreement until an applicable cure period has ended.
c. take any reasonable action to correct the Customer's default or to prevent Freedom Forever's loss; any amount Freedom Forever pays will be added to the amount the Customer owes Freedom Forever and will be immediately due.
d. require the Customer, at the Customer's expense, to return the System or promptly make it available to Freedom Forever for recapture in a reasonable manner.
e. proceed, by appropriate court action, to enforce performance of this Agreement and to recover damages for the Customer's breach including costs and attorneys' fees.
f. disconnect, turn off or take back the System by legal process or self-help, but Freedom Forever may not disturb the peace or violate the law.
g. report the non-operational status of the System to the Customer's utility informing them that the Customer is no longer net metering.
h. charge the Customer a reasonable reconnection fee for reconnecting the System to the Customer's utility or turning the Customer's System back on after Freedom Forever disconnects or turns off the System due to the Customer's default.
i. recover from the Customer (A) all unpaid Total Contract Price amounts, taxes, and all or any other sums then due and owing, and (B) seek a pre or post judgment lien or similar security interest on or against the Customer's home.
j. recover from the Customer all direct and indirect, internal and external expenses incurred in partial completion of the Work, plus the lesser of fifteen percent (15%) profit thereon or the maximum percentage of profit permitted by applicable law.
k. pursue any other remedy available to Freedom Forever in this Agreement or by law or in equity.

10.5 Multiple Remedies. By choosing any one or more of these remedies, Freedom Forever does not give up its right to use another remedy. By deciding not to use any remedy should this Agreement be in default, Freedom Forever does not give up the right to use that remedy in case of a subsequent default.

10.6 Reimbursement. The Customer agrees to repay Freedom Forever for any reasonable amounts we pay to correct or cover the Customer's default. The Customer also agrees to reimburse Freedom Forever for any direct and indirect, internal and external costs and expenses Freedom Forever incurs, plus the lesser of fifteen percent (15%) profit thereon or the maximum percentage of profit permitted by applicable law, relating to the System's return resulting from early termination.

freedom FOREVER

10.7 Non-Default Terminations. If any of the following events arise, Freedom Forever may terminate this Agreement without further liabilities or obligations on either party: (a) issuance of an order of a court or other public authority having jurisdiction which requires all the Work to be stopped; (b) Force Majeure Event that lasts more than three hundred sixty-five (365) days; (c) if there is a failure to obtain all permits and governmental approvals required for performance of the Work.

## ARTICLE 11 - INDEMNITY

11.1 To the fullest extent permitted by law, Customer shall indemnify, defend and hold harmless Freedom Forever from and against any and all loss, damage, expense and liability, including fines, penalties, court costs and reasonable attorneys' fees (collectively, "Liabilities") incurred by Freedom Forever in connection with or arising from any third-party claim, directly or indirectly arising from this Agreement or any action or inaction related thereto, to the extent caused by (a) any breach or violation of or default under this Agreement or any applicable legal requirements by Customer; or (b) any willful misconduct or gross negligent acts or omissions of Customer or its agents, contractors, subcontractors or others under Customer's control.

## ARTICLE 12 - LIMITATIONS OF LIABILITY

12.1 Limitation of Liability. Freedom Forever's total liability to the Customer, from any and all causes (including all claims under the warranties described in this Agreement), whether based on contract, tort (including negligence), strict liability or any other cause of action, shall in no event exceed the Total Contract Price. **NOTWITHSTANDING ANY OF THE FOREGOING, AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FREEDOM FOREVER SHALL NOT BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, OR CONSEQUENTIAL OR INDIRECT DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS.**

Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.

## ARTICLE 13 - MARKETING AND CUSTOMER CONTACT

13.1 Signage. Customer agrees to allow a Freedom Forever marketing sign to be displayed at the Property beginning during the first day of Work and for one (1) month after Work is completed.

13.2 Publicity. Customer agrees and hereby authorizes Freedom Forever's use of Customer's voice, photographs, videos and likeness in print media, radio, television, e-mail, social media, web materials, and any audio and/or video recording. Customer agrees to authorize Freedom Forever's use of the Property's photographs and videos in print media, radio, television, e-mail, social media, web materials and any audio and/or video recording.

13.3 Autodialed Telephone Calls and Text Messages. Customer hereby knowingly or voluntarily consents to receive autodialed telephone calls and SMS text messages from Freedom Forever and its affiliates, contractors, or on our behalf at the mobile telephone number provided herein. These telephone calls and SMS text messages may include promotional material related to our services or others' products and services, which may be sent using an automatic telephone dialing system. Customer understands that there is no requirement to agree to receive telephone calls and/or SMS text messages as a condition of entering into this Agreement. Standard call and text message charges may apply.

## ARTICLE 14 - GENERAL PROVISIONS

14.1 Governing Law. This Agreement is governed by the laws where the Property is located.

14.2 Notices. All notices given by either Party hereunder must be in writing and delivered by personal delivery, certified mail (return receipt requested), or overnight courier. A notice shall be deemed received upon personal delivery, the promised delivery date after deposit with a reputable overnight courier, or five (5) days after deposit in the mail. Notices to either Party shall be sent to the respective address provided on the cover page or other address as provided in writing.

14.3 Electronic Records. Customer may be entitled by law to receive certain information "in writing". However, Customer agrees that all information, documents, disclosures, notices, and agreements between Customer and Freedom Forever may be in electronic form (collectively, "Electronic Record(s)"). Customer further agrees that Freedom Forever may use and obtain electronic signatures (such as by clicking, checking, or signing using a digital pen) in the processing of Electronic Records. Freedom Forever will provide the Electronic Records by emailing them at the most recent e-mail address provided by Customer that Freedom Forever has on file and/or by making the Electronic Records available via a website address. Customer must notify Freedom Forever of any change in e-mail address(es). If Freedom Forever sends an Electronic Record, but Customer does not receive it because the most recent e-mail address that Freedom Forever has on file is incorrect, out of date, blocked by a service provider, filtered by a service provider as "spam" or "junk mail", or Customer is otherwise unable to receive the Electronic Record, Freedom Forever will be deemed to have provided the Electronic Record to Customer. Customer must have a computer with an internet connection, a compatible web browser, Adobe Acrobat Reader version 8.0 or above, and a valid and accessible e-mail account. Customer may request a paper copy of any Electronic Record, and Freedom [DS] a paper copy via U.S. mail within ninety (90) days.

Customer #1's initials: [signature]

Customer #2's initials: ______________

14.4 Data. Freedom Forever may collect and store: nonpublic personal information about Customer, the System, energy usage, Customer credit report(s), and other related information; and may install, operate, and maintain a device on the Property that Freedom Forever may use to collect and store information about energy use and related information (collectively, "Data"). Freedom Forever may use any software related to the operation of the System. Freedom Forever may use Data and access software to measure performance of the System. Customer agrees that Freedom Forever may use, store, and disclose the Data to our assignees, affiliates, actual or prospective lenders, financing parties, construction escrow services, investors, insurers, acquirers, along with equipment manufacturers and suppliers associated with the System, and Solar United Neighbors. Customer agrees that Freedom Forever may share the Data, including, without limitation, Customer's

freedom FOREVER

name, contact information, Property location, and other information Freedom Forever has collected or obtained about Customer with our affiliates and the Board if necessary. Freedom Forever's collection and processing of this Data is necessary for its legitimate interests, namely: the performance of a contract and to ensure the proper performance of the System; effectively communicating, responding, and resolving the queries and issues of Customer and Freedom Forever affiliates; and to administer, improve, and develop Freedom Forever's existing and new services and business.

14.5 No False and Abusive Language. Customer agrees that, at all times, Customer shall not make or cause to be made, directly or indirectly, any statement to any third party against Freedom Forever, its affiliates, its current and former directors, its current or former officers, and/or employees, that is false and abusive. Freedom Forever may take actions consistent with breach of this Agreement should it determine that the other party has made false and abusive statements (whether written or oral) about Freedom Forever, its affiliates, any of its current or former officers, and/or employees.

14.6 Arbitration and Attorneys' Fees. Pursuant to the Parties' Dispute Resolution Agreement (EXHIBIT C), all claims, disputes, and other matters in question between the Parties to this Agreement, arising out of or relating to this Agreement, or the breach thereof, shall be submitted to arbitration. The rules and procedures of such arbitration will be the Consumer Arbitration Rules of the American Arbitration Association ("AAA") unless the Parties mutually agree in writing otherwise. The decision of the arbitrator shall be final, conclusive and binding upon the Parties hereto, and shall be enforceable in any court of competent jurisdiction. The prevailing party in any arbitration or court proceeding shall be entitled to its reasonable attorneys' fees and all related costs and expenses as permitted by applicable state law. The Parties agree that the Dispute Resolution Agreement shall be specifically enforceable under the Federal Arbitration Act ("FAA"), as this contract involves interstate commerce, and the validity of the same has been consistently upheld by the FAA and is not in dispute.

14.7 Class Waiver. Unless prohibited by applicable law, you, as Customer, agree to bring all claims against Freedom Forever, parent(s), subsidiaries, affiliates only in your individual capacity and YOU, AS CUSTOMER, ARE WAIVING THE RIGHT TO INITIATE OR PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.

14.8 Survival. Subject to the limitations and other provisions of this Agreement, EXHIBIT A, ARTICLE 11, ARTICLE 12, and ARTICLE 14, as well as any other provision that, in order to give proper effect to its intent, shall survive the expiration or earlier termination of this Agreement.

14.9 Our Licenses. Freedom Forever Virginia, LLC is a licensed contractor in Virginia. For information about contractor licensing requirements, contact the applicable county and/or city. For general information about our licenses please visit http://www.freedomforever.com/licenses.

14.10 Release of Lien Claim. Upon satisfactory payment being made for the work performed, Freedom Forever, prior to any further payment being made, shall furnish to the person contracting for the home improvement an unconditional release from any potential lien claimant claim or mechanics lien authorized pursuant to Virginia law (§ 43-1 et seq.)for that portion of the work for which payment has been made.

14.11 Notice About General Liability Insurance. Freedom Forever carries general liability insurance with Philadelphia Insurance Companies. Customer may contact the insurance provider at (610) 617-7900 to check Freedom Forever's insurance coverage.

14.12 Notice About Workers Compensation Insurance. Freedom Forever carries workers' compensation insurance with Berkshire Hathaway Homestate Companies for all its employees. Customer may contact the insurance provider at (888) 495-8949 to check Freedom Forever's coverage.

14.13 Assignment. Except as provided in ARTICLE 7.8 above, neither Party may assign any of its rights hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the forgoing, Freedom Forever may, without consent of Customer, assign this Agreement to an affiliate of Freedom Forever. Any purported assignment in violation of this ARTICLE 14.13 shall be null and void.

14.14 Heirs, Successors and Assigns. The terms of this Agreement shall be binding upon the Parties hereto and their respective heirs, successors, assigns and legal representatives.

14.15 Right to Subcontract. Freedom Forever shall have the right to subcontract the performance of the Work and any other duties or obligations under this Agreement to a third party (a "Subcontractor"). In all cases, Freedom Forever shall be responsible and liable for the acts and omissions of each Subcontractor to the same extent as if such acts or omissions were by Freedom Forever or its employees and shall be responsible for all fees and expenses payable to any Subcontractor.

14.16 Waiver. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

14.17 Add On / Combined System Waiver. In the event the Customer has an existing, non-Freedom Forever installed solar energy system ("Existing System") on the Property and Customer desires to add on and combine the Existing System with a new System installed by Freedom Forever, Customer acknowledges and accepts the following:

a. Customer assumes the risk of waiving any existing warranty for the Existing System.
b. If the Existing System does not function properly due to the Work and addition of the new System, Customer assumes all such risk, loss and/or damages related to the Existing System. Customer assumes all risk and liability for any injury to Freedom Forever's subcontractors and its employees due to combining the Existing System and the new System.
c. Customer understands that Freedom Forever's Production Guarantee does not apply to the Existing System.

freedom FOREVER

14.18 **Amendment and Modification.** Except as covered under ARTICLE 6.2, this Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto.

14.19 **Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

14.20 **Severability.** If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement to affect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

14.21 **Further Documents.** Customer agrees to execute any further documents as may be necessary to allow Freedom Forever to perform under this Agreement.

14.22 **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

14.23 **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties as to the subject matter hereof, and the Parties are not bound by any oral expression or representation by any agent of either Party purporting to act for or on behalf of either Party or by any commitment or arrangement not specified in this Agreement. Any plans, specifications, and other data furnished with or in connection with this Agreement are descriptive of the specifications and terms and conditions contained herein, and in case of conflict between the provisions stated in the plans and specifications or other data, and the terms of this Agreement, the terms of this Agreement shall prevail.

By signing below, Customer accepts Freedom Forever's Terms and Conditions.

| Customer | Customer #2 (if applicable) | Freedom Forever Virginia, LLC |
|---|---|---|
| Customer Signature:<br>DocuSigned by: [signature]<br>7011AD32C2424FD... | Customer Signature: | /s/ Greg Albright<br>TITLE: President |
| NAME: Barn Henderson | NAME: | NAME: Greg Albright |
| DATE: 3/11/2024 \| 1:26 PM PDT | DATE: | DATE: 3/11/2024 \| 1:25 PM PDT |

freedom FOREVER

## LIST OF DOCUMENTS INCORPORATED INTO THIS AGREEMENT

**Documents Incorporated in this Agreement:**

1. Mechanic's Lien Notice
2. Notice of Three-Day Right to Cancel
3. Notice of Cancellation (Freedom Forever Copy)
4. Notice of Cancellation (Customer Copy)
5. Production Guarantee (EXHIBIT A)
6. Change Order Form (EXHIBIT B)
7. Dispute Resolution Agreement (EXHIBIT C)

freedom FOREVER

**POSSIBLE FILING OF MECHANIC'S LIEN PER Virginia law (§ 43-1 et seq.)**

**NOTICE**

**Virginia law (§ 43-1 et seq.) permits persons who have performed labor or furnished materials for the construction, removal, repair or improvement of any building or structure to file a lien against the property. This lien may be filed at any time after the work is commenced or the material is furnished, but not later than the earlier of (i) 90 days from the last day of the month in which the lienor last performed work or furnished materials or (ii) 90 days from the time the construction, removal, repair or improvement is terminated.**

**AN EFFECTIVE LIEN FOR WORK PERFORMED PRIOR TO THE DATE OF SETTLEMENT MAY BE FILED AFTER SETTLEMENT. LEGAL COUNSEL SHOULD BE CONSULTED.**

freedom FOREVER

**CUSTOMER RECEIPT OF:**
**NOTICE OF THREE-DAY RIGHT TO CANCEL**

You, the Customer, have the right to cancel this Agreement within three (3) business days. You may cancel by e-mailing, mailing, faxing, or delivering a written notice to Freedom Forever at Freedom Forever's place of business by midnight of the third business day after you received a signed and dated copy of the Agreement that includes this notice. Include your name, your address, and the date you received the signed copy of the contract and this notice.

If you cancel, Freedom Forever must return to you any amount paid by you prior to cancellation within ten (10) days of receiving the notice of cancellation. For your part, you must make available to Freedom Forever at your residence, in substantially as good condition as you received them, goods delivered to you under this contract of sale. Or, you may, if you wish, comply with Freedom Forever's instructions on how to return the goods at Freedom Forever's expense and risk. If you do make the goods available to Freedom Forever and Freedom Forever does not pick them up within twenty (20) days of the date of your notice of cancellation, you may keep them without any further obligation to pay for them. If you fail to make the goods available to Freedom Forever, or if you agree to return the goods to Freedom Forever and fail to do so, then you remain liable for performance of all obligations under the contract. You have a duty to take reasonable care of the goods in your possession before cancellation or revocation and for a reasonable time thereafter, during which time the goods are otherwise at Freedom Forever's risk. If Freedom Forever has performed any services pursuant to this Agreement prior to its cancellation, Freedom Forever is entitled to no compensation.

BY SIGNING BELOW, I ACKNOWLEDGE THAT I RECEIVED THE ABOVE "NOTICE OF THREE-DAY RIGHT TO CANCEL."

| CUSTOMER | CUSTOMER #2 (IF APPLICABLE) |
|---|---|
| CUSTOMER SIGNATURE: DocuSigned by: [signature] 7011AD32C2424FD | CUSTOMER SIGNATURE: |
| NAME: Barn Henderson | NAME: |
| DATE: 3/11/2024 \| 1:26 PM PDT | DATE: |

freedom FOREVER

**NOTICE OF CANCELLATION**
**(Freedom Forever Copy)**

3/11/2024 | 1:26 PM PDT _____ (Date of transaction)

You may cancel this transaction, without any penalty or obligation, within three business days from the above date.

If you cancel, any property traded in, any payments made by you under the Agreement, and any negotiable instrument executed by you will be returned within ten business days following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this agreement; or you may if you wish, comply with the instructions of the seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to Freedom Forever and Freedom Forever does not pick them up within twenty days of the date of cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to Freedom Forever, or if you agree to return the goods to Freedom Forever and fail to do so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram to Freedom Forever Virginia, LLC at 43445 Business Park Drive, Suite 110, Temecula, CA 92590 not later than midnight of the third business day after you received a signed and dated copy of the Agreement.

I hereby cancel this transaction.

Within 10 days after this transaction has been canceled, Freedom Forever Virginia, LLC must return to you any payments made by you and any note or other evidence of indebtedness.

______________________________
Customer's Signature

______________________________
Customer #2's Signature (if applicable)

______________________________
Date

freedom FOREVER

**NOTICE OF CANCELLATION**
**(Customer Copy)**

3/11/2024 | 1:26 PM PDT (Date of transaction)

You may cancel this transaction, without any penalty or obligation, within three business days from the above date.

If you cancel, any property traded in, any payments made by you under the Agreement, and any negotiable instrument executed by you will be returned within ten business days following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this agreement; or you may if you wish, comply with the instructions of the seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to Freedom Forever and Freedom Forever does not pick them up within twenty days of the date of cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to Freedom Forever, or if you agree to return the goods to Freedom Forever and fail to do so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram to Freedom Forever Virginia, LLC at 43445 Business Park Drive, Suite 110, Temecula, CA 92590 not later than midnight of the third business day after you received a signed and dated copy of the Agreement.

I hereby cancel this transaction.

Within 10 days after this transaction has been canceled, Freedom Forever Virginia, LLC must return to you any payments made by you and any note or other evidence of indebtedness.

______________________________
Customer's Signature

______________________________
Customer #2's Signature (if applicable)

______________________________
Date

freedom FOREVER

## EXHIBIT A
## PRODUCTION GUARANTEE

### ARTICLE 1 - DEFINITIONS

The following defined terms have the meanings set forth below:

1.1 "**Actual Annual kWh**" means, for any Production Year, the AC electricity produced by the System in kilowatt-hours (kWh).

1.2 "**Commencement Date**" means the date of initial operation of the System.

1.3 **"First Year Production"** means the estimated production of the System as found in EXHIBIT A, ARTICLE 2.1.

1.4 "**Guaranteed Annual kWh**" means, for any Production Year, the amount of AC electricity generation guaranteed, as set forth fully in EXHIBIT A, ARTICLE 2.

1.5 "**Guaranteed Energy Price**" means $0.18/kWh.

1.6 "**Production Guarantee**" means this entire EXHIBIT A.

1.7 "**Production Guarantee Term**" means the period beginning upon Commencement Date and ending on the earlier of: (a) the twenty-fifth (25th) anniversary thereof; or (b) the termination of this Production Guarantee.

1.8 "**Production Year**" means the twelve (12) month period beginning on the 1st day of the month following Commencement Date, and each successive twelve (12) month period thereafter during the Production Guarantee Term. For example, if Commencement Date occurred on March 15, each Production Year would run from April 1 to March 31.

1.9 "**Production Year Deficit Payment**" means, for any Production Year, a refund payment by Freedom Forever to the Customer in an amount calculated in accordance with EXHIBIT A, ARTICLE 3.

### ARTICLE 2 - PRODUCTION GUARANTEE

2.1 Production Guarantee. The Guaranteed Annual kWh of the System for Production Year 1 is ________________ and is subject to all of EXHIBIT A, ARTICLE 2. Freedom Forever guarantees that in each Production Year the System will generate the Guaranteed Annual kWh for such Production Year, subject to the other terms and conditions as fully set forth in this EXHIBIT A.

2.2 Degradation. The Guaranteed Annual kWh shall degrade and reduce by five percent (5%) for the first year following Production Year 1 and by a half percent (0.5%) every year thereafter, throughout the Production Guarantee Term.

2.3 Production Year Surplus. If at the end of a Production Year, the Actual Annual kWh for such Production Year is greater than the Guaranteed Annual kWh for that Production Year, there will be no additional cost to the Customer for this surplus energy. However, this surplus will be carried over and used by Freedom Forever to offset any future Production Year Deficits.

2.4 Production Year 1 Adjustment. In the event the Actual Annual kWh for Production Year 1 is less than eighty-five percent (85%) of the Guaranteed Annual kWh described in EXHIBIT A, ARTICLE 2.1, Customer agrees to allow Freedom Forever to replace or install additional panels so that the Annual kWh for Production Year 1 meets at least eighty-five percent (85%) of the Guaranteed Annual kWh for Production Year 1, the new Guaranteed Annual kWh for Production Year 1 will be the original Guaranteed Annual kWh multiplied by eighty-five percent (85%) and the Guaranteed Annual kWh for future Production Years will be adjusted to reflect the change, and Customer shall still be entitled to submit a production claim for the production deficit between the new Guaranteed Annual kWh and the Actual Annual kWh for Production Year 1. Freedom Forever will provide no notice of Production Year 1 Guaranteed Annual kWh adjustments made. In the event that Actual Annual kWh for Production Year 1 is greater than eighty-five percent (85%) but less than one hundred percent (100%) of the Guaranteed Annual kWh described in EXHIBIT A, ARTICLE 2.1, the new Guaranteed Annual kWh for Production Year 1 will be adjusted to the Actual Annual kWh produced in Production Year 1. Any adjustment of the Guaranteed Annual kWh is subject to the degradation schedule set forth in EXHIBIT A, ARTICLE 2.2.

2.5 No Adjustment on Surplus. Guaranteed Annual kWh will not be adjusted if the Actual Annual kWh for Production Year 1 exceeds the Guaranteed Annual kWh for Production Year 1.

2.6 Inverter System Connectivity. Freedom Forever shall install the Inverter System based on either a cellular or Wi-Fi internet connection. In the event the cellular carrier or the internet wireless technology ceases to be supported in the Inverter System, Freedom Forever shall not be responsible and Customer hereby agrees, at Customer's sole cost, to upgrade the Inverter System to ensure connectivity. Customer's failure to comply with Customer's obligations under this Article shall void the Production Guarantee. If a Wi-Fi internet connection is used, Customer shall maintain and make available, at the Customer's cost, a functioning indoor internet connection with a router, one DHCP enabled Ethernet port with internet access and standard AC power outlet close enough and free of interference to enable an internet-connected gateway provided by Freedom Forever to communicate wirelessly with the Inverter System. The Customer further agrees that maintaining the foregoing high-speed internet connection is a prerequisite to the Production Guarantee.

2.7 Further Documents. Customer agrees to execute any further documents as may be necessary to allow Freedom Forever to perform under this Production Guarantee .

2.8 Repair Parts. When performing any work under this Production Guarantee, Freedom Forever has the right, at its sole discretion, to repair or replace all or part of the System using new, remanufactured or refurbished parts or products.

freedom FOREVER

2.9 Exclusion Events. The production guarantee set forth in EXHIBIT A, ARTICLE 2.1 does not apply to any failure of the System to achieve Guaranteed Annual kWh for any Production Year, to the extent caused by any of the following exclusion events ("Exclusion Events"):

a. Someone other than Freedom Forever or its approved service providers shuts down, installs, removes, re-installs, modifies, alters or repairs the System.
b. Destruction, damage, or vandalism to the System, or its ability to safely produce energy, which is not caused by conduct of Freedom Forever, its employees, subcontractors, or agents.
c. The Customer fails to perform or breach the Customer's obligations under the Agreement, which failure or breach directly and materially affects the production of the System.
d. The Customer fails to provide access or reasonable assistance to Freedom Forever, to the extent any assistance is expressly required of the Customer under the Agreement, in diagnosing or repairing a problem, or fails to maintain the System as required by the Agreement and the recommendations of the manufacturers of the equipment which is part of the System.
e. The Customer fails to clean the modules at least once every six (6) months.
f. The Customer fails to take all reasonable steps to prevent any interference with the solar insolation that falls on the System.
g. The Customer fails to promptly notify Freedom Forever upon discovery of interference with the solar insolation that falls on the System even after taking all reasonable steps to prevent such interference.
h. Water ponding or puddling on the Customer's roof (i.e., standing water that fails to drain) not caused by Freedom Forever or its approved service providers.
i. Damage resulting from mold, fungus and other organic pathogens, regardless of the cause.
j. Superficial changes in the appearance of the System components due to exposure to weather and atmospheric conditions (e.g. chalking or blemishes).
k. Shading from foliage that is new growth or is not kept trimmed to its appearance on the date the System was installed.
l. Force Majeure Events.
m. A power or voltage surge not caused by Freedom Forever, its employees, subcontractors, or agents, including a grid supply voltage outside of the standard range specified by the utility.
n. Any System failure or lost production not caused by a System defect (e.g., the System is not producing power because it has been removed to make roof repairs or the Customer has required us to locate the inverter in a non- shaded area).
o. Any System failure or lost production caused by equipment failure which is not subject to the Limited Warranty.
p. Theft of the System other than by Freedom Forever, its employees, subcontractors, or agents.
q. Regulatory shutdowns of the System.
r. Changes in the electrical characteristics of the building(s) on the Property.
s. Any failure to maintain Inverter System connectivity and/or a working high-speed internet connection pursuant to EXHIBIT A, ARTICLE 2.6.
t. Following the expiration of the Limited Warranty and Manufacturer's Warranty, any System failure or lost production caused by equipment failure resulting from Customer's failure to maintain, repair, and replace the same.

2.10 Transferability of Production Guarantee. The Production Guarantee may be transferable when the Customer conveys or transfers the Property to another party. The Customer or the transferee must give notice, in writing, to Freedom Forever within twenty (20) days from the effective date of the conveyance or transfer. The transfer of the Production Guarantee shall be effective only if the transferee agrees to be bound by the conditions and terms of this Agreement. The transfer of the Production Guarantee shall be effective upon Freedom Forever's receipt of the written notice from transferee agreeing to the terms and conditions of the Agreement.

## ARTICLE 3 - PRODUCTION GUARANTEE CLAIM

3.1 Production Claim. If at the end of a Production Year the Actual Annual kWh for the Production Year generated by the System is less than the Guaranteed Annual kWh as mentioned in EXHIBIT A, ARTICLE 2, for that Production Year (a "Production Year Deficit"), then the Customer can make a claim about such deficit to Freedom Forever ("Production Claim"). The Customer must make any Production Claim within sixty (60) days following the end of the applicable Production Year. All Production Claims hereunder must be in writing, be identified as "Production Claim," and be delivered to us in accordance with ARTICLE 14.2 of the Agreement.

3.2 Claim Review. After receiving the Customer's Production Claim, Freedom Forever shall have the right to check Actual Annual kWh for the applicable Production Year and conduct on-site inspections on the Property for purpose of reviewing the production of the System and finding out the reasons, if any, which caused the Production Year Deficit. Within thirty (30) days after receiving the Customer's Production Claim, Freedom Forever will notify the Customer of approval or rejection. In the event that Freedom Forever approves a Production Claim, which means a Production Year Deficit has occur and is not caused by any Exclusion Event, Freedom Forever will make a Production Year Deficit Payment, provided first that Freedom Forever has been permitted by Customer to upgrade the system pursuant to ARTICLE 2.4 in any way that would avoid future Production Claims.

3.3 Production Year Deficit Payment. Within thirty (30) days after the approval, we will send the Customer a payment equal to the difference between the Actual Annual kWh for that Production Year and Guaranteed Annual kWh for that Production Year (minus any previous years' surpluses, as set forth in EXHIBIT A, ARTICLE 2.3), multiplied by the Guaranteed Energy Price Per kWh.

3.4 Calculation upon Exclusion Events. In the event any of the Exclusion Events, for purpose of calculating the Production Year Deficit Payment, if any, the production of the System during such event shall be deemed equal to the average production of the prior Production Years during the same time period.

## ARTICLE 4 - MAINTENANCE AND REPAIRS, EXPANSION

4.1 Inspection of System. The Customer agrees that Freedom Forever shall have the right, with prior notice and at times reasonably agreed to by the Customer, to inspect the System to determine if the Customer has complied with the conditions set forth in this EXHIBIT A. In the event that any inspection discloses that the Customer has failed, on or prior to the date of such inspection, to be in compliance with any of the Customer's obligations, then for purposes of calculating the Production Year Deficit Payment, if any, the production of the System during such compliance failure shall be deemed equal to the average production of the prior Production Years during the same time period.

freedom FOREVER

4.2 **Maintenance and Repair.** The Customer irrevocably grants to Freedom Forever the right, during the Production Guarantee Term, to repair, replace, and maintain the System and appurtenant equipment, and to conduct on-site measurements, including, but not limited to, reading meters and installing and observing on-site Inverter System. The Customer shall cooperate fully with the exercise of such right by Freedom Forever pursuant to this ARTICLE 4.2. The Customer shall further cooperate with Freedom Forever's performance of this Production Guarantee by providing utility information, and/or additional information as reasonably requested by Freedom Forever.

4.3 **Expansion and Relocation.** In the event an unforeseeable shading condition not caused by Freedom Forever exists and continues for five (5) days, the Customer agrees that Freedom Forever shall have the right to expand or relocate the System, or otherwise the Guaranteed Annual kWh for that Production Year or any future Production Years shall be reduced based upon such shading condition, and Freedom Forever will present the Customer with a proposed reduction to the Guaranteed Annual kWh for that Production Year or any future Production Years reflecting such interference.

4.4 **Expenses.** The Customer agrees that if the System needs any repair that is not the responsibility of Freedom Forever under this Agreement, or if the System needs to be expended or relocated to facilitate remodeling of the Property, the Customer will have Freedom Forever, or another similarly qualified service provider approved by Freedom Forever, perform such repairs and relocation at the Customer's expense.

4.5 **Service Tech Dispatch and Charges.** Upon Customer's request, Freedom Forever and/or its subcontractors may be dispatched to inspect the System and/or any part of the Property to perform, without limitation, an assessment, truck roll, or tarping (individually and collectively, a "Service Tech Dispatch"). In such an event, Customer must provide Freedom Forever with any information reasonably related to the Service Tech Dispatch, including, without limitation, System issues, defects, or outages. Following a Service Tech Dispatch, if (i) the technical issue is determined to be the fault of a party other than Freedom Forever, or (ii) Freedom Forever is unable to complete the dispatch or otherwise perform due to the fault of the Customer, then Freedom Forever may assess and invoice the Customer a fee (hereinafter, "Service Tech Dispatch Fee").

The Service Tech Dispatch Fee for the 2023 year shall be calculated as follows:

a. $250 if the Service Tech Dispatch to the Customer's Property is within fifty (50) miles of the nearest Freedom Forever branch location.
b. The Service Tech Dispatch Fee shall be increased by $50.00 for each additional fifty (50) miles between the Customer's Property and the nearest Freedom Forever branch location. By way of illustration only, if the Customer's Property is situated 150 miles from the nearest Freedom Forever branch location and the technical issue is determined to be the fault of a party other than Freedom Forever, then the Customer shall be invoiced $350.00 for the Service Tech Dispatch.

The Service Tech Dispatch Fee shall be increased annually, by the greater of: (i) five percent (5%) increase from the preceding year; or (ii) the percentage rate of increase for the Consumer Price Index, All Urban Consumers, United States, All Items for that year.

## ARTICLE 5 - TERMINATION

5.1 **Termination.** If (i) the Agreement is terminated by Freedom Forever because of a default by the Customer, or (ii) the Agreement is terminated by either party because of any extended Force Majeure Events in accordance with ARTICLE 9.1 of the Agreement, this Production Guarantee shall be automatically terminated.

5.2 **Deficit Payment upon Termination.** If any termination occurs on a date other than the last day of a Production Year, Freedom Forever shall have no obligation to make a Production Year Deficit Payment for the Production Year in which the termination occurs.

## ARTICLE 6 - NO SAVINGS GUARANTEE

6.1 **No Savings Guarantee.** Freedom Forever has not guaranteed, promised or otherwise represented any reduction in electricity costs in relation to the System that will be installed on the Property, and further provides no warranty or guaranty with respect to any cost savings from use of the System.

freedom FOREVER

**EXHIBIT B**
**CHANGE ORDER FORM**

**Customer Name(s):** ______________________________

**Project Address:** ______________________________

**Change Order Effective Date:** ______________________________

This Change Order will be incorporated by reference into and a made a part of the Supply and Installation Agreement dated ____________________ between ___________________________ and Freedom Forever Virginia, LLC ("Agreement"). Except as modified by this and any previously issued Change Order, all other terms and conditions of the Agreement remain in full force and effect.

The Customer may not require Freedom Forever to perform extra or change-order work without providing written authorization prior to the commencement of work covered by the new change order. A change order is not enforceable against the Customer unless it identifies the following in writing prior to the commencement of work covered by the new change order: (1) the scope of work encompassed by the order; (2) the amount to be added or subtracted from the contract; (3) the effect the order will make on the completion date. However, failure to comply with these requirements does not preclude the recovery of compensation for work performed based upon legal or equitable remedies designed to prevent unjust enrichment.

1. Mutual Change Order. The parties agree to make the following additions or modifications to, or deductions from the Agreement as follows:

A. EXPLANATION OF CHANGES: The Customer agrees to the following:

| |
|---|
| ☐ **Equipment Change:**<br>**From:** ______________________________<br>**To:** ______________________________ |
| ☐ **System Size Change:**<br>**From:** ______________________________<br>**To:** ______________________________ |
| ☐ **Production Guarantee ("PG") Change:**<br>**From:** ______________________________<br>**To:** ______________________________ |
| ☐ **Other Changes:**<br>**From:** ______________________________<br>**To:** ______________________________ |

B. CHANGE IN PRICE:

| |
|---|
| **Adjusted Price:**<br>☐ Not Applicable<br>☐ Applicable<br>**From:**<br>______________________________ |

freedom FOREVER

| |
|---|
| **To:** ______________________________ |

C. GUARANTEED COMPLETION DATE ADJUSTMENT:

| |
|---|
| **Adjusted Completion Date:**<br>☐ Not Applicable<br>☐ Applicable<br><br>**From:** ______________________________<br><br>**To:** ______________________________ |

D. OTHER ADJUSTMENTS, IF ANY:

| |
|---|
| ☐ Not Applicable<br>☐ Applicable<br><br>**From:** ______________________________<br><br>**To:** ______________________________<br><br>Additional explanation, if any:<br>______________________________ |

2. Accord and Satisfaction. The Adjusted Price, if any, constitutes full payment for the completed Work hereunder and for any delay, acceleration, disruption, inconvenience, loss of efficiency, cost, or expense arising out of, or incidental to, such Work.

3. Costs and Expenses. Each party shall pay its own costs and expenses in connection with preparing, drafting, negotiating and executing this Change Order, including but not limited to, the fees and expenses of its advisors, accountants and legal counsel.

| 1. CUSTOMER | 2. CUSTOMER #2 (IF APPLICABLE) | FREEDOM FOREVER VIRGINIA, LLC |
|---|---|---|
| SIGNATURE: | SIGNATURE: | SIGNATURE: /s/ Greg Albright |
| | | TITLE: President |
| NAME: | NAME: | NAME: Greg Albright |
| DATE: | DATE: | DATE: 3/11/2024 \| 1:25 PM PDT |

freedom FOREVER

**EXHIBIT C**
**DISPUTE RESOLUTION AGREEMENT**

1. ANY CONTROVERSY, DISPUTE, CLAIM, OR DISAGREEMENT BETWEEN THE PARTIES RELATING TO OR IN CONNECTION WITH THIS AGREEMENT AND/OR THE WORK ("DISPUTE") MUST BE RESOLVED EXCLUSIVELY BY BINDING ARBITRATION. THE ARBITRATION, INCLUDING SELECTION OF THE ARBITRATOR, WILL BE ADMINISTERED BY AAA (American Arbitration Association), UNDER ITS CONSUMER ARBITRATION RULES ("RULES"), except to the extent any of those rules conflict with our agreement in this Dispute Resolution Agreement, in which case this Dispute Resolution Agreement will govern. THE ARBITRATION WILL BE DECIDED BY A SINGLE NEUTRAL ARBITRATOR AGREED ON BY THE PARTIES. To the extent possible, the Parties agree to use teleconference and telecommunication devices for the arbitration and all proceedings related thereto. EITHER PARTY MAY INITIATE THE ARBITRATION PROCESS BY FILING THE NECESSARY FORMS WITH AAA. TO LEARN MORE ABOUT ARBITRATION AND THE RULES, CUSTOMER CAN CALL ANY AAA OFFICE OR REVIEW THE MATERIALS AT WWW.ADR.ORG. You and we each also agree that the Agreement affects interstate commerce so that the Federal Arbitration Act and federal arbitration law, not state law, apply and govern the enforceability of this Dispute Resolution Agreement (despite the general choice of law provision set forth below). THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED. THE ARBITRATOR MUST FOLLOW THIS AGREEMENT AND CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT (INCLUDING ATTORNEYS' FEES).

2. For any and all Disputes either of us have against the other, we must first give the other party an opportunity to resolve the claim by sending a written description of the claim to the other. Written descriptions of any claim against Freedom Forever should be sent to 27442 Portola Parkway, Suite #180, Foothill Ranch, CA 92610, ATTN: Freedom Legal Dept, and/or by email to legal@freedomforever.com. You and we each agree to negotiate the claim in good faith. We agree that we may not commence any arbitration or court proceeding unless you and we are unable to resolve the claim within sixty (60) days after the other party's receipt of the claim description and both parties have made a good faith effort to resolve the claim directly with the other party during that time.

3. If the parties are unable to resolve the claim within sixty (60) days despite those good faith efforts, then either you or we may start arbitration or small claims court proceedings. Customer must serve notice to Freedom Forever to 27442 Portola Parkway, Suite #180, Foothill Ranch, CA 92610, ATTN: Freedom Legal Dept, and/or by email to legal@freedomforever.com. If Freedom Forever initiates the arbitration, Freedom Forever will pay all the arbitration fees and costs. Each party will be responsible for its own attorneys' fees and costs except that the prevailing party in any Dispute will be entitled to recover its attorneys' fees, costs, and expenses from the non-prevailing Party if recoverable under applicable state law, in addition to any other appropriate relief.

4. Arbitration must be on an individual (not class or representative) basis and the arbitrator may not award relief for or against anyone who is not a party. This means Customer agrees that neither Customer nor Freedom Forever may (i) join or consolidate claims in arbitration by or against any other parties, or (ii) litigate in court or arbitrate any Dispute as a representative, member of a class, or in a private attorney general capacity. The arbitrator will have the authority to award any legal or equitable remedy or relief that a court could order or grant under this Agreement. However, the arbitrator may not change or alter the terms of this Agreement or make any award that would extend to any transaction other than Customer's. All statutes of limitations that are applicable to any Dispute shall apply with respect to any arbitration between the Parties. The arbitrator will issue a decision or award in writing, briefly stating the essential findings of fact and conclusions of law. Following the arbitrator's final determination and to the extent permissible by law, the determination for awarding attorneys' fees and costs shall be based on attribution of fault on the part of the Parties. By way of illustration and not limitation, in the event the allocation of fault is determined as 60% Customer and 40% Freedom Forever, then Freedom Forever shall only be entitled to 60% of its awarded attorneys' fees and costs.

5. Notwithstanding anything in this Dispute Resolution Agreement to the contrary, for Disputes in the amount of, or lesser than, the local jurisdictional limits in which the Property sits, the Parties agree to exclusively resolve the same via small claims court, in the jurisdiction set forth in this Agreement.

6. NOTICE: BY INITIALING IN THE SPACE BELOW, CUSTOMER IS AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THIS DISPUTE RESOLUTION AGREEMENT DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY VIRGINIA LAW AND CUSTOMER IS GIVING UP ANY RIGHTS CUSTOMER MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW CUSTOMER IS GIVING UP CUSTOMER'S JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THIS DISPUTE RESOLUTION AGREEMENT. IF CUSTOMER REFUSES TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, CUSTOMER MAY BE COMPELLED TO ARBITRATE UNDER APPLICABLE LAWS. CUSTOMER'S AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY. CUSTOMER HAS READ AND UNDERSTANDS THE FOREGOING AND AGREES TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THIS DISPUTE RESOLUTION AGREEMENT TO NEUTRAL ARBITRATION. CUSTOMER ALSO ACKNOWLEDGES AND AGREES THAT CUSTOMER IS GIVING UP CUSTOMER'S RIGHTS TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.

Customer(s) Initials: 1) DS [initials] ____ Freedom Forever: /s/ Greg Albright

freedom FOREVER

I hereby represent that I have read and agreed to all the terms and conditions of this Agreement and I have read and separately acknowledged each disclosure, statement, and description bearing my initials or signature in this Agreement.

CUSTOMER SIGNATURE:

DocuSigned by:

7011AD32C2424FD...

CUSTOMER #2 SIGNATURE (IF APPLICABLE):

**Exhibit B**

Fourth Amended Joint Chapter 11 Plan and Confirmation Order

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 05, 2025
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| MOSAIC SUSTAINABLE FINANCE CORPORATION, *et al.*,[1] | ) | Case No. 25-90156 (CML) |
| Debtors. | ) | (Jointly Administered) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF MOSAIC SUSTAINABLE FINANCE CORPORATION AND CERTAIN OF ITS AFFILIATED DEBTORS**

Mosaic Sustainable Finance Corporation, Modern Home LLC, and Solar Mosaic LLC, each debtor affiliates in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), as debtors and debtors in possession (the "Debtors") having:[2]

a. commenced, on June 6, 2025 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas, effective September 18, 2024 (the "Complex Case Procedures");

b. Filed,[3] on June 6, 2025, the *Declaration of Mark A. Renzi, Chief Restructuring Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Mosaic Sustainable Finance Corporation (6802); Solar Mosaic LLC (3655); Modern Home LLC (4998); Mosaic Funding Holdings LLC (0866); and SMCTX LLC (6303). The service address for each of the above Debtors is 601 12th Street, Suite 325, Oakland, California 94607.

[2] Capitalized terms used but not otherwise defined in these findings of fact, conclusions of law, and order (collectively, this "Confirmation Order") have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Bankruptcy Code (each as defined herein), as applicable. The rules of interpretation set forth in Article I.B of the Plan apply to this Confirmation Order.

[3] Unless otherwise indicated, use of the term "Filed" herein refers also to the service of the applicable document filed on the docket in these Chapter 11 Cases, as applicable.

*Motions* [Docket No. 5], detailing the facts and circumstances of these Chapter 11 Cases;

c. continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

d. obtained, on July 2, 2025, the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 211] (the "Final DIP Order");

e. Filed, on July 3, 2025, (i) the *Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliated Debtors* [Docket No. 219]; (ii) the *Disclosure Statement for the Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliated Debtors* [Docket No. 220]; and (iii) the *Debtors' Emergency Motion for Entry of an Order (A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures and Solicitation Packages, (C) Scheduling a Combined Hearing, (D) Establishing Procedures for Objecting to the Plan and Final Approval of the Disclosure Statement, (E) Approving the Form, Manner, and Sufficiency of Notice of the Combined Hearing, and (F) Granting Related Relief* [Docket No. 221] (the "Disclosure Statement Motion");

f. Filed, on July 30, 2025, (i) the *Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliated Debtors* [Docket No. 368] and (ii) the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliated Debtors* [Docket No. 369];

g. obtained, on July 31, 2025, entry of the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures and Solicitation Packages, (C) Scheduling the Confirmation Hearing, (D) Establishing Procedures for Objecting to the Plan, (E) Approving the Form, Manner, and Sufficiency of Notice of the Confirmation Hearing, and (F) Granting Related Relief* [Docket No. 386] (the "Disclosure Statement Order"), approving the Disclosure Statement and approving: (i) the related solicitation procedures (the "Solicitation Procedures"), (ii) the notice of the hearing to be held to consider confirmation of the Plan (the "Confirmation Hearing" and, such notice, the "Confirmation Hearing Notice" and, such publication notice, the "Publication Notice"), (iii) the notices of non-voting status (the "Notice of Non-Voting Status"), (iv) the ballots (the "Ballots"), (v) the Voting Record Date, (vi) the solicitation materials and documents included in the solicitation packages (the "Solicitation Packages"), and (vii) other forms, notices, and dates and deadlines;

h. caused the Solicitation Packages, including the Confirmation Hearing Notice, to be distributed on or about August 5, 2025, in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Complex Case Procedures,

the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by the *Affidavit of Service of Solicitation Materials* [Docket No. 537] (the "Initial Solicitation Affidavit") and *Affidavit of Service of Solicitation Materials* [Docket No. 538] (together with all the exhibits thereto, the "Solicitation Affidavits");

i. caused the Publication Notice to be published in the *Wall Street Journal* (national edition) on August 5, 2025, as evidenced by the *Certificate of Publication* [Docket No. 509] (the "Publication Affidavit," and together with the Solicitation Affidavits, the "Affidavits");

j. Filed, (i) on August 14, 2025, the *Notice of Filing of Plan Supplement to Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliate Debtors* [Docket No. 466]; (ii) on August 29, 2025, the *Notice of Filing of Amended Plan Supplement to Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliate Debtors* [Docket No. 565]; and (iii) on August 30, 2025, the *Notice of Filing of Second Amended Plan Supplement to Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliated Debtors* [Docket No. 567] (and as may be amended, supplemented, or otherwise modified from time to time, the "Plan Supplement" and which, for purposes of the Plan (as defined herein) and this Confirmation Order, is included in the definition of "Plan");

k. Filed, on August 15, 2025, the *Second Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliated Debtors* [Docket No. 473];

l. Filed, on August 29, 2025, the *Third Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliated Debtors* [Docket No. 563];

m. Filed, on September 3, 2025, the *Fourth Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Certain of Its Affiliated Debtors* [Docket No. 623]; (as may be amended, modified, or supplemented from time to time, the "Plan") attached hereto as **Exhibit A**;

n. Filed, on August 27, 2025, the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Its Affiliated Debtors* [Docket No. 541] (the "Voting Report");

o. Filed, on September 3, 2025, the *Declaration of Mark A. Renzi in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Certain of Its Affiliated* [Docket No. 628] (the "Renzi Declaration");

p. Filed, on September 3, 2025, the *Declaration of Patrick Bartels in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Mosaic Sustainable*

Case 25-90156 Document 726 Filed in TXSB on 09/05/25 Page 4 of 162

*Finance Corporation and Certain of Its Affiliated* [Docket No. 626] (the "Bartels Declaration");

q. Filed, on September 3, 2025, the *Declaration of Richard W. Morgner in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Certain of Its Affiliated* [Docket No. 625] (the "Morgner Declaration") and together with the Renzi Declaration and Bartels Declaration, the "Confirmation Declarations"); and

r. Filed, on September 4, 2025, the *Memorandum of Law in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Certain of Its Affiliated Debtors* [Docket No. 629] (the "Confirmation Brief").

The Bankruptcy Court having:

a. entered the Disclosure Statement Order approving the Solicitation Procedures and approving the Disclosure Statement as containing adequate information under section 1125 of the Bankruptcy Code;

b. set August 25, 2025 at 4:00 p.m. (prevailing Central Time) as the deadline for filing objections to confirmation of the Plan;

c. set August 25, 2025 at 4:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan;

d. set September 4, 2025 at 9:00 a.m. (prevailing Central Time) as the date and time for the Confirmation Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

e. reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Confirmation Declarations, the Voting Report, the Confirmation Hearing Notice, the Affidavits, and all pleadings, exhibits, statements, and comments regarding confirmation of the Plan, including all objections, statements, and reservation of rights filed by parties in interest on the docket of these Chapter 11 Cases;

f. held the Confirmation Hearing;

g. heard and considered the statements and arguments made by counsel in respect of Confirmation;

h. considered all testimony presented and evidence admitted at the Confirmation Hearing, as applicable;

i. overruled (i) any and all objections to the Plan and Confirmation, except as otherwise stated or indicated on the record and (ii) all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated; and

j. taken judicial notice of all papers and pleadings and other documents filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Bankruptcy Court that the Confirmation Hearing Notice and the opportunity for any party in interest to object to confirmation of the Plan having been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents Filed in support of confirmation of the Plan and other evidence presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court makes and issues the following findings of fact and conclusions of law, and orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

### A. Findings and Conclusions

1. The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

### B. Jurisdiction, Venue, and Core Proceeding

2. This Bankruptcy Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Consideration of whether the Plan complies with the applicable provisions

Case 25-90156 Document 126713 Filed in TXSB on 09/05/25 Page 88 of 248

of the Bankruptcy Code constitutes a core proceeding pursuant to 28 U.S.C. § 157(b) and this Bankruptcy Court has jurisdiction to enter a final order with respect thereto, consistent with Article III of the United States Constitution. Venue is proper before this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**C. Eligibility for Relief**

3. The Debtors were and are Entities eligible for relief under section 109 of the Bankruptcy Code. The Debtors are proper plan proponents under section 1121(a) of the Bankruptcy Code.

**D. Commencement and Joint Administration of these Chapter 11 Cases**

4. On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. In accordance with the *Order (I) Directing Joint Administration of Cases and (II) Granting Related Relief* [Docket No. 26], these Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015. Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

**E. Appointment of the Committee**

5. On June 19, 2025, the Office of the United States Trustee for Region 7 (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to Bankruptcy Code section 1102(a) and 1102(b)(1) [Docket No. 127].

**F. Judicial Notice**

6. This Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of this Bankruptcy Court, including all pleadings and other documents

filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before this Bankruptcy Court during the pendency of the Chapter 11 Cases. Any resolution of objections to confirmation of the Plan explained on the record at the Confirmation Hearing is hereby incorporated by reference. All unresolved objections, statements, informal objections, and reservations of rights, if any, related to the Plan or confirmation of the Plan are overruled on the merits and denied in their entirety.

**G. Burden of Proof**

7. Based on the record of these Chapter 11 Cases, each of the Debtors, as proponents of the Plan, has met the burden of proving each applicable element of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for confirmation of the Plan. In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard.

**H. Modifications to the Plan**

8. Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan following solicitation thereof, including the Plan Supplement, and any modifications to the Plan described or set forth in this Confirmation Order, constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest under the Plan. Notice of these modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes on the Plan under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims or Interests be afforded an opportunity to

change previously cast votes accepting or rejecting the Plan. Accordingly, the Plan is properly before this Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

### I. Disclosure Statement Order

9. On July 31, 2025, the Bankruptcy Court entered the Disclosure Statement Order, setting August 25, 2025, at 4:00 p.m. (prevailing Central Time) as the deadline for (a) voting to accept or reject the Plan and to opt-out of the Third-Party Release and (b) objecting to confirmation of the Plan (the "Objection Deadline").

### J. Solicitation

10. As described in and evidenced by the Voting Report, transmittal and service of the Solicitation Packages was timely, adequate, appropriate, and sufficient under the circumstances. The Solicitation (i) was conducted in good faith and (ii) complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and all other applicable non-bankruptcy laws applicable to the Solicitation.

11. On or around August 5, 2025, the Debtors and Kroll Restructuring Administration LLC ("Kroll"), as applicable, solicited votes to accept or reject the Plan after the Bankruptcy Court approved the adequacy of the Disclosure Statement, as applicable, pursuant to section 1125(a) of the Bankruptcy Code and the Disclosure Statement Order.

12. Each of the Debtors and Kroll, as applicable, have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e), and in a manner consistent with the applicable provisions of the Solicitation Procedures, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Complex Case Procedures, and all other

applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code, the exculpation provisions set forth in Section 12.4 of the Plan, and all other protections and rights provided in the Plan. The solicitation efforts included the Debtors and Kroll, as applicable, providing each known consumer who is a current or former borrower under a loan originated or serviced by the Debtors (each, a "Borrower" and, collectively, the "Borrowers") a Notice of Potential Voting Status (as defined in the Disclosure Statement Order), which notified Borrowers of the Plan and Confirmation Hearing through links to the Solicitation Package, provided Borrowers with a form for opting out of the third-party releases, which form contained the full text of the settlement, release, exculpation, and injunction provisions set forth in Article XII of the Plan, provided instructions for completing the Release Opt-Out Form, and advised that any Holder of a Claim or Interest that failed to timely and properly opt out would be deemed to have consented to the third party release provision in Section 12.3 of the Plan, and provided instructions for Borrowers to submit a Proof of Claim and vote on the Plan.

13. So long as the offering, issuance, and distribution of recoveries under the Plan are made pursuant to, and in compliance with, the Plan, the Debtors, Kroll, and their Related Parties, as applicable, will have participated in such offering, issuance, and distribution of recoveries in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, therefore, are not, and will not be, on account of such offering, issuance, and distributions, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made thereunder.

**K. Notice**

14. As evidenced by the Confirmation Hearing Notice, Affidavits, and the Voting Report and the record in these Chapter 11 Cases, the Debtors provided due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the release, exculpation, and injunction provisions contained in the Plan, the Confirmation Hearing, the Objection Deadline, and any other applicable dates described in the Solicitation Procedures and Disclosure Statement Order to all parties in interest in the Chapter 11 Cases. Such notice was adequate and sufficient and in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3016, 3017, 3019, and 3020(b), the Bankruptcy Local Rules, the Complex Case Procedures, and all other applicable non-bankruptcy laws, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is or shall be required.

**L. Tabulation**

15. As described in the Voting Report, the Claims in Class 3 (Prepetition First Out Claims), Class 4 (Prepetition Last Out Claim), Class 5 (General Unsecured Claims), Class 6 (Consumer Credit Transaction Claims), and Class 7 (Subordinated Claims) are Impaired under the Plan and entitled to vote on the Plan, and their respective holders have voted to accept the Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code. All procedures used to tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and all other applicable non-bankruptcy laws. The Claims in Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are Unimpaired under the Plan and conclusively presumed to have accepted the Plan and, therefore, the Debtors were not required to

solicit votes from the Holders of Claims in such Classes. Further, the Debtors were not required to solicit votes from Holders of Interests in Class 8 (Existing TopCo Equity Interests) or Class 9 (Existing Intercompany Equity Interests) because such Interests are Impaired and deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan. Nevertheless, the Debtors served Holders of Claims and Interests in the Non-Voting Classes with the Notice of Non-Voting Status and Release Opt-Out Form and served the Borrowers with the Notice of Potential Voting Status and Release Opt-Out Form.

**M. Plan Supplement**

16. The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan, and the filing and notice of such documents are good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and no other or further notice is required. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. Subject to the terms of the Plan, and only consistent therewith, the Debtors' right to alter, amend, update, or modify, in each case in whole or in part, the Plan Supplement before the Effective Date is reserved. All parties were provided due, adequate, and sufficient notice of the Plan Supplement. For the avoidance of doubt, the Debtors may amend or supplement the Plan Supplement following the entry of this Confirmation Order to the extent authorized by the Plan and this Confirmation Order.

**N. Compliance with Bankruptcy Code Requirements – Section 1129(a)(1)**

17. The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code. In addition, the Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

**(i) Proper Classification – Sections 1122 and 1123**

18. The classification of Claims and Interests under the Plan is proper and satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code. Article IV of the Plan provides for the separate classification of Claims and Interests into nine (9) Classes. Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests. The classifications reflect no improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests. Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims and Interests within that Class.

**(ii) Specified Unimpaired Classes – Section 1123(a)(2)**

19. The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code. Article IV of the Plan specifies that Claims and Interests in Class 1 (Priority Non-Tax Claims), and Class 2 (Other Secured Claims) (the "Unimpaired Classes") are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code.

20. Additionally, Article III of the Plan specifies that Allowed Administrative Expense Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims will be paid in full in accordance with the terms of the Plan, although these Claims are not classified under the Plan.

**(iii) Specified Treatment of Impaired Classes – Section 1123(a)(3)**

21. The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article IV of the Plan specifies that Claims and Interests, as applicable, in the following Classes (the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes:

| Class | Designation |
|---|---|
| 3 | Prepetition First Out Claims |
| 4 | Prepetition Last Out Claim |
| 5 | General Unsecured Claims |
| 6 | Consumer Credit Transaction Claims |
| 7 | Subordinated Claims |
| 8 | Existing TopCo Equity Interests |
| 9 | Existing Intercompany Equity Interests |

**(iv) No Discrimination – Section 1123(a)(4)**

22. The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors of each Claim or Interest in each respective Class, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

**(v) Adequate Means for Plan Implementation – Section 1123(a)(5)**

23. The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The provisions in Article VII and elsewhere in the Plan, Plan Supplement, Restructuring Transactions Memorandum,[4] and Disclosure Statement, provide, in detail, adequate and proper means for the Plan's implementation, including, among other provisions: (a) the good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan; (b) authorization for the Debtors, the Reorganized Debtor, Wind Down Debtors, the Litigation Trustee, and Plan Administrator, as applicable, to take all actions necessary to effectuate the Plan, including those actions necessary to effectuate the Restructuring Transactions; (c) preservation of the Debtors' corporate existence following the Effective Date (except as otherwise provided in the Plan); (d) vesting of the Estates' assets in the Reorganized Debtor, Wind Down Debtors, Plan Administrator, or Litigation Trust, as applicable; (e) the cancellation of

[4] Filed as Exhibit C to the Plan Supplement (the "Restructuring Transactions Memorandum").

existing agreements and Interests, as applicable; (f) the funding and sources of consideration for the Plan distributions, including the Global Settlement and Debtors' Cash on hand including Cash from operations, the proceeds of the DIP Loans, and any Sale Proceeds; (g) the creation and distribution of the Reorganized Common Equity; (h) the authorization and approval of corporate actions under the Plan; (i) the adoption of the New Organizational Documents; (j) the preservation of Claims and Causes of Action not released pursuant to the Plan; and (k) the exemption to comply with section 1146 of the Bankruptcy Code.

24. The precise terms governing the execution of these transactions are set forth in greater detail in the applicable Definitive Documents or forms of agreements or other documents included in the Plan Supplement or other documents related to the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

**(vi) Voting Power of Equity Securities – Section 1123(a)(6)**

25. The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. Section 7.11 of the Plan provides that the New Organizational Documents will comply with section 1123(a)(6) of the Bankruptcy Code. The New Organizational Documents prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

**(vii) Disclosure of New Directors and Officers – Section 1123(a)(7)**

26. The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Section 7.15 of the Plan sets forth the structure of the New Boards, which shall consist of members as designated in accordance with the New Organizational Documents.

**(viii) Impairment / Unimpairment of Classes – Section 1123(b)(1)**

27. The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Article IV of the Plan impairs or leaves unimpaired each Class of Claims and Interests.

**(ix) Assumption – Section 1123(b)(2)**

28. The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. Section 10.1 of the Plan provides for the treatment of all of the Debtors' Executory Contracts and Unexpired Leases, and Section 10.2 of the Plan provides for the payment of Cure Amounts related thereto, if applicable. The Debtors' determinations regarding the assumption or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and are in the best interests of the Debtors, the Debtors' Estates, Holders of Claims and Interests, and other parties in interest in the Chapter 11 Cases. Entry of this Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assumptions and assignments, and/or rejections, as applicable.

**(x) Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action – Section 1123(b)(3)**

29. Compromise and Settlement. The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code. In accordance with Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, and in consideration of the classification, distributions, releases, and other benefits provided under the Plan, except as stated otherwise in the Plan, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, subordination, and other legal rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. Entry into such compromises and settlements represented a sound exercise of the Debtors' business judgment. The compromise and settlement of such Claims

and Interests embodied in the Plan, including the Global Settlement, are in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

30. The entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such compromises and settlements are fair, equitable, reasonable, and in the best interest of the Debtors and their Estates.

31. Debtor Release and ABS Release. Sections 12.2 and 12.9 of the Plan describe certain releases granted by, respectively, the Debtors (the "Debtor Release") and the ABS Parties and the Specified Releasing Parties (collectively, the "ABS Release").

32. The Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Release and ABS Release. The Debtor Release and ABS Release are in the best interests of the Debtors and their Estates and satisfies the requirements of applicable law for approval pursuant to Bankruptcy Rule 9019. The Debtor Release and ABS Release are a necessary and integral part of the Plan, and are fair, reasonable, and in the best interest of the Debtors, their Estates, and Holders of Claims and Interests in accordance with section 1123(b) of the Bankruptcy Code. Additionally, the Plan, including the Debtor Release and ABS Release, was vigorously negotiated by sophisticated entities that were represented by able counsel and financial advisors, and in the case of the Debtor Release, the result of a thorough Independent Investigation conducted by the Debtors' independent director. The Debtor Release and ABS Release are: (a) in exchange for good and valuable consideration provided by the Released Parties, the Specified Released Parties, and ABS Released Parties, respectively; (b) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release and a good faith

settlement and compromise of the Claims released by the Release to ABS Released Parties and/or the ABS Parties Release; (c) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) in the case of the Debtor Release, are given and made after reasonable investigation by the Debtors and after due notice and opportunity for a hearing; and (f) a bar to any of the Debtors, their Estates, or the Reorganized Debtor asserting any Claim or Cause of Action released pursuant to the Debtor Release; (g) a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, the DIP Agent, the DIP Lenders, the Prepetition Secured Agent or the Prepetition Secured Lenders asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Release to ABS Released Parties; and (h) a bar to any of the ABS Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the ABS Parties Release.

33. Third-Party Release. Section 12.3 of the Plan describes certain releases granted by the Releasing Parties (the "Third-Party Release"). The Third-Party Release provides finality for the Debtors, the Reorganized Debtor, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Debtor. The Third-Party Release is a critical and integral component of the Plan, preventing significant and time-consuming litigation regarding the parties' respective rights and interests. The Third-Party Release was negotiated as a result of extensive arm's-length and good faith negotiations among parties, and subject to a thorough, rigorous Independent Investigation by the Debtors' independent director. It provides finality for the Debtors, their Estates, and the other Released Parties regarding the parties' respective obligations under the Plan and the transactions contemplated therein. Further, the Third-Party Release appropriately offers protection to parties who constructively participated in the Debtors' chapter 11 process, including, but not limited to, the DIP Lenders and DIP Agent

(who provided necessary funding for these Chapter 11 Cases), the Debtors' directors and officers (who drove the Debtors' restructuring process prior to and throughout these Chapter 11 Cases), and Holders of Claims or Interests that elected not to opt-out of the Third-Party Release (who consented to the release of all Claims and Causes of Action against the Released Parties). The Third-Party Release is also consistent with established practice in this jurisdiction and others. The opt-out mechanism is a valid means for obtaining consent to the Third-Party Release, and all parties in interest had ample notice of the Third-Party Release. The Confirmation Hearing Notice sent to Holders of Claims and Interests and published in the *Wall Street Journal* on August 5, 2025, the Notice of Non-Voting Status and Release Opt-Out Form sent to all Holders of Claims or Interests not entitled to vote on the Plan, and the Ballots and Third-Party Release Opt-Out Election sent to all Holders of Claims or Interests entitled to vote on the Plan, as well as the Notice of Potential Voting Status sent to the Borrowers, in each case, clearly and unambiguously stated that the Plan contained the Third-Party Release, provided the language of the Third-Party Release and included any relevant definitions, and provided instructions on how to opt-out of the Third-Party Release. Such release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and all Holders of Claims or Interests. Holders of Claims or Interests were given due and adequate notice that (i) the Plan contained a Third-Party Release, (ii) they could choose to opt-out of the Third-Party Release (including detailed instructions to do so); and (iii) by choosing to not opt-out of the Third-Party Release, they would be consenting to the Third-Party Release. The Third-Party Release is therefore consensual on the part of the Releasing Parties. Accordingly, the Third-Party Release is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties'

contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for a hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Causes of Action pursuant to the Third-Party Release. For the avoidance of doubt, and subject to Section 7.19 of the Plan, the Third-Party Releases do not release any Consumer Credit Transaction Claims against Solar Mosaic LLC, any Financing Partners (solely in their capacity as Financing Partners), and the ABS Vehicles.

34. Exculpation. The exculpation described in Section 12.4 of the Plan (the "Exculpation") is appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022) and *In re Highland Capital Mgmt., L.P.*, 132 F.4th 353, 360–62 (5th Cir. 2025), because it was proposed in good faith, was formulated following extensive good faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, each Exculpated Party has participated in the Chapter 11 Cases in good faith and is appropriately exculpated in connection with, or related to: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of confirmation and consummation of the Plan, making distributions under the Plan, the Disclosure Statement, the Plan Equitization Transaction, the Sale Process, the Sale Order, or the solicitation of votes for, or confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing; the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the

DIP Documents (including with respect to the DIP Loans), or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation or consummation of the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The Exculpation, including its carveout for actual fraud, willful misconduct, and gross negligence, is consistent with applicable law in this jurisdiction. The Released Parties and the Exculpated Parties are entitled to the protection of section 1125(e) of the Bankruptcy Code.

35. Injunction. The injunction provision set forth in Section 12.6 of the Plan (the "Injunction") is necessary to implement, preserve, and enforce the Reorganized Debtor's discharge, the Debtor Release, the Third-Party Release, and the Exculpation, and is narrowly tailored to achieve this purpose. The Injunction is appropriately tailored to achieve those purposes and appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.*, 132 F.4th 353, 360–62 (5th Cir. 2025).

36. Pursuant to Section 7.23 of the Plan and in accordance with section 1123(b) of the Bankruptcy Code, but subject to Article XII of the Plan, the Litigation Trust's or Reorganized

Debtor's, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Litigation Trust or Post-Effective Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article XII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtor as of the Effective Date. The provisions regarding the preservation of Causes of Action in the Plan, including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

37. Lien Releases. Except as otherwise provided in the Plan, this Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, as described in Section 12.8 of the Plan (the "Lien Release"), shall be fully released and discharged, and all of the right, title, and interest of any Holder of such security interests shall revert to the Reorganized Debtor. Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtor, to release any Collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested

by the Reorganized Debtor to evidence the release of such Liens and/or security interests, including the execution, delivery, and Filing or recording of such releases.

38. The Lien Release is necessary to implement the Plan. The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. The presentation or Filing of this Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**(xi) Additional Plan Provisions – Section 1123(b)(6)**

39. The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

**O. Cure of Defaults (11 U.S.C. § 1123(d))**

40. Section 10.2 of the Plan provides for the satisfaction of Cure Amounts associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. The Debtors or the Reorganized Debtor, as applicable, shall pay Cure Amounts, if any and if applicable, in the ordinary course of business. Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or the Reorganized Debtor, as applicable, upon assumption thereof. All counterparties to such Executory Contracts and Unexpired Leases that have failed to object timely to the proposed assumption are deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract.

41. Any Cure Dispute will be determined in accordance with the procedures set forth in Section 10.2 of the Plan and applicable bankruptcy and non-bankruptcy law.

42. The Debtors provided sufficient notice to the counterparties to the Executory Contracts and Unexpired Leases to be assumed under the Plan. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

**P. Debtor Compliance with the Bankruptcy Code – Section 1129(a)(2)**

43. The Debtors have complied with the applicable provisions of the Bankruptcy Code and, thus, satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code. Specifically, each Debtor:

a. is eligible to be a debtor under section 109, and is a proper proponent of the Plan under section 1121(a), of the Bankruptcy Code;

b. has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Bankruptcy Court; and

c. complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Bankruptcy Local Rules, any applicable non-bankruptcy laws, the Disclosure Statement Order, and all other applicable laws in transmitting the Solicitation Packages, and related documents and notices, and in soliciting and tabulating the votes on the Plan.

**Q. Plan Proposed in Good Faith – Section 1129(a)(3)**

44. The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors have proposed the Plan (and all documents necessary to effectuate the Plan) in good faith and not by any means forbidden by law. In so determining, this Bankruptcy Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan, the process leading to confirmation of the Plan, and the transactions to be implemented pursuant thereto. The Debtors' good faith is evident from the facts and the record of the Chapter 11 Cases, the Disclosure Statement, the hearing on approval of the Disclosure Statement, the record

of the Confirmation Hearing, and other proceedings held in the Chapter 11 Cases. The Plan and all documents necessary to effectuate the Plan were negotiated at arm's-length among, as applicable, the Debtors, the DIP Lenders and DIP Agent, the Committee, the Sponsors, and their respective advisors. The Chapter 11 Cases were filed and the Plan was negotiated and proposed with the legitimate purpose of allowing the Debtors to implement the transactions therein, and emerge from bankruptcy with a capital structure that will allow them to conduct their businesses and satisfy their obligations with sufficient liquidity and capital resources. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' and other applicable parties' good faith and assures fair treatment of Holders of Claims and Interests. Consistent with the overriding purposes of chapter 11, the Debtors filed the Chapter 11 Cases with the belief that the Debtors were in need of a restructuring, and the Plan was negotiated and proposed with the legitimate and honest intention of accomplishing a successful transaction, to maximize stakeholder value, and for no ulterior purpose. The Debtors, the Released Parties, the Committee, and the Exculpated Parties have been, are, and will continue to be acting in good faith within the meaning of section 1125(e) of the Bankruptcy Code if they proceed to (i) consummate the Plan, the Restructuring Transactions, and the agreements, settlements, transactions, and transfers contemplated thereby, and (ii) take any other actions authorized and directed by this Confirmation Order and the Plan to reorganize the Debtors' business.

**R. Payment for Services or Costs and Expenses – Section 1129(a)(4)**

45. The procedures set forth in the Plan for this Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

**S. Directors, Officers, and Insiders – Section 1129(a)(5)**

46. Section 7.15 of the Plan sets forth the structure of the New Board, which shall consist of members as designated in accordance with the New Organizational Documents. The members of the New Board and the officers of the Reorganized Debtor, to the extent known, will be disclosed on or before the Effective Date. Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**T. No Rate Changes – Section 1129(a)(6)**

47. Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Chapter 11 Cases. The Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission.

**U. Best Interest of Creditors – Section 1129(a)(7)**

48. The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis set forth in the Plan Supplement and the other evidence presented, proffered, or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) are based on appropriate assumptions and valid analysis and methodology, (iii) have not been controverted by other evidence, and (iv) establish that each holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

**V. Acceptance by Certain Classes – Section 1129(a)(8)**

49. Classes 1 and 2 constitute Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.

Of the Voting Classes, Class 3 (Prepetition First Out Claims), which is an Impaired Class under the Plan, has voted to accept the Plan exclusive of any acceptances by insiders. Class 5 (General Unsecured Claims) and Class 6 (Consumer Credit Transaction Claims) voted against the Plan. Further, Holders of Interests in Classes 8 and 9 are Impaired and receive no recovery on account of their Interests pursuant to the Plan and are deemed to have rejected the Plan (the "Deemed Rejecting Classes"). While the Plan does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code, given Class 3 voted to accept the Plan, the Plan is confirmable because it satisfies the requirements for "cram down" pursuant to sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, each as discussed further below.

### W. Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code – Section 1129(a)(9)

50. The treatment of Administrative Expense Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims, under Article III of the Plan, and of Priority Non-Tax Claims under Article IV of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

### X. Acceptance by at Least One Impaired Class – Section 1129(a)(10)

51. The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, Class 3 (Prepetition First Out Claims), which is Impaired, voted to accept the Plan by the requisite number and amount of Claims or Interests, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

### Y. Feasibility – Section 1129(a)(11)

52. The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The financial projections set forth in the Plan Supplement and the other evidence supporting

confirmation of the Plan proffered or adduced by the Debtors at, or prior to, or in the Renzi Declaration filed in connection with, the Confirmation Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; (d) establish that the Plan is feasible and confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor or any successor to the Reorganized Debtor under the Plan, except as provided in the Plan; and (e) establish that the Reorganized Debtor will have sufficient funds available to meet their obligations under the Plan.

**Z. Payment of Fees – Section 1129(a)(12)**

53. The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Section 3.5 of the Plan provides for payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).

**AA. Non-Applicability of Certain Sections – Sections 1129(a)(13), (14), (15), and (16)**

54. Sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases. The Debtors owe no retiree benefits, owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

**BB. "Cram Down" Requirements – Section 1129(b)**

55. The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that Class 5 (General Unsecured Claims) and Class 6 (Consumer Credit Transaction Claims) rejected the Plan and the Deemed Rejecting Classes have been deemed to reject the Plan, the Plan may still be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than

section 1129(a)(8) have been met, as discussed above. *Second*, the Plan is fair and equitable with respect to the Deemed Rejecting Classes and Class 5 and Class 6 which voted to reject the Plan. The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to such Class is receiving more than 100 percent on account of its Claim or Interest. Accordingly, the Plan is fair and equitable to all Holders of Claims and Interests in the Deemed Rejecting Classes and Class 5 and Class 6 which voted to reject the Plan. *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes and Class 5 and Class 6 which voted to reject the Plan because similarly situated creditors will receive substantially similar treatment on account of their Claim or Interest irrespective of Class. Therefore, the Plan satisfies section 1129(b) of the Bankruptcy Code and can be confirmed.

**CC. Only One Plan – Section 1129(c)**

56. The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in each of the Chapter 11 Cases.

**DD. Principal Purpose of the Plan – Section 1129(d)**

57. The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

**EE. Small Business Case – Section 1129(e)**

58. None of the Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

**FF. Good Faith Solicitation – Section 1125(e)**

59. Each of the Debtors, have acted fairly, in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable laws in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation and tabulation of votes on the Plan and the activities described in section 1125 of the Bankruptcy Code, as applicable, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

60. The Debtors have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(g), with regard to the offering, issuance, and distribution of recoveries under the Plan and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

**GG. Satisfaction of Confirmation Requirements**

61. Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**HH. Likelihood of Satisfaction of Conditions Precedent to the Effective Date**

62. Each of the conditions precedent to the Effective Date, as set forth in Section 11.2 of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Section 11.3 of the Plan.

**II. Implementation**

63. All documents and agreements necessary to implement the Plan, including the Definitive Documents, and all other relevant and necessary documents have been or will be

negotiated in good faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local laws. Consummation of the transactions contemplated by each such document or agreement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements. For the avoidance of doubt, on the Effective Date, each Person or Entity that is a party to each of the Definitive Documents and all other documents and agreements necessary to implement the Plan shall automatically be deemed to be a party to such documents or agreements, in accordance with their terms, regardless of whether it executed a signature page to such documents or agreements.

**JJ. Disclosure of Facts**

64. The Debtors have disclosed all material facts regarding the Plan including with respect to consummation of the Restructuring Transactions, and the fact that each Debtor will emerge from its Chapter 11 Case as a validly existing separate corporate entity, limited liability company, partnership, or other form, as applicable pursuant to the Plan.

**KK. Good Faith**

65. The Debtors and their respective directors, officers, management, counsel, advisors, and other agents have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Estates for the benefit of their stakeholders. The Plan accomplishes this goal. Accordingly, the Debtors or the Reorganized Debtor, as applicable, and their respective officers, directors, and advisors have been, are, and will continue to act in good faith if they proceed to: (a) consummate the Plan, the Global Settlement, the Restructuring Transactions, and all agreements, settlements, transactions, and transfers contemplated thereby;

and (b) take the actions authorized and directed by this Confirmation Order and the Plan to reorganize the Debtors' businesses and effectuate the New Organizational Documents and the other Restructuring Transactions.

**LL. Essential Elements of the Plan**

66. The Reorganized Common Equity issued under the Plan, New Organizational Documents, Global Settlement, and LendingClub License Agreement are essential elements of the Plan, necessary for Confirmation and consummation of the Plan, and is critical to the overall success and feasibility of the Plan. Entry into the instruments evidencing or relating to the Reorganized Common Equity is in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests. The Debtors have exercised reasonable business judgment in determining to enter into the instruments evidencing or relating to the Plan. The terms and conditions of the instruments contemplated by the Plan, are fair and reasonable, and were negotiated in good faith and at arm's-length.

**MM. Establishment of the Litigation Trust**

67. The terms and conditions of the Litigation Trust and the Debtors' entry into the Litigation Trust Agreement, including all actions, undertakings, and transactions contemplated thereby, and payment of all fees, indemnities, and expenses provided for thereunder, are essential elements of the Plan, necessary for the consummation thereof, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. The Litigation Trust is critical to the overall success and feasibility of the Plan, and the Debtors have exercised reasonable business judgment in determining to enter into the Litigation Trust Agreement, which have been negotiated in good faith and at arm's-length.

Case 25-90156 Document 1267 Filed in TXSB on 09/05/25 Page 32 of 162

**NN. Executory Contracts and Unexpired Leases**

68. Each rejection, assumption, and assumption and assignment of an Executory Contract or Unexpired Lease pursuant to Article X of the Plan shall be legal, valid, and binding upon the applicable Debtor and all non-Debtor parties to such Executory Contract or Unexpired Lease, all to the same extent as if such rejection, assumption, and assumption and assignment had been effectuated pursuant to an appropriate order of the Bankruptcy Court entered prior to the Effective Date under section 365 of the Bankruptcy Code.

**ORDER**

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

1. **Findings of Fact and Conclusions of Law.** The above findings of fact and conclusions of law, as well as any additional findings of fact and conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing, are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

2. **Solicitation.** The Solicitation complied with the Disclosure Statement Order, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases, and complied with the Bankruptcy Code, the Bankruptcy Rules, the Complex Case Procedures, and the Local Rules.

3. **Confirmation of the Plan.** The Plan is approved in its entirety and confirmed pursuant to section 1129 of the Bankruptcy Code. The documents contained in the Plan Supplement (including any supplements, amendments, or modifications thereof in accordance with

this Confirmation Order and the Plan whether made prior to or following entry of this Confirmation Order) or otherwise contemplated by the Plan (collectively, the "Plan Documents"), are approved, and the Debtors are authorized to execute and deliver such documents and perform thereunder. The terms of the Plan and the Plan Documents are incorporated herein by reference and are an integral part of this Confirmation Order. The terms of the Plan, the Plan Documents, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date upon the Debtors, the Reorganized Debtor, the Released Parties, the Releasing Parties, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. Subject to the terms of the Plan, the Debtors reserve the right to revoke or withdraw, or to alter, amend, update, or modify materially the Plan and the Plan Documents prior to the Effective Date in accordance with and as permitted by the Plan, subject to the consent rights set forth therein. The terms of the Plan, the Plan Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part of this Confirmation Order; *provided that*, if there is any direct conflict between the terms of the Plan (including the Plan Supplement) and the terms of this Confirmation Order, the terms of this Confirmation Order shall control solely to the extent of such conflict.

4. **Objections.** To the extent that any objections (including any statements, joinders, and reservations of rights contained therein) to confirmation of the Plan or any other responses or statements, joinders, and reservations of rights with respect thereto have not been withdrawn, waived, or settled prior to entry of this Confirmation Order, such objections and responses shall

Case 25-90156 Document 167 Filed in TXSB on 08/25/25 Page 41 of 162

be, and hereby are, overruled on the merits and denied with prejudice (except in connection with unresolved objections to the extent solely related to Cure Amounts arising under assumed Executory Contracts). All objections to confirmation of the Plan not filed and served prior to the Objection Deadline set forth in the Confirmation Hearing Notice, if any, are deemed waived and shall not be considered by this Bankruptcy Court. All parties have had a full and fair opportunity to litigate all issues raised or that might have been raised in the objections to confirmation of the Plan, and the objections have been fully and fairly litigated or resolved, including by agreed-upon provisions as set forth in this Confirmation Order. All withdrawn objections are deemed withdrawn with prejudice.

5. **Omission of Reference to Particular Plan Provisions.** The failure to specifically include or to refer to any particular article, section, or provision of the Plan or the Plan Supplement in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of this Bankruptcy Court that the Plan and any related documents be confirmed and approved in their entirety.

6. **Binding Effect.** Subject to Section 11.5 of the Plan, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, all Plan Documents) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtor, the Released Parties, the Releasing Parties, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

7. **Incorporation by Reference.** The terms and provisions of the Plan, the Plan Documents, all other relevant and necessary documents, and each of the foregoing's schedules and exhibits are, on and after the Effective Date, incorporated herein by reference and are an integral part of this Confirmation Order.

8. **Vesting of Assets in the Reorganized Debtor or Litigation Trust.** Except as otherwise provided in the Plan, this Confirmation Order, or any agreement, instrument, or other document incorporated in or entered into in connection with or pursuant to the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in accordance with the terms of the Plan, in each respective Reorganized Debtor, Wind Down Debtor, Plan Administrator, or the Litigation Trust, as applicable, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, this Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by this Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

9. **Corporate Action.** Upon the Effective Date, all of the actions contemplated under the Plan shall be deemed authorized and approved in all respects, without the need for further Bankruptcy Court approval or any board or equity holders approval or other corporate action, including: (a) the offering, issuance and distribution of the Reorganized Common Equity; (b) implementation of the Restructuring Transactions; (c) creation of the Litigation Trust; (d) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (e) adoption of the New Organizational Documents; (f) the rejection, assumption, or assumption and

assignment, as applicable, of Executory Contracts and Unexpired Leases (as applicable); and (g) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtor, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by any equity holders, members, directors, or officers of the Debtors or the Reorganized Debtor, as applicable.

10. **Implementation of the Plan.** On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, indentures, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtor, including but not limited to, any new agreements, documents, securities, and instruments relating to the Reorganized Common Equity, and the New Organizational Documents. The authorizations and approvals contemplated by Section 7.18 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law and without the need for further approval of the Bankruptcy Court.

11. **Restructuring Transactions.** On or before the Effective Date, or as soon as reasonably practicable thereafter, the applicable Debtors or the Reorganized Debtor (and their respective officers, directors, members, or managers (as applicable)) shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions and may

take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan (and without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan). On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions and all parties receiving distributions under or otherwise affected by the terms, provisions, restrictions and conditions contained in the Plan and/or any Plan Documents shall be deemed to have received sufficient and adequate notice of, and to have actual knowledge of, all such terms, provisions, restrictions.

12. **Approval of the LendingClub License Agreement.** On the Effective Date, the applicable Debtors or Reorganized Debtor and their respective officers, directors, members, or managers, as applicable, shall enter into and shall take any actions as may be necessary or appropriate to effect the LendingClub License Agreement and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the LendingClub License Agreement that are consistent with and pursuant to the terms and conditions of the LendingClub License Agreement (and without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan).

13. Confirmation of the Plan shall be deemed approval of the LendingClub License Agreement, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or Reorganized Debtor and their respective officers, directors, members, or managers, as applicable, in connection therewith, and authorization for the Debtors or Reorganized Debtor and their respective officers, directors,

members, or managers, as applicable, to enter into and execute the LendingClub License Agreement as of the Effective Date.

14. **Registration Exemptions.** As of the Effective Date, Section 7.10 (Exemption from Registration Requirements) of the Plan, is hereby approved. The offering, issuance (or entry into), and distribution of the Reorganized Common Equity shall be exempt from, among other things, the registration requirements of the Securities Act and any other applicable U.S. state or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities to the maximum extent permitted by law, in accordance with, and pursuant to section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).

15. **Approval of the Global Settlement.** Confirmation of the Plan shall be deemed approval of the Global Settlement, and all terms contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors, the Prepetition Secured Lenders, the DIP Lenders, the Committee, and the Sponsors. The Debtors, the Prepetition Secured Lenders, the DIP Lenders, the Committee, and the Sponsors may take all actions as may be necessary or appropriate to effect any terms described in, approved by, contemplated by, or necessary to effectuate the Global Settlement, as set forth in Section 7.31(c) of the Plan, that are consistent with and pursuant to the terms and conditions of the Global Settlement (and without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan).

16. **Approval of the Litigation Trust.** On the Effective Date, the Litigation Trustee shall execute the Litigation Trust Agreement and take all steps necessary to establish the Litigation Trust for the benefit of the Litigation Trust Beneficiaries. In accordance with the terms of the Plan

and the Litigation Trust Agreement, the Litigation Trustee in conjunction with the Litigation Trust Oversight Board, shall be responsible for administering the Litigation Trust.

17. **Approval of the Litigation Trust Agreement.** On the Effective Date, the Litigation Trust Agreement shall be executed, and the Debtors or Wind Down Debtors (as applicable) shall be deemed to transfer to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Trust Assets free and clear of all Liens, charges, Claims, encumbrances, and interests, in accordance with section 1141 of the Bankruptcy Code. The Debtors or Wind Down Debtors (as applicable) and the Litigation Trustee shall take all steps necessary to establish the Litigation Trust in accordance with the Plan, including entering into the Litigation Trust Agreement, and the beneficial interests therein. In the event of any conflict between the terms of the Plan and the terms of the Litigation Trust Agreement, the terms of the Plan shall govern.

18. **Litigation Trust Cash Contribution and Litigation Trust Expenses.** On the Effective Date, the Wind Down Debtors shall transfer to the Litigation Trust the Litigation Trust Assets, including the Litigation Trust Cash Contribution (consistent with and to the extent set forth in Section 7.31 of the Plan). Such Litigation Trust Cash Contribution shall be used solely for the Litigation Trust Expenses.

19. From and after the Effective Date, the Litigation Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the Litigation Trust Expenses from the Litigation Trust Cash Contribution, including, but not limited to, reasonable fees and expenses of the Litigation Trustee and the fees and expenses of any professionals retained by the Litigation Trust. Other than transferring their rights, title, and interest

in and to the Litigation Trust Cash Contribution, the Debtors and Reorganized Debtor shall have no obligation to pay any expenses of the Litigation Trust.

20. Neither the Reorganized Debtor nor any other Entity shall be responsible for Litigation Trust Cash Contribution or any Litigation Trust Expenses, and any Litigation Trust Expenses incurred by the Reorganized Debtor will be paid from the Litigation Trust Cash Contribution.

21. **Rights and Powers of the Litigation Trustee.** The Litigation Trustee's powers, rights, and responsibilities shall be limited to those specified in the Plan and the Litigation Trust Agreement.

22. The Litigation Trustee shall have the authority to reasonably retain any professionals necessary to assist the Litigation Trustee in carrying out its duties under the Litigation Trust Agreement; *provided that* the Litigation Trustee and any such professionals shall be compensated solely from the Litigation Trust Assets pursuant to the Litigation Trust Agreement.

23. **Litigation Trust Retained Causes of Action.** The Litigation Trustee shall have the exclusive right in respect of all Retained Causes of Action belonging to the Litigation Trust to prosecute, settle, abandon, or dismiss any and all such Retained Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided herein or in the Litigation Trust Agreement.

24. **Cancellation of Existing Securities and Agreements.** Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or the Plan Supplement, on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents directly or indirectly evidencing, related to or connected with

any Claim, other than certain Intercompany Claims and Existing Intercompany Equity Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect without further act or action under any applicable agreement, law, regulation, order, or rule. The holders of or parties to such cancelled instruments, securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

25. On the Effective Date, the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan, if any) shall be cancelled, terminated and of no further force or effect solely as to the Debtors, without further act or action, and the Debtors and the Reorganized Debtor shall not have any continuing obligations thereunder. From and after the Effective Date, the *Final Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* [Docket No. 209] shall be null and void.

26. On the Effective Date, the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights,

preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan, if any) shall be automatically and fully released and discharged.

27. **Executory Contracts and Unexpired Leases.** Pursuant to Article X of the Plan, as of and subject to the occurrence of the Effective Date, any Executory Contracts and Unexpired Leases not previously assumed, or not previously rejected, will be deemed rejected as of the Effective Date except any Executory Contract or Unexpired Lease identified on the Assumed Contracts List.

28. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to alter, amend, modify, or supplement the Assumed Contracts List prior to the Effective Date or such later date if permitted pursuant to the Plan.

29. Entry of this Confirmation Order shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date.

30. Each Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan or any Final Order of this Bankruptcy Court authorizing and providing for its assumption or assumption and assignment.

31. Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each Executory Contract or Unexpired Lease shall include all

modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, and rights of first refusal, in each case, whether entered into prepetition or after the Petition Date. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

32. To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, increases, accelerates or otherwise alters any obligations, rights, or liabilities of the Reorganized Debtor thereunder as a result of, gives rise to any rights or benefits to any non-Debtor party to any such Executory Contract or Unexpired Lease, or creates any Lien on any asset or property of the Reorganized Debtor as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of the Plan or any other Restructuring Transaction (including any change of control, sale of business, assignment, vesting, termination, acceleration, or similar provisions therein), then such provision shall be deemed unenforceable and modified (solely for purposes of the transactions contemplated under the Plan) such that the transactions contemplated by the Plan or any other Restructuring Transaction shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights, or liabilities

of the Reorganized Debtor thereunder, to be entitled to any rights or benefits thereunder, or create or impose a Lien on any asset or property of the Reorganized Debtor.

33. On the Effective Date, the Debtors will assume the Executory Contracts and Unexpired Leases set forth in the Assumed Contracts List, subject to the cure amounts set forth therein, and, if applicable, subject to further agreements, amendments, modifications, supplements, and restatements, in each case, as agreed between the applicable Debtor and the relevant counterparty. On the Effective Date, all Executory Contracts and Unexpired Leases that do not appear on the Assumed Contracts List shall be deemed rejected.

34. To the maximum extent permitted by law, unless otherwise provided in the Plan, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effects) under any Executory Contract or Unexpired Lease assumed pursuant to the Plan, or any other transaction, event, or matter that would (i) result in a violation, breach, or default under such Executory Contract or Unexpired Lease; (ii) increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Debtors or the Reorganized Debtor under such Executory Contract or Unexpired Lease; or (iii) result in the creation or imposition of a lien upon any property or asset of the Debtors or the Reorganized Debtor pursuant to the applicable Executory Contract or Unexpired Lease. Any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with the assumption thereof shall be deemed satisfied by the entry of this Confirmation Order.

35. The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article X of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption and assignment, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.

36. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to this Confirmation Order, shall be deemed disallowed and expunged as of the later of (i) the date of entry of an order of this Bankruptcy Court approving such assumption, (ii) the effective date of such assumption, or (iii) the Effective Date (with respect to Executory Contracts or Unexpired Leases assumed pursuant to this Confirmation Order) without the need for any objection thereto or any further notice to or action, order, or approval of this Bankruptcy Court.

37. Unless a party to an Executory Contract or Unexpired Lease has objected to the applicable Cure Amount or the assumption or assumption and assignment of such Executory Contract or Unexpired Lease identified in the Plan or Plan Supplement and any amendments thereto, as applicable, the Debtors or Reorganized Debtor, as applicable, shall pay such Cure Amount in accordance with the terms of the Plan and the assumption or assumption and assignment of any Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including relating to such assumption and assignment, defaults of provisions relating to any anti-assignment provisions or restricting the change in control or ownership interest composition or bankruptcy-related defaults, arising under such Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment. Each Executory Contract or Unexpired Lease assumed or assumed and assigned to the Reorganized Debtor pursuant to the Plan shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of this Bankruptcy Court authorizing and providing for its assumption.

Case 25-90156 Document 113 Filed in TXSB on 08/26/25 Page 46 of 62

38. **Insurance.** Each of the Debtors' D&O Liability Insurance Policies and Consumer Liability Insurance Policies, including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, shall be treated as Executory Contracts pursuant to the Plan. Unless otherwise provided in the Plan, on the Effective Date, in connection with all contemplated transactions under the Plan, the Wind Down Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies and Consumer Liability Insurance Policies, and assigned such policies to the Litigation Trust, without the need for any further notice to or action, order, or approval of the Bankruptcy Court. Nothing in the Plan, the Plan Supplement, the Disclosure Statement, this Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or draw on any collateral or security therefor. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations (as and to the extent provided in the D&O Liability Insurance Policies and Consumer Liability Insurance Policies) assumed by the foregoing assumption of the D&O Liability Insurance Policies and Consumer Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Wind Down Debtors and assigned to the Litigation Trust, under the Plan.

39. After the Effective Date, the Wind Down Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect, with respect to conduct occurring prior to the Petition Date, and all directors and officers of

the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

40. After the Effective Date, none of the Wind Down Debtors shall terminate or otherwise reduce the coverage under any Consumer Liability Insurance Policies in effect, and shall maintain coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff coverage to the fullest extent permitted by such policies.

41. In addition, to the maximum extent permitted by law, neither filing of these Chapter 11 Cases, the consummation of the Plan, nor the assignment of such policies to the Litigation Trust shall constitute a "change of control" or "assignment" (or similar provision) with respect to the D&O Liability Insurance Policies and Consumer Liability Insurance Policies assumed hereunder.

42. For the avoidance of doubt, all Holders of Consumer Credit Transaction Claims will be permitted to pursue their Claims against Solar Mosaic LLC under all available and applicable Consumer Liability Insurance Policies, subject to Section 7.19 of the Plan.

43. **Claims Payable by Third Parties.** No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

44. **Conditions Precedent to Effective Date.** The Effective Date of the Plan shall not occur unless and until all conditions set forth in Section 11.2 of the Plan have been satisfied or waived in accordance with Section 11.3 of the Plan.

45. **Injunctions, Releases, and Exculpation.** As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, all injunctions, releases, and exculpation provisions contained in the Plan, including those in Section 12.8 (Lien Release), Section 12.2 (Releases by the Debtors), Section 12.3 (Releases by Third Parties), Section 12.9 (ABS Release Provisions), Section 12.4 (Exculpation), and Section 12.6 (Injunction), are hereby approved and shall be effective and binding on all Persons, to the extent provided in the Plan, without further order or action by this Bankruptcy Court.

46. **Discharge.** Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are reinstated under the Plan) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i)

Case 25-90156 Document 1267 Filed in TXSB on 08/26/25 Page 49 of 162

of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Proof of Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim is Allowed; or (c) the Holder of such Claim or Equity Interest has accepted the Plan. Except as otherwise provided pursuant to the Plan, any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. This Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated under the Plan) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

47. For the avoidance of doubt, (i) nothing in Section 12.1 of the Plan shall affect the rights of Holders of Claims to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims are entitled under the Plan, (ii) notwithstanding any other Plan provision to the contrary, in the event a Sale Transaction is consummated, the Debtors shall not receive a discharge, pursuant to section 1141(d)(3) of the Bankruptcy Code, (iii) nothing herein shall discharge any debt subject to Section 1141(d)(6) of the Bankruptcy Code, and (iv) nothing herein shall discharge any Consumer Credit Transaction Claims against Solar Mosaic LLC, pursuant to the terms set forth in Section 7.19 of the Plan.

48. In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims,

Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle any Claims against the Debtors and their Estates, as well as claims and Causes of Action against other Entities.

49. **Government Approvals Not Required.** Except as otherwise expressly provided in the Plan or this Confirmation Order, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws of any state, province, or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, and any Plan Document, or the Restructuring Transactions. Notwithstanding the foregoing, nothing in the Plan Documents, shall cause the United States of America, inclusive of its agencies and sub-agencies (the "United States") or any state or local authority to be a Releasing Party under the Plan Documents; or affect or impair the exercise of the United States' or any state or local authority's police and regulatory powers.

50. **Preservation of Police and Regulatory Powers.** Nothing in this Confirmation Order, the Plan, Plan Documents, or any amendments thereto discharges, releases, precludes or enjoins: (i) any police or regulatory liability to a governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any liability to a Governmental Unit under police powers and regulatory statutes or regulations that any entity

would be subject to as the owner or operator of property or a business after the Effective Date; or (iv) any liability to a Governmental Unit on the part of any non-debtor. Nor shall anything in this Confirmation Order, the Plan, or Plan Documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Bankruptcy Court, any liability described in the preceding sentence. Nothing in this Confirmation Order, the Plan, or Plan Documents shall affect any setoff or recoupment rights of any Governmental Unit. Nothing in this Confirmation Order, the Plan, or Plan Documents divests any tribunal of any jurisdiction it may otherwise have under police powers or regulatory law to interpret this Confirmation Order, the Plan, or Plan Documents or to adjudicate any defense asserted under this Confirmation Order, the Plan, or Documents. For the avoidance of doubt, the Reorganized Debtor shall not be responsible for any liability or claim preserved under this paragraph that arose prior to the Effective Date. The Debtors confirm that all U.S. States and Territories have opted out of the Third-Party Release and are not Releasing Parties.

51. **Compliance with State Laws Regarding Transfer or Discontinuance.** Nothing in this Confirmation Order, the Plan, Plan Documents or any amendments thereto, or related documents, authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or statute or regulatory law.

52. **Preservation of Consumer Claims and Defenses.** Notwithstanding any provisions of this Confirmation Order, the Plan, Plan Documents, or any amendments thereto, all claims and defenses related to any Consumer Credit Transaction Claims against Solar Mosaic LLC, the Financing Partners (solely in their capacity as a Financing Partners), and the ABS Vehicles are preserved.

Case 25-90156 Document 1267 Filed in TXSB on 09/05/25 Page 52 of 162

53. **Provisions Regarding the State of Tennessee.** Notwithstanding anything to the contrary in the Plan or this Confirmation Order:

a. The Tennessee Department of Revenue's Allowed Priority Tax Claims, if any, shall be paid in full pursuant to 11 U.S.C. section 1129(a)(9)(C) plus interest, to the extent applicable, as required by 11 U.S.C. section 511. The Tennessee Department of Revenue shall not be required to file a proof of Priority Tax Claim pursuant to the provisions of Section 3.4(a) of the Plan.

b. The Tennessee Department of Revenue's Allowed Administrative Expense Claims, if any, shall be paid in full pursuant to 11 U.S.C. section 1129(a)(9)(A). Consistent with 11 U.S.C. section 503(b)(1)(D), the Tennessee Department of Revenue shall not be required to file any requests for payment of its administrative expense claims.

c. The State of Tennessee has opted out of the third-party releases.

54. **Provisions Regarding the State of Texas Comptroller.** Notwithstanding anything to the contrary in the Plan or this Confirmation Order:

a. Allowed Priority Tax Claims, if any, of the Texas Comptroller of Public Accounts, Revenue Accounting Division (the "Comptroller") shall be paid in full pursuant to 11 U.S.C. section 1129(a)(9)(C) plus interest, to the extent applicable, as required by 11 U.S.C. section 511. The Comptroller shall not be required to file a proof of Priority Tax Claim pursuant to the provisions of Section 3.4(a) of the Plan. The Comptroller may amend any claim filed without agreement of the Reorganized Debtor or authorization of the Bankruptcy Court.

b. Allowed Administrative Expense Claims, if any, of the Comptroller shall be paid in full pursuant to 11 U.S.C. section 1129(a)(9)(A). Consistent with 11 U.S.C. section 503(b)(1)(D), the Comptroller shall not be required to file any requests for payment of its administrative expense claims.

c. The Comptroller has opted out of the third-party releases.

d. The Comptroller's statutory and common law setoff rights against the Debtors are fully preserved in accordance with 11 U.S.C. § 553. Nothing in the Plan shall be interpreted to enjoin or limit the Comptroller from asserting those rights.

e. The Comptroller reserves any rights to pursue any non-debtor third parties for tax debts or claims.

f. A failure by the Reorganized Debtor (collectively with Wind Down Debtors, Debtors, Reorganized Debtor or any other defined term used to reference the Debtors' post Effective Date) to make a payment to the Comptroller that is required to be made pursuant to the terms of the Plan shall be a "Comptroller Event of Default". If the Reorganized Debtor(s) fails to cure a Comptroller Event of Default as to payments to the Comptroller within thirty (30) calendar days after service of written notice of default from the Comptroller upon the Debtor(s) via email and first class USPS mail at the address and email address listed in the Plan at Mosaic Sustainable Finance Corporation, 601 12th Street, Suite 325, Oakland, California 94607, Attention: Legal Department, Email: legalnotices@joinmosaic.com. The Comptroller may provide courtesy copies to Debtors' counsel via email addresses stated in the Plan. The Comptroller may (i) enforce the entire amount of its claim, (ii) exercise all rights and remedies under applicable nonbankruptcy law, and

(iii) seek such relief as may be appropriate in this court. Reorganized Debtor shall be allowed to cure up to two (2) defaults. Upon a third default, the Comptroller, at its option, may declare the default non-curable and proceed to collect the remainder of the debt.

55. **Provisions Regarding Quiet Title Landowners.** On August 6, 2025, Federal Home Loan Mortgage Corporation, HOF REO 1, Inc., American Financial Network, Inc. and MVP 1 REO, LLC (together, the "Quiet Title Landowners") filed a motion for relief from the automatic stay (the "QT Lift Stay Motion") and, on August 23, 2025, the Quiet Title Landowners filed an objection to confirmation of the Plan (the "QT Plan Objection"). In satisfaction of both the QT Lift Stay Motion and the QT Plan Objection, the Debtors and the Quiet Title Landowners entered into that certain *Joint Stipulation and Order Between Debtors and Quiet Title Landowners Regarding Limited Relief from Automatic Stay*, dated September 3, 2025 [Docket No. 620].

56. **Provisions Regarding Fannie Mae.** Nothing in the Plan or this Confirmation Order shall alter, affect, modify, impair, or discharge any of the rights, interests, defenses, and obligations of the Debtors, Reorganized Debtor, or the Federal National Mortgage Association or any of its affiliated entities (collectively, "Fannie Mae") with respect to real property owned or acquired by Fannie Mae ("REO"). For the avoidance of doubt, Fannie Mae's right to quiet title to REO is not a "claim" within the meaning of the bankruptcy code and Fannie Mae shall not be required to file a proof of claim to preserve such rights. The release, injunction, and related provisions of Article XII of the Plan shall not discharge, modify, affect, enjoin, or impair Fannie Mae's rights with respect to REO, regardless of whether Fannie Mae acquires such REO before or after the Effective Date of the Plan.

57. **Provisions Regarding Servicing Counterparties.** For the avoidance of doubt, notwithstanding the terms of the Plan, in the event that any current servicing counterparty of the Debtors and the Reorganized Debtor, or their affiliates, are unable to reach an agreement on a new servicing agreement prior to the Effective Date, (a) the accounts into which payments from the borrowers on the affected loans are deposited and (b) any loan files held within the existing eOriginal eVault with respect to such affected loans shall remain with the Wind Down Debtors.

58. **Provision Regarding WebBank.** WebBank and certain of the Debtors are parties to: (i) that certain Amended and Restated Marketing and Program Management Agreement, dated as July 31, 2020, by and between WebBank and Solar Mosaic LLC ("Solar Mosaic") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Program Agreement"); (ii) that certain Amended and Restated Servicing Agreement, dated as of July 31, 2020, by and between WebBank and Solar Mosaic (as assignee of Modern Home LLC ("Modern Home") pursuant to the Omnibus Assignment (defined below)) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Servicing Agreement"); (iii) that certain Amended and Restated Loan Sale Agreement, dated as of July 31, 2020, by and between WebBank and Solar Mosaic (as assignee of Modern Home pursuant to the Omnibus Assignment (defined below)) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Sale Agreement," and together with the Program Agreement and the Servicing Agreement, the "Program Documents"); (iv) that certain MSFC Guaranty, dated as of November 10, 2021, by Mosaic Sustainable Finance Corporation ("MSFC") in favor of WebBank (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Guaranty"); (v) that certain Backup Servicing Agreement, dated as of March 14, 2019, by and between Solar Mosaic (as assignee of Modern

Home pursuant to the Assignment (defined below)), WebBank and Concord Servicing LLC f/k/a Concord Servicing Corporation ("Concord") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Backup Servicing Agreement"); (vi) that certain Assignment and Assumption of Agreement, dated as of October 24, 2023, by and between Modern Home, Solar Mosaic, WebBank and Concord (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Assignment"); and (vii) that certain Assignment and Assumption and Omnibus Amendment Agreement, dated as of October 24, 2023, by and among Solar Mosaic, Modern Home, WebBank and MSFC (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Omnibus Assignment"). Each of the foregoing agreements is referred to herein as a "WebBank Agreement" and, collectively, as the "WebBank Agreements." Notwithstanding anything to the contrary in the Plan, the Plan Documents, or this Confirmation Order:

59. All rights with respect to any claims or defenses of WebBank, the Debtors, or the Plan Administrator pursuant to the WebBank Agreements, subject to the terms and conditions of the WebBank Agreements, are expressly preserved, including with respect to the filing of any Claim against the Debtors' estates and the reconciliation, classification, and, as applicable, allowance of such Claim.

60. The following WebBank agreements subject to the rejection motions previously filed by the Debtors at [Docket No. 22], [Docket No. 290], and [Docket No. 355] (collectively, the "Rejection Motions") shall be rejected by separate order(s) of the Court rather than pursuant to the Plan: (i) the Sale Agreement, (ii) the Program Agreement; and (iii) the Servicing Agreement. All other WebBank Agreements constituting Executory Contracts, if any, that are not designated for assumption and assignment on the Assumed Contract List shall be rejected under the Plan

effective as of the Effective Date. For the avoidance of doubt, the Guaranty is not and shall not be deemed to be an Executory Contract, and any Allowed Claims of WebBank against MSFC under the Guaranty shall not constitute rejection damages under section 502(g) of the Bankruptcy Code, but shall constitute General Unsecured Claims to the extent Allowed. All parties' rights as to the Rejection Motions, the impact of rejection of any WebBank Agreements and any rejection damages claims therefrom are expressly reserved except as otherwise provided in any orders on the Rejection Motions.

61. WebBank's right to assert Claims for postpetition interest, fees, costs, or charges as part of any Allowed Other Secured Claims is expressly reserved; provided that Debtors' and the Plan Administrator's defenses and rights to object to such Claims in accordance with the Bankruptcy Code and WebBank's defenses and rights with respect to any such objections are fully preserved.

62. WebBank's rights to setoff or recoupment, including, without limitation any right of setoff against the Collateral Account in accordance with the terms of the Sale Agreement, including as set forth in Section (e) of Schedule 3 thereto and/or any right to assert setoff or recoupment as a defense or affirmative defense, in each case solely to the extent such right(s) exist under applicable law, are expressly preserved and the rights and defenses of the Debtors and Plan Administrator are similarly preserved.

63. The Debtors confirm that WebBank has opted out of the Third-Party Release and is not a Releasing Party, and any claims or other rights of WebBank (including without limitation on account of or in connection with or with respect to the WebBank Agreements) against any parties other than the Debtors, their Estates or the Reorganized Debtors that cannot be released or

enjoined hereunder or under the Plan or Plan Documents without WebBank's consent under applicable law are expressly preserved.

64. **Provisions Regarding the Guerra Group.** The individuals on Exhibit A of the Guerra Group Objection [Docket No. 521] (individually or in a representative capacity, the "Guerra Group") have made the Third-Party Release Opt-Out Election pursuant to the last paragraph Section 12.3 of the Plan.

65. Guerra LLP may file a proof of claim on behalf of the Guerra Group before the Bar Date. For the avoidance of doubt: in the case of the proposed class representatives in De León v. Solar Mosaic LLC, 3:24-cv-04081 (N.D. Cal.), said proof of claim shall be deemed to have been made on behalf of the class they seek to represent. The effectiveness of said proof of claim shall be conditioned on the certification of the proposed class pursuant to Federal Rule of Civil Procedure 23. Accordingly, if the proposed class is not finally certified pursuant to Federal Rule of Civil Procedure 23, then (i) the class's proof of claim shall be void, and (ii) the class members identified in Exhibit A of the Guerra Group Objection [Docket No. 521] (as modified before the Bar Date) shall be allowed to file individual proofs of claim no more than sixty (60) days after the entry of any order denying class certification or decertifying a certified class. Finally, no party may object to the amount of the proposed class's conditional proof of claim until such time as the proposed class is certified pursuant to Federal Rule of Civil Procedure 23.

66. **1146 Exemption.** To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to or in connection with the Plan (including, if applicable, the Sale Transaction), including: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any

mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral security for any or all of the Exit Term Loans or other indebtedness or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any U.S. federal, state or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate federal, state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless ordered otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

67. **Statutory Fees and Quarterly Reports.** The Debtors or Reorganized Debtor, as applicable, shall pay all fees required to be paid to the Clerk of this Bankruptcy Court and the U.S.

Trustee pursuant to 28 U.S.C. 1930(a) that become due and payable prior to the Effective Date. After the Effective Date the Debtors, Wind Down Debtors, and/or the Plan Administrator, as applicable, shall file with this Bankruptcy Court separate quarterly reports in a form reasonably acceptable to the U.S. Trustee as they become due. On and after the Effective Date, the Debtors, Wind Down Debtors, and/or the Plan Administrator, as applicable, are obligated to pay any such fees when they become due and payable until the earliest of the closure, dismissal, or conversion to chapter 7 of the respective case.

68. **Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtor.

69. **Authorization to Consummate.** The Debtors and the Reorganized Debtor, as applicable, are authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article XI of the Plan.

70. **Documents, Mortgages, and Instruments.** Each federal, state, commonwealth, provincial, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the transactions, including the Restructuring Transactions, contemplated by the Plan and this Confirmation Order.

71. **Reversal/Stay/Modification/Vacatur of Order.** Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Bankruptcy Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or Lien incurred or undertaken by the Debtors, the Reorganized Debtor, or any other party authorized or required to take action to implement the Plan, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification, or vacatur of this Confirmation Order, any act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, the Plan Documents, or any amendments or modifications to the foregoing.

72. **Provisions of Plan and Order Nonseverable and Mutually Dependent.** Each term and provision of the Plan, as it may have been altered or interpreted in accordance with Section 14.6 of the Plan, is: (a) valid and enforceable in accordance with its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtor's consent, as applicable (subject to the consent rights contained or incorporated in the Plan); and (c) nonseverable and mutually dependent. The provisions of the Plan and the provisions of this Confirmation Order hereby deemed nonseverable and mutually dependent.

73. **Post-Confirmation Modifications.** In accordance with Section 14.3 of the Plan, without need for further order or authorization of this Bankruptcy Court, the Debtors, in consultation with the Committee or the Litigation Trust, are authorized and empowered to make any and all modifications to any and all documents that are necessary or desirable to effectuate the

Plan that are consistent with the Plan, subject to any applicable consents or consultation rights set forth therein, as applicable. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their respective rights to revoke or withdraw, or to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times after Confirmation, and, to the extent necessary, may initiate proceedings in this Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Section 14.3 of the Plan and subject to any applicable consent rights under the Plan.

74. **Applicable Non-Bankruptcy Law.** Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Confirmation Order, the Plan, the Plan Documents, and any other related documents or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

75. **Waiver of Filings.** Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Bankruptcy Court or the Office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

76. **Notices of Confirmation and Effective Date.** As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall serve notice of the occurrence of the Effective Date, substantially in the form annexed hereto as **Exhibit B**, on all holders of Claims

and Interests, the U.S. Trustee, and all other parties in interest. The notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Confirmation Order and the occurrence of the Effective Date.

77. **Failure of Consummation.** Notwithstanding the entry of this Confirmation Order, if consummation of the Plan does not occur as to any Debtor, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtor or any other Person.

78. **Substantial Consummation.** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

79. **Waiver of Stay.** The requirements under Bankruptcy Rule 3020(e) that a confirmation order is stayed until the expiration of 14 days after entry are hereby waived. This Confirmation Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

80. **References to and Omissions of Plan Provisions.** References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer

to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of this Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by reference.

81. **Headings.** Headings utilized herein are for convenience and reference only, and do not constitute a part of this Confirmation Order for any other purpose.

82. **Inconsistency.** The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern and any such provision of this Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

83. **Final Order.** This Confirmation Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof.

84. **Retention of Jurisdiction.** To the fullest extent permitted by applicable law, and notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to

Case 25-90156 Document 1267 Filed in TXSB on 09/05/25 Page 65 of 162

sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, with respect to the matters set forth in Article XIII of the Plan.

Signed: September 05, 2025

Christopher Lopez
United States Bankruptcy Judge

Case 25-90156 Document 1167-1 Filed in TXSB on 08/06/25 Page 61 of 162

# Exhibit A

## Plan

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| MOSAIC SUSTAINABLE FINANCE CORPORATION, *et al.*,[1] | ) | Case No. 25-90156 (CML) |
| Debtors. | ) | (Jointly Administered) |

# FOURTH AMENDED JOINT CHAPTER 11 PLAN OF MOSAIC SUSTAINABLE FINANCE CORPORATION AND CERTAIN OF ITS AFFILIATED DEBTORS

**PAUL HASTINGS LLP**
Charles Persons (TX Bar No. 24060413)
Schlea Thomas (TX Bar No. 24131710)
609 Main Street, Suite 2500
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
Email: charlespersons@paulhastings.com
schleathomas@paulhastings.com

**PAUL HASTINGS LLP**
Matthew M. Murphy (admitted *pro hac vice*)
Geoffrey M. King (admitted *pro hac vice*)
Michael Jones (admitted *pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: mattmurphy@paulhastings.com
geoffking@paulhastings.com
michaeljones@paulhastings.com

*Counsel to the Debtors*
*and Debtors in Possession*

Dated: September 3, 2025

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Mosaic Sustainable Finance Corporation (6802); Solar Mosaic LLC (3655); Modern Home LLC (4998); Mosaic Funding Holdings LLC (0866); and SMCTX LLC (6303). The service address for each of the above Debtors is 601 12th Street, Suite 325, Oakland, California 94607.

# FOURTH AMENDED JOINT CHAPTER 11 PLAN OF MOSAIC SUSTAINABLE FINANCE CORPORATION AND ITS AFFILIATED DEBTORS

Mosaic Sustainable Finance Corporation, Modern Home LLC, and Solar Mosaic LLC, each debtors and debtors-in-possession in the above-captioned cases (each, a "***Debtor***," and collectively, the "***Debtors***") propose this fourth amended joint chapter 11 plan for the resolution of the outstanding Claims against, and Interests in, the Debtors.[2]

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement, filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.

**The Debtors are pursuing on parallel paths both the Plan Equitization Transaction and a Sale Transaction, all as described in further detail in the Disclosure Statement. If the Debtors do not timely receive a bid for the purchase of all or substantially all of their assets in accordance with the terms and conditions set forth in the Bidding Procedures Order, they will consummate the Plan Equitization Transaction.**

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I. DEFINITIONS AND INTERPRETATION

### *A. Definitions.*

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1.** "***AAL***" means that certain Agreement Among Lenders dated as of March 27, 2024, by and among the Prepetition Secured Agent, the Prepetition First Out Lenders and the Prepetition Last Out Lenders, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

***1.2.*** ***"ABS Interests"*** means the ABS Vehicle-issued notes held by the Debtors.

[2] Debtors Mosaic Funding Holdings LLC and SMCTX LLC did not have any Holders of Claims submit votes for the Plan. Accordingly, these Debtors will be wound down in an orderly fashion and their Chapter 11 Cases will be dismissed in due course.

1.3. "***ABS Parties***" means, collectively, each of the ABS Vehicles, U.S. Bank and Wilmington Trust (but only with respect to any role related to any of the ABS Vehicles).

1.4. "***ABS Parties Release***" has the meaning set forth in Section 12.9.

1.5. "***ABS Released Parties***" has the meaning set forth in Section 12.9.

1.6. "***ABS Vehicles***" means the various asset-backed securitization vehicles to which certain of the loans originated by the Debtors were ultimately sold in connection with the issuance of notes that yielded proceeds that funded the Debtors' origination activities, including those entities set forth in the Plan Supplement.

**1.7.** "***Administrative Bar Date***" means the deadline for filing all requests for allowance and payment of Administrative Expense Claims, which, except in the case of Professional Fee Claims, shall be thirty (30) days after the Effective Date. Professional Fee Claims shall be filed in accordance with the provisions of Section 3.3 herein.

**1.8.** "***Administrative Expense Claim***" means a Claim (other than any DIP Claim) for costs and expenses of administration of the Chapter 11 Cases Allowed under Bankruptcy Code sections 503(b), 507(a)(2), 507(b), or, if applicable, 1114(e)(2), including, but not limited to: (a) any actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including, but not limited to, wages, salaries, commissions for services, and payments for inventories, leased equipment, and premises); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330, 331, 363, or 503(b) to the extent incurred on or before the Effective Date; (c) all U.S. Trustee Fees; (d) any 503(b)(9) Claims; and (e) any Claims that have been designated "Administrative Claims" by Final Order of the Bankruptcy Court.

**1.9.** "***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code, provided, that, that no party shall constitute an Affiliate solely due to being an assignee or transferee of a loan originated by Solar Mosaic LLC.

**1.10.** "***Affinity Sponsors***" means Affinity Partners Parallel Fund I LP, Affinity Partners Fund I LP, Affinity Partners GP LP, A Fin Management LLC, SBOC Co. LLC, and Affinity Partners.

**1.11.** "***Allowed***" means, with respect to a Claim under this Plan, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim or Proof of Interest filed by the Bar Date or a request for payment of an Administrative Expense Claim filed by the Administrative Bar Date, as applicable (or for which Claim a Proof of Claim or Proof of Interest is not required under the Plan, the Bankruptcy Code, or a Final Order, including the Interim DIP Order and Final DIP Order); (b) a Claim that is scheduled by the Debtors as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim or Proof of Interest, as applicable, has been timely filed; or (c) a Claim allowed pursuant to the Plan or a Final Order, including the Interim DIP Order and Final DIP Order; provided, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be Allowed only if and to the extent that

Case 25-90156 Document 267-13 Filed in TXSB on 08/26/25 Page 105 of 162

with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim or Proof of Interest is or has been timely filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim or Proof of Interest filed after the Bar Date or a request for payment of an Administrative Expense Claim filed after the Administrative Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "Allow" and "Allowing" shall have correlative meanings.

**1.12.** "***Assumed Contracts***" means those Executory Contracts and Unexpired Leases that are to be (i) assumed by the Debtors and continue in force with the Reorganized Debtors in the event of a Plan Equitization Transaction; or (ii) assumed by the Debtors and assigned to the applicable Successful Bidder or its designee in the event of a Sale Transaction pursuant to and as set forth in any applicable Sale Documents.

**1.13.** "***Assumed Contracts List***" means the list or lists of Assumed Contracts, which will be included in preliminary form in the Plan Supplement.

**1.14.** "***Assumed Liabilities***" has the meaning set forth in any Sale Documents (or other such similar term as may be used in such Sale Documents).

**1.15.** "***Auction***" means an auction (if any) conducted by the Debtors to solicit bids for a sale or disposition of all or substantially all of the Debtors' assets, free and clear of all Liens, Claims, encumbrances, and other interests pursuant to section 363 of the Bankruptcy Code, pursuant to the terms and conditions of the Bidding Procedures.

**1.16.** "***Avoidance Actions***" means any and all avoidance, recovery, subordination, or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5, and section 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

**1.17.** "***Ballot***" means the form distributed by the Debtors or the Claims Agent to Holders of impaired Claims entitled to vote on this Plan on which the acceptance or rejection of this Plan is to be indicated.

**1.18.** "***Bankruptcy Code***" means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.19.** "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas, or any other court exercising competent jurisdiction over the Chapter 11 Cases or any proceeding therein.

**1.20.** "***Bankruptcy Rules***" means (a) the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, (b) the Local Rules, and (c) any chambers rules of the Bankruptcy Court.

**1.21.** "***Bar Date***" means the applicable date established by the Bankruptcy Court by which respective Proofs of Claim and Interests must be filed.

**1.22.** "***Bidding Procedures***" means procedures pursuant to the Bidding Procedures Order governing the submission and evaluation of bids to purchase all or substantially all of the Debtors' assets.

**1.23.** "***Bidding Procedures Order***" means an order of the Bankruptcy Court approving the Bidding Procedures.

**1.24.** "***Business Day***" means any day other than a Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or a day on which banks are not open for general business in New York, New York.

**1.25.** "***Cash***" means the legal currency of the United States and equivalents thereof.

**1.26.** "***Causes of Action***" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).

**1.27.** "***Chapter 11 Cases***" means the cases (anticipated to be jointly administered cases) under chapter 11 of the Bankruptcy Code to be commenced by the Debtors on the Petition Date in the Bankruptcy Court.

**1.28.** "***Claim***" means any "claim" as defined in section 101(5) of the Bankruptcy Code against any Debtor or property of any Debtor, including any Claim arising after the Petition Date.

**1.29.** "***Claims Agent***" means Kroll Restructuring Administration LLC in its capacity as noticing, claims and solicitation agent for the Debtors pursuant to one or more orders of the Bankruptcy Court.

**1.30.** "***Claims Objection Deadline***" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 30 days after the Effective Date and (b) such other deadline as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

**1.31.** "***Claims Register***" means the official register of Claims maintained by the Claims Agent.

**1.32.** "***Class***" means a category of Claims or Interests established under Article IV of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.33.** "***Collateral***" means any property, wherever located, or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim.

**1.34.** "***Confirmation Date***" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.35.** "***Confirmation Hearing***" means a hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.36.** "***Confirmation Order***" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as may be amended, modified, or supplemented from time to time, which shall be subject to the Definitive Document Consent Rights.

**1.37.** ***"Consumer Credit Transaction Claims***" means any Claim related to an interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time).

***1.38. "Consumer Liability Insurance Policies"*** means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to or providing coverage to any of the Debtors for any liability arising out of Consumer Credit Transaction Claims. Solar Mosaic LLC shall have priority to the proceeds of the Consumer Liability Insurance Policies for any of Solar Mosaic LLC's liabilities (such as defense costs and expenses) over any other claims, creditors, judgments or settlements.

**1.39.** "***Creditors' Committee***" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S Trustee on June 19, 2025, in accordance with section 1102 of the Bankruptcy Code, as the same may be reconstituted from time to time.

**1.40.** "***Cure Amount***" has the meaning set forth in Section 10.2 of this Plan.

**1.41.** "***Cure Dispute***" has the meaning set forth in Section 10.2 of this Plan.

**1.42.** "***D&O Liability Insurance Policies***" means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to or providing coverage to any of the Debtors for current or former directors', managers', and officers' liability; provided that the D&O Liability Insurance Policies shall not include the Consumer Liability Insurance Policies unless and until either (a) a particular Consumer Liability Insurance Policy is determined by a final adjudication of a court having relevant jurisdiction, to not apply to any Consumer Credit Transaction Claim; or (b) final resolution of all the Consumer Credit Transaction Claims against Solar Mosaic LLC.

**1.43.** "***Debtor(s)***" has the meaning set forth in the preamble.

**1.44.** "***Debtor ABS Agreements***" has the meaning set forth in Section 12.9.

**1.45.** "***Debtor Loan Interests***" means any consumer loans originated by Solar Mosaic LLC held on Solar Mosaic LLC's balance sheet as of the Effective Date.

**1.46.** "***Debtor Releasing Party***" means any Releasing Party that is a Debtor.

**1.47.** ***"Definitive Documents"*** means (a) the Plan; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the Disclosure Statement Order; (e) the Plan Supplement; (f) the DIP Documents; (h) the Litigation Trust Agreement; (i) the Plan Administrator Agreement; (j) the Lending Club License; (k) any and all documentation required to implement, issue, and distribute the Plan Equitization Transaction, including any transition services agreements; (l) the New Organizational Documents; and (m) any other agreements, documentation or instruments necessary or advisable to implement, consummate, or document the transactions contemplated by the Plan (in each case, including all exhibits, schedules, amendments, modifications, supplements, appendices, annexes, instructions, and attachments thereto).

**1.48.** "***DIP Agent***" means the administrative and the collateral agent for the DIP Lenders with respect to the DIP Credit Agreement, which shall be either (a) Forbright Bank (f/k/a Congressional Bank) or (b) another financial institution selected by, and qualified to perform the duties customarily associated with such roles as determined by, the Required DIP Lenders in consultation with TopCo.

**1.49.** "***DIP Budget***" shall have the meaning assigned to the term "Approved Budget" in the DIP Credit Agreement.

**1.50.** "***DIP Claims***" means all Claims of the DIP Agent and/or the DIP Lenders related to, arising under, or in connection with the Interim DIP Order, Final DIP Order and the DIP Documents, including, without limitation, Claims for all principal amounts outstanding, interest, fees, reasonable and documented expenses (including the reasonable and documented expenses of counsel as set forth in the DIP Credit Agreement), costs and other charges of the DIP Agent and the DIP Lenders in respect of the obligations of the Debtors arising under the DIP Credit Agreement.

**1.51.** "***DIP Credit Agreement***" means the Debtor-in-Possession Credit Agreement, dated as of June 6, 2025, by and among Solar Mosaic LLC, the DIP Lenders and DIP Agent, as the same may be modified, amended or supplemented from time to time, in accordance with the terms thereof (and including any and all documents and instruments executed in connection therewith).

**1.52.** "***DIP Documents***" means collectively, the DIP Motion, the DIP Orders, and the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

**1.53.** "***DIP Lenders***" means, collectively, and as of the relevant time, those lenders that are party to the DIP Credit Agreement.

**1.54.** "***DIP Loans***" means the loans under the debtor-in-possession financing facility on the terms and conditions set forth in the DIP Credit Agreement.

**1.55.** "***DIP Motion***" means the motion filed by the Debtors seeking entry of the DIP Orders, together with all exhibits thereto and any declarations, affidavits or other documents filed in connection with such motion.

**1.56.** "***DIP Orders***" means the Interim DIP Order and Final DIP Order.

**1.57.** "***Disallowed***" means a finding or conclusion of law of the Bankruptcy Court in a Final Order, or provision in the Confirmation Order, disallowing a Claim or Interest.

**1.58.** "***Disbursing Agent***" means the Wind Down Debtors or the Entity designated by the Wind Down Debtors, who may be the Plan Administrator, to make distributions under this Plan.

**1.59.** "***Disclosure Statement***" means the disclosure statement that relates to this Plan, including all exhibits and schedules annexed thereto or referred to therein (in each case, as it or they may be amended, modified, or supplemented from time to time).

**1.60.** "***Disclosure Statement Hearing***" means a hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

**1.61.** "***Disclosure Statement Order***" means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, as may be amended, modified, or supplemented from time to time.

**1.62.** "***Disputed Claim***" means, as of any relevant date, any Claim, or any portion thereof: (a) that is not an Allowed Claim as of the relevant date; and/or (b) is otherwise disputed by any of the Debtors, the Wind Down Debtors, the Reorganized Debtors, or the Plan

Administrator, as applicable, in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled; or (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors or any party in interest has interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order as of the relevant date.

**1.63.** ***"Distributable Asset Proceeds"*** means the proceeds realized by the Wind Down Debtors and Plan Administrator in connection with one or more sales of the ABS Interests and any other assets of the Wind Down Debtors following the Effective Date.

**1.64.** "***Distribution Date***" means: (a) with respect to Administrative Expense Claims, Priority Non-Tax Claims, Priority Tax Claims, Other Secured Claims, and U.S. Trustee Fees, the date that is the latest of: (i) the Effective Date; (ii) the date such Claim would be due and payable in the ordinary course of business; and (iii) any date that is within thirty (30) days after such Claim becomes an Allowed Claim or otherwise becomes payable under this Plan (or, if such date is not a Business Day, on the next Business Day thereafter); (b) with respect to Fee Claims, the date (or as soon thereafter as reasonably practicable) that such Claims become Allowed Claims; and (c) with respect to all other Claims, the Effective Date or as soon as reasonably practicable thereafter.

**1.65.** "***Distribution Record Date***" means, other than with respect to securities deposited with the DTC, the date for determining which Holders of Claims are eligible to receive initial distributions under the Plan, which date shall be the Confirmation Date. The Distribution Record Date shall not apply to distributions to be made through DTC, which shall be made, if any, in accordance with the customary exchange procedures of DTC or this Plan or otherwise in accordance with the applicable procedures of DTC.

**1.66.** ***"DTC"*** means the Depository Trust Company.

**1.67.** "***Effective Date***" means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 11.2 of this Plan have been satisfied or waived and no stay of the Confirmation Order is in effect.

**1.68.** "***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.69.** "***Equity Interest***" means collectively, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, and any other equity, ownership, membership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, or other equity, ownership, membership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement).

**1.70.** "***Estate***" means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**1.71.** "***Exculpated Party***" means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (a) the Debtors; (b) the Creditors' Committee and each of its members, and (c) the Plan Administrator.

**1.72.** "***Exculpation***" means the exculpation provision set forth in Article XII of the Plan.

**1.73.** "***Executory Contract***" means a contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

**1.74.** "***Existing Equity Interests***" means Equity Interests existing as of the Effective Date.

**1.75.** "***Existing Intercompany Equity Interests***" means any Existing Equity Interests in a Debtor or a subsidiary of a Debtor that are owned or held by another Debtor.

**1.76.** "***Existing TopCo Equity Interests***" means any Existing Equity Interests in TopCo.

**1.77.** "***Exit Term Loan Credit Agreement***" means the credit agreement between the Reorganized Debtors or its subsidiaries or Affiliates, as applicable, and the lenders party thereto to effectuate the issuance of the Exit Term Loans.

**1.78.** "***Exit Term Loan Documents***" means the Exit Term Loan Credit Agreement and together with all other related documents, instruments, and agreements in respect of the Exit Term Loans, in each case, as amended, restated, modified, or supplemented from time to time.

**1.79.** "***Exit Term Loans***" means term loans under the Exit Term Loan Credit Agreement comprising converted New Money DIP Claims.

**1.80.** ***"Exit Term Sheet"*** means the term sheet setting forth the material terms of the Exit Term Loan Credit Agreement and other Exit Term Loan Documents, which will be filed as part of the Plan Supplement.

**1.81.** "***Fee Claim***" means a Claim by a Professional Person for compensation, indemnification or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, including in connection with final fee applications of such Professional Persons.

**1.82.** "***Final DIP Order***" means an order of the Bankruptcy Court approving the DIP Loans and granting the Debtors the authority to use cash collateral and provide certain "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) on a final basis.

**1.83.** "***Final Order***" means an order, ruling or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or

move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment; provided, further, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

**1.84.** ***"Financing Partners"*** means the various financial institutions through which completed loans originated through the Debtors were funded and/or to which such loans were sold, including, without limitation, the Warehouses, and those entities set forth in the Plan Supplement; *provided* that Financing Partners shall not include any of the ABS Vehicles.

**1.85.** ***"Funding Notice"*** has the meaning set forth in Section 7.31 of the Plan.

**1.86.** "***General Unsecured Claim***" means any unsecured Claim, other than an Administrative Expense Claim, a Priority Non-Tax Claim, a Priority Tax Claim, Consumer Credit Transaction Claim, or an Intercompany Claim, including, without limitation, Claims arising from the rejection of Executory Contracts and Unexpired Leases, and Claims arising from any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by, a Debtor in connection therewith.

**1.87.** "***General Unsecured Claims Distribution***" means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor, *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to General Unsecured Claims and Consumer Credit Transaction Claims of that particular Debtor in priority of payment under the Bankruptcy Code (including the satisfaction in full of the DIP Claims and the Prepetition Secured Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law.

**1.88.** ***"Global Settlement"*** means the settlement by and among the Debtors, the DIP Lenders, the Prepetition Secured Lenders, the Creditors' Committee, and the Sponsors, which settlement is incorporated into the terms of this Plan.

**1.89.** "***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

**1.90.** "***GUC Recovery Pool***" means Cash proceeds of at least $1,000,000, contributed to the Debtors by the Sponsor Payment and as funded in accordance with Section 7.34.

**1.91.** "***Holder***" means any Entity or Person holding a Claim or Interest.

**1.92.** ***"Independent Investigation"*** means an investigation by the Debtors' independent director into potential claims and causes of action against, among others, the Debtors' current and former directors and officers, shareholders, and other related parties.

**1.93.** ***"Insurance Proceeds Recovery Action"*** means an action commenced or continued by a Holder of a Consumer Credit Transaction Claim against Solar Mosaic LLC in a court having relevant jurisdiction seeking relief as to such claims for the purpose for making exclusively available for the satisfaction of the damages awarded to the Holders of a Consumer Credit Transaction Claims the proceeds of applicable Consumer Liability Insurance Policies. Holders of Consumer Credit Transaction Claims that hold claims that arise out of loans still held by Solar Mosaic LLC may seek additional injunctive and declaratory relief, as well as cancellation of the relevant loans, in the relevant Insurance Proceeds Recovery Actions. In no event shall the aggregate recoveries of any Holder of a Consumer Credit Transaction Claim, under the Plan, in an Insurance Proceeds Recovery Action, and/or otherwise, exceed the Allowed amount of such Holder's Consumer Credit Transaction Claim.

**1.94.** "***Intercompany Claim***" means any Claim, Cause of Action, or remedy held by or asserted against a Debtor by another Debtor.

**1.95.** "***Interests***" means, collectively, Equity Interests and Existing Intercompany Equity Interests.

**1.96.** "***Interim DIP Order***" means the Bankruptcy Court order authorizing and approving the Debtors' entry into the DIP Credit Agreement on an interim basis.

**1.97.** ***"Lending Club License"*** has the meaning set forth in Section 7.35.

**1.98.** "***Litigation Trust***" shall mean the trust established under this Plan and the Litigation Trust Agreement to hold legal and equitable title to the Litigation Trust Assets.

**1.99.** "***Litigation Trust Agreement***" shall mean the trust agreement in the form and substance reasonably acceptable to the Debtors, the Prepetition Agent, and the DIP Agent that, together with the terms of the Plan, establishes the Litigation Trust and governs the powers, duties, and responsibilities of the Plan Administrator as trustee for the Litigation Trust. The Litigation Trust Agreement shall be filed as part of the Plan Supplement.

**1.100.** "***Litigation Trust Assets***" shall consist of the following: (i) all Retained Causes of Action belonging to the Wind Down Debtors, including the proceeds related thereto, as determined by the Debtors in connection with the Independent Investigation; (ii) the Litigation Trust Cash Contribution; (iii) all assets recovered by the Plan Administrator on behalf of the Litigation Trust on or after the Effective Date through enforcement, resolution, settlement, collection, return, or otherwise; and (iv) any proceeds resulting from the Plan Administrator's investment of the Litigation Trust Assets on or after the Effective Date owned by the Wind Down Debtors on the Effective Date. For the avoidance of doubt, all Avoidance Actions that are not Retained Causes of Action (i.e. Retained Causes of Action purchased through the Sale Transaction or that vest in a Reorganized Debtor) belonging to the Wind Down Debtors shall not constitute Litigation Trust Assets.

**1.101.** "***Litigation Trust Beneficiary***" shall mean a Holder of a Litigation Trust Interest, whether individually or as agent on behalf of one or more other Entities, as the holder of an Allowed 5 or Class 6 Claim.

**1.102.** "***Litigation Trust Cash Contribution"*** shall consist of Cash proceeds of at least $3,000,000, contributed to the Debtors by the Sponsor Payment and as funded pursuant to Section 7.34 of the Plan in order to fund the operations, investigations and the prosecution of Retained Causes of Action by the Litigation Trustee on behalf of the Litigation Trust.

**1.103.** "***Litigation Trust Distribution Proceeds***" shall mean all Cash realizable from the Litigation Trust Assets after the payment of, and reserving for, Litigation Trust Expenses in accordance with the Litigation Trust Agreement.

**1.104. "*Litigation Trust Expenses*"** shall mean all reasonable legal and other fees and expenses incurred by the Litigation Trustee on account of administration of the Litigation Trust, including, without limitation, reasonable attorneys' fees and expenses, insurance costs, taxes, escrow expenses and all other costs of administering the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement.

**1.105. "*Litigation Trust Interests*"** shall mean the non-transferable interests in the Litigation Trust issued to the Litigation Trust Beneficiaries pursuant to this Plan and the Litigation Trust Agreement.

**1.106. "*Litigation Trust Oversight Board*"** shall mean the Oversight Board to be created on the Effective Date and to be comprised of three (3) members selected by the Creditors' Committee, with which the Litigation Trustee, in connection with the performance of its duties, must consult and cooperate, and which shall have the duties and the powers set forth in the Litigation Trust Agreement.

**1.107.** "***Litigation Trustee***" means the Person or Entity (or any successor thereto) means the Person or Entity designated by the Committee in consultation with the Debtors, the DIP Agent, and any successor subsequently appointed pursuant to the Litigation Trust Agreement.

**1.108.** "***Lien***" has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.109. *"Loan Ownership Database"*** means the list of the identities and contact details of the current owners of all loans originated or arranged by the Debtors to be maintained by the Plan Administrator, to which the Plan Administrator may grant access to current and former borrower upon receipt of a Loan Ownership Information Request and compliance with the conditions set forth in the Plan Administration Agreement.

**1.110.** "***Loan Ownership Information Request"*** means a request by a current or former borrower of the Debtors for access to relevant information in the Loan Ownership Database in order to ascertain the identity and contact details of the current owner of the loan made to such borrower by the Debtors or one its Financing Partners or ABS Vehicles.

**1.111.** "***Local Rules***" means the Bankruptcy Local Rules for the Southern District of Texas.

**1.112.** "***New Boards***" means the initial boards of the Reorganized Debtors.

**1.113.** ***"New Money DIP Claims***" means all DIP Claims arising solely out of the New Money DIP Term Loan Facility (as defined in the Final DIP Order).

**1.114.** "***New OpCo***" means a newly-formed Entity, established in accordance with the steps set forth in the Restructuring Transactions Memorandum, that will be a direct subsidiary of Reorganized TopCo.

**1.115.** "***New Organizational Documents***" means the new Organizational Documents of the Reorganized Debtors, to be entered into on the Effective Date, including certificates of incorporation, limited liability company agreements, stockholders or shareholders agreements, operating agreements, equity subscription or purchase agreements, charters or by-laws.

**1.116.** "***Non-Debtor Releasing Party***" means any Releasing Party that is not a Debtor.

**1.117.** "***Organizational Documents***" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as by-laws or a partnership agreement, or an operating, limited liability company or members agreement).

**1.118.** "***Other Priority Claim***" means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**1.119.** "***Other Secured Claim***" means any Secured Claim against a Debtor other than a DIP Claim or a Prepetition Secured Loan Claim.

**1.120.** "***Person***" has the meaning set forth in section 101(14) of the Bankruptcy Code and also means any individual, corporation, partnership, association, indenture trustee, limited liability company, cooperative, organization, joint stock company, joint venture, estate, fund, trust, unincorporated organization, Governmental Unit or any political subdivision thereof, or any other Entity or organization of whatever nature.

**1.121.** "***Petition Date***" means the date on which the Debtors commenced the Chapter 11 Cases.

**1.122.** "***Plan***" means this fourth amended joint chapter 11 plan proposed by the Debtors, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

**1.123.** "***Plan Administrator***" means, the Person or Entity (or any successor thereto) means the Person or Entity designated by the Debtors in consultation with the DIP Agent, and in consultation with the Committee, who will have all the powers and authorities set forth in Section 7.19 of this Plan. The initial Plan Administrator shall be Olive Advisors LLC.

**1.124.** "***Plan Administrator Agreement***" means, if applicable, that certain agreement entered into no later than the Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan and which, solely in the event of a Plan Equitization Transaction, shall be in form and substance satisfactory to the Debtors and the DIP Agent and the Prepetition Secured Agent, in consultation with the Committee.

**1.125.** "***Plan Documents***" means the documents, other than this Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including the documents to be included in the Plan Supplement and any and all exhibits to this Plan and the Disclosure Statement.

**1.126.** "***Plan Equitization Transaction***" means (a) conversion of the New Money DIP Claims (subject to any recoveries pursuant to Section 7.34) into a pro rata share of the Exit Term Loans, and (b) the equitization of (1) 100% of the Second Out DIP Claims, and (2) 100% of the Prepetition First Out Claims into their respective allocable portion of 100% of Reorganized Common Equity.

**1.127.** "***Plan Supplement***" means any compilation of documents and forms of documents (including term sheets), agreements, schedules, and exhibits to the Plan, including (i) the New Organizational Documents, (ii) the Schedule of Retained Causes of Action, (iii) the Restructuring Transactions Memorandum, (iv) the Litigation Trust Agreement, (v) the Assumed Contracts List, (vi) the Plan Administrator Agreement, (vii) to the extent known, the identity of the known members of the New Board and the nature and compensation for any director who is an "insider" under the Bankruptcy Code, and (viii) any and all other documents necessary to effectuate the Restructuring Transactions or that are contemplated by the Plan subject to this Agreement, which shall be filed by the Debtors on or before the Plan Supplement Deadline, and additional documents, if any, filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

**1.128.** ***"Plan Supplement Deadline"*** means the deadline established by the Bankruptcy Court for the filing of the Plan Supplement.

**1.129.** "***Post-Effective Debtors***" means the Reorganized Debtors and, if applicable, the Wind Down Debtors.

**1.130.** "***Pre-Effective Date PA Duties***" has the meaning set forth in Section 7.20(a).

**1.131.** "***Prepetition First Out Lenders***" shall have the meaning assigned to the term "First Out Lenders" in the AAL.

**1.132.** "***Prepetition Last Out Lenders***" shall have the meaning assigned to the term "Last Out Lenders" in the AAL.

**1.133.** "***Prepetition Secured Credit Agreement***" means that certain Credit Agreement, dated as of June 22, 2021, among Solar Mosaic LLC, the Prepetition Secured Agent, and the Prepetition Secured Lenders from time to time party thereto, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

**1.134.** "***Prepetition Secured Agent***" means Forbright Bank (f/k/a Congressional Bank), in its capacity as administrative agent for the Prepetition Secured Lenders.

**1.135.** "***Prepetition Secured Lenders***" means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, Prepetition Secured Loan Claims.

**1.136.** "***Prepetition First Out Claims***" means any Prepetition Secured Loan Claim held by a Prepetition First Out Lender.

**1.137.** "***Prepetition Last Out Claims***" means any Prepetition Secured Loan Claim held by a Prepetition Last Out Lender.

**1.138.** "***Prepetition Secured Loan Claims***" means any Claim on account of Prepetition Secured Loans arising under or pursuant to the Prepetition Secured Credit Agreement or the other Prepetition Secured Loan Documents.

**1.139.** "***Prepetition Secured Loan Documents***" means the "Loan Documents" as defined in the Prepetition Secured Credit Agreement.

**1.140.** "***Prepetition Secured Loans***" means the term loans arising under or pursuant to the Prepetition Secured Credit Agreement.

**1.141.** "***Priority Non-Tax Claim***" means any Claim, other than a DIP Claim, an Administrative Expense Claim, a Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**1.142.** "***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.143.** "***Priority Tax Claims Bar Date***" means the date that is 180 days after the Petition Date.

**1.144.** "***Professional Fee Claim***" means any Claim by a Professional Person for compensation for services rendered or reimbursement of expenses incurred by such Professional Person on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional Person's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

**1.145.** "***Professional Fee Escrow Account***" means an account funded by the Debtors with Cash no later than the Effective Date in the amount equal to the Professional Fee Escrow Amount.

**1.146.** "***Professional Fee Escrow Amount***" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professional Persons have incurred or will

incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Effective Date, which shall be estimated pursuant to the method set forth in Article II of the Plan.

**1.147.** "***Professional Person(s)***" means all Persons (a) retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.148.** "***Proof of Claim***" means a proof of Claim filed by a Holder of a Claim against the Debtors in the Chapter 11 Cases.

**1.149.** "***Proof of Interest***" means a proof of Interest filed by a Holder of any Interests in the Debtors the Chapter 11 Cases.

**1.150.** "***Related Funds***" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person, or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

**1.151.** "***Related Parties***" means collectively with respect to any Person or Entity, each of, and in each case solely in its capacity, such Person's or Entity's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, and any Person or Entity claiming by or through any of them, including such Related Parties' respective heirs, executors, estates, servants, and nominees, provided, that, that the Warehouses shall not constitute Related Parties of the Debtors; provided, further, that, that the ABS Released Parties shall not constitute Related Parties of the Debtors; provided, further, that no party shall constitute a Related Party solely due to being an assignee or transferee of a loan originated by the Debtor Solar Mosaic LLC.

**1.152.** "***Release Objection***" means an objection to the releases set forth in Article XII of this Plan filed by any Holders of Claims in Classes 3, 4, 5, 6 and 7 prior to the deadline to object to confirmation of the Plan.

**1.153.** ***"Release to ABS Released Parties***" has the meaning set forth in Section 12.9.

**1.154.** "***Released Parties***" means, collectively, and each solely in its capacity as such: (a) the Reorganized Debtors, the Debtors, and their Estates; (b) the Plan Administrator; (c) the Litigation Trustee; (d) the DIP Agent and the DIP Lenders; (e) the Prepetition Secured Agent; (f) the Prepetition Secured Lenders that are DIP Lenders, in their capacity as Prepetition Secured Lenders; (g) the Creditors' Committee (if any) and each of its members solely in their capacity as members of the Creditors' Committee; (h) the Sponsors (in their and their Related Parties' and Affiliates' capacities as equity holders, directors or officers of the Debtors, and lenders to the

Debtors and/or their affiliates (including without limitation as holders of Subordinated Notes Claims, holders of Prepetition Last Out Claims, and lenders to Mosaic Funding X LLC), as applicable) (i) the Warehouses and the Financing Partners and (1) each such parties' lenders thereto and (2) Wilmington Trust (other than with respect to Wilmington Trust as an ABS Party), and (j) each of such parties' Affiliates and Related Parties; provided that no Person or Entity shall be a Released Party unless they are also a Releasing Party.

**1.155.** "***Releasing Parties***" means, collectively, and each solely in its capacity as such: (a) the Debtors, their Estates, and Post-Effective Debtors; (b) the Plan Administrator; (c) the Litigation Trustee; (d) the DIP Agent and the DIP Lenders; (e) the Prepetition Secured Agent; (f) the Prepetition Secured Lenders; (g) the Creditors' Committee and each of its members solely in their capacity as members of the Creditor's Committee; (h) the Sponsors (i) the Warehouses and the Financing Partners and (1) each such parties' lenders thereto and (2) Wilmington Trust (other than with respect to Wilmington Trust as an ABS Party); and (j) all Holders of Claims that (i) vote to accept or reject the Plan and do not timely make the Third Party Release Opt-Out Election by checking the relevant box on their Ballots or submitting a Third Party Release Opt-Out Form, thereby indicating such Holders' decision not to participate in the releases set forth in Article XII of the Plan; (ii) are deemed to accept or reject the Plan and either do not timely make the Third Party Release Opt-Out Election by submitting the Third Party Release Opt-Out Form or do not file a Release Objection; (iii) do not vote to accept or reject the Plan, and either do not timely make the Third Party Release Opt-Out Election by submitting the Third Party Release Opt-Out Form or do not file a Release Objection; and (iv) all unimpaired creditors of the Debtors who either do not timely make the Third Party Release Opt-Out Election by submitting the Third Party Release Opt-Out Form or file a Release Objection.

**1.156.** "***Reorganized Common Equity***" means the common Equity Interests of Reorganized TopCo authorized under the New Organizational Documents of the Reorganized Debtors and issued and/or distributed on the Effective Date in accordance with this Plan.

**1.157.** "***Reorganized Debtor(s)***" means Reorganized TopCo.

**1.158.** "***Reorganized TopCo***" means on or after the Effective Date, TopCo, as reorganized pursuant to and under the Plan Equitization Transaction, or any successors thereto, by merger, consolidation, reorganization or otherwise.

**1.159.** "***Required Prepetition Secured Lenders***" means the "Required Lenders" as defined in the Prepetition Secured Credit Agreement, subject to the terms of the AAL.

**1.160.** "***Required DIP Lenders***" means the "Required Lenders" as defined in the DIP Credit Agreement.

**1.161.** "***Restructuring Transactions***" means either (a) the Plan Equitization Transaction or (b) the Sale Transaction, or (c) both the Plan Equitization Transaction and the Sale Transaction, as the context requires.

**1.162.** "***Restructuring Transactions Memorandum***" means, solely in the event of the Plan Equitization Transaction, a document to be included in the Plan Supplement that will set

forth the material components of the Restructuring Transactions, including a summary of any transaction steps necessary to complete the Plan.

**1.163.** **"*Retained Causes of Action*"** means all Causes of Actions, rights and claims described in the Schedule of Retained Causes of Action filed with the Plan Supplement.

**1.164.** "***Sale Documents***" means one or more asset purchase agreements, other agreements, instruments, pleadings, orders and related documents, including, without limitation, the applicable Assumed Contracts List, pursuant to which the Debtors implement and consummate any Sale Transaction.

**1.165.** "***Sale Order***" means the order entered by the Bankruptcy Court authorizing and approving the Sale Transaction.

**1.166.** "***Sale Proceeds***" means all proceeds from consummation of a Sale Transaction that are distributable or payable to the Estates, which proceeds shall consist of Cash.

**1.167.** "***Sale Process***" means the sale process conducted in accordance with the Bidding Procedures Order.

**1.168.** "***Sale Toggle Event***" means entry into one or more qualifying asset purchase agreements or other definitive document to consummate a Sale Transaction, solely to the extent entered into in connection with a Sufficient Bid and in compliance with the Bidding Procedures Order.

**1.169.** "***Sale Transaction***" means a sale of all or substantially all of the remaining assets of the Debtors, which may be through one or more sales of the assets or Equity Interests of the Debtors, as further set forth herein, pursuant to sections 363 or 1129 of the Bankruptcy Code and the Bidding Procedures, solely if a Sufficient Bid is received by the Debtors.

**1.170.** "***Schedule of Retained Causes of Action***" means the schedule of Retained Causes of Action, including any Retained Causes of Action that shall vest in one or more of the Post-Effective Debtors or Litigation Trust, as applicable, on the Effective Date, which will be contained in the Plan Supplement.

**1.171.** "***Second Out DIP Claims"*** means all DIP Claims arising solely of the Second Out DIP Term Loan Facility (as defined in the Final DIP Order).

**1.172.** "***Secured Claim***" means a Claim: (a) that is secured by a valid, perfected and enforceable Lien on Collateral, to the extent of the value of the Claim Holder's interest in such Collateral as of the Confirmation Date; (b) to the extent that the Holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code; or (c) otherwise Allowed pursuant to the Plan or order of the Bankruptcy Court as a secured claim.

**1.173.** "***Securities Act***" means the Securities Act of 1933, as amended.

**1.174.** **"*Specified Released Parties*"** has the meaning set forth in Section 12.9.

Case 25-90156 Document 1267-13 Filed in TXSB on 09/05/25 Page 168 of 248

**1.175.** **“*Specified Releasing Parties”*** has the meaning set forth in Section 12.9.

**1.176.** ***Sponsors”*** means, collectively, the Affinity Sponsors and the Warburg Sponsors.

**1.177.** “***Subordinated Claim***” means any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise.

**1.178.** “***Subordinated Claims Distribution***” means, to the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor, less (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Subordinated Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, to the extent applicable, the satisfaction in full of the DIP Claims, the Prepetition Secured Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law.

**1.179.** “***Subordinated Notes”*** means (1) that certain Subordinated Note, dated as of June 11, 2024 (as amended September 25, 2024), by and among Solar Mosaic LLC and SBOC CO. LLC, for an initial loan of $7,500,000, and (ii) that certain Subordinated Note, dated as of June 11, 2024 (as amended October 9, 2024), by and among Solar Mosaic LLC and SMECL CO. LLC for an initial loan of $5,625,000.

**1.180.** “***Successful Bidder***” means any Entity or Entities whose bid(s) for all or substantially all of the Debtors’ assets pursuant to a Sufficient Bid as the highest and otherwise best bid for such assets or equity, respectively, pursuant to a Sale Order. For the avoidance of doubt, the Successful Bidder may be more than one Entity, submitting one or more bids, and if applicable, use of the term “Successful Bidder” herein may be read as “Successful Bidders.” Where a Successful Bidder has consent rights (or is referenced) under the Plan, such consent rights (or reference) only apply to the extent such consent right (or reference) relates to the respective Successful Bidder’s Sale Transaction.

**1.181.** “***Sufficient Bid***” means a qualified bid for a Sale Transaction, or series of qualified bids (so long as each such qualified bid does not contemplate a sale of any assets covered by any such other qualified bid) for a Sale Transaction aggregated together, that the Debtors, in consultation with the DIP Agent and the Prepetition Secured Agent, determine have satisfied, among other things, the following conditions: (a) be a good faith, *bona fide*, irrevocable bid, (b) be in writing and executed by a duly authorized representative of the bidder, (c) unless otherwise agreed by the DIP Agent and the Prepetition Secured Agent in their applicable sole discretion, provide for receipt by the Debtors of aggregate Cash consideration sufficient for the payment in full in Cash at the closing of the Sale Transaction contemplated by such qualified bid(s) of: (1) all of the DIP Claims, and (2) all of the Prepetition First Out Claims, (d) be accompanied by a Cash deposit equal to at least 10% of the purchase price, (e) include written evidence acceptable to the Debtors demonstrating appropriate corporate or similar governance authorization of the bidder(s) to consummate the Sale Transaction contemplated by the proposed bid(s), (f) include written evidence that demonstrates that the bidder has the necessary financial ability to timely close the Sale Transaction contemplated by the proposed qualified bid(s) (including written evidence of the bidder’s internal financial resources and ability to finance its

bid with Cash on hand, available lines of credit, uncalled capital commitments or otherwise available funds), (g) not contain conditions or contingencies of any kind, relating to financing, internal approvals, due diligence, third party consents or approvals (other than governmental or regulatory consents that may be required to consummate the proposed Sale Transaction, including any antitrust approval that may be required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, which shall be described in the bid together with evidence satisfactory to the Debtors of the ability to obtain such approvals or consents as soon as reasonably practicable), the satisfaction or achievement of any financial targets, thresholds or metrics, the absence of any material adverse effect since a date earlier than the date the bid was submitted, or any other conditions or contingencies other than conditions to closing that are customary for sales to non-"stalking horse" bidders in sales of assets under section 363 of the Bankruptcy Code (but, for the avoidance of doubt, excluding any of the conditions set forth in this clause (g)), (h) be reasonably likely to be consummated (if selected as the winning bid) promptly following entry of the Sale Order or Confirmation Order, as applicable, or otherwise within a time frame acceptable to the Debtors, the DIP Agent and the Prepetition Secured Agent, and (j) in the case of a series of qualified bids (so long as each such qualified bid does not contemplate a sale of any assets covered by any such other qualified bid) for a Sale Transaction aggregated together, each qualified bid in such series is conditioned on the consummation of the other qualified bid(s) in such series at substantially the same time. Notwithstanding the foregoing, Forbright Bank, in its capacity as the DIP Agent and the Prepetition Secured Agent, is automatically deemed a qualified bidder and may seek to credit bid, subject to the AAL, all or a portion of (x) the DIP Claims and (y) the Prepetition First Out Claims, and any such credit bid shall be deemed a qualified bid without otherwise complying with the conditions set forth in clauses (a) through (j), including, without limitation, the requirement that qualified bids be accompanied by a cash deposit.

**1.182.** "***Supplemental Assumed Contracts List***" has the meaning set forth in Section 10.2 of this Plan.

**1.183.** "***Third-Party Release***" means the third-party release set forth in Article XII of this Plan.

**1.184.** ***"Third-Party Release Opt-Out Election"*** means the election to be made by Holders of Claims by checking the relevant box on their Ballots or submitting a Third Party Release Opt-Out Form.

**1.185.** **"*Third-Party Release Opt-Out Form*"** means the form to be submitted by Holders of Claims that do not receive or submit Ballots in accordance with the Solicitation Procedures Order.

**1.186.** "***TopCo***" means Mosaic Sustainable Finance Corporation.

**1.187.** "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

**1.188.** "**U.S. Bank**" means U.S. Bank Trust National Association; U.S. Bank Trust Company, National Association; and U.S. Bank National Association, together with their

subsidiaries and affiliates, in their respective roles as owner trustee, administrative agent, securities intermediary and other related roles under the transaction documents governing the CSS HIL 2024-1 Trust including, without limitation, that certain Amended and Restated Trust Agreement, dated as of April 30, 2024, by and among CSS HIL 2024 Holdings, LLC, as settlor and as beneficiary, and U.S. Bank Trust National Association, as owner trustee; that certain Loan and Security Agreement, dated as of April 2024 by and among the CSS HIL 2024-1 Trust, as borrower, the Class A Lenders, Class B Lenders, Class C Lenders, Class D Lenders and Class E Lenders, described therein and U.S. Bank Trust National Association, as administrative agent; and the other transaction documents relating thereto.

**1.189.** "***U.S. Trustee***" means the United States Trustee for Region 2.

**1.190.** "***U.S. Trustee Fees***" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.191.** ***"Warburg Sponsors"*** means Warburg Pincus Energy Partners, L.P., Warburg Pincus Private Equity XII, L.P., Warburg Pincus Private Equity XII-B, L.P., Warburg Pincus Private Equity XII-D, L.P., Warburg Pincus Private Equity XII-E, L.P., WP XII Partners, L.P., Warburg Pincus XII Partners, L.P., SMECL Co. LLC, Warburg Pincus LLC, Warburg Pincus Energy, L.P., Warburg Pincus Energy-B, L.P, WP Energy Partners, L.P., and WP XII Partners, L.P.

**1.192.** ***"Warehouses"*** means the following non-debtor subsidiaries of Debtor Mosaic Funding Holdings LLC: Mosaic Funding I LLC, Mosaic Funding II LLC, Mosaic Funding IV LLC, Mosaic Funding V LLC, Mosaic Funding VI LLC, Mosaic Funding VII LLC, Mosaic Funding VII LLC, Mosaic Funding IX LLC, Mosaic Funding X LLC, and Mosaic Funding XI LLC.

**1.193.** "***Wilmington Trust***" means Wilmington Trust, National Association, together with its subsidiaries and affiliates, in its capacities, as applicable, as indenture trustee, owner trustee, underlying trustee, trustee, account bank, collateral agent, securities intermediary, paying agent, securities registrar or otherwise in relation to the transactions listed on Exhibit A of the Second Amended Notice of Appearance and Request for Service of Papers [ECF No. 552].

**1.194.** ***"Wind Down"*** means the administration and wind down of any remaining affairs of the Wind Down Debtors, as well as the dissolution and liquidation of the Wind Down Debtors' Estates after the Effective Date.

**1.195.** "***Wind Down Account***" means an account funded by the Debtors with Cash no later than the Effective Date in the amount consistent with the Wind Down Budget.

**1.196.** "***Wind Down Amount***" means, in the event of a Sale Transaction, an amount sufficient to fund (a) the payment in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims to the extent not otherwise assumed under any Sale Documents, and (b) the costs to wind down the Estates and Chapter 11 Cases in accordance with the Wind Down Budget, which amount shall be funded from the Sale Proceeds.

**1.197.** "***Wind Down Budget***" means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases as set forth in the Plan Supplement.

**1.198.** "***Wind Down Co***" means an Entity that, in the discretion of Debtors, may be established on the Effective Date for the benefit of holders of Claims against the Debtors (which Entity may be a liquidating trust or a Wind Down Debtor) in connection with the distribution of assets of the Debtors (including proceeds from the Sale Transaction) that did not otherwise vest in the Reorganized Debtors (as determined by the Debtors).

**1.199.** "***Wind Down Debtors***" means, on or after the Effective Date, the Debtors that are not Reorganized Debtors pursuant to and under a Plan Equitization Transaction.

***B. Interpretation; Application of Definitions and Rules of Construction.***

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. The use of "include" or "including" is without limitation, whether stated or not. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan. Any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. References to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Equity Interests," "Holders of Interests," "Disputed Interests," and the like, as applicable. Subject to the provisions of any contracts, certificates or articles of incorporation, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules. The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns. Any reference to directors or board of directors includes managers, managing members or any similar governing body, as the context requires, and references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws.

***C. Appendices and Plan Documents.***

All Plan Documents and appendices to this Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or

via the Claims Agent's website at https://cases.ra.kroll.com/Mosaic/, or obtain a copy of any of the Plan Documents by a written request sent to the Claims Agent at the following address:

Mosaic Sustainable Finance Corporation Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

## ARTICLE II.
## CERTAIN INTERCREDITOR ISSUES

**2.1.** ***Settlement of Certain Intercreditor Issues.***

The treatment of Claims and Interests under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

**2.2.** ***Formation of Debtor Groups for Convenience Purposes.***

The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making distributions under this Plan in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal Entities.

**2.3.** ***Intercompany Claims.***

(a) Intercompany Claims.

(i) Plan Equitization Transaction. In the event of the Plan Equitization Transaction, on or after the Effective Date, any and all Intercompany Claims between and among Topco and any of its direct or indirect subsidiaries shall, at the option of the Debtors, the Prepetition Secured Agent, and the DIP Agent, either be (i) extinguished, canceled and/or discharged on the Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired. To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(ii) Sale Transaction. In the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (i) extinguished, canceled and/or discharged on the Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired. To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

## ARTICLE III.
## DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

The Plan constitutes a joint plan of reorganization for all of the Debtors. All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on this Plan.

A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

### 3.1. *DIP Claims.*

On the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person. If a Sale Transaction is consummated, in full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from Sale Proceeds. In the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, in satisfaction, settlement, release and discharge of Allowed DIP Claims, each Holder of an Allowed DIP Claim shall receive:

(a) On account of its New Money DIP Claim, (1) a pro rata share, based on such Holder's ratable share of the New Money DIP Claim, of the Exit Term Loans, (2) proceeds from the Lending Club Transaction, and (3) its pro rata share of the Distributable Assets Proceeds in accordance with the priorities set forth in Section 7.34, in each case up to the Allowed Amount of the New Money DIP Claims.

(b) On account of its Second Out DIP Claim, a pro rata share of the Reorganized Common Equity shall be issued to Holders of Allowed DIP Claims.[3]

To the extent all Allowed DIP Claims are paid in full, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

**3.2. *Administrative Expense Claims.***

(a) <u>Time for Filing Administrative Expense Claims</u>.

The Holder of an Administrative Expense Claim, other than DIP Claims, Fee Claims, Intercompany Claims, or U.S. Trustee Fees that accrued on or before the Effective Date other than in the ordinary course of business must file with the Bankruptcy Court and serve on the Reorganized Debtors, the Wind Down Debtors (or Wind Down Co), and the Plan Administrator (if appointed) proof of such Administrative Expense Claim no later than the Administrative Bar Date. Such proof of Administrative Expense Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim, and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the Holder of the Administrative Expense Claim; (3) the asserted amount of the Administrative Expense Claim; (4) the basis of the Administrative Expense Claim; and (5) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

The Debtors, the Wind Down Debtors or the Plan Administrator, as applicable, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors, the Wind Down Debtors, or the Plan Administrator, as applicable, may also choose to object to any Administrative Expense Claim no later than the Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the

[3] In connection with the treatment of Holders of Prepetition First Out Claims as described in Section 5.3 of the Plan, Holders of Second Out DIP Claims and Prepetition First Out Claims will collectively receive a pro rata share of 100% of the Reorganized Common Equity.

Debtors, the Wind Down Debtors, or the Plan Administrator, as applicable (or other party with standing) object to a timely-filed and properly served Administrative Expense Claim, such Administrative Expense Claim will be deemed Allowed in the amount requested after expiration of the Claims Objection Deadline (as may be extended). In the event that the Debtors, the Wind Down Debtors, or the Plan Administrator object(s) to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

(b) Treatment of Administrative Expense Claims.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the Holder of such Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim or such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors-in-possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, that any Allowed Administrative Expense Claim that has been assumed by a Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan.

**3.3. *Fee Claims.***

(a) Time for Filing Fee Claims.

Any Professional Person seeking allowance of a Fee Claim shall file with the Bankruptcy Court its final application for allowance of compensation for services rendered and reimbursement of expenses incurred on and prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than forty-five (45) calendar days after the Effective Date or such other date as established by the Bankruptcy Court. Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order.

(b) Treatment of Fee Claims.

The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Confirmation Order. The Wind Down Debtors or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash to such Professional Persons in the amount the Bankruptcy Court allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; provided that the Debtors' and the Wind Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds

held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Professional Persons, the Wind Down Debtors or the Plan Administrator, as applicable, shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims.

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash on hand of the Debtors equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professional Persons and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the Bankruptcy Court. No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors, the Post-Effective Debtors, or the Plan Administrator, as applicable. Notwithstanding the foregoing sentence, funding of the Professional Fee Escrow Account will not be reported as a disbursement from the Estates, and disbursements from the Professional Fee Escrow Account on account of payment of Allowed Professional Fee Claims will be reported as disbursements from the Estates on the relevant monthly operating report(s). When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professional Persons pursuant to one or more orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be remitted to the Wind Down Debtors or the Plan Administrator, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Any further disbursements of such funds shall be reported in accordance with the Bankruptcy Rules.

The Professional Persons shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors (which estimate may include a cushion to cover unexpected or unknown fees) before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than three (3) Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional Person's final request for payment of Professional Fee Claims filed with the Bankruptcy Court, and such Professional Persons are not bound to any extent by the estimates. If a Professional Person does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional Person for inclusion in the Professional Fee Escrow Amount. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; provided that the Wind Down Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

Following the Effective Date, the Wind Down Debtors or Plan Administrator, as applicable, shall have authority with respect to matters related to Professional Fee Claim requests by Professional Persons, if any, acting at their direction in accordance with the terms of the Plan.

**3.4.** ***Priority Tax Claims.***

(a) Time for Filing Priority Tax Claims.

The Holder of a Priority Tax Claim must file with the Bankruptcy Court and serve on the Post-Effective Debtors, the Plan Administrator (if appointed), the Claims Agent, and the U.S. Trustee, proof of such Priority Tax Claim by the Priority Tax Claims Bar Date. Such proof of Priority Tax Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Priority Tax Claim and if the Priority Tax Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the Holder of the Priority Tax Claim; (3) the asserted amount of the Priority Tax Claim; (4) the basis of the Priority Tax Claim; and (5) supporting documentation for the Priority Tax Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF PRIORITY TAX CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED. IF FOR ANY REASON ANY SUCH PRIORITY TAX CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

(b) Treatment of Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Prepetition Secured Agent and DIP Agent, each Holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, either: (a) on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the Holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due; provided, further, that (i) in the event of a Plan Equitization Transaction, notwithstanding any provision of the Plan to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state law shall be assumed by and reinstated against the applicable Reorganized Debtor and (ii) in the event of a Sale Transaction, any Allowed Priority Tax Claim that has been expressly assumed by a Successful Bidder under the Sale Documents shall not be an obligation of the Debtors. On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person.

**3.5.** ***U.S. Trustee Fees and Related Reporting Obligations.***

All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due. After the Effective Date, the Debtors,

Case 25-90156 Document 1267 Filed in TXSB on 09/26/25 Page 91 of 162

the Wind Down Debtors, and/or the Plan Administrator (if appointed), as applicable, shall file with the Bankruptcy Court separate reports when they become due. After the Effective Date, the Debtors, Wind Down Debtors, and/or the Plan Administrator (if appointed), as applicable, shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable. The Debtors, the Wind Down Debtors, and/or the Plan Administrator (if appointed), as applicable, shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors, the Wind Down Debtors, and/or the Plan Administrator (if appointed), as applicable, is responsible. The U.S. Trustee shall not be treated as providing any release under the Plan. U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to file any Proof of Claim or any request for administrative expense for U.S. Trustee Fees. The provisions of this paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary.

## ARTICLE IV.
## CLASSIFICATION OF CLAIMS AND INTERESTS

**4.1.** ***Classification of Claims and Interests.***

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (a) impaired or unimpaired by this Plan; (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; or (c) deemed to accept or reject this Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | No | No (deemed to accept) |
| Class 2 | Other Secured Claims | No | No (deemed to accept) |
| Class 3 | Prepetition First Out Claims | Yes | Yes |
| Class 4 | Prepetition Last Out Claims | Yes | Yes |
| Class 5 | General Unsecured Claims | Yes | Yes |
| Class 6 | Consumer Credit Transaction Claims | Yes | Yes |
| Class 7 | Subordinated Claims | Yes | Yes |
| Class 8 | Existing TopCo Equity Interests | Yes | No (deemed to reject) |
| Class 9 | Existing Intercompany Equity Interests | Yes | No (deemed to reject) |

The Plan constitutes a separate chapter 11 plan for each Debtor. Except for the Claims addressed in Article III above (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the applicable Debtors.

The Plan consolidates certain Claims against all Debtors solely for purposes of voting and confirmation. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Expense Claims, DIP Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, as described in Article III.

If a controversy arises regarding whether any Claim is properly classified under the Plan for purposes of voting, the Bankruptcy Court shall, upon proper motion and notice, determine

such controversy at the Confirmation Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

**4.2. *Unimpaired Classes of Claims.***

The following Classes of Claims are unimpaired and, therefore, deemed to have accepted this Plan and are not entitled to vote on this Plan under section 1126(f) of the Bankruptcy Code:

(a) Class 1: Class 1 consists of all Priority Non-Tax Claims.

(b) Class 2: Class 2 consists of all Other Secured Claims.

**4.3. *Impaired Classes of Claims.***

The following Classes of Claims are impaired and entitled to vote on this Plan:

(a) Class 3: Class 3 consists of all Prepetition First Out Claims.

(b) Class 4: Class 4 consists of all Prepetition Last Out Claims.

(c) Class 5: Class 5 consists of all General Unsecured Claims.

(d) Class 6: Class 6 consists of all Consumer Credit Transaction Claims.

(e) Class 7 Class 7 consists of all Subordinated Claims.

The following Classes of Claims are deemed impaired and not entitled to vote on this Plan:

(a) Class 8: Class 8 consists of all Existing TopCo Equity Interests.

(b) Class 9: Class 9 consists of all Existing Intercompany Equity Interests.

**4.4. *Separate Classification of Other Secured Claims.***

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under this Plan.

## ARTICLE V.
## TREATMENT OF CLAIMS AND INTERESTS

**5.1. *Priority Non-Tax Claims (Class 1).***

(a) Treatment: The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan. In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable Distribution Date, each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Prepetition Secured Agent and DIP Agent): (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. In the event of a Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

(b) Voting: Priority Non-Tax Claims are not impaired Claims. In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

**5.2. *Other Secured Claims (Class 2).***

(a) Treatment: The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan. In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each Holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.

Each Holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein. Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person and the Holder of such Claims shall deliver to the Debtors or

Post-Effective Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, or *lis pendens*, or similar interests or documents. Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Post-Effective Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

(b) Deficiency Claims: To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under this Plan as a General Unsecured Claim, only as applicable, and shall be classified and treated as the applicable Class 5 Claim.

(c) Voting: The Other Secured Claims are not impaired Claims. In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

**5.3. *Prepetition First Out Claims (Class 3).***

(a) Treatment: On the Effective Date, the Prepetition Secured Loan Claims shall be Allowed under this Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person. In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition First Out Claim, except to the extent that the Prepetition Secured Agent or a Holder of a Prepetition First Out Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Prepetition First Out Lender shall receive, subject to the terms of this Plan and the AAL, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of:

(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, the pro rata share allocable to such Prepetition First Out Lender of the Reorganized

Common Equity[4] (in accordance with the AAL), up to the Allowed Amount of the Prepetition First Out Claims; or

(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (i) payment in full, in Cash, on account of its Allowed Prepetition First Out Claim, or, (ii) proceeds from a Sale Transaction are insufficient for payment in full, in cash, on account of the Allowed Prepetition First Out Claims, payment, in Cash, on account of its Allowed Prepetition First Out Claim, in each case up to the Allowed Amount of the Prepetition First Out Claims.

(b) Voting: The Prepetition First Out Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition First Out Claims.

**5.4.** ***Prepetition Last Out Claims (Class 4)***

(a) Treatment: On the Effective Date, the Prepetition Secured Loan Claims shall be Allowed under this Plan in the amount set forth in the Final DIP Order, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person. In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition Last Out Claim, except to the extent that the Prepetition Secured Agent or a Holder of a Prepetition Last Out Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Prepetition Last Out Lender shall receive, subject to the terms of this Plan and the AAL:

(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, the Prepetition Last Out Claims shall be subordinated and junior to all Allowed General Unsecured Claims and Allowed Consumer Credit Transaction Claims for purposes of distributions under the Plan, and each Prepetition Last Out Lender shall receive its pro rata share of the Distributable Assets Proceeds only upon payment in full of the Prepetition First Out Claims, Allowed General Unsecured Claims, and Allowed Consumer Credit Transaction Claims and in accordance with the priorities set forth in Section 7.34; or

(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, the Prepetition Last Out Claims shall

---

[4] In connection with the treatment of Holders of Second Out DIP Claims as described in Section 3.1 of the Plan, Holders of Prepetition First Out Claims and Second Out DIP Claims will collectively receive a pro rata share of 100% of the Reorganized Common Equity.

be subordinated and junior to all Allowed General Unsecured Claims and Allowed Consumer Credit Transaction Claims for purposes of distributions under the Plan, and each Prepetition Last Out Lender shall receive its pro rata share of the Distributable Assets Proceeds only upon payment in full of the Prepetition First Out Claims, Allowed General Unsecured Claims, and Allowed Consumer Credit Transaction Claims and in accordance with the priorities set forth in Section 7.34.

(b) Voting: The Prepetition Last Out Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition Last Out Claims.

**5.5. *General Unsecured Claims (Class 5).***

(a) Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim against the Debtors, except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim against the Debtors shall receive:

(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, (x) the greater of the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) (A) its *pro rata* share of the GUC Recovery Pool allocable to the applicable Debtors, (B) its pro rata share of the Distributable Assets Proceeds in accordance with the priorities set forth in Section 7.34 and (C) Litigation Trust Interests, in accordance with the distribution priorities set forth in the Litigation Trust Agreement, in each case up to the Allowed Amount of such Allowed General Unsecured Claim, but excluding, for the avoidance of doubt, any Litigation Trust Interests constituting proceeds of Consumer Credit Transaction Claims, provided, that, the Subordinated Note Claims shall be subordinated and junior to all Allowed General Unsecured Claims and Allowed Consumer Credit Transaction Claims for purposes of distributions under the Plan, and each holder of a Subordinated Notes Claim shall receive its pro rata share of the Distributable Assets Proceeds only upon payment in full of the Prepetition First Out Claims, Allowed General Unsecured Claims, and Allowed Consumer Credit Transaction Claims; or

(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the General Unsecured Claims Distribution, if any, allocable to the applicable Debtors, if any, (B) its pro rata share of the Distributable Assets Proceeds in accordance with the priorities set forth in Section 7.34

and (C) Litigation Trust Interests, in accordance with the distribution priorities set forth in the Litigation Trust Agreement, in each case up to the Allowed Amount of such Allowed General Unsecured Claim[5], but excluding, for the avoidance of doubt, any Litigation Trust Interests constituting proceeds of Consumer Credit Transaction Claims, provided, that, the Subordinated Note Claims shall be subordinated and junior to all Allowed General Unsecured Claims and Allowed Consumer Credit Transaction Claims for purposes of distributions under the Plan, and each holder of a Subordinated Notes Claim shall receive its pro rata share of the Distributable Assets Proceeds only upon payment in full of the Prepetition First Out Claims, Allowed General Unsecured Claims, and Allowed Consumer Credit Transaction Claims.

(b) Voting: The General Unsecured Claims against the Debtors are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against the Debtors.

**5.6. *Consumer Credit Transaction Claims (Class 6).***

(a) Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Consumer Credit Transaction Claim against the Debtors, except to the extent that a Holder of a Consumer Credit Transaction Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Consumer Credit Transaction Claim against the Debtors shall receive:

(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) (A) its *pro rata* share of the GUC Recovery Pool allocable to the applicable Debtors, (B) the recovery of such claimant on account of its Consumer Credit Transaction Claims, including, without limitation, by prosecution of an Insurance Proceeds Recovery Action; (C) its pro rata share of the Distributable Assets Proceeds in accordance with the priorities set forth in Section 7.34 and (D) Litigation Trust Interests, in accordance with the distribution priorities set forth in the Litigation Trust Agreement, in each case up to the Allowed Amount of such Consumer Credit Transaction Claims and including, for the avoidance of doubt, any Litigation Trust Interests constituting proceeds of Consumer Credit Transaction Claims; or

5 In a Sale Transaction, the Litigation Trust Assets will consist of, among other things, Retained Causes of Action that have not otherwise been purchased in the Sale Transaction.

(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, (A) its *pro rata* share of the General Unsecured Claims Distribution, if any, allocable to the applicable Debtors, if any, (B) the recovery of such claimant on account of its Consumer Credit Transaction Claims, (C) its pro rata share of the Distributable Assets Proceeds in accordance with the priorities set forth in Section 7.34, and (D) Litigation Trust Interests, in accordance with the distribution priorities set forth in the Litigation Trust Agreement, in each case up to the Allowed Amount of such Consumer Credit Transaction Claims and including, for the avoidance of doubt, any Litigation Trust Interests constituting proceeds of Consumer Credit Transaction Claims.

(b) Voting: The Consumer Credit Transaction Claims against the Debtors are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Consumer Credit Transaction Claims against the Debtors.

**5.7. *Subordinated Claims (Class 7).***

(a) Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Subordinated Claim, except to the extent that a Holder of a Subordinated Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of a Subordinated Claim shall receive:

(i) in the event the Restructuring Transactions are consummated through the Plan Equitization Transaction, no distribution or recovery on account of its Subordinated Claim; or

(ii) in the event the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any. If the proceeds of the Sale Transaction do not result in a Subordinated Claims Distribution, then such Holder of a Subordinated Claim shall receive no consideration on account of its Subordinated Claim.

(b) Voting: The Subordinated Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Subordinated Claims.

**5.8. *Existing TopCo Equity Interests (Class 8).***

(a) Treatment: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing TopCo Equity Interest, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction or the Sale Transaction, on the Effective Date, all Allowed Existing TopCo Equity Interest shall be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of

each Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under this Plan on account of such Allowed Existing TopCo Equity Interest.

(b) Voting: In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Existing TopCo Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Existing TopCo Equity Interests.

### 5.9. *Existing Intercompany Equity Interests (Class 9).*

(a) Treatment: On the Effective Date, whether the Restructuring Transactions are consummated through the Plan Equitization Transaction or the Sale Transaction, each Holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, the DIP Agent and the Prepetition Secured Agent, be (i) extinguished, canceled and/or discharged on the Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired.

(b) Voting: The Existing TopCo Equity Interests are impaired Interests. In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Existing Intercompany Equity Interest are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Existing Intercompany Equity Interest.

## ARTICLE VI.
## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS

### 6.1. *Class Acceptance Requirement.*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Holders of the Allowed Claims in such Class that have voted on the Plan. A Class of Interests that is entitled to vote on the Plan has accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of Allowed Interests of such Class that have voted on the Plan.

### 6.2. *Tabulation of Votes on a Non-Consolidated Basis.*

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.

**6.3. *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."***

Because certain Classes are deemed to have rejected this Plan, the Debtors will request confirmation of this Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes. Subject to Section 14.3 and Section 14.4 of this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. Subject to Section 14.3 and Section 14.4 of this Plan, the Debtors also reserve the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

**6.4. *Elimination of Vacant Classes.***

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

**6.5. *Voting Classes; Deemed Acceptance or Rejection by Non-Voting Classes.***

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

Classes 1 and 2 are unimpaired under this Plan and Holders of Claims or Interests in such Classes are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Classes 1 and 2 are not entitled to vote to accept or reject this Plan.

Claims in Classes 8 and 9 are impaired and shall receive no distributions under this Plan and Holders of Claims or Interests in such Class are, therefore, conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Claims in Classes 8 and 9 are not entitled to vote on this Plan and votes of such Holders shall not be solicited.

**6.6. *Confirmation of All Cases.***

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; provided, however, that the Debtors, with the consent of the Prepetition Secured Agent and DIP Agent, may at any time waive this Section 6.6.

### 6.7. *Vacant and Abstaining Classes.*

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. Moreover, any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept this Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 6.8. *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) is impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date, absent consensual resolution of such controversy among the Debtors and the complaining Entity or Entities.

## ARTICLE VII.
## MEANS FOR IMPLEMENTATION

### 7.1. *Non-Substantive Consolidation.*

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof. Except as specifically set forth herein, nothing in this Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any Claim against any other Debtor. Additionally, claimants holding Claims and Interests against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as holding a separate Claim or separate Interest, as applicable, against each Debtor's Estate; provided, however, that no Holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.

### 7.2. *Plan Equitization Transaction.*

The Plan Equitization Transaction will be consummated unless a Sufficient Bid is received by the Debtors prior to or during the Auction, and the Sale Toggle Event occurs. The Debtors will announce publicly no later than the Auction whether the Restructuring Transaction will be consummated pursuant to the Plan Equitization Transaction.

Following entry of the Confirmation Order and subject to any applicable limitations set forth in any post-Effective Date agreements, or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors may take all actions as may be necessary or appropriate to effect the Restructuring Transaction (including any transaction described in, approved by, contemplated by or necessary to effectuate this Plan), and as set forth in the Restructuring

Transactions Memorandum, including: (a) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, migration, consolidation, or other Organizational Documents with the appropriate governmental authorities pursuant to applicable law; (d) the execution, delivery, and filing, if applicable, of the New Organizational Documents; (e) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (f) all other actions that the Reorganized Debtors reasonably determine, in consultation with the Prepetition Secured Agent and the DIP Agent and are necessary or appropriate, including making filings or recordings that may be required by applicable law. For the purposes of effectuating this Plan, none of the Restructuring Transactions contemplated herein shall constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction or matter that would result in a violation, breach, or default under, or increase, accelerate, or otherwise alter any obligations, rights or liabilities of the Debtors or the Reorganized Debtors under, or result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to, any agreement, contract, or document of the Debtors, and any consent or advance notice required under any agreement, contract, or document of the Debtors shall be deemed satisfied by confirmation.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**7.3. *Sale Transaction.***

In the event any Sale Transaction is consummated, the Sale Proceeds, the Professional Fee Escrow Amount, the Wind Down Amount, any reserves required pursuant to the applicable Sale Documents, the Debtors' rights under the applicable Sale Documents, payments made directly by the applicable Successful Bidder on account of any Assumed Liabilities under the applicable Sale Documents, payments of Cure Amounts made by the applicable Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan (including the Retained Causes of Action), if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in this Plan. Unless otherwise agreed in writing by the Debtors and the applicable Successful Bidder, distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the applicable Successful Bidder even if such Claim is Allowed against the Debtors, and such Claims shall have no recovery from the Debtors under the terms of the Plan.

### 7.4. *Continued Corporate Existence in Certain Debtors; Vesting of Assets; Dissolution of Certain Debtors.*

(a) General. Except as otherwise provided in this Plan or as otherwise may be agreed between the Debtors, the Prepetition Secured Agent and the DIP Agent, each of the Debtors that becomes a Reorganized Debtors shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each of the Reorganized Debtors, in consultation with the Prepetition Secured Agent and the DIP Agent, may take such action as permitted by applicable law and such Reorganized Debtor's New Organizational Documents, as such Reorganized Debtor, may determine is reasonable and appropriate, including, but not limited to, causing: (a) a Reorganized Debtor to be merged with and into another Reorganized Debtor, or a subsidiary and/or Affiliate of a Reorganized Debtor; (b) creation of a new subsidiary of a Reorganized Debtor, (c) a Reorganized Debtor to be dissolved; (d) the conversion of a Reorganized Debtor from one Entity type to another Entity type; (e) the legal name of a Reorganized Debtor to be changed; (f) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (g) the reincorporation of a Reorganized Debtor under the law of jurisdictions other than the law under which the Debtor currently is incorporated.

(b) Vesting of Assets. Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estates, wherever located, including all claims, rights and Causes of Action and any property acquired by the applicable Reorganized Debtors under or in connection with this Plan, as set forth in the Restructuring Steps Memorandum, shall vest in the applicable Reorganized Debtor, free and clear of all Claims, Liens, charges, other encumbrances and Interests, with any remaining property of the Estates remaining with the Wind Down Debtors or the Litigation Trust, as applicable. On and after the Effective Date, except as otherwise provided in this Plan or in the Confirmation Order, each applicable Reorganized Debtor may operate its business(es) and may use, acquire and dispose of property, wherever located, and each Reorganized Debtor may prosecute, compromise or settle any Retained Causes of Action that have vested into such Reorganized Debtor without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Without limiting the foregoing, the Wind Down Debtors may pay the charges that they incur on or after the Effective Date, if any, for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court. Anything in this Plan to the contrary notwithstanding, any unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.

(c) Administration of the Wind Down Debtors. On or as soon as reasonably practicable after the Effective Date, the Wind Down Debtors shall be authorized, following the completion of the distributions set forth in Article IV hereof, to commence the Wind Down and

administer the Wind Down Debtors until such time as the Wind Down Debtors or Plan Administrator, as applicable, determine to merge, dissolve and/or wind down the Wind Down Debtors under applicable law; provided that, notwithstanding such dissolution, Wind Down Debtors shall remain authorized to continue the Wind Down, including filing any necessary documents with the appropriate authorities, including any tax returns, and to facilitate the closing of the Chapter 11 Cases as to such Debtors.

**7.5. *Indemnification Provisions in Organizational Documents.***

Subject to the occurrence of the Effective Date, to the fullest extent permitted by applicable law, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively, against any Claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor (but not the Reorganized Debtors, for the avoidance of doubt) and assigned to the Wind Down Debtor, which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date.

**7.6. *Sources for Cash Distributions under this Plan.***

In the event of a Plan Equitization Transaction, the Debtors shall fund Cash distributions under the Plan with Cash on hand, including Cash from operations, and the proceeds of the DIP Loans. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors or the Disbursing Agent in accordance with Article VIII.

In the event of a Sale Transaction, the Debtors shall fund Cash distributions under the Plan from Cash on hand (if any), and the Sale Proceeds in accordance with the terms of the Sale Documents and the Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the New Organizational Documents), the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of managers or directors, as applicable (or other applicable governing bodies), of the applicable Reorganized Debtors deem appropriate.

**7.7. *[Reserved].***

**7.8. *[Reserved].***

**7.9. *Reorganized Debtors' Ownership.***

In the event of a Plan Equitization Transaction, on the Effective Date, in accordance with the terms of the Plan and the Restructuring Transactions Memorandum and as further set forth in the Plan Supplement, Reorganized TopCo shall issue and deliver all of the Reorganized

Common Equity to Holders of Second Out DIP Claims and Holders of Prepetition First Out Claims pursuant to the terms and conditions of this Plan and the New Organizational Documents. The issuance of Reorganized Common Equity pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest, and all of the Reorganized Common Equity issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Any Holder of an Allowed Second Out DIP Claim may designate that all or a portion of such Holder's pro rata share of the Reorganized Common Equity to be distributed as part of the treatment of such Allowed DIP Claims, be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Claims Agent at least five (5) Business Days prior to the Effective Date. Any Holder of an Allowed Prepetition Secured Loan Claim may designate that all or a portion of such Holder's *pro rata* share of the Reorganized Common Equity to be distributed as part of the treatment of such Allowed Prepetition Secured Loan Claims, be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Claims Agent at least five (5) Business Days prior to the Effective Date. Any such designee shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

**7.10.** ***Exemption from Registration Requirements.***

The offering, issuance, and distribution of any securities, including the Reorganized Common Equity, in exchange for Claims pursuant to Article III of the Plan and/or any and all settlement agreements incorporated herein or otherwise entered into in accordance with the terms of the Plan, shall be exempt from, among other things, the registration requirements of the Securities Act and any other applicable U.S. state or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code). Except as otherwise provided in the Plan or the governing certificates or instruments, any and all such Reorganized Common Equity so issued under the Plan (a) will not be "restricted securities" (as defined under the Securities Act), and (b) will be freely tradable and transferable under the Securities Act by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Debtors or the Reorganized Debtors, in each case, subject to (x) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (y) compliance with applicable securities laws and any rules and regulations, including those of the United States Securities and Exchange Commission or U.S. state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments, and (z) any restrictions in the New Organizational Documents of Reorganized TopCo.

Notwithstanding anything to the contrary in the Plan, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether issuance of the Reorganized Common Equity is exempt from registration.

**7.11. *Organizational Documents.***

In the event of a Plan Equitization Transaction, the Reorganized Debtors shall enter into such agreements and/or amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan and the Bankruptcy Code, which shall: (1) contain terms consistent with the Plan Supplement; and (2) authorize the issuance, distribution, and reservation of the Reorganized Common Equity to the Entities entitled to receive such issuances, distributions and reservations, as applicable under the Plan. The New Organizational Documents will be deemed to be modified to prohibit (and will include a provision prohibiting) the issuance of non-voting equity securities, pursuant to and solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. Without limiting the generality of the foregoing, as of the Effective Date, the Reorganized Debtors shall be governed by the New Organizational Documents applicable to it. On or immediately before the Effective Date, each Debtor and each Reorganized Debtor will file its respective New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of its state of incorporation or formation, to the extent required under this Plan or applicable nonbankruptcy law for such New Organizational Documents to become effective. After the Effective Date, the Reorganized Debtors may amend and restate the formation, incorporation, organizational, and constituent documents, as applicable, as permitted by the laws of its respective jurisdiction of formation or incorporation, as applicable, and the terms of such documents.

As a condition to receiving the Reorganized Common Equity, Holders of Allowed Second Out DIP Claims and Allowed Prepetition Secured Loan Claims and/or any of their respective designees for receipt of Reorganized Common Equity will be required to execute and deliver the applicable New Organizational Documents for Reorganized TopCo. For the avoidance of doubt, any Entity's or Person's receipt of Reorganized Common Equity under, or as contemplated by, the Plan shall be deemed as its agreement to the applicable New Organizational Documents for Reorganized TopCo, and such Entities and Persons shall be deemed signatories to the applicable New Organizational Documents for Reorganized TopCo without further action required on their part (solely in their capacity as members of Reorganized TopCo). The New Organizational Documents for Reorganized TopCo will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of Reorganized Common Equity will be bound thereby in all respects even if such Holder has not actually executed and delivered a counterpart thereof.

**7.12. *Exemption from Certain Transfer Taxes and Recording Fees.***

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to or in connection with the Plan (including, if applicable, the Sale Transaction), including: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral security for any or all of the Exit Term Loans or other indebtedness or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any U.S. federal, state or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate U.S. federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Plan.

**7.13. *Other Tax Matters.***

In the event of a Plan Equitization Transaction, from and after the Effective Date, the Reorganized Debtors shall be authorized to make and to instruct any of their wholly-owned subsidiaries to make any elections available to them under applicable law with respect to the tax treatment of the Restructuring Transaction.

**7.14. *Cancellation of Existing Securities and Agreements.***

Except for the purpose of evidencing a right to distribution under this Plan, and except as otherwise set forth in this Plan or in the Restructuring Transactions Memorandum, on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents directly or indirectly evidencing, related to or connected with any Claim, other than certain Intercompany Claims and Existing Intercompany Equity Interests, in each case as set forth in the Plan, and any rights of any Holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect without further act or action under any applicable agreement, law, regulation, order, or rule. The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan. Notwithstanding anything to the contrary herein, each of the DIP Credit Agreement and the Prepetition Secured Credit Agreement shall continue in effect solely to the extent necessary to permit Holders of the DIP Claims and Prepetition Secured Loan Claims to receive distributions under this Plan on account of such respective Claims. Except as provided pursuant to this Plan, upon satisfaction of the DIP Claims and the Prepetition Secured Loan Claims, respectively (and as the case may be), each of the DIP Agent and the Prepetition Secured Agent, respectively (and as the case may be), shall be discharged of all of their respective obligations associated with the DIP Credit Agreement and the Prepetition Secured Credit Agreement, respectively (and as the case may be). Nothing here in shall impair or otherwise affect the Reorganized Debtors' obligations under the Exit Term Loan Documents.

On the Effective Date, except as otherwise specifically provided for in this Plan (including in the Restructuring Transactions Memorandum): (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of

first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to this Plan, if any) shall be cancelled, terminated and of no further force or effect solely as to the Debtors, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to this Plan, if any) shall be automatically and fully released and discharged.

**7.15. *Boards.***

(a) In the event of a Plan Equitization Transaction, subject to the terms of the applicable New Organizational Documents, on the Effective Date, the New Boards shall consist of those individuals identified in the Plan Supplement to be filed with the Bankruptcy Court at or before the Confirmation Hearing. Unless reappointed, the members of the boards of the Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Debtor, and may be replaced or removed in accordance therewith.

(b) Following the Effective Date, the Plan Administrator shall be the sole director, manager or managing member, as applicable, of each of the Wind Down Debtors. The members of the boards of the Debtors prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors or Wind Down Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

**7.16. *Management.***

In the event of a Plan Equitization Transaction, as of the Effective Date, the individuals who will serve in certain senior management positions of the Reorganized Debtors shall consist of those individuals set forth in the Plan Supplement. From and after the Effective Date, the Wind Down Debtors shall be managed and administered by the Plan Administrator, who shall be appointed the sole officer of each of the Wind Down Debtors and shall have full authority to administer the provisions of the Plan. The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.

**7.17.** ***Directors and Officers and Consumer Liability Insurance Policies***

In accordance with the Plan, (i) on the Effective Date, the Wind Down Debtors shall be deemed to have assumed all of the Debtors' D&O Liability and Consumer Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, which "tail policy" shall not be otherwise terminated or reduced) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies and Consumer Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Wind Down Debtors under the Plan as to which no Proof of Claim or Proof of Interest need be filed; (iii) the Wind Down Debtors shall retain the ability to supplement such D&O Liability Insurance Policies Consumer Liability Insurance Policies as the Wind Down Debtors may deem necessary; and (iv) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies and Consumer Liability Insurance Policies. The D&O Liability Insurance Policies and Consumer Liability Insurance Policies shall constitute Litigation Trust Assets, provided that, for the avoidance of doubt, the D&O Liability Insurance Policies and Consumer Liability Insurance Policies shall maintain coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies.

For the avoidance of doubt, on and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

**7.18.** ***Corporate Action.***

(a) On the Effective Date, the New Organizational Documents and any other applicable amended and restated corporate Organizational Documents of each of the Reorganized Debtors, shall be deemed authorized in all respects. On the Effective Date, all actions contemplated by this Plan (including any transaction described in, or contemplated by, the Restructuring Transactions Memorandum) and the Restructuring Transaction shall be deemed authorized and approved in all respects, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.

(b) Any action under the Plan to be taken by or required of the Debtors or the Reorganized Debtors, including the adoption or amendment of certificates of formation, incorporation and by-laws, entry into the Exit Term Loan Documents, the issuance of securities and instruments, or the selection of officers or directors shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or the Reorganized Debtors' equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

(c) On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, deliver, acknowledge, file, and/or record, as applicable, such securities, documents, contracts, instruments, releases and other agreements and take such other action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, in the name of and on behalf of the Debtors and the Reorganized Debtors, as applicable, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, or shareholder approval or action. In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Debtor.

(d) The authorizations, approvals and directives contemplated by this Section 7.18 shall be effective notwithstanding any requirements under non-bankruptcy Law.

**7.19.** ***Consumer Liability Insurance Proceeds***

All Holders of Consumer Credit Transaction Claims will be permitted to pursue their Claims against Solar Mosaic LLC under all available and applicable Consumer Liability Insurance Policies. The proceeds of such policies, which shall be assumed by the Debtors and assigned to the Litigation Trust, shall be exclusively available for the satisfaction of the damages awarded to Holders of Consumer Credit Transaction Claims in Insurance Proceeds Recovery Actions. Holders of Consumer Credit Transaction Claims that hold claims that arise out of loans still held by Solar Mosaic LLC may seek additional injunctive and declaratory relief, as well as cancellation of the relevant loans, in the relevant Insurance Proceeds Recovery Actions. In addition, and for avoidance of doubt, Holders of Consumer Credit Transaction Claim may pursue Claims against all parties not subject to the Third-Party Release, including the Financing Parties and the ABS Released Parties. In no event shall the aggregate recoveries of any Holder of a Consumer Credit Transaction Claim, under the Plan, in an Insurance Proceeds Recovery Action, and/or otherwise, exceed the Allowed amount of such Holder's Consumer Credit Transaction Claim.

**7.20.** ***Plan Administrator.***

(a) Appointment; Duties. The Debtors, DIP Agent and the Prepetition Secured Agent, in consultation with the Committee, shall designate the Person who initially will serve as the Plan Administrator in the Plan Supplement; provided, however, that: (i) the Debtors shall have the right at any time prior to the Effective Date to remove the Plan Administrator without cause; and (ii) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time. On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan to: (y) establish bank accounts as may be required to fulfill the Debtors' obligations under this Plan; and (z) exercise such other power and authority as may be set forth in the Confirmation Order (collectively, the "***Pre-Effective Date PA Duties***"). On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan, including, but not limited to, those powers set forth in Section 7.20.

(b) Qualifications; Plan Administrator Agreement.

(i) *Plan Administrator as Fiduciary*. The Plan Administrator shall be a fiduciary of the Wind Down Debtors, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under this Plan and under the Plan Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement. To the extent necessary, following the Effective Date, the Plan Administrator shall be deemed to be a judicial substitute for the Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

(ii) *Provisions of Agreement and Order*. The Plan Administrator Agreement and the Confirmation Order shall provide that: (i) the Plan Administrator shall be a fiduciary of the Wind Down Debtors; (ii) neither the Debtors (except as expressly set forth in the Plan Administrator Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the Plan Administrator in performing the Pre-Effective Date PA Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to this Plan on account of any such action taken or omitted to be taken; (iii) if the Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Plan Administrator position shall thereafter be dissolved automatically.

(c) Resignation, Death or Removal. The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown. In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Bankruptcy Court shall designate another Person to become Plan Administrator and thereupon the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

(d) Wind Down Funds. On the Effective Date, the Plan Administrator shall establish and fund the Wind Down Account from all Cash of the Debtors as of the Effective Date, *minus* the distributions to Holders of Claims required by this Plan, *plus* any Cash received by the Wind Down Debtors on and after the Effective Date. To the extent any funds remain in the Wind Down Account after all distributions have been made pursuant to the Plan, any such excess funds shall be returned to the DIP Agent for the benefit of the DIP Lenders.

**7.21. *Wind Down of the Debtors' Estates.***

(a) The Plan Administrator shall oversee the Wind Down and shall make distributions to, and otherwise hold all property of the Estates for the benefit of, Holders of Allowed Claims and Allowed Interests in accordance with the Plan and the Confirmation Order. Neither the Wind Down Debtors nor the Plan Administrator shall be required to post a bond in favor of the United States.

(b) As forth in the Plan Administrator Agreement, the Plan Administrator shall have the power and authority to perform the following acts with respect to the Wind Down Debtors, in addition to any powers granted by law or conferred by any other provision of the Plan and orders of the Bankruptcy Court: (i) take all steps and execute all instruments and documents necessary to make distributions to holders of Allowed Claims and Allowed Interests that the Wind Down Debtors are responsible for payment of pursuant to the terms of this Plan; (ii) object to Claims, if any, as provided in this Plan and prosecute such objections; (iii) resolve, compromise and/or settle any objections to the amount, validity, priority, treatment or allowance of Claims, Administrative Expense Claims, or Interests; (iv) comply with this Plan and the obligations hereunder; (v) if necessary, employ, retain, or replace professionals to represent it with respect to its responsibilities; (vi) take all actions necessary or appropriate to enforce the Wind Down Debtors' rights and fulfill the Wind Down Debtors' obligations under the Sale Documents; (vii) prepare and file applicable tax returns for the Wind Down Debtors; (viii) deposit Estate funds, draw checks and make disbursements consistent with the terms of this Plan; (ix) purchase or continue insurance protecting the Wind Down Debtors, the Plan Administrator and property of the applicable Estates; (x) seek entry of a final decree in any of the Wind Down Debtors' Chapter 11 Cases at the appropriate time; (xi) resolve, compromise and/or settle any Cure Disputes; (xii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization (as such term is described in Internal Revenue Code section 501(c)(3) (whose contributions are deductible under Internal Revenue Code section 170)) of the Plan Administrator's choice, any Estate assets that are of no material benefit, including distributable Cash under this Plan; (xiii) maintain the Loan Ownership Database and process Loan Ownership Information Requests in conjunction with the Reorganized Debtors (and its affiliates) as necessary (provided that the Reorganized Debtors shall be reasonably compensated for any time or services provided in connection with maintaining the Loan Ownership Database); and (xiv) take such other action as the Plan Administrator may determine to be necessary or desirable to carry out the purpose of this Plan.

(c) Following the Effective Date, none of the Wind Down Debtors shall engage in any business activities or take any actions except those necessary to effectuate the Plan (including under the Sale Documents), the terms of the Plan Administrator Agreement, and administer the Wind Down. On and after the Effective Date, the Plan Administrator may, in the name of the Wind Down Debtors, take such action and settle and compromise Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order.

**7.22. *Creation of the Litigation Trust***

On the Effective Date, the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan and the beneficial interests therein, which shall be for the benefit of the Litigation Trust Beneficiaries. Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title, and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, except as specifically provided in the Plan or the Confirmation Order, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims, liens, encumbrances, or interests subject only to the Litigation Trust Interests and the Litigation Trust Expenses, as provided for in the Plan and the Litigation Trust Agreement,. The Litigation Trustee shall be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee, which shall be designated by the Committee, in consultation with the Debtors, the DIP Agent and the Prepetition Secured Agent, until a successor is chosen pursuant to the terms of the Litigation Trust Agreement. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement. The Litigation Trust shall hold and distribute the Litigation Trust Assets in accordance with the provisions of the Plan and the Litigation Trust Agreement. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement. For the avoidance of doubt, after the Effective Date, the Wind Down Debtors and the Estates shall have no interest in the Litigation Trust Assets, the transfer of the Litigation Trust Assets to the Litigation Trust is absolute, and the Litigation Trust Assets shall not be held or deemed to be held in trust by the Litigation Trustee on behalf of any of the Debtors or the Estates.

**7.23. *Purpose of the Litigation Trust***

The Litigation Trust shall be established for the purpose of: pursuing or liquidating the Litigation Trust Assets, and making Distributions to the Litigation Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Litigation Trustee shall be entitled to pursue (or refuse to pursue) any Claims objections and settlements with respect to the Litigation Trust Assets. The Litigation Trust will retain counsel acceptable to the Litigation Trustee in order to pursue and liquidate the Litigation Trust Assets. The Litigation Trust Agreement shall provide that Holders of Allowed General Unsecured Claims or Allowed Consumer Credit Transaction Claims may assign any applicable direct claims that such Holders have against third parties related to the Debtors to the Litigation Trust, which shall be subject to the distribution priorities set forth in the Litigation Trust Agreement.

**7.24. *Litigation Trustee, Litigation Trust Oversight Board, and Litigation Trust Agreement.***

The Litigation Trustee shall be selected by the Committee, in consultation with the Debtors and the DIP and Prepetition Agent. The initial Litigation Trustee shall be named following the Effective Date.

The Litigation Trust Oversight Board shall be created on the Effective Date and be comprised of three (3) members selected by the Creditors' Committee, with which the Litigation Trustee, in connection with the performance of its duties, must consult and cooperate, and which shall have the duties and powers set forth in the Litigation Trust Agreement. The initial members of the Litigation Trust Oversight Board shall be Adam McNeile and Kristi Kelly.

The Litigation Trust Agreement generally will provide for, among other things: (i) the payment of the Litigation Trust Expenses; (ii) the payment of other reasonable expenses of the Litigation Trust; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; (iv) the investment of Cash by the Litigation Trustee within certain limitations, including those specified in the Plan; (v) the orderly liquidation of the Litigation Trust Assets; and (vi) litigation of any Retained Causes of Action belonging to the Litigation Trust, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action.

The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals (including those previously retained by the Debtors or the Committee) to assist in carrying out the Litigation Trustee's duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement.

The Litigation Trust Agreement shall provide that the Litigation Trustee and the members of the Litigation Trust Oversight Board shall be indemnified by and receive reimbursement from the Litigation Trust Assets against and from any and all loss, liability, expense (including reasonable attorneys' fees), or damage which the Litigation Trustee incurs or sustains, in good faith and without either willful misconduct, gross negligence or fraud, acting as Litigation Trustee under or in connection with the Litigation Trust Agreement.

On and after the Effective Date, the Litigation Trustee shall have the power and responsibility to do all acts contemplated by the Plan to be done by the Litigation Trustee and all other acts that may be necessary or appropriate in connection with the disposition of the Litigation Trust Assets and the distribution of the proceeds thereof, as contemplated by the Plan and in accordance with the Litigation Trust Agreement. In all circumstances, the Litigation Trustee shall act in its reasonable discretion in the best interests of the Litigation Trust Beneficiaries pursuant to the terms of the Plan and the Litigation Trust Agreement.

**7.25.** ***Compensation and Duties of Litigation Trustee***

The salient terms of the Litigation Trustee's employment, including the Litigation Trustee's duties and compensation, shall be set forth in the Litigation Trust Agreement. The Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases. The Litigation Trustee shall also be reimbursed for all documented, actual, reasonable, and necessary out-of-pocket expenses incurred in the performance of his or her duties under the Litigation Trust Agreement.

**7.26.** ***Ability to Seek and Obtain Discovery***

From and after the Effective Date, the Plan Administrator, including in its capacity as Litigation Trustee and any successor Litigation Trustee, shall have the ability to seek and obtain examination (including document discovery and depositions) under Bankruptcy Rule 2004 against any Person or Entity in furtherance of the Plan and the purpose of the Litigation Trust, and the Bankruptcy Court shall retain jurisdiction to order examinations (including examinations under Bankruptcy Rule 2004) against any Person or Entity, and to hear all matters with respect to the same.

**7.27.** ***Cash Investments in the Litigation Trust.***

Funds in the Litigation Trust shall be invested in demand and time deposits in banks or other savings institutions, or in other temporary, liquid investments, such as Treasury bills, consistent with the liquidity needs of the Litigation Trust as determined by the Litigation Trustee, in accordance with Bankruptcy Code section 345, unless the Bankruptcy Court otherwise requires; provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

**7.28.** ***Dissolution of the Litigation Trust.***

The Litigation Trustee shall be discharged and the Litigation Trust shall be terminated, at such time as: (a)(i) all of the Litigation Trust Assets have been liquidated; (ii) all duties and obligations of the Litigation Trustee under the Litigation Trust Agreement have been fulfilled; and (iii) all Distributions required under the Litigation Trust Agreement have been made; OR (b) as otherwise provided in the Litigation Trust Agreement. Upon dissolution of the Litigation Trust, any remaining Litigation Trust Assets may be transferred by the Litigation Trustee to a charitable organization(s) or sold as part of a remnant asset sale.

**7.29.** ***Control Provisions.***

To the extent there is any inconsistency between this Plan as it relates to the (i) Litigation Trust and the Litigation Trust Agreement, or (ii) the Plan Administrator Agreement, the terms of the Plan shall control.

**7.30.** ***Limitation of Liability; Indemnification***

The Litigation Trustee, Plan Administrator and each of its respective designees, employees, agents, representatives or professionals shall not be liable for the act or omission of any other member, designees, agent or representative of the Litigation Trustee or Plan Administrator, nor shall they be liable for any act or omission taken or omitted to be taken in their respective capacities, other than acts or omission resulting from willful misconduct, gross negligence, or fraud. The Litigation Trustee and Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee. The Plan Administrator and Litigation Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with attorneys, accountants, financial advisors and agents, which consultation may act as a defense for any act taken, omitted to be taken, or suffered to be done in

accordance with advice or opinions rendered by such persons. Notwithstanding such authority, the Litigation Trustee and Plan Administrator shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or fraud. The Litigation Trust shall indemnify and hold harmless the Litigation Trustee and its designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

**7.31.** ***Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights.***

(a) Pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to this Plan on account of any Allowed Claim or Allowed Interest and this Plan shall be deemed a motion to approve the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (i) in the best interest of the Debtors, the Reorganized Debtors, and their respective Estates and property, and of Holders of Claims or Interests; and (ii) fair, equitable and reasonable.

(b) Except as provided herein, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and Entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to this Plan.

(c) The Debtors, the Prepetition Secured Lenders, the DIP Lenders, the Creditors' Committee, and the Sponsors engaged in extensive, detailed good faith and arm's length negotiations to resolve any outstanding issues and to formulate a chapter 11 plan supported by the Prepetition Secured Lender Parties, the DIP Secured Parties, the Creditors' Committee, and the Sponsors. The Debtors, the Prepetition Secured Lenders, the DIP Lenders, the Creditors' Committee, and the Sponsors ultimately agreed to the Global Settlement, pursuant to which, among other things, (i) Prepetition Secured Agent has agreed to settle certain potential

Causes of Action against Sponsors and contribute the settlement proceeds (i.e. the Sponsor Payment) to find a portion of the Global Settlement, and (ii) the DIP Agent and Prepetition Secured Agent have agreed to carve-out collateral proceeds from their liens on specified collateral as consideration to fund portions of the Global Settlement for the benefit of junior creditors. The terms of the Global Settlement are as follows:

(i) The Creditors' Committee supports this Plan, including but not limited to the release and exculpation provisions set forth in Article VII hereof.

(ii) The Sponsors shall pay a total of $2,500,000 in total, with the Affinity Sponsors funding $1,250,000 and the Warburg Sponsors funding $1,250,000 (the "***Sponsor Payment***") to fund the Litigation Trust Cash Contribution and the GUC Recovery Pool. On the Effective Date of the Plan, the Sponsors shall pay $250,000 to fund the GUC Recovery Pool and $750,000 to the Litigation Trustee. The Affinity Sponsors and the Warburg Sponsors shall each contribute the balance of their respective distributions from Mosaic Funding X LLC to the Litigation Trustee on the fifteenth (15th) day of each month until their portion of the Sponsor Payment has been fully funded (provided that, if distributions from Mosaic Funding X LLC are insufficient to satisfy the full amount of the Sponsor Payment, the Sponsors shall contribute any remaining amounts directly to the Litigation Trustee on a several basis until the Affinity Sponsors and Warburg Sponsors have each funded $1,250,000, respectively), unless the Litigation Trustee provides a notice to the Sponsors (a "***Funding Notice***") stating that the Litigation Trustee has determined that all or some of the balance of the Sponsor Payment is reasonably necessary to fund activities of the Litigation Trust. In the event the Litigation Trustee provides a Funding Notice to the Sponsors, the Sponsors shall fund the amount requested in the Funding Notice within 5 business days and pay the balance of the Sponsor Payment, if any, out of distributions from Mosaic Funding X LLC.

(iii) Holders of Prepetition Last Out Claims and Subordinated Notes Claims shall be subordinated and junior to all Allowed General Unsecured Claims and Allowed Consumer Credit Transaction Claims for purposes of distributions under the Plan.

(iv) In accordance with Section 7.34, the first $1 million in proceeds from the sale of the ABS Interests shall be used to help fund the Wind-Down Budget, with the remaining proceeds to be paid to the DIP Agent for the benefit of the DIP Lenders.

(v) In accordance with Section 7.34, any proceeds of the Debtor Loan Interests will be used to fund the GUC Recovery Pool.

Case 25-90156 Document 1267-1 Filed in TXSB on 08/26/25 Page 123 of 124

(vi) In accordance with Section 7.34, the first \$2.5 million of proceeds from any remaining Distributable Asset Proceeds will be distributed to the to the DIP Agent for the benefit of the DIP Lenders, with any additional Distributable Asset Proceeds in excess of that amount being distributed 25% to the Plan Administrator in order to fund the GUC Recovery Pool and 75% to the DIP Agent for the benefit of the DIP Lenders.

(vii) The Prepetition Lenders and DIP Lenders will forego any recoveries from the Litigation Trust; except to the extent proceeds remain after all holders of Litigation Trust Interests are distributed the full amount to which they are entitled pursuant to the Plan and remaining assets are transferred to the Wind Down Debtors.

(viii) The Consumer Liability Insurance Policies will be contributed to the Litigation Trust for the benefit of Holders of the Consumer Credit Transaction Claims.

(ix) The Debtors and their Estates release any claims and Causes of Action against the Sponsors, the Financing Partners, the ABS Parties, and their respective Related Parties.

(x) The Prepetition Secured Lenders and Prepetition Secured Agent release any claims and Causes of Action, if any, against the Sponsors, including in connection with Mosaic Funding X LLC.

(xi) The Global Settlement is subject to satisfaction of all of the conditions above and consummation of the Restructuring Transactions.

(xii) All Cash held by the Debtors that does not fund the Global Settlement or items in the Approved Budget (as defined in the Final DIP Order) shall be paid to the DIP Agent for the benefit of the DIP Lenders on the Effective Date.

**7.32. *Additional Transactions Authorized Under this Plan.***

On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to reinstate Claims or Interests or render Claims or Interests not impaired, as provided for under this Plan.

Solar Mosaic LLC hereby irrevocably nominates, constitutes and appoints the Reorganized Debtor as its true and lawful attorney-in-fact (with full power of substitution) and hereby authorizes the Reorganized Debtor and/or its Affiliates or designees, in the name of and on behalf of the Solar Mosaic LLC, to execute, deliver, acknowledge, certify, file, and record any termination of any financing statement filed or recorded in the name of Solar Mosaic LLC pursuant to the Uniform Commercial Code of the applicable state prior to the Effective Date.

This limited power of attorney is and shall be coupled with an interest and shall be irrevocable, and shall survive the dissolution of Solar Mosaic LLC.

**7.33.** ***Exit Term Loan Documents.***

On or around the Effective Date, the Reorganized Debtors shall execute and deliver the Exit Term Loan Documents, and shall execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court, or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity. Prior to the Effective Date, the Debtors will file the Exit Term Sheet as part of the Plan Supplement. On the Effective Date, the Exit Term Loan Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

**7.34.** ***Distributable Assets Proceeds.***

(a) **ABS Interests.** On or following the Effective Date (unless effectuated prior to the Effective Date), the Wind Down Debtors or the Plan Administrator shall distribute the ABS Interests pursuant to the following priorities:

First, to the Plan Administrator in order to fund the Wind-Down Budget in an amount up to $1 million;

Second, to the DIP Agent, to the DIP Agent for the benefit of the DIP Lenders.

(b) **Debtor Loan Interests.** On or following the Effective Date (unless effectuated prior to the Effective Date), the Wind Down Debtors or the Plan Administrator shall utilize the proceeds from the Debtor Loan Interests to fund the GUC Recovery Pool.

(c) **Remaining Distributable Assets Proceeds**. On or following the Effective Date (unless effectuated prior to the Effective Date), the Wind Down Debtors or the Plan Administrator shall distribute all other Distributable Asset Proceeds (except for the ABS Interests and Debtor Loan Interests) pursuant to the following priorities:

First, to the DIP Agent, to the DIP Agent for the benefit of the DIP Lenders, in an amount up to $2,500,000; and

Second¸ (a) 75% of any remaining Distributable Asset Proceeds to be distributed to the DIP Agent for the benefit of the DIP Lenders, and (b) 25% of any remaining Distributable Asset Proceeds to be distributed to the Plan Administrator in order to fund the GUC Recovery Pool.

**7.35.** ***Lending Club License***

Pursuant to Sections 1123(b)(4) and 1141(c) of the Bankruptcy Code, the Debtors shall sell, convey and otherwise transfer certain assets and rights to the Licensee (as defined in the Lending Club License) as set forth in the Plan Supplement (the "***Lending Club License***").

Proceeds of the Lending Club License will be applied to outstanding DIP Claims pursuant to Section 3.1 of the Plan, except as otherwise agreed to by the DIP Agent.

## ARTICLE VIII. DISTRIBUTIONS

**8.1. *Distributions.***

The Disbursing Agent shall make all distributions to the applicable Holders of Allowed Claims in accordance with the terms of this Plan, the Plan Administration Agreement and the Litigation Trust Agreement. Following the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall make continuing efforts to liquidate all Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement, provided that the timing of all Distributions made by the Litigation Trustee to Litigation Trust Beneficiaries shall be in accordance with the Litigation Trust Agreement and the Plan.

**8.2. *No Postpetition Interest on Claims.***

Except with respect to Allowed DIP Claims and the Prepetition Secured Loan Claims and unless otherwise specifically provided for in the Confirmation Order or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

**8.3. *Date of Distributions.***

Unless otherwise provided herein, any distributions under this Plan and deliveries to be made hereunder shall be made on the applicable Distribution Date; provided that the Wind Down Debtor or Plan Administrator may utilize periodic Distribution Dates to the extent that use of a periodic Distribution Date does not delay payment of the Allowed Claim more than thirty (30) days. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**8.4. *Distribution Record Date.***

As of the close of business on the Distribution Record Date, the various lists of Holders of Claims in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims after the Distribution Record Date. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' Executory Contracts and Unexpired Leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount. For the avoidance of doubt, the

"Distribution Record Date" shall not apply to the distribution of securities through DTC, which (if any) shall be made in accordance with the customary procedures of DTC.

**8.5. *Disbursing Agent.***

(a) Powers of Disbursing Agent. The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions under this Plan or payments contemplated hereby in respect of the Reorganized Debtors; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b) Expenses Incurred by the Disbursing Agent On or After the Effective Date. Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Wind Down Debtors (solely if the Plan Administrator is not the Disbursing Agent), the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash and will not be deducted from distributions under this Plan made to Holders of Allowed Claims by the Disbursing Agent. The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Wind Down Debtors or Plan Administrator and without the need for approval by the Bankruptcy Court, as set forth in Section 3.2(b) of this Plan. In the event that the Disbursing Agent and the Wind Down Debtors are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

(c) Bond. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors. Furthermore, any such Entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

(d) Cooperation with Disbursing Agent. The Wind Down Debtors and Plan Administrator, as applicable, shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of Holders of Claims, in each case, that are entitled to receive distributions under this Plan, as set forth in the Debtors' or the applicable Reorganized Debtors' books and records. The Wind Down Debtors and Plan Administrator, as applicable, will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in Section 8.14 of this Plan.

**8.6. *Delivery of Distribution.***

Subject to the provisions contained in this Article VIII, with respect to distributions required to be made to Holders of Allowed Claims by the Plan Administrator or Wind Down Debtors under this Plan, the Disbursing Agent will, subject to Bankruptcy Rule 9010, make all distributions under this Plan or payments to any Holder of an Allowed Claim as and when required by this Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed Proofs of Claim or transfers of Claim filed with the Bankruptcy Court. In the event that any distribution under this Plan to any such Holder is returned as undeliverable, no distribution or payment to such Holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter such distribution under this Plan shall be made to such Holder without interest; provided, however, that such distributions under this Plan or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of ninety (90) days from: (i) the Effective Date; and (ii) the first Distribution Date after such Holder's Claim is first Allowed. Notwithstanding the foregoing, all distributions to be made on account of the Prepetition First Out Claims and distributions to be made on account of the Prepetition Last Out Claims, if any, shall be delivered to the Prepetition Secured Agent for the benefit of itself and the applicable Prepetition Secured Lenders in accordance with the terms of this Plan and the AAL.

**8.7. *Unclaimed Property.***

Ninety (90) days from the later of: (i) the Effective Date, and (ii) the first Distribution Date after such Holder's Claim is first Allowed, all unclaimed property, wherever located, or interests in property distributable hereunder on account of such Claim shall revert to the applicable Reorganized Debtor or Wind Down Debtor or its successor or assign and be deposited in the Wind Down Account, and any Claim or right of the Holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred. The Wind Down Debtors and the Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records, and the Proofs of Claim filed against the Debtors, as reflected on the Claims Register maintained by the Claims Agent.

**8.8. *Satisfaction of Claims.***

Unless otherwise specifically provided herein, any distributions under this Plan and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

**8.9. *Manner of Payment Under Plan.***

Except as specifically provided herein, at the option of the Wind Down Debtors or Plan Administrator, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or Plan Administrator, as the case may be.

**8.10. *De Minimis Cash Distributions.***

None of the Wind Down Debtors, the Plan Administrator or the Disbursing Agent shall have any obligation to make a distribution that is less than $50.00 in Cash.

**8.11. *Distributions on Account of Allowed Claims Only.***

Notwithstanding anything herein to the contrary, no distribution under this Plan shall be made on account of a Claim until such Claim becomes an Allowed Claim.

**8.12. *No Distribution in Excess of Amount of Allowed Claim.***

Notwithstanding anything herein to the contrary, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution under this Plan of a value in excess of the Allowed amount of such Claim.

**8.13. *No Fractional Shares.***

Notwithstanding anything herein to the contrary, there will be no distribution of fractional shares of Reorganized Common Equity and no cash in lieu to be distributed on account of such fractional shares.

**8.14. *[Reserved].***

**8.15. *Withholding and Reporting Requirements.***

In connection with this Plan and all distributions under this Plan hereunder, the Plan Administrator, Wind Down Co, Wind Down Debtors, the Disbursing Agent and any Claims Agent shall comply with all withholding and reporting requirements imposed by any U.S. federal, state, provincial, local or foreign tax law, and all distributions under this Plan hereunder shall be subject to any such withholding and reporting requirements. The Wind Down Debtors, wind Down Co, Plan Administrator, the Disbursing Agent and any Claims Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including requiring a Holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of this Plan: (a) each Holder of an Allowed Claim that is to receive a distribution under this Plan under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations on account of such distribution; and (b) no distributions under this Plan shall be required to be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Plan Administrator, Wind Down Co., Wind Down Debtors, the Disbursing Agent or the Claims Agent, as applicable, for the payment and satisfaction of such tax obligations or has, to their satisfaction, established an exemption therefrom.

## ARTICLE IX.
## PROCEDURES FOR RESOLVING CLAIMS

### 9.1. *Claims Process.*

Except as otherwise required by order of the Bankruptcy Court, Holders of Claims need not file Proofs of Claim with the Claims Agent or the Bankruptcy Court and shall be subject to the Bankruptcy Court claims process only to the extent set forth in this Plan and/or Confirmation Order.

### 9.2. *Objections to Claims.*

Other than with respect to Fee Claims, only the Plan Administrator, Wind Down Debtors, Reorganized Debtors, or Wind Down Co, on behalf of itself and the other the Wind Down Debtors, shall be entitled to object to Claims on and after the Effective Date, except that nothing herein shall be understood to waive the Reorganized Debtors', Plan Administrator's, or the Wind Down Debtors' right to argue that a Claim filed against the Debtors or the Reorganized Debtors has been discharged under the Plan. Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) one hundred eighty (180) days following the later of (x) the Effective Date and (y) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof. From and after the Effective Date, either the Plan Administrator or the Wind Down Debtors, as applicable, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

### 9.3. *Payments and Distributions with Respect to Disputed Claims.*

If an objection to a Claim is filed as set forth in Section 9.2, except as otherwise agreed by (i) the Plan Administrator or (ii) the Wind Down Debtors, as applicable, if any portion of a Claim (other than a Fee Claim) is a Disputed Claim, no payment or distribution (partial or otherwise) provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

## ARTICLE X.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1. *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, in the event a Sale Transaction is consummated, to the extent assumption has not already occurred pursuant to a Sale Order, the Assumed Contracts to be assumed and assigned in connection with such Sale Transaction will be deemed assumed and assigned to the applicable Successful Bidder in accordance with the applicable Sale Documents.

On the Effective Date, in the event of a Plan Equitization Transaction, except as otherwise provided in herein, any Executory Contracts and Unexpired Leases (i) not previously assumed, or (ii) not previously rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected as of the Effective Date except any Executory Contract or Unexpired Lease

identified on the Assumed Contracts List (which shall initially be filed with the Plan Supplement) as a contract or lease to be assumed.

On the Effective Date, in the event of a Sale Transaction, except as otherwise provided herein, any Executory Contract or Unexpired Lease (i) not previously assumed, (ii) not assumed and assigned in accordance with any Sale Documents, (iii) not previously rejected pursuant to an order of the Bankruptcy Court, or (iv) not subject of a pending motion to reject, assume or assume and assign, will be deemed rejected as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions, assumptions and assignments, or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date or, as to assumed Executory Contracts and Unexpired Leases, on such later date as may be identified on the Assumed Contracts List. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party (including New OpCo or a designee of the Reorganized Debtors in the event of a Plan Equitization Transaction or the applicable Successful Bidder in the event of a Sale Transaction) on or prior to the Effective Date, shall be deemed rejected as of the Effective Date. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease or the execution of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. For the avoidance of doubt, confirmation of the Plan shall not, except as otherwise provided herein or in the Restructuring Transactions Memorandum, be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary herein, the Debtors or Reorganized Debtors, as applicable, reserve the right to amend or supplement the Assumed Contracts List in their discretion prior to the Effective Date (or such later date as may be permitted by this Plan); provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

**10.2.** ***Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.***

Notwithstanding anything to the contrary herein, in the event of a Sale Transaction, the terms of any Sale Documents and any Sale Order shall govern the cure of defaults, assumption and assignment, and compliance with section 365 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases assumed and assigned pursuant to such Sale Documents and Sale Order.

In the event of a Plan Equitization Transaction except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, any monetary defaults arising under such Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "***Cure Amount***") in full in Cash by the Debtors either (i) on the Effective Date or as soon as reasonably practicable thereafter, or (ii) in the event of a Cure Dispute, within thirty (30) days after the date on which such Cure Dispute has been resolved (either consensually or through judicial decision).

With respect to all Executory Contracts and Unexpired Leases to which any Debtor is a party, the Debtors shall file the Assumed Contracts List, setting forth the Cure Amount, if any, for each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to Section 10.1 of this Plan, and serve such Assumed Contracts List on each applicable counterparty. **Any party to an Executory Contract or Unexpired Lease to which a Debtor is a counterparty that fails to object to the applicable Cure Amount listed on the Assumed Contracts List within fourteen (14) calendar days of the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Assumed Contracts List (including a Cure Amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Assumed Contracts List.**

If, prior to the Effective Date, the Debtors identify additional Executory Contracts and Unexpired Leases to which a Debtor is a counterparty that might be assumed or assumed and assigned by the Debtors, the Debtors will promptly file a supplemental Assumed Contracts List ("***Supplemental Assumed Contracts List***") and serve such Supplemental Assumed Contracts List on each applicable counterparty. Each applicable counterparty shall have fourteen (14) calendar days of the filing thereof to object to the applicable Cure Amount set forth on the Supplemental Assumed Contracts List.

In the event of a dispute (each, a "***Cure Dispute***") regarding: (i) the Cure Amount; (ii) the ability of the applicable Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to the proposed assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption or assumption and assignment. To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute; provided that the Debtors reserve Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).

**10.3.** ***Claims Based on Rejection of Executory Contracts and Unexpired Leases.***

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases under this Plan must be filed with the Claims Agent within thirty (30) days after the date of the

effectiveness of the rejection of the applicable Executory Contract or Unexpired Lease. **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely filed shall be subject to disallowance by further order of the Court upon objection on such grounds.** All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article IV, except to the extent such Allowed Claim, or a portion of such Allowed Claim, arising from the rejection of an Executory Contract is secured, in which case such Allowed Claim, or such portion of such Allowed Claim, shall be an Other Secured Claim and treated in accordance with Article IV.

**10.4.** ***Contracts and Leases Entered into After the Petition Date.***

The Debtors or Reorganized Debtors, and, to the extent assigned to a Successful Bidder in the event of a Sale Transaction, the Successful Bidder, as applicable, will perform under any contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by any Debtor, and will be liable thereunder in the ordinary course of business.

**10.5.** ***Reservation of Rights.***

Neither the exclusion nor inclusion of any contract or lease in the Assumed Contracts List, as applicable, nor anything contained in the Plan or Sale Documents, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Amount to any contract and lease counterparties, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors or Plan Administrator, as applicable, shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article XIII.

**10.6.** ***Employee Compensation and Benefits.***

Subject to the provisions of the Plan, all compensation and benefits programs shall be treated as Executory Contracts under the Plan and, unless otherwise rejected, to the extent consented to by the Prepetition Secured Agent and the DIP Agent, deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Confirmation of the Plan, or any assumption of compensation and benefits programs pursuant to the terms herein, shall not be deemed to trigger any applicable change of control, assignment, vesting, termination, acceleration or similar provisions therein. No counterparty shall have rights under a compensation and benefits programs assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

In the event of a Plan Equitization Transaction, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management

team of the Debtors, or will enter into new compensation arrangements, as applicable, on the Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Prepetition Secured Agent and the DIP Agent and which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Prepetition Secured Agent and the DIP Agent.

In the event of a Plan Equitization Transaction, the New Board shall assume, assume as amended, or reject the existing long term incentive plans of Reorganized Topco, if any, and, if applicable, its direct or indirect subsidiaries, in each case structured to incentivize operating performance and align economic interests on terms and conditions acceptable to the New Board and the Prepetition Secured Agent and DIP Agent.

In the event of a Sale Transaction, the compensation and benefits programs shall either be assumed and assigned upon consummation of an applicable Sale Transaction in accordance with the terms and conditions of the applicable Sale Documents or, if no Successful Bidder assumes the compensation and benefits programs, rejected. On the Effective Date, or in the event of assumption by a Successful Bidder of the compensation and benefits programs, all Proofs of Claim filed for amounts due under any compensation and benefits programs shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan.

## ARTICLE XI.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

### 11.1. *Conditions Precedent to Confirmation.*

Confirmation of this Plan is subject to the satisfaction or waiver of the following conditions:

(a) the DIP Orders shall have been entered by the Bankruptcy Court and shall remain in full force and effect;

(b) the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan;

(c) entry of the Disclosure Statement Order;

(d) entry of the Confirmation Order;

(e) the DIP Credit Agreement and the DIP Orders, shall not have been terminated in accordance with its respective terms; and

(f) in the event of a Sale Transaction, the receipt of a Sufficient Bid and the Sale Documents shall not have been terminated in accordance with their terms.

Case 25-90156 Document 1271-3 Filed in TXSB on 09/26/25 Page 134 of 162

**11.2. *Conditions Precedent to the Effective Date.***

The occurrence of the Effective Date is subject to the satisfaction or waiver of the following conditions:

(a) the Confirmation Order having become a Final Order in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified;

(b) no court of competent jurisdiction or other competent governmental or regulatory authority having issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

(c) each of the applicable Definitive Documents having been executed, delivered, acknowledged, and/or filed, as applicable, by the Entities and Persons intended to be parties thereto and effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein having been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Definitive Documents;

(d) in the event of the Plan Equitization Transaction, each of the offers, issuances, sales, and/or deliveries of Reorganized Common Equity in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no proceeding by any Governmental Unit or other Entity or Person that alleges that any such offer, issuance, sale and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such proceeding shall be threatened in writing or instituted by any Governmental Unit on or prior to the Effective Date;

(e) the DIP Credit Agreement and the DIP Orders, having not been terminated in accordance with its respective terms;

(f) to the extent a Plan Equitization Transaction is implemented, all of the actions set forth in the Restructuring Transactions Memorandum, as applicable, having been completed and implemented;

(g) there not having been instituted or threatened to be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Entity (x) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transaction contemplated herein and in the Definitive Documents or (y) imposing a material award, claim, injunction, fine or penalty that, in each case, both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

(h) the Debtors having obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and having filed all notices and reports, if any,

required to be filed, including with any Governmental Unit, by the Debtors in connection with this Plan's effectiveness, in each case, as may be required by a Governmental Unit;

(i) in the event of the Plan Equitization Transaction, the Reorganized Common Equity to be issued and/or delivered on the Effective Date having been validly issued by Reorganized TopCo, having been fully paid and non-assessable, and being free and clear of all taxes, Liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents of Reorganized TopCo;

(j) all requisite filings with any Governmental Unit and third parties having become effective, and all such Governmental Unit and third parties having approved or consented to the Restructuring Transactions, to the extent required;

(k) any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions having been obtained;

(l) the Plan Administrator Agreement shall have been executed;

(m) the Reorganized Debtors have entered into a sufficient number of servicing agreements and related ancillary agreements with the Warehouses, Financing Partners and ABS Vehicles, as determined by the Prepetition Secured Agent and DIP Agent, in their sole discretion;

(n) the Litigation Trust shall be established and validly existing and the Litigation Trust Agreement shall have been executed;

(o) in the event of a Sale Transaction, the Sale Documents, as applicable, not having been terminated in accordance with their terms;

(p) the following documents being in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions, and not having been, as applicable, stayed, modified, reversed, vacated, subject to any pending appeal, and/or terminated prior to the Effective Date: (a) the New Organizational Documents; (b) if applicable, any Sale Order; (c) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (d) all other documents necessary to consummate a transaction of the type contemplated by this Plan to the extent not otherwise listed above.

(q) all conditions precedent to the effectiveness of the Exit Term Loan Documents shall be or have been, as applicable, funded and closed and be in full force and effect.

(r) The requisite number of holders must have validly delivered consents pursuant to the consent solicitation processes commenced on August 22, 2025, with respect to each of the ABS Vehicles.

**11.3. *Satisfaction and Waiver of Conditions Precedent.***

Except as otherwise provided herein, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Any of the conditions set forth in Section 11.1 and Section 11.2 of this Plan may be waived in whole or part upon agreement by the Debtors and the Prepetition Secured Agent and the DIP Agent, and as the case may be, without notice and a hearing, and the Debtors' benefits under any "mootness" doctrine, but only to the extent applicable, shall be unaffected by any provision hereof. The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

**11.4. *Effect of Failure of Conditions.***

If all of the conditions to effectiveness have not been satisfied (as provided in Section 11.1 and Section 11.2 hereof) or duly waived (as provided in Section 11.3 hereof) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors, in consultation with the DIP Agent, the Prepetition Secured Agent, and the Committee, in a notice filed with the Bankruptcy Court prior to the expiration of such period, then this Plan shall be null and void in all respects. If the Confirmation Order is vacated pursuant to this Section 11.4, this Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under this Plan shall be made, the Debtors and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

**11.5. *Binding Effect.***

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under this Plan and whether or not such Holder has accepted this Plan.

**11.6. *Substantial Consummation.***

Substantial consummation of this Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

# ARTICLE XII.
# RELEASE, INJUNCTION, AND RELATED PROVISIONS

### 12.1. *Discharge of Claims and Termination of Certain Equity Interests; Compromise and Settlement of Claims, Certain Equity Interests, and Controversies.*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim is Allowed; or (3) the Holder of such Claim or Equity Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. For the avoidance of doubt, (i) nothing in this Section 12.1 shall affect the rights of Holders of Claims to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims are entitled under the Plan, (ii) notwithstanding any other Plan provision to the contrary, in the event a Sale Transaction is consummated, the Debtors shall not receive a discharge, pursuant to section 1141(d)(3) of the Bankruptcy Code, (iii) nothing herein shall discharge any debt subject to Section 1141(d)(6) of the Bankruptcy Code, and (iv) nothing herein shall discharge any Consumer Credit Transaction Claims against Solar Mosaic LLC.

In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle

any Claims against the Debtors and their Estates, as well as claims and Causes of Action against other Entities.

12.2. *Releases by the Debtors.*

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtor Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release, to the maximum extent permitted by law, to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, this Plan, the Definitive Documents, the Plan Equitization Transaction, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the confirmation or consummation of this Plan or the solicitation of votes on this Plan, in each case, that such Debtor Releasing Party would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; provided, however, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party; and/or (ii) the rights of such Debtor Releasing Party to enforce this Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or any Sale Transaction or assumed pursuant to this Plan or any Sale Transaction or assumed pursuant to Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date without further notice to or order**

**of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this <u>Article XII.2</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non- compete obligation owed to the Debtors or the Reorganized Debtors. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; and (2) all Retained Causes of Action set forth in the Schedule of Retained Causes of Action.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after consideration of the results of the Independent Investigation and due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.**

12.3. *Third-Party Release.*

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Non-Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third-Party Release</u>") from any and all Claims, Interests, Causes of Action, and any other debts, obligations, rights, suits, damages, actions,**

**remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Definitive Documents, the Plan Equitization Transaction, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the confirmation or consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, that, the ABS Parties and the Financing Partners (solely in their capacity as Financing Partners), including the Warehouses (and each such parties' lenders thereto) shall not constitute Released Parties solely for purposes of this Section 12.3; provided, further, that the foregoing provisions of this Third-Party Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party; and/or (ii) the rights of such Non-Debtor Releasing Party to enforce this Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or any Sale Transaction or assumed pursuant to this Plan or any Sale Transaction or Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein; or (2) any retained Causes of Action, including, without limitation, as set forth on the Schedule of Retained Causes of Action and (3) any Consumer Credit Transaction Claims against Solar**

Case 25-90156 Document 1267-1 Filed in TXSB on 08/25/25 Page 142 of 167

**Mosaic LLC and any Financing Partners (solely in their capacity as Financing Partners) and any ABS Released Parties.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made in good faith based upon, among other things, consideration of the Independent Investigation and after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.**

**For the avoidance of doubt, neither the Third-Party Release nor any other provision of this Section 12.3 shall apply to any Person or Entity that makes the Third-Party Release Opt-Out Election.**

**12.4. *Exculpation.***

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of confirmation and consummation of this Plan, making distributions under this Plan, the Disclosure Statement, the Plan Equitization Transaction, the Sale Process, the Sale Order, or the solicitation of votes for, or confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing; the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the DIP Documents (including with respect to the DIP Loans), or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation or consummation of this Plan; provided, however, that the foregoing provisions of this Exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed**

**pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in this Article XII.4 shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

12.5. *Discharge of Claims and Termination of Interests.*

**Except as otherwise provided for herein and pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property or Estates; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests (other than any Existing Intercompany Equity Interests that are reinstated hereunder) shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, provided, that, nothing herein shall release, discharge or otherwise impair any Consumer Credit Transaction Claims against Solar Mosaic LLC and any Financing Partners (solely in their capacity as Financing Partners) or ABS Released Parties.**

12.6. *Injunction.*

**Except as otherwise provided herein or for obligations issued pursuant hereto, all Persons or Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to Exculpation pursuant to Article XII, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or**

Case 25-90156 Document 1267-1 Filed in TXSB on 08/05/25 Page 142 of 162

**other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties or the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, discharged, exculpated or settled pursuant to the Plan, provided, that, nothing herein shall release or enjoin any Consumer Credit Transaction Claims against Solar Mosaic LLC and any Financing Partners (solely in their capacity as a Financing Partner) or ABS Released Parties.**

**12.7.** ***Setoffs and Recoupment.***

Except as otherwise provided herein and except with respect to the Secured Claims, each Reorganized Debtor, Wind Down Debtor, or the Plan Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that the applicable Debtor, Reorganized Debtor or Wind Down Debtor may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); provided that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor, Wind Down Debtor or the Plan Administrator, as applicable, of any such claims, rights, and Causes of Action.

**12.8.** ***Release of Liens.***

Except as otherwise provided in the Confirmation Order, herein or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or

other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns or the Wind Down Debtors, Litigation Trustee or the Plan Administrator, as applicable. Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any Collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Wind Down Debtors, Litigation Trustee or the Plan Administrator (at the expense of the Debtors, Plan Administrator or Reorganized Debtors, as applicable) that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Reorganized Debtors, Litigation Trustee, Wind Down Debtors or Plan Administrator, as applicable, shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

**12.9.** ***ABS Release Provisions***

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, for good and valuable consideration provided by each of the ABS Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtor Releasing Parties, the Reorganized Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Agent and the Prepetition Secured Lenders (the "***Specified Releasing Parties***") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release, to the maximum extent permitted by law, to each of the ABS Parties and each of such parties' Affiliates and Related Parties (collectively, the "***ABS Released Parties***") (and each such ABS Released Party so released shall be deemed forever released by the Specified Releasing Parties) and their respective assets and properties (the "***Release to ABS Released Parties***") from any and all claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement,

this Plan, the Definitive Documents, the Plan Equitization Transaction, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any ABS Released Parties; (iv) the negotiation, formulation or preparation of this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the confirmation or consummation of this Plan or the solicitation of votes on this Plan, in each case, that such Specified Releasing Party (if such Specified Releasing Party is a Debtor Releasing Party, whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) would have been legally entitled to assert or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the ABS Released Parties.

Notwithstanding anything to the contrary in the Plan, neither the foregoing provisions of this Release to ABS Released Parties nor any other release or exculpation contained herein shall operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable ABS Released Party; (ii) the rights of such Specified Releasing Party to enforce this Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents, including any servicing arrangements and administration agreements entered into between the parties on or after the Effective Date, delivered under or in connection with this Plan or any Sale Transaction or assumed pursuant to this Plan or any Sale Transaction or assumed pursuant to Final Order of the Bankruptcy Court; (iii) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein, including any servicing agreements and administration agreements entered into between the parties on or after the Effective Date; (iv) any and all rights, remedies or claims of the Debtor Releasing Parties with respect to various contracts or arrangements between any Debtor(s) and any ABS Vehicle(s) (the "***Debtor ABS Agreements***"), and to the extent the Debtors seek to assume or reject the Debtor ABS Agreements, the Debtors' and, if applicable, the Reorganized Debtor's rights, with respect to any such motion to assume or reject the Debtor ABS Agreements are fully reserved; and/or (v) any and all rights, remedies or claims of the Specified Releasing Parties with respect to any servicing agreements, administration agreements and any other agreements to which a Specified Releasing Party is a party thereto that are entered into in connection with the Restructuring Transactions.

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Debtors, the DIP Agent, the Reorganized Debtors, the DIP Lenders, the Prepetition Secured Agent and the Prepetition Secured Lenders (the "***Specified Released Parties***"), the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Release to ABS Released Parties provided by

the Specified Releasing Parties above, each ABS Party, on behalf of itself and any other Persons that might seek to claim under or through such ABS Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Specified Released Parties (and each such Specified Released Party so released shall be deemed forever released by the ABS Parties) and their respective assets and properties (the "***ABS Parties Release***") from any and all Claims, Interests, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Definitive Documents, the Plan Equitization Transaction, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iii) the business or contractual arrangements between any Debtor and any ABS Released Parties; (iv) the negotiation, formulation or preparation of this Plan, the Disclosure Statement, the Plan Supplement, the Definitive Documents, any Sale Documents, the DIP Documents (including with respect to the DIP Loans), or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the confirmation or consummation of this Plan or the solicitation of votes on this Plan that such ABS Party would have been legally entitled to assert (whether individually or collectively) against any of the Specified Released Parties.

Notwithstanding anything to the contrary in the Plan, neither the foregoing provisions of this ABS Parties Release nor any other release or exculpation contained herein shall operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Specified Released Party; (ii) the rights of such ABS Party or Wilmington Trust to enforce this Plan, any Sale Documents and the contracts, instruments, releases, indentures, and other agreements or documents, including any servicing arrangements and administration agreements entered into between the parties on or after the Effective Date, delivered under or in connection with this Plan or any Sale Transaction or assumed pursuant to this Plan or any Sale Transaction or Final Order of the Bankruptcy Court; (iii) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth herein, including any servicing arrangements and administration agreements entered into between the parties on or after the Effective Date ; and/or (iv) any and all rights, remedies or claims of the ABS Parties or Wilmington Trust with respect to the Debtor ABS Agreements, and (A) to the extent the Debtors seek to assume or reject the Debtor ABS Agreements, the ABS Parties' rights with respect to any

such motion to assume or reject the Debtor ABS Agreements are fully reserved and (B) in the event of any such rejection or assumption, the ABS Parties' and Wilmington Trust's rights, remedies or claims shall not be modified, abridged, waived, released or otherwise affected with respect to any Non-Debtor party to such Debtor ABS Agreements; and/or (v) any and all rights, remedies or claims of the ABS Parties or Wilmington Trust with respect to any servicing agreements, administration agreements and any other agreements to which a ABS Party or Wilmington Trust is a party thereto that are entered into in connection with the Restructuring Transactions. Nothing in this Plan shall operate to waive, release or otherwise affect any and all rights, remedies or claims of the ABS Parties or Wilmington Trust with respect to any party that is not a Specified Released Party.

The release set forth in this Section 12.9 shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the release set forth in this Section 12.9.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Release to ABS Released Parties and the ABS Parties Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Release to ABS Released Parties and the ABS Parties Release are: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the ABS Released Parties and/or the Specified Released Parties, including such parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Release to ABS Released Parties and/or the ABS Parties Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, the DIP Agent, the DIP Lenders, the Prepetition Secured Agent or the Prepetition Secured Lenders asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Release to ABS Released Parties; and (8) a bar to any of the ABS Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the ABS Parties Release.

The release set forth in this Section 12.9 shall not operate to waive, release, or otherwise discharge any Claim or Cause of Action of any non-Specified Releasing Party, including any Consumer Credit Transaction Claim, against any ABS Released Party, all of which are expressly preserved except as otherwise set forth in the Plan.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all

matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a) To hear and determine applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the Cure Disputes resulting therefrom;

(b) To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c) To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d) To ensure that distributions under this Plan to Holders of Allowed Claims are accomplished as provided herein;

(e) To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f) To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(g) To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h) To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i) To hear and determine all Fee Claims;

(j) To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any Sale Documents (if any), the Plan Administrator Agreement, Litigation Trust Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing; <u>provided</u> that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(k) To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan,

Case 25-90156 Document 1267 Filed in TXSB on 09/25/25 Page 149 of 166

including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(l) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m) To hear and determine all disputes involving the existence, nature or scope of the discharge, releases and injunction provisions contained in the Plan;

(n) To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o) To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p) To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement Hearing, the Confirmation Hearing, the Administrative Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(q) To recover all assets of the Debtors and property of the Estates, wherever located; and

(r) To enter a final decree closing each of the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of this Article XIII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

### 14.1. *Dissolution of Creditors' Committee.*

If a Creditors' Committee is appointed, it shall be automatically dissolved on the Effective Date and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases under the Bankruptcy Code, except for purposes of continued participation in any pending appeals from Bankruptcy Court orders and filing applications for Professional Person compensation in accordance with this Plan.

### 14.2. *Termination of Professional Persons.*

On the Effective Date, the engagement of each Professional Person retained by the Debtors that are not Wind Down Debtors and the Creditors' Committee, if any, shall be

terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Fee Claims, and the Wind Down Debtor or Plan Administrator, as applicable, shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Fee Claims. Nothing herein shall preclude any Reorganized Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

**14.3. *Amendments.***

Subject to the terms and conditions of this Plan, this Plan may be amended, modified, or supplemented by the Debtors, with the prior written consent of the Prepetition Secured Agent and the DIP Agent, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of Holders of Allowed Claims and Allowed Interests pursuant to this Plan, the Debtors may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented. With the prior written consent of the Prepetition Secured Agent and the DIP Agent, the Debtors may make technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; provided, however, that, such technical adjustments and modifications are immaterial or do not adversely affect the treatment of Holders of Claims or Interests under the Plan.

**14.4. *Revocation or Withdrawal of this Plan.***

The Debtors reserve the right, in consultation with the DIP Agent, the Prepetition Secured Agent, and the Committee, to revoke or withdraw this Plan prior to the Effective Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw this Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Person.

**14.5.** ***Allocation of Distributions under this Plan Between Principal and Interest.***

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall for U.S. federal (and applicable state and local) income tax purposes be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (but solely to the extent that such other amount is an allowable portion of such Allowed Claim).

**14.6.** ***Severability.***

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, in consultation with the DIP Agent, Prepetition Secured Agent, and the Committee, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**14.7.** ***Governing Law.***

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

**14.8.** ***Section 1125(e) of the Bankruptcy Code.***

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors, the Prepetition Secured Agent, and the DIP Agent participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under this Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

Case 25-90156 Document 1267-3 Filed in TXSB on 09/05/25 Page 152 of 162

**14.9. *Inconsistency.***

In the event of any inconsistency among the Plan, the Disclosure Statement, any exhibit to the Plan, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern; provided, however, the foregoing shall not abrogate any party's consent rights. In the event of a conflict between any provision of this Plan and the Confirmation Order, the Confirmation Order shall govern and control.

**14.10. *Time.***

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

**14.11. *Exhibits.***

All exhibits to this Plan (including, without limitation, all documents filed with the Plan Supplement and all exhibits and ancillary agreements thereto) are incorporated and are a part of this Plan as if set forth in full herein.

**14.12. *Notices.***

All notices, demands, or requests in connection with the Plan shall be in writing (including by facsimile or electronic mail transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or electronic mail transmission, when received and telephonically confirmed, addressed as follows:

(a) if to the Debtors, to:

Mosaic Sustainable Finance Corporation
601 12th Street
Suite 325
Oakland, California 94607
Attention: Legal Department
Email: legalnotices@joinmosaic.com

with copies to:

Paul Hastings LLP
Charles Persons
Schlea Thomas
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300

Facsimile: (713) 353-3100
Email: charlespersons@paulhastings.com
schleathomas@paulhastings.com

-and-

Matthew M. Murphy
Geoffrey M. King
Michael Jones
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: mattmurphy@paulhastings.com
geoffking@paulhastings.com
michaeljones@paulhastings.com

(b) if to a Prepetition Secured Lender:

Forbright Bank, as Prepetition Secured Agent
4445 Willard Avenue, Suite 1000
Chevy Chase, Maryland 20815
Attention: Kenneth Elias
Email: kelias@forbrightbank.com

with copies to:

Blank Rome LLP
Kenneth J. Ottaviano
Stephanie K. Hor-Chen
444 West Lake Street ,Suite 1650
Chicago, Illinois 60606
Telephone: (312) 776-2600
Facsimile: (312) 776-2601
Email: ken.ottaviano@blankrome.com
stephanie.horchen@blankrome.com

**14.13. *Filing of Additional Documents.***

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**14.14. *Reservation of Rights.***

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect

Case 25-90156 Document 1267 Filed in TXSB on 08/26/25 Page 154 of 162

to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

**14.15. *Tax Matters.***

The Wind Down Debtors, Litigation Trustee, Wind Down Co, or Plan Administrator, as applicable, shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors or Litigation Trust, as applicable for any and all taxable periods ending after the Petition Date through, and including, the Effective Date. In the event of a Sale Transaction, from and after the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences relating to the activities of the Wind Down Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

It is intended that the Litigation Trust qualify as a grantor trust for federal income tax purposes, and that the Litigation Trust Beneficiaries are treated as grantors. The transfer of the Litigation Trust Assets will be treated for federal income tax purposes as a transfer to the Litigation Trust Beneficiaries, followed by a deemed transfer from such Litigation Trust Beneficiaries to the Litigation Trust. Accordingly, the Litigation Trust Beneficiaries will be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. Generally, all items of income, gain, loss, deduction, and credit will be included in the income of the Litigation Trust Beneficiaries as if such items had been recognized directly by the Litigation Trust Beneficiaries in the proportions in which they own beneficial interests in the Litigation Trust. Unless indicated otherwise, the rest of this discussion assumes that the Litigation Trust will qualify as a grantor trust for federal income tax purposes, and that the Litigation Trust Beneficiaries are treated as grantors.

The Litigation Trustee shall comply with all tax reporting requirements, including, without limitation, filing returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation § 1.671-4(a) and the guidelines set forth for a "liquidating trust" in Revenue Procedure 94-95, 1994-2 C.B. 684. In connection therewith, the Litigation Trustee may require Litigation Trust Beneficiaries to provide certain tax information as a condition to receipt of Distributions, including certification of the Litigation Trust Beneficiary's Taxpayer or Employer Identification Number.

Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Litigation Trust as a liquidating trust for purposes of the IRC and applicable Treasury Regulations, as soon as reasonably practicable after the Litigation Trust Assets are transferred to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. Such valuation shall be made available from time to time to all parties to the Litigation Trust Agreement and to all Litigation

Case 25-90156 Document 671-3 Filed in TXSB on 08/26/25 Page 153 of 162

Trust Beneficiaries, to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

In accordance with the provisions of section 6012(b)(3) of the IRC, the Litigation Trustee shall cause to be prepared, at the cost and expense of the Litigation Trust, the income tax returns (federal, state and local) that the Debtors are required to file (to the extent such returns have not already been filed by the Effective Date). The Litigation Trustee shall timely file each such tax return with the appropriate taxing authority and shall pay out of the Litigation Trust Assets all taxes due with respect to the period covered by each such tax return.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), attribution of Litigation Trust taxable income or loss shall be by reference to the manner in which any economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

All income of the Litigation Trust will be subject to tax on a current basis. The Plan requires the Debtors, the Litigation Trust, and the Litigation Trust Beneficiaries to report consistently with characterization of the Litigation Trust as a grantor trust and requires the Litigation Trustee to file tax returns treating the Litigation Trust as a "grantor trust" pursuant to Treasury Regulation section 1.671-4(a) and to report to each Litigation Trust Beneficiary a statement of the Litigation Trust Beneficiary's share of Litigation Trust income, gain, loss, deduction, and credit for inclusion in the Litigation Trust Beneficiary's U.S. federal income tax return. Litigation Trust Beneficiaries therefore may owe tax on Litigation Trust income, without regard to whether cash distributions are made to beneficial owners by the Litigation Trust.

Amounts paid to Litigation Trust Beneficiaries are subject to generally applicable withholding, information, and backup withholding rules. The Litigation Trustee may require any Litigation Trust Beneficiary to furnish to the Litigation Trustee its employer or Taxpayer Identification Number as assigned by the IRS or certify to the Litigation Trustee's satisfaction that Distributions to the Litigation Trust Beneficiary are exempt from backup withholding. The Litigation Trustee may condition any Distribution to any Litigation Trust Beneficiary upon receipt of such identification number. If after reasonable inquiry, any Litigation Trust Beneficiary fails to provide such identification number to the Litigation Trustee, the Litigation Trustee shall deem such Litigation Trust Beneficiary's Claim as Disallowed and no Distribution shall be made on account of such Litigation Trust Beneficiary's Claim.

The Litigation Trustee may request an expedited determination of taxes of the Debtors or of the Litigation Trust under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on

behalf of, the Debtors and the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

Dated: September 3, 2025

Respectfully submitted,

**MOSAIC SUSTAINABLE FINANCE CORPORATION,** on behalf of itself and its affiliated Debtors

*/s/ Mark A. Renzi*
Name: Mark A. Renzi
Title: Chief Restructuring Officer

# **Exhibit B**

## Notice of Effective Date

Case 25-90156 Document 1271 Filed in TXSB on 09/06/25 Page 154 of 162

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| MOSAIC SUSTAINABLE FINANCE CORPORATION, *et al.*,[1] | ) | Case No. 25-90156 (CML) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF MOSAICSUSTAINABLE FINANCE CORPORATION AND CERTAIN OF ITS AFFILIATED DEBTORS AND (II) OCCURRENCE OF THE EFFECTIVE DATE**

**PLEASE TAKE NOTICE** that, on September [●], 2025, the Honorable Christopher M. Lopez, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"),[2] entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Fourth Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Certain of Its Affiliated Debtors* [Docket No. [●]] (the "Confirmation Order") confirming the *Fourth Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and Certain of Its Affiliated Debtors* (as supplemented or amended, the "Plan").

**PLEASE TAKE FURTHER NOTICE** that, the Effective Date of the Plan occurred on [●].

**PLEASE TAKE FURTHER NOTICE** that, copies of the Plan, the Disclosure Statement, the Plan Supplement, and the Confirmation Order may be obtained free of charge by visiting the website maintained by Kroll Restructuring Administration LLC at https://cases.ra.kroll.com/Mosaic. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov/. Please note that a PACER password and login are required to access documents via PACER.

**PLEASE TAKE FURTHER NOTICE** that, the Plan and the provisions thereof are binding on the Debtors, the Reorganized Debtor, any holder of a Claim against, or Interest in, any of the Debtors and such holder's respective successors and assigns, whether or not such Claim or

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Mosaic Sustainable Finance Corporation (6802); Solar Mosaic LLC (3655); Modern Home LLC (4998); Mosaic Funding Holdings LLC (0866); and SMCTX LLC (6303). The service address for each of the above Debtors is 601 12th Street, Suite 325, Oakland, California 94607.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Interest is Impaired under the Plan and whether or not such holder voted to accept or reject the Plan.

**PLEASE TAKE FURTHER NOTICE** that, the Bankruptcy Court has approved the discharge, release, exculpation, injunction, and related provisions in Article XII of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

[*Remainder of Page Intentionally Left Blank*]

Dated: [●], 2025
Houston, Texas

/s/ *[Draft]*

**PAUL HASTINGS LLP**
Charles Persons (TX Bar No. 24060413)
Schlea M. Thomas (TX Bar No. 24131710)
609 Main Street, Suite 2500
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
Email: charlespersons@paulhastings.com
schleathomas@paulhastings.com

-and-

Matthew M. Murphy (admitted *pro hac vice*)
Geoffrey M. King (admitted *pro hac vice*)
Michael Jones (admitted *pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: mattmurphy@paulhastings.com
geoffking@paulhastings.com
michaeljones@paulhastings.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on [●], 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ [Draft]*___________________________
Charles Persons

# **Exhibit C**

Restructuring Transactions Memorandum Attached to the Plan Supplement

Restructuring Transactions Memorandum

Pursuant to the Amended Joint Chapter 11 Plan of Mosaic Sustainable Finance Corporation and its Affiliated Debtor (as modified, amended, or supplemented from time to time, the "Plan"), the Debtors currently anticipate that they will implement and seek confirmation of the Plan Equitization Transaction pursuant to the following steps which shall occur in the order set forth below.

This Restructuring Transactions Memorandum (the "Memorandum") reflects the Debtors' current intentions with respect to the Restructuring Transactions. For the avoidance of doubt, nothing in this Memorandum shall limit or modify in any way any authority or discretion granted to the Debtors under the Plan or the Confirmation Order. The Debtors reserve all rights to amend, revise or supplement the Plan Supplement, including this Memorandum, subject to the Plan, at any time prior to the Effective Date, or on any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Any capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the Plan. To the extent any terms or conditions herein conflict with provisions of the Plan, the Plan shall control. This Memorandum is summary in nature, and may not include all transactions to be effectuated in connection with implementation of the Plan.

The Debtors currently anticipate that the following steps (collectively, the "Restructuring Transactions") shall occur in the order set forth below, with no step being effected until the prior step is complete (except as where otherwise noted).

| ***On or prior to the Effective Date:*** | ***Task/Transaction*** |
|---|---|
| 1. | Forbright Bank ("Plan Sponsor") shall form and own 100% of the issued and outstanding equity interests in Solar Servicing Holdings LLC ("New HoldCo"); New HoldCo own 100% of the equity interests in newly formed (a) Solar Servicing LLC ("New Servicing OpCo") and (b) FB Solar Admin LLC ("New Admin OpCo"). |
| 2. | At the election of the Prepetition Secured Agent, Solar Mosaic shall assign and transfer the intellectual property designated in writing by the Prepetition Secured Agent to TopCo. |
| 3. | Solar Mosaic shall assign and transfer to TopCo copies of the information, forms and data necessary for continued operating of the Servicing Business, as the same is designated by the DIP Agent. |

| | |
|---|---|
| 4. | Except for any servicing counterparty which has its contract included on the Assumed Contracts List, each of the counterparties to the servicing agreements with Solar Mosaic (including any ABS Vehicle (and related underlying trusts), Warehouses and other wholesale loan counterparties) who wish to contract with New Servicing OpCo for go-forward servicing after the Effective Date, shall have entered into a new servicing agreement with New Servicing OpCo, the effectiveness of which shall be conditioned upon the occurrence of the Effective Date (the collectively, the "Successor Servicing Agreements"). |
| 5. | Each of the counterparties to the administration agreements by and among each ABS Vehicle, its applicable underlying trust, and Solar Mosaic, as Administrator, who wish to contract with New Admin OpCo for go-forward Administration of the bonds after the Effective Date, shall have entered into a new Administration agreement with New Admin OpCo, the effectiveness of which shall be conditioned upon the occurrence of the Effective Date (the collectively, the "Successor Administration Agreements"). |
| 6. | Each of the lenders to the Warehouses who have elected receive administrative services from the plan administrator shall have entered into an agreement (the "Plan Administrator Reimbursement and Fee Agreement") to compensate and indemnify the Plan Administrator in exchange for administrative services that the Plan Administrator provides. The scope of such indemnity shall be for liability incurred in the provision of such services and for the defense of any litigation related to the applicable Warehouse or its property. Each Warehouse lender's indemnity shall be on a *pro rata* basis, in accordance with each such facility's share of the unpaid principal balance of all consumer loans collectively owned by the relevant Warehouse; provided, that, such agreements shall become effective together with the Plan Administrator Agreement on the Effective Date. |
| 7. | Solar Mosaic shall deliver the notices of requests for indemnification under installer agreements to the applicable installers. |
| ***On Effective Date:*** | ***Task/Transaction*** |
| 1. | All Executory Contracts and Unexpired Leases other than those (a) identified on the Assumed Contracts List, or (b) previously assumed or rejected by the Debtors, shall be rejected effective as of the Effective Date. |
| 2. | The Successor Servicing Agreements shall become effective as between New Servicing OpCo and the applicable counterparties. |
| 3. | The Successor Administration Agreements shall become effective as between New Admin OpCo and the applicable counterparties. |

| | |
|---|---|
| 4. | The Plan Administrator Agreement (including the Plan Administrator Reimbursement and Fee Agreement, if any) shall become effective and the Plan Administrator shall be appointed and vested with control over the Wind Down Debtors and their Estates. |
| 5. | Pursuant to the Plan, the Prepetition First Out Lenders and DIP Lenders shall exchange (a) 90% of the outstanding Prepetition First Out Claims and (b) 100% of the DIP Claim comprising Second Out DIP Term Loans (as defined in the Final DIP Order), respectively, for their *pro rata* shares of 100% of the Reorganized Common Equity of Reorganized TopCo, and all such exchanged obligations shall be deemed extinguished pursuant to the Plan as to all Debtors. |
| 6. | Pursuant to the Plan, all issued and outstanding equity interests of any kind in TopCo existing as of the Effective Date shall be deemed canceled and extinguished in their entirety. |
| 7. | Reorganized TopCo shall be divested of all equity interests held in Solar Mosaic, which shall remain a Wind Down Debtor, and control of which shall be, as of the Effective Date, turned over to the Plan Administrator, along with the other Wind Down Debtors. |
| 8. | Plan Sponsor shall contribute 100% of the equity interests of New HoldCo to Reorganized TopCo. |
| 9. | Reorganized TopCo to contribute all assets, contracts, and copies of the information, forms and data necessary for the continued operation of the Servicing Business to New HoldCo and, with immediate effect, New HoldCo shall contribute the same to New Servicing OpCo. |
| 10. | The Prepetition First Out Lenders shall transfer 10% of the Prepetition First Out Claims to the Litigation Trust in exchange for interests in the Litigation Trust in the manner and priority set forth in the Litigation Trust Agreement. |
| 11. | Each DIP Lender shall roll 100% of its DIP Claims comprising the then outstanding New Money DIP Term Loans (as defined in the Final DIP Order) into the Exit Facility under which Reorganized TopCo shall be obligated, as borrower, under the Exit Facility Credit Agreement and other Exit Facility Loan Documents. |
| 12. | All Retained Causes of Action set forth in the Schedule of Retained Causes of Action shall be transferred to and vest in the Litigation Trust together with all other Retained Causes of Action (excluding, for the avoidance of doubt, any Retained Causes of Action retained by any other party as set forth on the Schedule of Retained Causes of Action). |
| 13. | The Debtors shall make the Litigation Trust Cash Contribution to the Litigation Trust. |